UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

DAVID CHOI, Individually and on Behalf of :   Civil Action No.
All Others Similarly Situated, :
                         :   <u>CLASS ACTION</u>
                Plaintiff, :
                         :   COMPLAINT FOR VIOLATIONS OF THE
      vs. :   SECURITIES ACT OF 1933
                         :
COUPANG, INC., BOM SUK KIM, :
GAURAV ANAND, MICHAEL PARKER, :
MATTHEW CHRISTENSEN, LYDIA JETT, :
NEIL MEHTA, BENJAMIN SUN, KEVIN :
WARSH, HARRY YOU, GOLDMAN SACHS :
& CO. LLC, ALLEN & COMPANY LLC, and :
J.P. MORGAN SECURITIES LLC, :
                         :
                Defendants. :
                         :

————————————————————— x   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff David Choi ("plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public U.S. Securities and Exchange Commission ("SEC") filings of Coupang, Inc. ("Coupang" or the "Company"), Company press releases, conference call transcripts, investor presentations, and analyst and media reports, and other public reports and information regarding the Company.  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Coupang Class A common stock pursuant and/or traceable to the registration statement issued in connection with Coupang's March 2021 initial public offering ("IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act"), against Coupang, certain of Coupang's officers and directors, and certain of the IPO's underwriters.

2.      Coupang is one of the largest e-commerce companies in Asia.  Headquartered in Seoul, South Korea, the Company uses mobile applications and Internet websites to offer a wide range of products and services throughout the South Korean retail market, including home goods, apparel and beauty products, electronics, grocery and restaurant orders and deliveries, and content streaming.  The Company has also stated that it is expanding into travel and financial services. While the Company's main operations are located predominantly in South Korea, it has operations and support services throughout China, Singapore, Japan, Taiwan, and the United States.

3.      Founded in 2010, Coupang made a name for itself by commercializing South Korean quick delivery services through aggressive investment in infrastructure technology and

distribution centers.  Growing to approximately 68,000 workers, Coupang has established approximately 100 fulfillment and logistics centers in over 30 cities, encompassing over 40 million square feet.  Coupang offers hundreds of millions of products, sourced from its owned-inventory and private-label branded products, third-party selections, and over 200,000 merchants for delivery within hours of customers placing online orders.  Coupang also provides a "Rocket WOW" customer loyalty program to offer additional benefits to its most engaged and frequent customers. Due to its large footprint and quick delivery, Coupang is commonly referred to as the Amazon.com of South Korea.

4.     Since inception and leading up to the IPO, Coupang experienced consistent revenue growth, securing its place as the largest player in the South Korean e-commerce market.  The Company's revenues tripled from $4 billion to over $11.9 billion, from year-ended December 31, 2018 to December 31, 2020.  The Company's market share is estimated to have grown from approximately 7% of the market in 2018 to approximately 14% of the market in 2020.

5.     Coupang operates in an intensely competitive e-commerce market where the recognition and reputation of its brand among its customers, merchants (the parties that sell their products on Coupang's marketplace), suppliers (manufacturers and distributors from whom it buys products), and workforce is paramount to the Company's continued growth and success.  To that end, Coupang distinguishes itself from its competitors – and its growth is dependent upon – its ability to provide lower prices on products for consumers, a better workplace environment for its workers, and significant opportunities for its suppliers and merchants, all of which the Company credits to its unique technology, competitive advantages, and expansive infrastructure.

6.     Leading up to the IPO, Coupang's revenue grew rapidly as the COVID-19 pandemic (which began in early 2020) increased customers' preference for the conveniences of

online shopping.  Capitalizing on its recent growth, Coupang sought to conduct an IPO in the United States.

7.      On February 12, 2021, Coupang filed with the SEC a registration statement for the IPO on Form S-1, which, after two amendments, was declared effective on March 10, 2021 ("Registration Statement").  On March 11, 2021, Coupang filed with the SEC a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement.  Pursuant to the Registration Statement, Coupang sold to the investing public 100 million shares of Coupang Class A common stock at $35 per share, for total gross proceeds of $3.5 billion.[1]  Coupang's IPO was the largest by a foreign company on Wall Street since China's Alibaba Group Holding Limited's ("Alibaba") IPO in 2014.

8.      The Registration Statement for the IPO was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation.

9.      Specifically, the Registration Statement failed to disclose the following adverse facts that existed at the time of the IPO:

(a)     that Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations, including: (i) pressuring suppliers to raise prices of products on competing e-commerce platforms in order to ensure Coupang's prices would be more competitive; (ii) coercing suppliers into purchasing advertisements that would benefit Coupang financially; (iii) forcing suppliers to shoulder all

---

[1]     In addition, certain selling stockholders also offered 30 million shares of their Class A common stock.  Coupang did not receive proceeds from the sale of shares by the selling stockholders.

expenses from sales promotions; and (iv) requesting wholesale rebates from suppliers without specifying any terms relating to rebate programs, all of which served to artificially maintain the Company's lower prices and artificially inflate the Company's historical revenues and market share;

(b)     that Coupang had improperly adjusted search algorithms and manipulated product reviews on its marketplace platform in order to prioritize its own private-label branded products over those of other sellers and merchants, to the detriment of consumers, merchants, and suppliers;

(c)     that, unbeknownst to its Rocket WOW members, Coupang was selling products to non-member customers at lower prices than those offered to its Rocket WOW members;

(d)     that Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions;

(e)     that all of the above illicit practices exposed the Company to a heightened, but undisclosed, risk of reputational and regulatory scrutiny that would harm the Company's critical relationships with consumers, merchants, suppliers, and the workforce; and

(f)     that Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, and, thus, unsustainable.

10.     By July 14, 2022, Coupang Class A common stock closed below $15 per share – ***more than 50% below*** the $35 per share price investors paid for the stock in the IPO less than a year-and-a-half earlier.

## JURISDICTION AND VENUE

11.     The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.  This Court has jurisdiction over the subject matter of this action pursuant to §22 of the 1933 Act, 15 U.S.C. §77v.

12.     Personal jurisdiction and venue are also proper pursuant to §22 of the 1933 Act. This Court has personal jurisdiction over each defendant and venue is proper in this District.  The violations of law complained of herein occurred substantially in this District.   All of the Underwriter Defendants (defined below) are headquartered in this District or maintain primary offices in this District, and the IPO was conducted from this District.  In connection with the IPO, shares of Coupang's Class A common stock were listed and traded on the New York Stock Exchange ("NYSE") located in this District.  Further, the Registration Statement represented that Coupang's transfer agent and registrar for its Class A common stock was American Stock Transfer & Trust Company, LLC, located at 6201 15th Avenue, Brooklyn, New York 11219.

13.     Coupang also broadly and irrevocably submitted to jurisdiction in this District in connection with undertaking the IPO, pledging, in pertinent part, in the Underwriting Agreement for the IPO as follows[2]:

> This Agreement and any transaction contemplated by this Agreement and any claim, controversy or dispute arising under or related thereto shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflict of laws that would result in the application of any other law than the laws of the State of New York.  ***The Company and each Selling Stockholder agree that any suit or proceeding arising in respect of this Agreement or any transaction contemplated by this Agreement will be tried exclusively in the U.S. District Court for the Southern District of New York (the "S.D.N.Y.")*** or, if that court does not have subject matter jurisdiction, in any state court located in The City and County of New York (together with the S.D.N.Y., the "New York Courts")

---

[2]     Emphasis added here and throughout unless otherwise noted.

and the Company and each Selling Stockholder agree to submit to the jurisdiction of, and to venue in, such courts.

14.     Because the Underwriter Defendants were counterparties to the Underwriting Agreement and each of the Individual Defendants authorized the execution of the Underwriting Agreement by Coupang, each of them also submitted to the jurisdiction of this Court by directing acts within this District out of which this action arises.

## PARTIES

15.     Plaintiff David Choi purchased Coupang Class A common stock pursuant and/or traceable to the Registration Statement, as reflected in the Certification attached hereto and incorporated herein by reference, and has been damaged thereby.

16.     Defendant Coupang, Inc. is one of the largest e-commerce businesses in Asia.  The Company is incorporated in Delaware and headquartered in Seoul, South Korea, and has offices across South Korea, China, Singapore, Japan, Taiwan, and the United States.  The Company maintains a dual-class voting structure designed to ensure that Company insiders maintain control over the Company and its affairs out of proportion with their economic stake.  The rights of the holders of Class A common stock and Class B common stock are identical, except with respect to voting and conversion.  Each share of Class A common stock is entitled to one vote per share. Each share of Class B common stock is entitled to 29 votes per share and is convertible into one share of Class A common stock.  Coupang's Class A common stock trades on the NYSE under the ticker symbol "CPNG."

17.     Defendant Bom Suk Kim ("Kim") is the founder of Coupang and was its Chief Executive Officer ("CEO") and served as a Director on Coupang's Board of Directors (the "Board") at the time of the IPO.  Kim beneficially owned all outstanding Coupang Class B stock, giving him majority voting control over the Company before, during, and after the IPO.  Kim sold

- 6 -

1.2 million of his personal Coupang shares in the IPO, generating $42 million in gross offering proceeds.

18.     Defendant Gaurav Anand was Coupang's Chief Financial Officer at the time of the IPO.

19.     Defendant Michael Parker was Coupang's Chief Accounting Officer at the time of the IPO.

20.     Defendant Matthew Christensen was a Director on Coupang's Board at the time of the IPO until he resigned, effective immediately, on June 7, 2021.

21.     Defendant Lydia Jett was a Director on Coupang's Board at the time of the IPO until she resigned, effective immediately, on October 26, 2021.

22.     Defendant Neil Mehta was a Director on Coupang's Board at the time of the IPO.

23.     Defendant Benjamin Sun was a Director on Coupang's Board at the time of the IPO.

24.     Defendant Kevin Warsh was a Director on Coupang's Board at the time of the IPO.

25.     Defendant Harry You was a Director on Coupang's Board at the time of the IPO.

26.     The defendants identified in ¶¶17-25 above are referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement for the IPO. Each of the Individual Defendants also reviewed and helped prepare the Registration Statement and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's Class A common stock to investors in the IPO for their own financial benefit and the financial benefit of Coupang.

27.     Defendants Goldman Sachs & Co. LLC, Allen & Company LLC, and J.P. Morgan Securities LLC (collectively, the "Underwriter Defendants") served as the majority underwriters

for the IPO.   According to the Registration Statement, the Underwriter Defendants sold 92.3 million (of the total 130 million) Coupang shares sold in the IPO at $35 per share and shared $67.84 million (of the total $95.5 million) in underwriting discounts and commissions.   The Underwriter Defendants' failure to conduct adequate due diligence in connection with the IPO and the preparation of the Registration Statement was a substantial factor leading to the harm complained of herein.

<b>SUBSTANTIVE ALLEGATIONS</b>

**Coupang's Business and Robust Growth**
**Leading Up to the IPO**

28.     Founded in 2010 by defendant Kim, Coupang began as a social commerce platform where users could purchase tickets for theaters or travel.  In 2014, it pivoted to an e-commerce platform, directly purchasing products from third parties and selling them to customers.  At that time, Coupang launched "Rocket Delivery service," which delivered same day or the next day packages via online applications and technology software.  Currently, the Company also offers "Same-Day Delivery," "Dawn Delivery," and overseas shipping options; free 30-day returns; content streaming through "Coupang Play"; grocery delivery through "Rocket Fresh"; and online food delivery service in South Korea through "Coupang Eats."

29.     Coupang predominantly operates in South Korea, one of the most competitive and fastest-moving retail markets in the world.  The Company boasts a highly connected, tech-savvy customer base that relies heavily on mobile device usage.  Coupang competes with a wide variety of online and offline companies providing goods and services to customers and merchants, including traditional retailers and merchandisers, such as department stores, discount warehouses, direct retailers, and home-shopping channels.  The Company also competes in "two-sided

markets" where it must attract both customers and merchants to use its technology applications and websites.

30.     Coupang experienced consistent revenue growth leading up to the IPO and has become the largest e-commerce player in the South Korean market.  The Company's revenue principally consists of retail sales earned from online product sales to customers, commissions earned on transactions through its online business, consideration from online restaurant ordering and delivery services, third-party advertising, and subscription fees from its Rocket WOW members.  The Registration Statement stated that the Company's annual total net revenues tripled from 2018 through 2020, from $4 billion to $11.9 billion, respectively.  In addition, the Company's market share is estimated to have grown from approximately 7% of the market in 2018 to approximately 14% of the market in 2020.

31.     At the time of the IPO, Coupang had a larger business-to-consumer logistics footprint than any other product e-commerce company in South Korea with over 100 fulfillment and logistics centers in over 30 cities, encompassing over 25 million square feet.  The Company's 50,000 person workforce consisted of the largest directly employed delivery fleet in South Korea, including over 15,000 full-time drivers that deliver to many neighborhoods multiple times a day.

32.     Coupang offered hundreds of millions of product stock-keeping units ("SKUs"), sourced from over 200,000 merchants and suppliers through the Company's owned-inventory and third-party selections and its own private-label branded products.  At the time of the IPO, Coupang delivered 365 days a year and guaranteed 1-day delivery or faster on millions of items.  Rocket WOW members also received unlimited free shipping with no minimum spend, free returns, expedited shipping, and exclusive discounts, among other benefits.

33.     With the onset of the COVID-19 pandemic in South Korea in early 2020, consumers flocked to online shopping *en masse*, and Coupang's growth soared.  The Company's 2020 revenues reached almost $12 billion, up 90% from pre-pandemic levels in 2019.  The market took notice and, by mid-2020, Coupang was named as the second-highest-ranked company on the 2020 CNBC "Disruptor List," a list of 50 private companies with breakthroughs influencing business and market competition.  To keep up with the rising demand for its delivery services, Coupang added nearly 25,000 new jobs in 2020.

34.     Coupang sought to go public in the United States through the IPO to capitalize on the Company's massive growth.  On February 12, 2021, Coupang filed with the SEC the Registration Statement for the IPO on Form S-1, which, after two amendments, was declared effective on March 10, 2021.  On March 11, 2021, Coupang filed the prospectus for the IPO with the SEC, which incorporated and formed part of the Registration Statement.  Through the Registration Statement, Coupang sold 100 million shares of Coupang Class A common stock to the investing public at $35 per share, generating approximately $3.5 billion in gross offering proceeds for the Company.  Certain private owners of Coupang, including defendant Kim, sold additional shares in the IPO, the proceeds from which did not go to the Company.

35.     Unbeknownst to investors, leading up to and at the time of the IPO, Coupang's historical growth had been artificially inflated by the Company's systemic, improper, unethical, and risky practices in violation of applicable laws and regulations.  As detailed below, at the time of the IPO, these undisclosed practices exposed the Company to a severe, but unrevealed, risk of reputational and regulatory scrutiny, diminished business and financial prospects, and harm to its critical relationships with consumers, merchants, suppliers, and the workforce.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS
## IN THE REGISTRATION STATEMENT

36.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation.

37.     The Registration Statement highlighted Coupang's relationships with its consumers, merchants, suppliers, and the workforce as a foundation for the Company's ongoing success and growth.  The Registration Statement stated, in pertinent part, as follows:

> We believe that *the recognition and reputation of our brand among our customers, merchants, suppliers, and our workforce has contributed to the growth and success of our business.  Maintaining and enhancing the recognition and reputation of our brand is critical to our business and competitiveness*.

> \*     \*     \*

> *That growth reflects our success in attracting, retaining, and increasing the engagement of our customers*.  In our experience, improvement in customer experience directly correlates with acceleration of customer engagement.

38.     The Registration Statement also emphasized Coupang's purportedly altruistic and ethically minded culture, focused on redefining the e-commerce industry.  For example, the Registration Statement discussed Coupang's focus on "*Improving the Lives of Customers, Employees, and Merchants*" and its "*opportunity and responsibility to challenge expectations about important social issues in our community*."

39.     The Registration Statement also distinguished Coupang from its competitors by promoting Coupang's ability to offer its consumers lower-priced products, which were attributed to the Company's innovative technology and infrastructure.  The Registration Statement stated, in pertinent part, as follows:

We believe that by investing for the long term in technology and ***infrastructure with a fanatical culture of customer centricity, we are delivering a superior customer experience at a lower cost and are continuing to redefine standards for e-commerce worldwide***.

\*     \*     \*

To create ever-improving experiences at lower prices for customers, ***we focus on innovations around our end-to-end integrated network of technology and infrastructure, new offerings, and effective merchant solutions***.   These investments help us ***deliver superior selection, convenience, and low prices to customers while helping merchants to improve and grow their businesses***.

\*     \*     \*

- **Low Prices**.  Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items.  We achieve this through our diversified procurement strategy, which involves scaled procurement from local and international suppliers, direct sourcing from manufacturers, and our creation of a system that rewards merchants for providing competitive prices.  In addition, cost efficiencies that we drive across our operations and economies generated from scale enable us to pass these savings on to our customers in the form of lower prices.

40.     In addition, the Registration Statement characterized Coupang's Rocket WOW membership program as "a customer loyalty program to offer ***even more value*** to [its] most engaged and frequent customers."   The Registration Statement credited the Rocket WOW membership program as "one of the key ***long-term drivers***" to Coupang's customer "***growth, retention, and engagement***" based on the program's purported perks, including "***exclusive discounts***."   The Registration Statement also noted Coupang's "inten[t] to ***continue enhancing the value proposition*** of Rocket WOW membership for [its] customers in the years to come."

41.     The Registration Statement further highlighted the varied product selection and competitive prices Coupang purportedly offered due to its numerous suppliers and merchants.  The Registration Statement stated, in pertinent part, as follows:

> ***We have established an extensive network of suppliers and merchants, which enables us to obtain a wide selection of merchandise while maintaining low prices for customers***.  We offer millions of SKUs under our owned-inventory selection,

which requires significant procurement expertise from local and international suppliers.  We also source a large proportion of merchandise directly from manufacturers, which can result in better pricing for our customers.  Our marketplace attracts a large number of merchants, including small and medium-sized businesses, **which enables us to obtain a wide and unique selection of merchandise.  As a result, we are able to offer hundreds of millions of SKUs while delivering low prices and a superior experience for our customers**.

42.     The Registration Statement discussed Coupang's purported focus on empowering its merchants through assistance and support programs, such as promotional and marketing programs, including "Customer-to-Product Matching" which stated that Coupang prioritized products based on "**relevance and predicted customer experience**" to help merchants broaden their scope and increase sales, stating, in pertinent part, as follows:

> **How We Serve Merchants**.  We believe that our merchants and the selection that they bring significantly enhance our customer offerings.  We have expanded our merchant base over time and **fostered long-term merchant loyalty as we extended our value proposition through merchant solutions.  We will continue to partner with merchants and provide solutions that enable them to grow, scale, and succeed**.
>
> \*     \*     \*
>
> **Partnership With Small Merchants**
>
> \*     \*     \*
>
> **We will continue supporting small merchants in 2021**.  We are working with the Korean Fair Trade Commission on a joint program to provide small merchants with assistance with early settlement of transactions, securing loans, **and support for promotional programs, including coupons and advertising.  We intend to continue supporting small merchants through further financial aid and marketing services**.

43.     The Registration Statement further detailed the purported benefits to customers and merchants derived from Coupang's technology platform which ostensibly prioritized personalized product offerings, stating, in pertinent part, as follows:

> In addition to our owned-inventory selection, we offer hundreds of millions of SKUs sourced from over 200,000 merchants on our marketplace.  **Our search technology produces a simplified experience that overcomes the lack of**

- 13 -

*standardization and duplicate listings by leveraging our product knowledge graph to show more unique products in search results, helping customers find, compare, and make purchasing decisions easily*.

\*       \*       \*

*Our ability to attract new customers and increase spend from existing customers depends on our ability to provide a superior experience. To this end, we offer a wide selection of products at competitive prices* and an unparalleled delivery experience, convenient online shopping, and comprehensive customer service. *We have developed technology that enables us to increase our operating efficiency through enhanced product merchandising and supply chain management, and to provide our customers with personalized product promotions and recommendations*.

44.    Moreover, the Registration Statement described the mechanism behind the Company's product searching technology as organizing products "by product, not by seller," stating, in pertinent part, as follows:

- **AI-Driven Search and Personalized Recommendations**. The foundation of our search and recommendations is a product knowledge graph *that organizes by product, not by seller, which enhances the customer experience. Search and recommendation results are aided by deep learning, data analytics, and image recognition among other inputs to produce greater relevance and personalization*. As a result, we believe *customers can identify what they want and the best value for that product easier through our tools than those on competitive services* that require customers to sort through multiple sellers to compare offers for a given product.

45.    The Registration Statement also downplayed an ongoing investigation by the Korean Fair Trade Commission ("KFTC") into Coupang's relationships with suppliers and failed to disclose the severity of the issues under review or the scope and nature of the Company's illegal and anti-competitive behaviors that posed an exceptional risk of adverse regulatory action, stating, in pertinent part, as follows:

In 2019, LG Household & Healthcare ("LGHH") filed a complaint with the Korean Fair Trade Commission ("KFTC") alleging that [Coupang] violated the Korean Act on Fair Transactions in Large Retail Business and Monopoly Regulation and Fair Trade Act. The complaint claimed, among other issues, that [Coupang] engaged in unfair returns of LGHH products, illegally requested that

- 14 -

LGHH disclose confidential business information, and unfairly refused to do business with LGHH.

Following the complaint, the KFTC has made two field investigation visits to our office in July 2019 and October 2020. *We have provided documents and evidence in response to the investigation*. In addition to LGHH's allegations, the investigation addresses our negotiations and contracting with retail suppliers generally. *The investigation is ongoing, and we are cooperating with the investigation. Under Korean law, the issues addressed in the investigation can be resolved through civil, administrative, or criminal proceedings*. The ultimate case resolution *could include fines*, orders to alter our processes or procedures, and criminal investigations or charges against individuals or the company.

46.     The Registration Statement further mischaracterized the various forms of "consideration" Coupang received from suppliers in exchange for its services, including "rebates" and "advertising services," stating, in pertinent part, as follows:

*The Company receives consideration from suppliers for various programs, including rebates, incentives, and discounts, as well as advertising services provided on its website and mobile applications*. The Company generally records these amounts received from suppliers to be a reduction of the prices the Company pays for their goods, and a subsequent reduction in cost of sales as the inventory is sold.

47.     The Registration Statement highlighted Coupang's marketing efforts and stated that the Company's new advertising offerings and "promotions" would continue to positively expand Coupang's addressable market, stating, in pertinent part, as follows:

In addition to our e-commerce services, we also have a new offering in the online advertising space. *We offer opportunities to advertise on our websites and mobile applications, including through banner advertisements, joint promotions, and other programs. This offering is in the early stages, and we will continue to innovate*. In the near-to-medium term, we expect this offering to expand our total addressable market to include the advertising market, which was $12 billion in 2019 and is expected to grow to $14 billion by 2024.

*          *          *

We market our offerings to customers directly through brand advertising and direct marketing. *We use broad-based promotional campaigns, such as media ads, to promote opportunities our service provides. Our direct marketing primarily consists of customer discounts, promotions, and referrals. We attract*

- 15 -

*customers through sponsored search, social networking sites, email marketing campaigns, and other similar initiatives*.

48.     In addition, the Registration Statement highlighted Coupang's focus on "Social Impact and Human Capital Resources" and "Initiatives For Our Workforce" and represented that Coupang was providing its employees with a "better" workplace – which the Registration Statement characterized as "one of the reasons for [Coupang's] success" – stating, in pertinent part, as follows:

> In a market where the industry standard is a six-day workweek, we were the first to establish a five-day workweek for our drivers, even as we became the first major service to provide deliveries to customers seven days a week.  We also hire our drivers, Coupang Friends, directly, and provide them with paid time off and full benefits.  The vast majority of drivers in the industry receive neither.  Additionally, we are planning to grant up to ₩100 billion, or approximately $90 million, of restricted stock awards to our frontline workers and non-manager employees.  We believe we are the first company in Korea to make our frontline employees stockholders.
>
> *We hope such examples demonstrate that innovation can unlock both a better world for our customers and a better workplace for our employees.  We want to inspire others to follow our lead*.
>
> *        *        *
>
> Founded in 2010, we are a home-grown technology company that has now become one of the three largest private sector employers in the nation.  We are a significant driver of new economic opportunities for the people of Korea.  As of December 31, 2020, we directly employed over 50,000 employees globally.  *We consider our employee relations to be positive*.  For example, we hire our Coupang Friends parcel delivery drivers as full-time employees *with stable work, manageable hours, and competitive benefits, which differs from the market practice of employing parcel delivery drivers as contractors.  We are committed to offering our employees industry-leading wages, comprehensive benefits, and training programs*.
>
> . . . *We subscribe to the philosophy that we, our suppliers, merchants, and employees should prosper together*.
>
> *        *        *
>
> *Our employees and frontline workers are the backbone of Coupang and one of the reasons for our success*.

- 16 -

49.    The Registration Statement also credited the Company's "Technology," "Customer-to-Product Matching," "Social Impact and Human Capital Resources," "Initiatives For Our Workforce," and "Partnership With Small Merchants," among other factors, as keys to Coupang's competitiveness, stating, in pertinent part, as follows:

> *We believe that we are well positioned to effectively compete on the basis of the factors listed above*.  We also face competition from major global Internet companies, such as eBay.  However, at this time, foreign e-commerce companies have a limited presence in Korea.

50.    The statements in ¶¶37-49 were materially false and misleading when made because they failed to disclose the following adverse facts that existed prior to and at the time of the IPO:

(a)    that Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations, including: (i) pressuring suppliers to raise prices of products on competing e-commerce platforms in order to ensure Coupang's prices would be more competitive; (ii) coercing suppliers into purchasing advertisements that would benefit Coupang financially; (iii) forcing suppliers to shoulder all expenses from sales promotions; and (iv) requesting wholesale rebates from suppliers without specifying any terms relating to rebate programs, all of which served to artificially maintain the Company's lower prices and artificially inflate the Company's historical revenues and market share;

(b)    that Coupang had improperly adjusted search algorithms and manipulated product reviews on its marketplace platform in order to prioritize its own private-label branded products over those of other sellers and merchants, to the detriment of consumers, merchants, and suppliers;

(c)     that, unbeknownst to its Rocket WOW members, Coupang was selling products to non-member customers at lower prices than those offered to its Rocket WOW members;

(d)     that Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions;

(e)     that all of the above illicit practices exposed the Company to a heightened, but undisclosed, risk of reputational and regulatory scrutiny that would harm the Company's critical relationships with consumers, merchants, suppliers, and the workforce; and

(f)     that Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, and, thus, unsustainable.

51.     The undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties, and risks that required disclosure in the Registration Statement.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required the Company to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure in the Registration Statement of "the material factors that ma[d]e an investment in [the IPO] speculative or risky" and an explanation of "how [the] risk affect[ed] [Coupang] or the securities being offered."  The Registration Statement failed to disclose material facts necessary to apprise Class A common stock purchasers of the true risks inherent in investing in the Company in violation of Item 303 and Item 105.  Indeed, the purported risk disclosures provided in the Registration Statement, to the extent they were relevant at all, were themselves materially

misleading because they failed to disclose the true facts impacting Coupang's business, operations, and financial results and/or characterized materially adverse facts that had *__already__* materialized as contingent possibilities that *__may__* or *__could__* impact Coupang in the future but that had not yet materialized.

52.     On or around April 27, 2021, less than two months after the IPO, *United Press International* reported on systemic, unsafe working conditions for Coupang's delivery drivers and employees at Coupang's fulfillment centers, noting that *__nine__* Coupang workers had died over the past year due to an inhumane working environment.  The report further stated that the Committee for Coupang Workers' Human Rights and Health, created to improve the Company's workplace conditions, was pushing to form a labor union to force a safer work environment in response to poor conditions at the Company.  The report quoted the co-chairman of the committee as stating: "'The management method of running a business at the expense of people's lives should not be tolerated for any reason.  Humans are not machines.'"  The report further emphasized Coupang's efforts to "muzzle media coverage" by suing journalists who had written about the Company's worker deaths.

53.     On June 17, 2021, a deadly and devastating fire broke out in the basement of the Company's Deokpyeong Logistics Fulfillment Center, located south of Seoul.  It took emergency response workers multiple days to extinguish the blaze.  Tragically, one firefighter became trapped in the building and was later found dead.  The fire sparked outrage among the public in South Korea.  Protestors claimed that the fire resulted from Coupang's imposition of inhumane working conditions.   According to a statement issued by a transportation union under the Korean Confederation of Trade Unions, "[a]ctivation of sprinklers was delayed because they were shut off due to frequent malfunction."  Thousands of users posted online claiming to have deleted their

- 19 -

Coupang accounts under a hashtag that translated to "Leave Coupang."  Many of the posts chastised the Company's poor working conditions and accused Coupang of overworking its employees in its warehouses.  Opposition lawmaker Kim Yong-pan, a member of the Public Administration and Security Committee in the National Assembly, South Korea's legislature, called the fire "a sad event that shows negligence of safety is still prevalent in our society."  Aside from consumer criticism, the fire cost Coupang approximately $296 million in lost inventory, property, equipment, and other costs.

54.     On September 10, 2021, a KFTC representative announced that Coupang was participating in, and would be regulated for, search algorithm manipulation that had improperly prioritized its own products over those of third-party sellers.  This announcement signaled a significant expansion of the regulator's prior findings that Coupang had engaged in anti-competitive business practices with suppliers.  While attending the "Fairness, Transparency and Competition Issues in Search Algorithms" conference at the European Chamber of Commerce in Korea, Vice Chairman of the KFTC Kim Jae-Shin specifically mentioned Coupang by name when attacking e-commerce businesses engaged in illicit business practices such as search algorithm manipulation and stated: "We will strictly respond to the act of adjusting and distorting the rules in order to give preference to their products and services by exploiting the dual status of platform operators as both referee and player."

55.     On March 22, 2022, *Korea JoonAng Daily* reported that the KFTC had opened yet another investigation into Coupang.  This time the KFTC was reportedly examining claims that Coupang had manipulated product reviews for its private-label branded products, sold through its Coupang Private Label Business ("CPLB") subsidiary, to make them appear more positive.  The article stated, in pertinent part, as follows:

On March 15, civic groups such as the People's Solidarity for Participatory Democracy and The Voice of Consumers accused Coupang of making their employees write positive reviews for CPLB products.

CPLB is a subsidiary wholly owned by Coupang.  It sells everyday items such as clothes, pet supplies and food on the e-commerce website.

The civic groups claim Coupang ordered its employees to write positive reviews for some 42,000 CPLB products since July last year, when the subsidiary started business.  They said the reviews didn't explicitly state they were written by Coupang or CPLB workers, even though a disclaimer is required for reviews by employees of affiliates and people who were given the products for free.

The FTC said it will investigate whether the civic groups' claims are true and if Coupang violated the Monopoly Regulation and Fair Trade Act and the Act on Fair Labeling and Advertising.

According to the civic groups, a suspected Coupang or CPLB employee bought huge amount of products – 600 latex gloves, 350 masks, 150 liters (40 gallons) of cat litter sand throughout a month – and gave five stars to CPLB products but left one star ratings on non-Coupang products.

The civic groups also claimed that the positive reviews and higher star ratings made CPLB products show up at the top of a search, giving them more exposure and leading to more purchases.

56.     On July 13, 2022, *The Korea Times* issued an article entitled "Coupang, Naver Hit By Antitrust Allegations," which reported that Coupang was now also under investigation by the KFTC for falsely advertising the membership benefits of its Rocket WOW membership services, stating, in pertinent part, as follows:

Korea's two IT giants, Coupang and Naver, are under investigation by the Fair Trade Commission (FTC) over allegations that they falsely advertised membership benefits and deceived customers, according to industry watchers, Wednesday.

A dozen investigators with the antitrust agency were dispatched to the headquarters of Coupang in Songpa District, southeastern Seoul, and Naver in Bundang District of Seongnam, Gyeonggi Province, from late Monday through Tuesday, to conduct on-site investigations.

Coupang allegedly sold goods to non-member customers at a lower price than those who paid monthly fees of 4,990 won ($3.82) for Wow membership, a sales practice Wow members characterize as reverse discrimination.

The allegation was first raised in May and amplified since then due to a large number of Coupang users filing complaints with a government website run by the Anti-Corruption & Civil Rights Commission.

Many claimed that the prices shown to members and non-members alike indicate Wow members would be able to buy goods at cheaper prices compared to non-members, but the price is the same when Wow members make a purchase.

57.     By July 14, 2022, Coupang Class A common stock closed below $15 per share – *more than 50% below* the $35 per share price investors paid for the stock in the IPO less than a year-and-a-half earlier.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action on behalf of all purchasers of Coupang Class A common stock pursuant and/or traceable to the Registration Statement (the "Class"). Excluded from the Class are defendants and their families; the officers, directors, and affiliates of defendants and members of their immediate families; the legal representatives, heirs, successors, or assigns of any of the foregoing; and any entity in which any defendant has or had a controlling interest.

59.     The members of the Class are so numerous that joinder is impracticable.  Coupang Class A common stock is actively traded on the NYSE and tens of millions of shares were sold in the IPO.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through discovery, plaintiff believes there are hundreds, if not thousands, of members in the Class.  Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

60.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a)     whether defendants violated the 1933 Act, as alleged herein;

(b)     whether the Registration Statement misrepresented and/or omitted material information in violation of the 1933 Act; and

(c)     whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

61.     Plaintiff's claims are typical of the claims of the Class, as all Class members were similarly affected by defendants' conduct.

62.     Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in securities class actions.

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## COUNT I

### For Violation of §11 of the 1933 Act
### Against All Defendants

64.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

65.     This Count is brought under §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

66.     The Registration Statement for the IPO contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein.

67.     Coupang is the registrant for the IPO.  Defendants were responsible for the contents and dissemination of the Registration Statement.  Each of the Individual Defendants signed or authorized the signing of the Registration Statement on their own behalf.  The Underwriter Defendants marketed and underwrote the IPO and sold the majority of Coupang stock issued in the IPO to plaintiff and the Class.

68.     As the issuer of the shares, Coupang is strictly liable to plaintiff and the Class for the Registration Statement's material misstatements and omissions.  Signatories of the Registration Statement, and possibly other defendants, may also be strictly liable to plaintiff and the Class for such material misstatements and omissions.   None of the defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were complete, accurate, or non-misleading.

69.     By reason of the conduct alleged herein, defendants violated §11 of the 1933 Act. Plaintiff and Class members purchased Coupang Class A common stock pursuant and/or traceable to the Registration Statement and have sustained damages as a result.  The value of the stock has declined substantially subsequent to the IPO and due to defendants' violations.  At the time of their purchases, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

70.     Less than one year has elapsed from the time that plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that plaintiff filed

this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this action.

## COUNT II

### For Violation of §15 of the 1933 Act
### Against Coupang and the Individual Defendants

71.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

72.     This Count is brought under §15 of the 1933 Act, 15 U.S.C. §77o, against defendants Coupang and the Individual Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

73.     As detailed herein, each of the defendants committed primary violations of the 1933 Act by engaging in conduct in contravention of §11 of the 1933 Act.

74.     The Individual Defendants were each control persons of Coupang by virtue of their positions as directors, senior officers, and/or significant shareholders of the Company.  They each had direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of the Company.   The Company also controlled the Individual Defendants, given the influence and control the Company possessed and exerted over the Individual Defendants and all of its employees.

75.     The Company and the Individual Defendants took additional steps to cement their control over the Company and its affairs.  For example, the Company and the Individual Defendants created a dual class voting structure to ensure that public investors would effectively have no say over the management of Coupang and that the Company would not be subject to independent oversight after the IPO.  Class B shares entitled their holders to 29 votes, whereas

Class A shares entitled their owners to just one.  Immediately following the IPO, Kim possessed over 76% of the voting power of the Company as a result of his ownership of all 174.8 million outstanding Class B shares.  As such, Kim had the ability to control the outcome of matters submitted to stockholders for approval, including the election of directors and the approval of any change in control transaction.

76.     By reason of the conduct alleged herein, the Company and the Individual Defendants violated §15 of the 1933 Act, and plaintiff and the Class have suffered harm as a result.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, individually and on behalf of the proposed Class, respectfully prays for judgment against defendants as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the Class compensatory damages against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D.     Granting such other, further, and/or different relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 26, 2022

ROBBINS GELLER RUDMAN
 & DOWD LLP
SAMUEL H. RUDMAN


_s/ Samuel H. Rudman_
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
ROBERT J. ROBBINS
KATHLEEN B. DOUGLAS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
rrobbins@rgrdlaw.com
kdouglas@rgrdlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

JOHNSON FISTEL, LLP
RALPH M. STONE
1700 Broadway
41st Floor
New York, NY  10019
Telephone:  212/292-5690
212/292-5680 (fax)
ralphs@johnsonfistel.com

Attorneys for Plaintiff

CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

David Choi ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 25th day of July 2022.



DocuSigned by:

David Choi

C46E97732008447...

David Choi

DocuSign Envelope ID: B3165761-DE85-1A35-A514-EE9D9BBEE951

<u>Schedule A</u>

David Choi
Coupang, Inc. (CPNG)

| Date Acquired | Amount of Shares Acquired | Price* |
|---|---|---|
| 7/2/2021 | 25 | $41.19 |
| 9/27/2021 | 75 | $28.00 |

*  Rounded to two decimal places