**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, THE NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, THE NEW YORK CITY POLICE PENSION FUND, THE NEW YORK CITY FIRE DEPARTMENT PENSION FUND, THE BOARD OF EDUCATION RETIREMENT SYSTEM OF THE CITY OF NEW YORK, THE NEW YORK CITY DEFERRED COMPENSATION PLAN, and THE TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK VARIABLE ANNUITY PROGRAM, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 1:22-cv-07309-VSB |
| v. | <u>JURY TRIAL DEMANDED</u> |
| COUPANG, INC., BOM SUK KIM, GAURAV ANAND, MICHAEL PARKER, MATTHEW CHRISTENSEN, LYDIA JETT, NEIL MEHTA, BENJAMIN SUN, KEVIN WARSH, HARRY YOU, GOLDMAN SACHS & CO. LLC, ALLEN & COMPANY LLC, J.P. MORGAN SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., HSBC SECURITIES (USA), INC., DEUTSCHE BANK SECURITIES INC., UBS SECURITIES LLC, MIZUHO SECURITIES USA LLC, and CLSA LIMITED | |
| Defendants. | |

**FIRST AMENDED CLASS ACTION COMPLAINT**
<u>**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

## TABLE CONTENTS

NATURE OF THE ACTION ................................................................................................. 1

JURISDICTION AND VENUE .......................................................................................... 7

PARTIES .......................................................................................................................... 8

SUBSTANTIVE ALLEGATIONS .................................................................................. 12

I.      RELEVANT BACKGROUND ................................................................................ 12

     A.      The History of Coupang and Its Business ................................................. 12

     B.      Coupang's Blockbuster IPO ..................................................................... 15

     C.      Coupang's Ownership Following the IPO ................................................ 18

II.      UNSAFE WORKING CONDITIONS PERSISTED AT COUPANG ................................ 20

     A.      Coupang's Unsafe Working Environment Had Been the Subject of Intense Market Scrutiny Before the IPO ................................................. 21

         1.      A Series of Frontline Workers Died From Cardiac Issues Before the IPO ............................................................................... 21

         2.      Coupang Faced Backlash for Mishandling an Outbreak of COVID-19 .......... 25

     B.      Coupang Repeatedly Assured Investors That It Prioritized Safety ......................... 27

     C.      Several Workplace Disasters Revealed That Coupang Maintained Unsafe Working Conditions During the Class Period ......................................... 28

         1.      A Fire Obliterated One of Coupang's Most Important Facilities, Resulting in Hundreds of Millions of Dollars In Losses and Outsized Costs Associated with Labor and Operations ................................................ 28

         2.      Another Delivery Worker Dies On the Job After Showing Heart Abnormalities During His Health Examination ............................... 35

III.      COUPANG EXPLOITED ITS SUPPLIERS AND MERCHANTS BUT REPEATEDLY DENIED SUCH PRACTICE TO INVESTORS ...................................... 37

     A.      Coupang Forced its Suppliers to Bear the Cost of Margin Losses On Items That Were Subject To Its Price Match System ................................................ 37

         1.      Coupang's Price Match System Created Significant Margin Erosion ............ 37

         2.      Coupang Forced Its Suppliers to Bear the Brunt of Its Lost Margins ............ 39

         3.      Several Suppliers Reported Coupang's Improper Practices to the KFTC ...................................................................................... 40

         4.      Coupang Forcefully Denied the Allegations ................................... 41

         5.      After a Thorough Investigation, the KFTC Fined Coupang for Mistreating Its Suppliers ............................................................... 42

     B.      Coupang Improperly Used Copyrighted Materials From Merchants Selling Goods on Its Platform But Claimed the Practice Benefited the Merchants ............. 45

i

1.    Coupang Introduced The Item Market and Granted Itself Unrestricted
Access to Its Merchants' Material .................................................45

2.    Merchants Raised Concerns and Coupang Denied Any Wrongdoing ...........46

3.    The Market Learned That Coupang Was Improperly Using Protected
Trade Content to the Detriment of Small Businesses ....................................47

C.    Coupang Manipulated Its Search Results to Favor Its PB Products Over Those
Offered by Third Parties ................................................................50

IV.    COUPANG DID NOT MAINTAIN REQUIRED CONSUMER DISPUTE
RESOLUTION STANDARDS ................................................................54

VIOLATIONS OF THE SECURITIES ACT ................................................................56

I.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS
IN THE IPO REGISTRATION STATEMENT ................................................56

II.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS
IN THE S-8 REGISTRATION STATEMENT ................................................68

COUNT I .........................................................................................................84

COUNT II ........................................................................................................86

COUNT III .......................................................................................................88

VIOLATIONS OF THE EXCHANGE ACT ................................................................89

I.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........89

A.    The IPO Materials ...................................................................89

B.    March 11, 2011 *Bloomberg Markets* Interview ....................................101

C.    April 3, 2021 Newsroom Statement.......................................................103

D.    May 4, 2021 Newsroom Statement........................................................103

E.    May 12, 2021 Quarterly Earnings Call ................................................105

F.    1Q 2021 Form 10-Q...........................................................................106

G.    July 2, 2021 Press Release ................................................................106

H.    August 11, 2021 Quarterly Earnings Call...............................................107

I.    2Q 2021 Form 10-Q...........................................................................108

J.    August 19, 2021 Newsroom Statement .................................................108

K.    September 16, 2021 Press Release.......................................................109

L.    November 12, 2021 Quarterly Earnings Call ..........................................110

M.    3Q 2021 Form 10-Q...........................................................................111

N.    February 27, 2022 Newsroom Statement...............................................111

O.    2021 Form 10-K................................................................................112

II.    THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER...........................114

A.  The Exchange Act Defendants Acted With Scienter When They Represented That Coupang Maintained A Safe Working Environment and Failed to Disclose That Unsafe Working Conditions Continued Unabated ........................114

B.  The Exchange Act Defendants Acted With Scienter When They Misrepresented or Failed to Disclose Their Coercive Business Dealings With Third Parties ........118

C.  The Exchange Act Defendants Knew That Coupang Was Misusing the Work of Third-Party Merchants ........................................................................122

D.  The Exchange Act Defendants Acted With Scienter When They Repeatedly Represented That Coupang Maintained Policies and Procedures That Protected Their Customers ........................................................................122

E.  Additional Facts Probative of Scienter ........................................................123

1.  The Operations of Coupang's Logistics Network and Online Store Are At the Core of Its Business ........................................................124

2.  The Existence of Numerous Governmental Investigations into Coupang Is Indicative of Scienter ........................................................127

3.  Coupang's Efforts to Cover Up Its Misdeeds Are Strong Evidence of Scienter ........................................................................................129

4.  Kim and Anand Enriched Themselves Through the Sale of Inflated Stock ........................................................................................131

5.  The Announcement of Kim's Resignation in the Immediate Aftermath of the June 2021 Fire Further Supports an Inference of Scienter ........................................................................................132

6.  Coupang's Remedial Actions Further Support an Inference of Scienter ........................................................................................133

7.  Defendants Kim and Anand Are Hands-On Managers ...............................134

8.  Coupang Is a Highly Scrutinized Company ........................................135

III.  LOSS CAUSATION ........................................................................................136

IV.  PRESUMPTION OF RELIANCE ....................................................................141

V.  NO SAFE HARBOR ........................................................................................143

COUNT IV ..........................................................................................................144

COUNT V ............................................................................................................146

CLASS ACTION ALLEGATIONS ....................................................................147

PRAYER FOR RELIEF ......................................................................................149

JURY DEMAND ..................................................................................................150

iii

Court-appointed lead plaintiffs Teachers' Retirement System of the City of New York, the New York City Employees Retirement System, the New York City Police Pension Fund, the New York City Fire Department Pension Fund, the Board of Education Retirement System of the City of New York, the New York City Deferred Compensation Plan, and the Teachers' Retirement System of the City of New York Variable Annuity Program (collectively, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, as for their First Amended Class Action Complaint against defendants Coupang, Inc. ("Coupang" or the "Company"), Bom Suk Kim, Gaurav Anand, Michael Parker, Matthew Christensen, Lydia Jett, Neil Mehta, Benjamin Sun, Kevin Warsh, Harry You, Goldman Sachs & Co. LLC, Allen & Company LLC, J.P. Morgan Securities LLC, Citigroup Global Markets Inc., HSBC Securities (USA), Inc., Deutsche Bank Securities Inc., UBS Securities LLC, Mizuho Securities USA LLC, and CLSA Limited (collectively, "Defendants"), allege the following on personal knowledge as to their own acts and on information and belief as to all else based upon the investigation by counsel, which has included, among other things, a review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("SEC"), securities analyst research reports, press releases, media reports, other publicly available information issued by, or about, Coupang and/or the industry in which it operates, and interviews with former employees of Coupang. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action that asserts both strict liability and negligence claims under the Securities Act of 1933 (the "Securities Act") and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act"). Lead Plaintiffs bring claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of all persons or entities

that purchased Coupang Class A common stock in Coupang's initial public offering of such securities, held between March 11, 2021, and March 15, 2021 (the "IPO"), as well as all persons or entities that purchased or otherwise acquired Coupang Class A common stock pursuant and/or traceable to the registration statement filed by Coupang on Form S-1 (File No. 333-253030) (as amended, the "IPO Registration Statement"), or the registration statement filed by Coupang on Form S-8 (File No. 333-255632) (the "S-8 Registration Statement") (the "Securities Act Class"). Separately, Lead Plaintiffs bring claims for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder on behalf of all persons or entities that purchased or otherwise acquired Coupang Class A common stock between March 11, 2021, and March 14, 2022, inclusive (the "Class Period") and were damaged thereby (the "Exchange Act Class," and together with the Securities Act Class, the "Classes").

2.       Founded in 2010, Coupang is the largest e-commerce company in South Korea, and one of the largest e-commerce companies in all of Asia.  Headquartered in Seoul, South Korea, the Company operates an online marketplace that offers a wide range of products, including home goods, electronics, fresh groceries, and its own "private label" branded items.  Not only does Coupang sell its own inventory of goods which it sources from a network of "suppliers," it also allows third-party "merchants" to sell their own goods on its platform.  Coupang's relationship with these merchants allows it to provide a much wider selection of products to customers than would otherwise be possible, adding to its appeal and convenience.

3.       To break the traditional tradeoff between wide selection and quick delivery, Coupang built a vertically integrated distribution network of approximately 100 logistics centers across South Korea and its very own fleet of dedicated delivery drivers.  By the start of the Class Period, approximately 70% of South Korea's 51 million residents lived within 7 miles of a Coupang logistics

facility, enabling Coupang to offer speedy delivery options on millions of items through its "Rocket Delivery" service, including next-day and same-day delivery.  Due to its large footprint and quick delivery, Coupang became known as the "Amazon of South Korea."  Much of Coupang's ability to retain and attract customers is based on the speed and convenience of ordering from Coupang, made possible by its large supply chain infrastructure.

4.     Through its unique business model of wide selection, speed, and convenience, Coupang experienced consistent revenue growth, securing its place as the largest player in the South Korean e-commerce market.  The Company's revenue continued to skyrocket in 2020 as the COVID-19 pandemic increased customers' preference for the conveniences of online shopping and home delivery.  Coupang's total revenue tripled from $4 billion to almost $12 billion in the three-year span from 2018 to 2020.

5.     To capitalize on its explosive growth, Coupang decided to commence an IPO in the United States in early 2021.  On February 12, 2021, Coupang filed with the SEC an initial draft of the IPO Registration Statement, which, after two amendments, was declared effective on March 10, 2021.  On March 11, 2021, Coupang filed with the SEC a final prospectus on Form 424B4, which formed part of the IPO Registration Statement (the "Prospectus").  Pursuant to these IPO materials, Coupang sold to the investing public 100 million shares of Coupang Class A common stock at $35 per share, for total gross proceeds of $3.5 billion.  Coupang's IPO was the largest by a foreign company on Wall Street since China's Alibaba Group Holding Limited's debut in 2014.

6.     In its IPO materials, and continuing throughout the Class Period, Coupang issued numerous false and misleading statements to the market concerning its working conditions and the safety of its workers; its business dealings with its suppliers and merchants; and its policies and procedures to protect customers.

7.    *First*, Coupang repeatedly informed investors that it provided best-in-class working conditions and "prioritized" worker safety for its frontline workers who operate its vast network of warehouses and delivery vehicles.  These representations were critically important to investors because in the year before the IPO Coupang was embroiled in a steady stream of public scandals involving its labor conditions, including the mishandling of a severe and heavily scrutinized COVID-19 outbreak at one of its logistics facilities in May 2020, and a series of at least ***nine*** deaths among its frontline workers during, or shortly after, their arduous shifts.  In the days leading up to Coupang's IPO, analysts and investors both warned that labor conditions for its frontline workers "***raised questions about the sustainability of Coupang's long-term growth***." Investors were rightly concerned.  Coupang's business, including its speedy and reliable delivery, depended on the smooth operation of its vast supply chain network and that network, in turn, only functioned through its frontline workers.

8.    In truth, however, and contrary to Coupang's affirmations, Coupang's unsafe working conditions continued unabated.  For example, on June 17, 2021, a fire broke out at one of Coupang's largest and most important fulfillment centers.  Before the fire, there was an utter disregard for fire safety at this mega-facility.  Indeed, an inspection in February 2021 revealed a stunning ***277 defects with the fire safety system.***  The fire led to an enormous loss in Coupang's revenues, as well as high labor costs and recruitment issues.

9.    *Second*, Coupang portrayed its sales and marketing practices as beneficial for all corporate stakeholders.  For example, the Company informed investors that it leveraged its proprietary technology to create "personalized" search results for customers, help suppliers grow their business, and allow merchants to "compete holistically" on price.  It also told the market that it used its scale to secure the best prices in the Korean market for consumers.  Coupang also advised

that its past performance (including its results of operations in 2019 and 2020) was the product of organic growth in various respects. None of these disclosures were accurate or disclosed all facts necessary to make them not misleading.

10.    Unbeknownst to investors, Coupang used its position of power to coerce hundreds of suppliers—including large businesses such as Yuhan Kimberly, Procter & Gamble, and Lego— to *raise* the price of their goods on competing sites or to purchase advertising from Coupang against their will to protect the Company's profit margins on those goods when they eroded or were lost due to its "price match" guarantee. After a multi-year investigation that included the collection of documents, testimony, and a plenary hearing in front of the commissioners of South Korea's Fair Trade Commission ("KFTC"), the KFTC found that Coupang engaged in these practices. In fact, the KFTC found that these practices violated several of South Korea's antitrust laws, and sanctioned Coupang. The KFTC reduced its monetary sanction when Coupang acknowledged its wrongdoing.

11.    In addition, Coupang misappropriated protected trade content from its merchants to maximize the commissions it earned on third-party sales. Coupang's marketplace utilized an "Item Winner" system using a single image to represent the same product offered by numerous merchants, and it selected the Item Winner from that group based on several criteria, including price. Coupang advertised this system as a tool that was good for buyers and sellers as it reduced search result clutter, promoted low prices, and reduced barriers to entry. But Coupang misused protected marketing materials provided to it by merchants, including, for example, professionally-staged product images, by using them in the Item Winner profile for *other merchants*, thus maximizing its own commissions. Coupang repeatedly assured investors that it did not misappropriate protected third-party content. The KFTC put an end to this practice in July 2021.

12.     Coupang also manipulated its search algorithm to favor its higher-margin private brand ("PB") products to the detriment of suppliers and merchants with similar products.  After the KFTC opened an investigation and conducted an unannounced on-site inspection into this matter at Coupang's headquarters, the Company began mobilizing employees to write favorable product reviews for PB products as part of its "Coupang Experience Group" program to ensure they remained at the top of its search results.  As regulatory scrutiny tightened, Coupang shifted its practices again.  It continued having employees or affiliates thereof write favorable product reviews but without identifying themselves as Coupang employees, as required by the Coupang Experience Group.  The KFTC opened another investigation into Coupang's manipulation of product reviews in 2022.

13.     *Third*, Coupang repeatedly represented throughout the Class Period that "we have policies and procedures to protect both merchants and customers on our marketplace."  It did so despite (i) being under investigation by the KFTC since before its IPO for failing to maintain dispute resolution standards required by law to protect consumers; (ii) acknowledging to the KFTC that it did not maintain such standards; and (iii) admitting to the KFTC that its failure to do so was illegal.  On March 6, 2022, the KFTC announced that it ordered Coupang to take corrective action because Coupang continued this defiant practice.

14.     Before its IPO, and throughout the Class Period, the market was concerned that Coupang was exploiting its position of power to benefit itself.  Coupang concealed its activities and repeatedly slapped down such concerns, labeling any such rumors as "false."

15.     When the truth about Coupang's practices was revealed through a series of corrective disclosures or materializations of risks, Lead Plaintiffs and other members of the Classes suffered significant losses and damages.

6

**JURISDICTION AND VENUE**

16.     The claims asserted herein arise under Sections 11, 12, and 15 of the Securities Act, codified at 15 U.S.C. §§ 77k, 77l, and 77o, as well as Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, codified at 17 C.F.R. § 240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22(a) of the Securities Act, codified at 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a).

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as well as Section 22(a) of the Securities Act, codified at 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa.  The IPO took place in this judicial district, the shares of Class A common stock issued by Coupang in connection with the IPO were delivered against payment in this judicial district, the transfer agent and registrar for Coupang's Class A common stock is located in this judicial district, and Coupang's Class A common stock is listed and trades on the New York Stock Exchange ("NYSE"), a national securities exchange located in this judicial district.  In addition, Coupang broadly and irrevocably submitted to jurisdiction in this Court in connection with the IPO, pledging as follows in the underwriting agreement between Coupang and the representative of the Underwriter Defendants (as defined herein), a form of which was attached as Exhibit 1.1 to the IPO Registration Statement (the "Underwriting Agreement"):

> The Company and each Selling Stockholder agree that any suit or proceeding arising in respect of this Agreement or any transaction contemplated by this Agreement will be tried exclusively in the U.S. District Court for the Southern District of New York (the "S.D.N.Y.") or, if that court does not have subject matter jurisdiction, in any state court located in The City and County of New York (together with the S.D.N.Y., the "New York Courts") and the Company and each Selling Stockholder agree to submit to the jurisdiction of, and to venue in, such courts.

7

Because the Underwriter Defendants (as defined herein) were counterparties to the Underwriting Agreement and each of Exchange Act Individual Defendants (as defined herein) and the Securities Act Individual Defendants (as defined herein) authorized the execution of the Underwriting Agreement by Coupang, each of them also submitted to the jurisdiction of this Court by directing acts within this judicial district out of which this Action arises.

19.    In connection with the acts and omissions alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.    Lead Plaintiffs purchased Coupang Class A common stock during the Class Period, including pursuant and/or traceable to the IPO Registration Statement, as set forth in the certifications previously filed in this Action (ECF No. 28-3), and were damaged thereby, as set forth herein.

21.    Defendant Coupang is an e-commerce business incorporated in Delaware and headquartered in Seoul, South Korea.  It has offices in South Korea, China, Singapore, Japan, Taiwan, and the United States.  Coupang's Class A common stock trades on the NYSE under the ticker symbol CPNG.

22.    Defendant Beomseok Kim, known more commonly in the United States as Bom Suk Kim ("Kim"), is the founder of Coupang and has served as Coupang's Chief Executive Officer ("CEO") and as a Director on Coupang's Board of Directors (the "Board") since May 2010.  Kim signed the IPO Registration Statement in his own capacity and on behalf of Coupang and signed the S-8 Registration Statement.

23.    Defendant Gaurav Anand ("Anand") has served as Coupang's Chief Financial Officer ("CFO") since December 2020.  Prior to his role as CFO, Anand served as Coupang's

Chief Operating Officer from January 2019 to December 2020, the Chief of Staff to Coupang's CEO from January 2017 to December 2018, and as CFO of Global eCommerce for Coupang from January 2017 to December 2017. Anand signed the IPO Registration Statement and signed the S-8 Registration Statement in his own capacity and on behalf of Coupang.

24.    Defendant Michael Parker ("Parker") served as Coupang's Chief Accounting Officer from October 2019 to September 2022. Since September 2022, Parker has served as Coupang's Vice President, Investor Relations. Parker signed the IPO Registration Statement and the S-8 Registration Statement.

25.    Defendant Matthew Christensen ("Christensen") was a Director on Coupang's Board at the time of the IPO until he resigned, effective immediately, on June 7, 2021. Christensen signed the IPO Registration Statement and the S-8 Registration Statement.

26.    Defendant Lydia Jett ("Jett") was a Director on Coupang's Board at the time of the IPO until she resigned, effective immediately, on October 26, 2021. Jett signed the IPO Registration Statement and the S-8 Registration Statement.

27.    Defendant Neil Mehta ("Mehta") was a Director on Coupang's Board at the time of the IPO. Mehta signed the IPO Registration Statement and the S-8 Registration Statement.

28.    Defendant Benjamin Sun ("Sun") was a Director on Coupang's Board at the time of the IPO. Sun signed the IPO Registration Statement and the S-8 Registration Statement.

29.    Defendant Kevin Warsh ("Warsh") was a Director on Coupang's Board at the time of the IPO. Warsh signed the IPO Registration Statement and the S-8 Registration Statement.

30.    Defendant Harry You ("You") was a Director on Coupang's Board at the time of the IPO. You signed the IPO Registration Statement and the S-8 Registration Statement.

31.     Defendant Goldman Sachs & Co. LLC ("Goldman") is a financial institution incorporated in New York with its principal place of business in New York, New York.  Goldman acted as an underwriter for Coupang's IPO and served as the representative of the underwriting syndicate for Coupang's IPO.

32.     Defendant Allen & Company LLC ("Allen & Company") is a financial institution incorporated in the state of New York with its principal place of business in New York, New York.  Allen & Company acted as an underwriter for Coupang's IPO.

33.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is a financial institution incorporated in the state of Delaware with its principal place of business in New York, New York.  J.P. Morgan acted as an underwriter for Coupang's IPO.

34.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a financial institution incorporated in the state of New York with its principal place of business in New York, New York.  Citigroup acted as an underwriter for Coupang's IPO.

35.     Defendant HSBC Securities (USA), Inc. ("HSBC") is a financial institution incorporated in the state of Delaware with its principal place of business in New York, New York.  HSBC acted as an underwriter for Coupang's IPO.

36.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a financial institution incorporated in the state of Delaware with its principal place of business in New York, New York.  Deutsche Bank acted as an underwriter for Coupang's IPO.

37.     Defendant UBS Securities LLC ("UBS") is a financial institution incorporated in the state of Delaware with its principal place of business in New York, New York.  UBS acted as an underwriter for Coupang's IPO.

38.    Defendant Mizuho Securities USA LLC ("Mizuho") is a financial institution incorporated in the state of Delaware with its principal place of business in New York, New York. Mizuho acted as an underwriter for Coupang's IPO.

39.    Defendant CLSA Limited ("CLSA") is a financial institution that performs significant business in New York, New York and maintains an office in New York, New York. CLSA acted as an underwriter for Coupang's IPO but it is not a broker-dealer registered with the SEC and agreed to not offer or sell any shares of the Class A common stock that it purchased in connection with the IPO in the United States.

40.    Defendants Goldman, Allen & Company, J.P. Morgan, Citigroup, HSBC, Deutsche Bank, UBS, Mizuho, and CLSA are referred to herein as the "Underwriter Defendants" and the Underwriter Defendants without CLSA are referred to herein as the "Broker-Dealer Defendants." The Underwriter Defendants served as the underwriters for the IPO.  The Underwriter Defendants sold 130 million shares of Coupang Class A common stock in the IPO at $35 per share.  The Underwriter Defendants' failure to conduct adequate due diligence in connection with the IPO and the preparation of the IPO Registration Statement was a substantial factor leading to the harm complained of herein.

41.    For ease of reference, Defendants Kim and Anand are referred to herein as the "Exchange Act Individual Defendants," Defendants Coupang, Kim, and Anand are referred to herein as the "Exchange Act Defendants." Defendants Christensen, Jett, Mehta, Sun, Warsh, and You and referred to herein as the "Director Defendants." The Director Defendants, together with Defendants Kim, Anand, and Parker are referred to herein as the "Securities Act Individual Defendants." The Underwriter Defendants, together with the Securities Act Individual Defendants and Coupang are referred to herein as the "Securities Act Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.   RELEVANT BACKGROUND

#### A.   The History of Coupang and Its Business

42.   Often referred to as the "Amazon of South Korea," Coupang is the largest e-commerce business in South Korea.  Like Amazon, Coupang operates an online marketplace and an extensive logistics network that can source and deliver a vast array of products from produce to high-end electronics.  As of its IPO in March 2021, Coupang offered a variety of goods, including items sourced from third-party merchants and suppliers, as well as its own PB products. Coupang purports to deliver 365 days a year, with guaranteed one day deliveries for many of the items it offers on its online marketplace.

43.   Founded in Delaware on May 28, 2010, by Defendant Kim as Forward Ventures LLC, the Company started as a coupon-based e-commerce platform which operated under the trade name Coupang where users could purchase tickets for theaters or travel at discounted prices, similar to the business model of Groupon.  In fact, the name Coupang is a portmanteau of the words "coupon" and "pang," the sound often used in Korean to signify hitting a jackpot.  It soon expanded to include an eBay-inspired online marketplace comprised of third-party goods.

44.   Thereafter, Defendant Kim decided to transform Coupang from a Groupon-style business into a vertically integrated e-commerce platform like Amazon.  At the time, other e-commerce platforms in South Korea lacked fulfillment capacity and relied on merchants to deliver items to consumers via third-party shipping services.  But relying on third-party merchants and their preferred shipping companies created unique challenges for these e-commerce operators.  Not only did they lack control over product storage conditions and fulfillment lead times, but the so-called "last mile" of the delivery process—the stretch between the final distribution hub and the customer's doorstep—was notoriously expensive and unreliable.  Defendant Kim sought to

remedy that flaw by purchasing goods directly from suppliers for resale on Coupang's marketplace and building an end-to-end distribution network that could quickly source and deliver nearly any item a customer wanted with the click of a button.  Kim bluntly told *Forbes* in 2014 that "[w]e want to be the Amazon of Korea."

45.    In 2013, Coupang started selling an owned-inventory selection of items.  It also acquired the data-analytics company CalmSea and began using machine learning to cut down delivery times.  Like Amazon, Coupang analyzed purchasing patterns to inform inventory decisions and position stock in its warehouses based on demand rather than product category.

46.    To further reduce delivery times, Coupang began hiring a small fleet of its very own full-time delivery drivers and, in March 2014, launched its "Rocket Delivery" service, which guaranteed next-day delivery free of charge on qualifying items.  This immediately set Coupang apart from other e-commerce platforms in South Korea and has since become intimately associated with its brand.  The Company's deliverymen, known as "Coupang Men," served as the ambassadors of its new business.

47.    South Korea provided a fertile venue for Coupang's new business platform.  With over 60% of the country covered in mountains and the highest mobile phone penetration rate anywhere in the world, South Korea contains a series of densely populated urban areas with a tech-savvy, highly connected population base.  In fact, nearly half of the country's population resides in the area surrounding Seoul, South Korea's capital city, making it the fifth largest metropolitan area in the world.  And in a country that promotes speed and convenience, South Korea is home to one of the largest and fastest-growing e-commerce markets in the world.

48.    In approximately September 2015, Coupang expanded its website and app to include a "marketplace" for third-party businesses to sell their goods directly to customers.  This

opened Coupang's platform to small and medium-sized merchants who lacked the resources and/or infrastructure to engage in wholesale transactions and broadened Coupang's product mix.

49.     After transitioning its e-commerce platform into the brokerage of third-party items, in 2016, Coupang changed its name from Forward Ventures, LLC to Coupang, LLC.

50.     As its business grew, Coupang began to offer new services and products.  In 2017, Coupang started selling its own PB products.  In 2018, it introduced Dawn Delivery, which guaranteed delivery by 7 a.m. on orders placed by midnight on the previous day.

51.     In 2019, Coupang launched Rocket WOW and Coupang Eats.  Similar to Amazon Prime, Rocket WOW is a subscription-based loyalty program that purportedly offers various benefits to members for a flat monthly fee, including free shipping with no minimum spend. Rocket WOW soon expanded to include Rocket Fresh, a fresh food grocery delivery service. Similar to Uber Eats, Coupang Eats is a delivery service for food prepared by independent restaurants.  Both Rocket Fresh and Coupang Eats leveraged the vast logistics network that Coupang built for its Rocket Delivery service.

52.     After the COVID-19 pandemic swept across South Korea in 2020, homebound consumers flocked to online shopping in unprecedented numbers and Coupang's growth soared. During 2020, Coupang's active customers—those who placed at least one order with Coupang during the relevant period—increased by 18.2%, but net retail sales per active customer grew by 61.5%.  Coupang's annual revenue reached almost $12 billion, representing a 90% increase from pre-pandemic levels in 2019.

53.     As Coupang's business grew, so too did its labor and logistics resources.  By the end of 2020, it employed nearly 50,000 workers in South Korea.  In addition, as of December 31, 2020, Coupang operated over 100 fulfillment and logistics centers in over 30 cities across South

Korea, encompassing over 25 million square feet or the equivalent of 400 football fields.  Coupang boasted that this network was so extensive that 70% of South Korea's 51 million residents lived within 7 miles of a Coupang logistics facility.

54.    But building an expansive comprehensive logistics network required an astounding investment in infrastructure and human capital.  Coupang claims that, since 2013, it has invested "billions" of dollars into its logistics network and the technology behind it.  In addition, its labor costs have increased approximately fourteenfold since 2014.

55.    In addition, Coupang's huge investment in its logistics network, and new initiatives, have prevented it from turning a profit for many years.  Coupang has not generated a profit since at least 2014, the year it introduced its Rocket Delivery service.  Even though Coupang has experienced revenue growth every year since 2014, it has consistently operated at a net loss.  For example, Coupang reported net losses of $1.1 billion, $699 million, and $475 million in 2018, 2019, and 2020, respectively, even though it reported total net revenue in excess of $4 billion, $6.2 billion, and $11.9 billion in each of those periods.

### B.    Coupang's Blockbuster IPO

56.    To capitalize on its explosive growth,  Coupang decided to commence an IPO in the United States.  On February 12, 2021, Coupang publicly filed with the SEC a registration statement on Form S-1 (File No. 333-253030) containing a preliminary prospectus relating to the potential IPO of up to 120,000,000 shares of Class A common stock of a new entity by the name of Coupang, Inc.  It filed amendments thereto on March 1, 2021, and March 9, 2021, respectively (as amended, the IPO Registration Statement).  The IPO Registration Statement became effective at 4:00 p.m. Eastern Time on March 11, 2021.

57.    The IPO Registration Statement disclosed that, pursuant to Delaware law, Coupang LLC planned to convert into Coupang, Inc., and that the IPO would be comprised of:  (i) a new

issuance of 100,000,000 shares of Class A common stock by Coupang, Inc.; and (ii) 20,000,000 shares of Class A common stock of Coupang, Inc. held by certain existing stockholders (the "Selling Stockholders"), including 1,200,000 shares of Class A common stock owned by Defendant Kim.  The IPO Registration Statement identified the Underwriter Defendants as the underwriters for the IPO and attached various exhibits, including (i) a form of the Underwriting Agreement; and (ii) a form of the Plan of Conversion to be adopted and approved by Coupang, LLC, which set forth the terms, conditions and procedures governing the conversion of Coupang, LLC into Coupang, Inc., as Exhibit 2.1 (the "Conversion Agreement").[1]

58.     After the IPO Registration Statement was declared effective by the SEC on March 10, 2011, Coupang filed another registration statement on Form S-1MEF (File No. 333-254113) to automatically add 10,000,000 shares of Class A common stock to the securities registered by the Selling Stockholders in the IPO Registration Statement pursuant to Rule 462(b) of the Securities Act (the "MEF Registration Statement"), thus increasing the aggregate amount of Class A common stock offered in the IPO to 130,000,000 shares.  As Coupang explained in subsequent SEC filings, "[t]he Registration Statement on Form S-1 (File No. 333-253030) for our IPO of our Class A common stock was declared effective by the SEC on March 10, 2021" and "registered an aggregate of 130,000,000 shares of our Class A common stock (30,000,000 of which were held by selling stockholders)."   The MEF Registration Statement expressly incorporated the IPO Registration Statement by reference.  The MEF Registration Statement was signed by Coupang and the Securities Act Individual Defendants.

---

[1] Immediately before the effectiveness of the IPO Registration Statement, at approximately 3:59 p.m. Eastern Time on March 10, 2021, Coupang filed a Certificate of Conversion with the Secretary of the State of Delaware and, thereby, converted from Coupang, LLC into Coupang, Inc. in accordance with Delaware law (the "Corporate Conversion").

59.     On March 11, 2021, Coupang filed the final Prospectus for the IPO pursuant to Rule 424(b)(4), deemed to be part of the IPO Registration Statement in accordance with Rule 430A of the Securities Act, which provided final pricing information for the IPO.

60.     Coupang conducted its IPO between March 11, 2021, and March 15, 2021. Through the IPO Registration Statement, Coupang and the Selling Stockholders sold all 130,000,000 shares of Class A common stock to the investing public at $35 per share, making it the largest IPO on Wall Street since Alibaba Group Holding Limited's debut in 2014. This valued Coupang at over $60 billion. Coupang's share price soared 80% to open at $63.50 on March 11, 2011, implying an enterprise value on a fully diluted basis of $114 billion.

61.     Coupang, the Selling Stockholders, and the Underwriter Defendants benefitted handsomely from the IPO. Coupang generated net proceeds of approximately $3.4 billion from its sale of its 100,000,000 shares of Class A common stock. The Selling Stockholders collectively generated net proceeds of approximately $1.1 billion from the sale of their 30,000,000 shares of Class A common stock. Defendant Kim sold 1,200,000 shares of his own Class A common stock for $42 million. And the Underwriter Defendants received underwriting discounts and commissions of approximately $95 million.

62.     Meanwhile, in connection with the IPO and throughout the Class Period, Defendants made materially false and misleading statements, and/or failed to disclose that Coupang continued to maintain unsafe working conditions, engaged in improper sales and marketing practices with suppliers and merchants, and failed to maintain written policies to protect consumers who used its online store, subjecting the Company to a heightened, risk of regulatory scrutiny (and the attendant risks of punitive measures, including fines), diminished business and financial prospects, harm to its

critical relationships with customers, suppliers and merchants, and loss of assets, including inventory, equipment, and storage capacity.

63.    Throughout the Class Period, Coupang maintained an online newsroom page entitled "FACTS," which was singularly dedicated to denying any rumors of wrongdoing.  For example, in response to an article by the *Financial Times* "Coupang's New York listing clouded by worker deaths," Coupang posted a statement to its newsroom in April 2021 insisting that "Coupang pays great attention to the health and welfare of all employees" and deflected responsibility by claiming that "cardiac and cerebrovascular disorders . . .  are the 2nd and 4th leading causes of death in Korea."  And after civic groups revealed that Coupang was misappropriating copyrighted images from small third-party businesses to support its Item Winner system, Coupang issued a statement to its newsroom, declaring that "Coupang's Item Winner (one product, one page system) is an improved service that allows . . . sellers [to] compete fairly" and "the claim that Coupang infringes on the copyrights of sellers' images is not true at all."

### C.    Coupang's Ownership Following the IPO

64.    Before the Corporate Conversion, Coupang, LLC had issued equity interests to various parties, including employees and early investors, in the form of common units and preferred units.  In connection with the Corporate Conversion, all common and preferred units automatically converted into Class A common stock, except for those owned by Defendant Kim.  All of Defendant Kim's common units and preferred units instead converted into Class B common stock.  The rights of the holders of Class A common stock and Class B common stock are identical, except with respect to voting and conversion.  Each share of Class A common stock is entitled to one vote per share, whereas each share of Class B common stock is entitled to ***twenty-nine*** votes per share and is convertible into one share of Class A common stock at any time at the option of the holder or automatically upon transfer except in limited circumstances.

65.     As of the close of the IPO, there were a total of approximately 1,555,059,600 shares of Class A common stock outstanding and 174,802,990 shares of Class B common stock outstanding.  And as the sole owner of all Class B common shares, Defendant Kim possessed over 76% of the combined voting power over the Company.  As such, Coupang warned that this "will limit or preclude your ability to influence corporate matters for the foreseeable future."

66.     Notably, however, only the 130,000,000 shares of Class A common stock sold in the IPO were freely tradeable without restriction following the close of the IPO.  All other shares of Class A common stock not sold in the IPO and all shares of Class B common stock owned by Defendant Kim were "restricted securities" within the meaning of Rule 144 of the Securities Act, meaning they cannot be sold publicly unless they are registered under the Securities Act or qualify for an exemption from registration under Rule 144 or Rule 701 of the Securities Act.

67.     In addition, the IPO Registration Statement specifically represented that "all" of the restricted shares not sold in the IPO were subject to one or more lock up agreements which prohibited their sale until August 13, 2021 (the "Lock-Up Period"), unless the conditions for an early release from the Lock-Up Period were satisfied.  There were a series of at least six early releases from the Lock-Up Period beginning six trading days after the date of the Prospectus.

68.     After the close of trading on March 15, 2021, Coupang announced that the conditions for the first early release from the Lock-Up Period were satisfied.  By satisfying the conditions for the first early release, the Lock-Up Period ended with respect to all outstanding shares of the Company acquired by certain employees pursuant to the exercise of options awarded under Coupang's pre-IPO employee incentive plan, and held as of February 26, 2021, making those shares of Class A common stock (as converted) eligible for sale in the market on March 18, 2021, the next trading day, subject to compliance with Rule 144 of the Securities Act.

69.     Before the market opened on March 18, 2021, Coupang filed the S-8 Registration Statement containing a reoffer prospectus relating to 29,700,836 shares of Class A common stock that were subject to the first early release from the Lock-Up Period on behalf of 2,103 individuals, which became effective immediately upon filing.  The registration of these shares permitted their resale on the secondary market without violating Rule 144 of the Securities Act.  The S-8 Registration Statement was signed by Coupang and the Securities Act Individual Defendants.

70.     Coupang was obligated to publicly announce whether any of the early releases from the Lock-Up Period were satisfied as promptly as practicable before the release became effective. It made no such announcements other than the one on March 15, 2021.

## II.    UNSAFE WORKING CONDITIONS PERSISTED AT COUPANG

71.     The vast majority of products and services offered by Coupang are built around, and dependent upon, its extensive end-to-end logistics network, including its selection of owned-inventory items.   This comprehensive infrastructure network acts as the superhighway that Coupang uses to shuttle goods from inventory warehouse to consumer doorstep, often in one day or less.  It is the defining feature of Coupang, which sets it apart from competitors.  Indeed, by the time of the IPO, Coupang had a larger business-to-consumer logistics footprint than any other e-commerce company in South Korea and was the only company in South Korea that delivered 365 days per year, even on peak days before major holidays.

72.     While Coupang utilizes proprietary technology to optimize certain aspects of distribution network, including how best to orchestrate the movement of inventory, it is by no means fully automated.  On the contrary, Coupang's vast logistics network is physically operated by an equally large collection of frontline workers, including warehouse workers and Coupang Men (which were rebranded as "Coupang Friends" before the IPO).   Accordingly, Coupang

describes these workers as the "backbone of Coupang" and, indeed, acknowledges that they are "one of the reasons for [its] success."

73.     As Coupang grew, so too did the demands on its frontline workers.  To keep up with the pace of expansion, and its strategy to deliver goods faster than anyone else, often overnight, Coupang pushed its workers to meet increasingly onerous work targets and breakneck deadlines.  As just one example, Coupang's driver's union found that the individual delivery loads for Coupang Friends increased from 57 packages per day in 2015 to *340 packages per day* by the start of the pandemic in February 2020.  But rather than taking steps to protect its workers against the demands of this work, Coupang's near-constant fixation with maintaining its competitive edge created a culture that disregarded the safety and well-being of its frontline workers.

**A.      Coupang's Unsafe Working Environment Had Been the Subject of Intense Market Scrutiny Before the IPO**

**1.      A Series of Frontline Workers Died From Cardiac Issues Before the IPO**

74.     South Korea's labor laws distinguish between indefinite-term employees, known as "regular" employees, and all other workers on payroll, including fixed-term or part-time employees, known as irregular or "non-regular" employees.  Regular employees are guaranteed certain protections, including no more than 52 hours of work per week, and one-hour breaks for every eight-hour shift, among other things.  But non-regular workers do not receive these same protections, including the cap on weekly work.  As explained below, Coupang exploited this loophole to its advantage.

75.     Although Coupang hires all its frontline workers directly, the substantial majority are non-regular employees.  By the end of 2020, approximately 90% of the workers Coupang hired to staff its warehouses were non-regular employees.  Some of these non-regular workers are hired on fixed-term contracts lasting three to twelve months but most are day-to-day employees hired

the night before through mobile employment applications, allowing Coupang to match its labor costs to the ebb and flow of business. As for its fleet of delivery drivers, Coupang boasts that it hires all Coupang Friends as "full-time employees" but here too there is a large imbalance between regular and non-regular workers. Rookie drivers begin on a non-regular contract and are eligible to advance to regular employment after two years, but most quit before that opportunity arises.

76.    The lack of job security in these non-regular positions provided ample incentive to meet the performance targets set by any employer, and Coupang provided even further incentive. Managers were known to publicly scold workers who fell behind their performance targets or write-up employees who voiced dissent regarding work conditions.

77.    The physical toll of these pressures became even more pronounced as workloads skyrocketed with the increased demand brought about with the onset of the COVID-19 pandemic. From February 2019 to February 2020, daily orders with Coupang increased from 1 million per day to 3.2 million per day. According to Korea's Workers Compensation and Welfare Service ("KCOMWEL")—the body charged with adjudicating workplace injury and disease disputes in South Korea—the number of workplace injuries at Coupang increased ***three-fold*** from 2018 to 2020, with a total of 982 injuries in 2020. Aside from serious injuries reported to KCOMWEL, many day laborers experienced a spectrum of physical ailments following a full shift of work.

78.    In the year before the IPO, a series of deaths by young and middle-aged employees kept Coupang in the news for overworking its frontline workers to keep up with its Rocket Delivery service as orders surged during the COVID-19 pandemic:

- On March 12, 2020, a Coupang Friend in his mid-40s was found dead by a colleague inside of a residential building at 2 a.m., after just two weeks on the job. An autopsy revealed that he suffered from coronary heart disease.

- On May 27, 2020, a 45-year-old worker at a logistics facility collapsed in a bathroom at 2:40 a.m. during an overnight shift after suffering cardiac arrest. An autopsy determined coronary sclerosis as the cause of death.

- On June 1, 2020, a cook in Coupang's Cheonan logistics center collapsed in the kitchen after complaining of chest pain and went into cardiac arrest.

- On October 12, 2020, a 27-year-old worker at Coupang's fulfillment center in Daegu by the name of Deok-Jun Jang collapsed in the shower at home shortly after finishing an overnight shift. His cause of death was later determined to be a heart attack.

- On November 10, 2020, a 50-year-old equipment maintenance worker in Coupang's Majang logistics center passed away after moving heavy equipment and suffering a heart attack. He had worked 81 hours that week.

- On January 11, 2021, a worker in her 50s collapsed in a bathroom at Coupang's Dongtan logistics facility on her sixth day on the job after a nine-hour overnight shift in an unheated warehouse on one of the coldest days of the year.

- On March 6, 2021, a 48-year-old overnight delivery worker died at his low-cost living quarters during a brief vacation from work. His autopsy revealed cerebral hemorrhaging and a swollen heart.

- On March 6, 2021, a delivery manager in his 40s collapsed at home after working until 11 p.m.

All of these deaths have a common theme: heart-related conditions. This is notable because cardiac disorders are the second leading cause of death in South Korea. In fact, "kwarosa" is a Korean term that refers to sudden death from heart failure or stroke due to strenuous work.

79.     For its part, Coupang largely denied responsibility for these deaths. It insisted that it cannot be implicated in the deaths from June 1, 2020, and November 10, 2020, because those workers were employed by subcontractors, not Coupang. As for the other deaths, Coupang skirted responsibility by highlighting its work standards and arguing that there was no causal connection between the death and the employee's workload.

80.     Coupang has a history of disrupting investigations related to worker safety. South Korean companies pay insurance fees to KCOMWEL, which compensates workers if their injuries

are determined to be work-related, but it is the responsibility of the worker or their family to prove the causal connection with evidence. In 2020, Coupang workers filed 239 claims with KCOMWEL. But Coupang disputed nearly 30% of these claims, three times more than the amount of any other company. Ultimately, KCOMWEL approved all but 15 (or 6%) of these cases as work-related, including at least one where the warehouse safety management officer submitted a multi-point rebuttal to the claim and argued that the claim was "malicious."

81.     The case of Deok-Jun Jang illustrates just how physically demanding the work of a Coupang frontline worker can be. He worked on daily contracts since June 2019. In the months leading up to his death, he worked the overnight shift five to seven days in a row. He referred to the period right before each hourly deadline as "hell" in his text messages. In April 2020, he visited a hospital for a knee injury during which he complained of "general muscle fatigue and pain" from "excessive work." Jang lost over 30 pounds since he started working at Coupang. On the day he died, he complained of chest pain and nausea. His autopsy showed that there were signs of severe muscular breakdown in his body.

82.     Less than a week after his death, Coupang issued a statement in its newsroom, claiming that the media was unfairly "blaming Coupang by linking the unfortunate death of [Deok-Jun Jang] to the problem of overwork," and stating that "the average working hours of the deceased per week was about 44 hours." It urged the media to "stop trying to maliciously exploit [Jang's] death." On October 26, 2020, Sung Hwan Eum, the head of Human Resources at Coupang Fulfillment Services, appeared with an attorney to respond to questions at a parliamentary hearing on worker deaths. Asked if Jang died from overwork, Eum responded that this was "a matter for [KCOMWEL] to decide." The following day, Coupang issued another statement in its newsroom

24

to correct certain "facts" in news stories.  The release stated, "Coupang has created an exemplary work environment," and warned "[w]e will respond strongly to any distortion of the facts."

83.     Dissatisfied with Coupang's response, Jang's parents filed a claim with KCOMWEL in November 2020.  Coupang responded that Jang's death should *not* be recognized as a work-related incident.  Accordingly, Jang's family asked Coupang for seven types of documents to prove their claim that the death was work-related.  But Coupang refused to provide anything other than a copy of Jang's employment agreement and a statement of severance pay.

84.     On February 4, 2021, the Daegu Occupational Disease Judgement Committee issued a written report concluding that the work intensity of Jang's job contributed to his death. Among other things, the report found that Jang worked an average of almost 59 hours per week after accounting for the statutorily mandated 30% increase for overnight work, and that Jang worked twice as much as the musculoskeletal burden work standards promulgated by South Korea's Ministry of Employment and Labor (the "Labor Ministry").

85.     On February 9, 2021, KCOMWEL informed Coupang that it officially recognized Jang's death as work-related.  An official with KCOMWEL told the media that "[w]e determined that the workload and working hours had a significant causal relationship with the death of [Jang]." Later that day, Coupang issued a statement by Joe Nortman, CEO of Coupang Fulfillment Services, in its newsroom in which he expressly apologized for Jang's death.  Coupang later took down the statements it posted to its newsroom in October 2020 regarding Jang's death.

### 2.     Coupang Faced Backlash for Mishandling an Outbreak of COVID-19

86.     The safety practices followed at Coupang's distribution centers were the subject of extensive public scrutiny not long before its IPO following a mass outbreak of COVID-19 at its logistics facility in Bucheon, South Korea.

87.     On the morning of May 24, 2020, authorities notified Coupang that a case of COVID-19 from as far back as May 12, 2020, traced back to a worker at its logistics facility in Bucheon.  The six-story Bucheon warehouse is a windowless, cold storage facility that Coupang used to house fresh food and is operated by a revolving staff of over 1,000 employees and short-term workers.  But rather than shut down the facility for a thorough remediation—as recommended by the Korea Centers for Disease Control and Prevention ("KCDC")—Coupang suspended work for three hours to disinfect and then had the next shift of frontline workers resume business as usual later that day.  Facility management even sent a text message seeking volunteers to take on additional shifts to make up for the lost time.  On the evening of May 25, 2020, a full day after reopening its doors to several waves of frontline workers, a day laborer who worked the evening shift at the Bucheon facility on May 24, 2020, tested positive for COVID-19.  By May 26, 2020, Coupang shut down the facility and the number of positive cases began to grow.

88.     The incident received widespread attention and shed light on working conditions at the facility.  Workers at the Bucheon facility told the media that many workers often had to remove their masks due to the physical nature of the job and that social distancing guidelines were not observed in smoking rooms, commuter buses, or cafeterias.  Coupang also came under fire for its short-sighted response.  The Company claimed that it thoroughly disinfected the Bucheon warehouse on May 24, 2020, and May 25, 2020, but health investigators found the virus on shared safety hats, shoes of frontline workers, and communal computer workstations just a few days later.

89.     In total, there were at least 152 cases of COVID-19 traced back to the Bucheon warehouse, including 84 frontline workers and 68 others due to subsequent contact.

90.     Coupang blamed the outbreak on a patient further up the chain of transmission who obstructed contact tracing efforts.  But government leaders condemned Coupang for its role in the

outbreak. Eun-kyeong Jung, the head of KCDC, rebuked Coupang for its "inadequate prevention measures." Health Minister Neung-hoo Park told the public that "a mix of the environment, which made it hard to wear masks, and the lack of distancing in rest areas and the cafeteria contributed to the latest outbreak." Jae-myung Lee, the Governor of Gyeonggi Providence, where Bucheon is located, stated "[i]t is regrettable that hundreds of workers were exposed to the danger [of infection] even after the company became aware of a confirmed patient."

### B.    Coupang Repeatedly Assured Investors That It Prioritized Safety

91.    In light of the above events, maintaining a safe working environment was a critical issue for investors. Coupang repeatedly underscored that "***safety is the most important value in Coupang***" and claimed to have made substantial investments in "safety management." In fact, Coupang expressly recognized in its IPO Registration Statement that "heightened public attention regarding worker safety and occupational health may subject [the Company] to regulatory and media scrutiny," which could, in turn, "result in government inquiries or substantial harm to our brand, reputation, and prospects."

92.    According to a *Financial Times* article published on March 8, 2021, just three days before the IPO, "[a]nalysts said that . . . the issues [recent worker deaths] . . . ***raised questions about the sustainability of Coupang's long-term growth***." Similarly, the *Korea Times* wrote on March 9, 2011, that "[i]nvestors and stock market analysts say Coupang's business sustainability depends upon a detailed assessment of its labor conflicts." On March 11, 2021, the same day as Coupang's IPO, *The New York Times* commented that "Coupang has also faced scrutiny over its labor practices" including "exploiting its warehouse workers in its mad rush to turn around orders as fast as possible." Indeed, a *Bloomberg* anchor told Kim on March 11, 2021, during one of his first public interviews following the IPO that the worker deaths at Coupang were "***a real concern for U.S. investors***."

93.     In the IPO Registration Statement, and continuing thereafter, Coupang maintained that it provided best-in-class working conditions for frontline workers and that it prioritized safety.

94.     What's more, Coupang urged investors to ignore any information that was not reported by the Company itself, and to discard reports from the media or other third parties as unreliable.  The text under the Table of Contents in the Prospectus included in the IPO Registration Statement cautioned investors against relying on any such external information, including reports of unsafe working conditions at Coupang, stating in full:

> Neither we, the selling stockholders, nor any of the underwriters have authorized anyone to provide you with any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses we have prepared.  Neither we, the selling stockholders, nor any of the underwriters take any responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you.

95.     In its Registration Statement, Coupang insisted that "[w]e consider our employee relations to be positive."   Defendants continued to make similarly false and misleading statements after the IPO.  For example, on April 3, 2021, Coupang issued a statement on its newsroom in which it declared that "Coupang pays great attention to the health and welfare of all employees" and will continue "prioritizing the health and safety of its employees."

C.     **Several Workplace Disasters Revealed That Coupang Maintained Unsafe Working Conditions During the Class Period**

1.     **A Fire Obliterated One of Coupang's Most Important Facilities, Resulting in Hundreds of Millions of Dollars In Losses and Outsized Costs Associated with Labor and Operations**

96.     The Deokpyeong fulfillment center (the "Deokpyeong Facility") was a large-scale, four-story warehouse in Incheon, about 50 miles west of Seoul, with a total floor area of more than 1,350,000 square feet.  Coupang purchased the mega-center in 2016 for approximately $125 million.  It was used by Coupang to store non-perishable goods and service customers in

southeastern Seoul and parts of Gyeonggi and Chungcheong provinces to the south.  Because of its size and location, it was one of Coupang's most important fulfillment centers.

97.     At approximately 5:11 a.m. on the morning of June 17, 2021, a fire broke out on the bottom floor of Coupang's cavernous Deokpyeong Facility.  An electrical wire running vertically along the end of a product shelf to a fan on top of the shelf caught fire from an electrical fault, generating sparks.  The fire quickly spread to the cardboard boxes used to store items in the product shelf and soon engulfed the entire shelf.

98.     Even though the fire system at the Deokpyeong Facility detected the fire as early as 5:20 a.m., it was not reported to the fire department until 5:36 a.m.  Internal records from the fire system's receiver log confirm that the fire system was manually turned off by engaging the Fire Recovery button in the control room for the system *six seconds* after the alarm went off at 5:20:18 a.m.  This not only turned the alarm off, it also turned off all visual alarms, emergency broadcasting, sprinkler valves, and returned both the smoke and heat detectors as well as the water pump back to their original state.  Those same records confirm that the system was manually overrode in this same manner *six times in a row*, even as additional fire signals came in.  The fire system did not return back to "automatic" functions until 5:32 a.m., at least 20 minutes after the fire first broke out.  During this time, the fire continued to spread, engulfing the facility.

99.     Because of the large amount of flammable materials scattered throughout the facility, like vinyl and paper boxes, the fire was not completely extinguished until June 22, 2021, six days later.  Rescue efforts required a total of 667 firefighters and 255 pieces of equipment.  Tragically, the chief of one of the stations that responded became trapped and was later found dead.  Rescue efforts to find him were suspended because of fears the building would collapse.

Ultimately, the entire Deokpyeong Facility, including the massive inventory stored there, was destroyed.

100.    On the afternoon of June 18, 2021, Coupang posted a statement to its newsroom by Hanseung Kang, CEO of Coupang's Korean subsidiary, in which he said "[w]e are very sorry for causing concern to many people" and "we apologize once again to the many people who were affected by this fire."  On June 19, 2021, after news broke that the firefighter's remains were found, Coupang posted another statement to its newsroom in which it said "[a]ll Coupang members express their deepest condolences" for the firefighter.  On June 20, 2020, Hanseung Kang issued another statement on Coupang's newsroom in which he expressed his "apologies once again to everyone."  He also added that "Safety is the most important value to Coupang" but acknowledged that "through this fire, we realize once again that there is no end to our efforts for safety."

101.    Before the devastating June 17, 2021 fire, there were numerous fire hazards present at the Deokpyeong Facility.  For example, because it lacked air conditioning, Coupang placed rotating fans on the top of product shelves throughout the facility during the warmer summer months, often plugging them into wires that passed along the top and sides of product shelves.  The risk of an electrical fire posed by this setup was heightened because of an excessive buildup of dust throughout the Facility.  Indeed, numerous reviews posted online by day laborers who took on a shift at the Facility between 2020 and 2021 independently confirmed that the facility had an exceptional amount of "dust" in the work environment.[2]  One review from  June 4, 2021, indicated there was "so much dust" it covered the "face, hands, arms, and neck" by the end of a shift.

102.    In addition, the Deokpyeong Facility was operated in a manner that increased the risk for a fire to spread.  According to a confidential witness with first-hand knowledge of the

---

[2]    https://m.blog.naver.com/kje8805/221794833988;    https://blog.naver.com/gkskqufl20/222384997194; https://blog.naver.com/kyjmimi121/222159086674 ; https://ovelove.tistory.com/31

matters discussed herein ("CW1"), the Deokpyeong Facility "regularly ran at 110% - 120% capacity," which was itself a "fire risk" for Coupang because items would accumulate "in aisle ways" and "in front of doors."  CW1 worked as Director – Fulfillment Center Operations at Coupang from January 2019 to December 2021.  In this position, CW1 managed Coupang's fulfillment centers in Dongtan and Pyeongtaek, South Korea, around Seoul, and reported to Joe Nortman, CEO of Coupang Fulfillment Services, the subsidiary responsible for Coupang's logistics operations.  As a manager of a Coupang facility, CW1 regularly spoke about safety incidents at his facility and those at other facilities with senior executives, including Nortman and Defendants Kim and Anand.  CW1 added that the Deokpyeong Facility was so far over capacity on the inside that there were regularly "thousands of thousands of boxes outside under tarps."

103.    As required by law, the Deokpyeong Facility was equipped with a fire detection system that included a fire alarm.  However, the alarm was routinely ignored before June 17, 2021. For some time before June 17, 2021, the fire alarm at the Deokpyeong Facility frequently malfunctioned.  But rather than fix the issue, workers were simply told to disregard the alarm if it went off.  Indeed, a frontline worker at the facility from fall 2019 to August 2020 appeared on an MBC Radio show and explained that the fire alarm frequently malfunctioned when he was working there but ***managers informed workers to pay no attention to it***.  Similarly, a manager who worked in the aptly named "disaster prevention room" in the Deokpyeong Facility, which contained the controls for its fire system, later confirmed in a statement to police that, the standard practice was to press the key that reset the system ***whenever the fire alarm went off***.

104.    Beyond that, a legally mandated annual inspection of the fire system at the Deokpyeong Facility performed in February 2021 by an independent third-party company identified ***277 defects with the fire system***.  The report from that inspection, dated February 22,

2021 (the "Fire Inspection Report"), cataloged systemic problems across nearly every major component of the fire system.  The most common defects related to the sprinkler system, nearly half of which involved issues arising from the fire detectors that activated the sprinkler system in the event of smoke or heat.  More specifically, among the defects, the sprinkler facilities were the most common with 60 cases.  Moreover, defects related to detectors that activate sprinklers by detecting smoke or heat in the event of a fire accounted for almost half, with 28 cases. Additionally, the device fixing the sprinklers was missing, and the sprinkler spraying radius did not meet the required standards. 26 other defects were found, such as damage to the fire shutter, which automatically closes in cases of fire to prevent the spread of fire.  There were 20 additional problems due to defective fire shutters.  On the second basement floor alone, where the fire was presumed to have occurred, there were no fire extinguishers and a sensor linked to the sprinkler valve did not work.  The fire alarm was also out of order and the fire detector did not work.  64 violations were pointed out in the second basement floor alone.

105.    The sheer number of defects identified in the Fire Inspection Report was extraordinary, even for a structure the size of the Deokpyeong Facility.  The last inspection took place in August 2020.  The accumulation of such a large number of problems since the last report represents a shocking disregard for safety at Coupang.

106.    News regarding the fire at the Deokpyeong Facility, and associated rescue efforts, captivated the nation.  South Korea's President, Jae-in Moon, expressed his condolences for the lost firefighter's family and vowed to make sure the same tragedy would not be repeated.  Public officials including Prime Minister Book-kyum Kim, visited the mourning altar established for the fallen firefighter to pay their respects.

107.    As news coverage intensified, details regarding the fire safety failings at the Deokpyeong Facility began to emerge.  For example, the Coupang Logistics Center chapter of Korea's Public Transportation Union held a press conference in front of Coupang's headquarters in Seoul on June 18, 2021, during which workers from the facility noted that "the workplace is always heavily dusty" and "countless electrical devices are running nonstop every day."  The workers also stated that the sprinklers were turned off due to frequent malfunctions.  On June 20, 2021, Sang-gyu Lee, head of the Fire and Disaster Headquarters of the province where the Deokpyeong Facility is located, confirmed that the sprinklers were "delayed by about 8 minutes" based on the preliminary investigation.  Then, on the evening of June 21, 2021, a worker from the Deokpyeong Facility offered a scathing first-hand account of the fire in a petition posted to the official website of the President of South Korea entitled "The fire at Coupang's Deokpyeong Logistics Center was not the first."  The petition contained facts that only someone who worked at the Deokpyeong Facility at the time of the fire would have, including a detailed understanding of the internal layout of the facility and information regarding the fire that was corroborated by subsequent evidence.  The worker said the alarm first went off between 5:10 and 5:15 a.m. but the worker did not stop because, whenever that happened in the past, workers were told "don't worry about it, just keep doing what you're doing."  After personally seeing smoke, the worker pleaded with a security guard to alert authorities and was laughed at by the official, who told the worker not to cry wolf.  The post soon went viral.

108.    This news sparked outrage among the public in South Korea.  Protestors claimed that the fire—like the COVID-19 outbreak at the Bucheon facility—resulted from a blatant disregard for safety standards and work conditions for frontline workers.  ***Users posted online urging others to delete their Coupang accounts using the hashtag #LeaveCoupang.***  The boycott

grew as news of the online petition spread.  For example, the *Korea Times* wrote on June 22, 2021, that the boycott was "growing" following the spread of the "grim facts" from the online petition. That same article provided that "Coupang has been bent on maximizing its profit under the motto of 'Rocket Delivery' by exploiting workers."  The boycott also caught international headlines.  On June 22, 2021, the *Financial Times* reported that Coupang was facing "a wave of consumer boycotts" following the publication of the petition.

109.    Aside from public criticism, the fire at the Facility would ultimately cost Coupang ***millions of dollars in lost inventory, equipment, and other charges***.  The fire damaged Coupang's business and badly harmed its reputation among current and potential frontline workers as well as customers.  Coupang, however, did not disclose the full costs of either the fire or the unsafe working conditions to which the Company was subjecting employees.

110.    In addition to the obvious safety concerns raised by the fire, the loss of such a mega-facility placed an enormous strain on Coupang's logistics network.  According to a confidential witness with first-hand knowledge of the matters discussed herein ("CW2"), Coupang struggled with capacity constraints following the Deokpyeong Facility fire.  CW2 worked as Head of Asset Recovery – Program Management from 2020 to 2022.  In this position, CW2 was responsible for ensuring that Coupang had enough capacity at its facilities to process returns, which totaled roughly 400,000 items per day.  CW2 reported to Rohit Kunal, Vice President – Global Operation, Design and Supply Chain Planning, who, in turn, reported to Defendant Anand.  CW2 recalled that Coupang stopped processing returns altogether because its capacity was stretched so thin following the fire at the Deokpyeong facility.  Customers still received refunds for returned items but instead of processing those items, Coupang began to "stockpile" them wherever it could find space.  Coupang was "just piling them up because there was no way to get to them."

111.    On August 11, 2021, Coupang reported a $518.6 million loss for the quarter ended June 30, 2021, *a fivefold increase from its loss in the same quarter of 2020*.  This outsized loss was due primarily to almost $300 million in inventory and equipment losses due to the June 2021 fire.  According to an August 12, 2021, *Financial Times* article discussing these developments, *the fire was a major contributor to the losses*.  An article in the *JoongAng Daily* wrote that the fire "*more than doubled [Coupang's] loss*."

112.    On November 12, 2021, Coupang released its financial results for the third quarter of 2021, disclosing much higher than anticipated costs from the June 2021 fire, especially costs associated with labor and operations.  On the corresponding earnings call that Coupang hosted later that day, Defendant Kim disclosed that *the Company was having trouble hiring employees and that this difficulty was attributable in part to the June 2021 fire.*  Further, Defendant Kim disclosed that *the fire had "lead to [] inefficiency in [Coupang's] network."*  Similarly, in its related quarterly financial report, Coupang stated that *the fire had reduced the Company's capacity.*

### 2.    Another Delivery Worker Dies On the Job After Showing Heart Abnormalities During His Health Examination

113.    In South Korea, new employees working night shifts are required by law to complete a pre-employment health screening before starting a new position.  Employers, like Coupang, pay for the procedure and receive certain information from the results of the examination, including information on heart function, such as the heart rate of the examinee.  This information can alert an employer to certain conditions that either disqualify someone from a potential position or present a heightened risk for a job-specific injury.

114. By the start of the IPO, Coupang required all new parcel delivery drivers to undergo the legally mandated pre-employment health screening, through which it would receive, among other things, information on the heart function of the applicant.

115. However, CW1 disclosed that, at that time, Coupang was "hurting so bad for people" to fill its frontline roles that it allowed individuals to begin work who had at-risk medical conditions, including "high blood pressure." In such cases, said CW1, Coupang assigned the individual to a "light" position and informed them that they needed to undergo a "follow-up" health screening to confirm that the condition was brought back under control. For example, in March 2021, Coupang onboarded a new employee to work as a Coupang Friend parcel delivery driver even though his pre-employment medical screen showed heart abnormalities. Consistent with CW1's recollection, the new driver was given a light workload as an entry-level Coupang Friend.

116. On March 24, 2021, news broke that a Coupang Friend in his early 40s was found unconscious earlier that day next to his company-issued car at a residential area in Incheon, South Korea, and pronounced dead on the way to the hospital. As the *Korea Herald* commented in a report the next morning, "[t]he courier's death immediately triggered speculation that he may have become the latest delivery worker to die from apparent overwork."

117. In response, Coupang released a statement to media sources early on March 25, 2021, which explained that the courier was only on his second day of delivery duty and added that, "in general, new employees are assigned less delivery volume than other employees," apparently attempting to preempt a possible link between the death and overwork. But the official unwittingly volunteered in the same statement that the worker was undergoing a "thorough medical check-up" because he showed "heart-related abnormalities in his initial medical examination."

118.    Coupang's disclosure on March 25, 2021, raised immediate concerns about its hiring practices.  For example, the *Maeil Ilbo* observed later that same day that "[s]ome are raising issues with the placement of employees with abnormal [heart] findings."  Similarly, the head of the Coupang chapter of the Korea Public Transportation Union stated that same day that it was "problematic" that Coupang "sent the courier out for delivery even though the deceased had a heart problem and was undergoing a second health check-up."

## III.    COUPANG EXPLOITED ITS SUPPLIERS AND MERCHANTS BUT REPEATEDLY DENIED SUCH PRACTICE TO INVESTORS

### A.    Coupang Forced its Suppliers to Bear the Cost of Margin Losses On Items That Were Subject To Its Price Match System

#### 1.    Coupang's Price Match System Created Significant Margin Erosion

119.    Before the IPO, Coupang derived its revenue from several sources, including online product sales to customers from its owned-inventory selection, commissions earned on third-party goods sold through its marketplace, consideration from online restaurant ordering and delivery services, third-party advertising, and subscription fees from Rocket WOW members.

120.    By far, however, the substantial majority of Coupang's revenues were generated from online product sales from its owned-inventory selection of goods.  Coupang procured its own merchandise from a network of local and international suppliers, and resold the items on its website and app.  The Company made money on these items by buying them in bulk at attractive prices and reselling them for more than the purchase price.  It procured these items either through an intermediary, such as a distributor or agent, or sourced them directly from manufacturers themselves.

121.    Coupang claimed that offering low priced merchandise has always been a central component of its business strategy.  In fact, the IPO Registration Statement stated that its business

model is founded on the principle that customers should not be forced to choose between quick delivery, low prices, and broad selection when engaged in e-commerce.

122.    Beginning in or around 2016, Coupang internally began implementing a price match system known as "lowest price matching" or "dynamic pricing," pursuant to which it automatically reduced the list price for an owned-inventory item to match or beat the price for the same item on competing platforms, such as E-Mart, 11th Street, or G-Market, among others.  For example, if the price of a box of crackers is offered for sale by Coupang for 800 won (the official currency of South Korea), but E-Mart offers that same box of crackers for 700 won as part of a sale, Coupang would automatically adjust the price of that box to 700 won, or less.  Coupang confirmed on its website in June 2019 that "the price [on Coupang] is changed to the lowest price by comparing the price of major domestic shopping malls in real time."

123.    Coupang's price match system, however, cannibalized its anticipated profit margin, or what it refers to internally as pure product profit ("PPP"), on any item subject to an automatic price reduction.  Coupang typically procured items for its owned-inventory collection at a fixed per-unit cost.  Therefore, the lower it sold the item on its platform, the less money it made on it. For example, if the per-unit price to purchase the box of crackers was 550 won, it would only make 150 won instead of 250 won by reducing the price from 800 won to 700 won due to its price match system.  The margin erosion in this simple example is magnified for higher-margin, more expensive items sold by Coupang.  In certain instances, Coupang's price match system forced it to sell goods *below* the cost at which it procured them, resulting in what Coupang referred to internally as a "negative gross profit" or "negative PPP."

### 2.      Coupang Forced Its Suppliers to Bear the Brunt of Its Lost Margins

124.    Soon after instituting its price match system—and experiencing the margin erosion described above—Coupang began using a number of coercive and unfair practices with its suppliers to recover, or minimize, its margin losses on price match items.

125.    First, beginning in 2017, Coupang began demanding that suppliers *raise* the price of their products on competing platforms when the price for that item automatically fell on Coupang due to a promotion on competing online platform.  If the supplier refused, Coupang coerced these suppliers to do so by threatening to stop selling the product on Coupang (a process Coupang referred to as going "de-live" or "blind"), refusing to continue purchasing from the supplier going forward, or implying as much.  On occasion, Coupang sent such suppliers the URL for each competing platform, where the same product was sold at a lower price, or a Microsoft Excel file containing the same, and applied further pressure by phone or KakaoTalk, a messaging app for smartphones popular in South Korea.  Many suppliers withdrew discount events on competing sites as a result.  This, of course, not only interfered with the supplier's business but also negatively impacted consumers by stifling price competition and maintaining higher prices.

126.    Second, beginning in March 2017, Coupang demanded that suppliers purchase advertising from Coupang to make up for margin losses caused by operation of Coupang's price match system.  If suppliers refused, Coupang coerced them to do so by threatening to stop selling the product on Coupang's marketplace, or refusing to purchase from them in the future.  Many suppliers purchased the specified advertising against their will.

127.    Third, beginning in January 2017, Coupang demanded that suppliers provide it with "sales incentive" payments for reaching sales goals, when none were specified in the annual sales contract.  Given what they stood to lose if they did not do so, many suppliers made the payments to Coupang even though they were under no obligation to do so.

128.    Finally, Coupang forced suppliers to cover the full amount of the discount attributable to downloadable coupons offered by Coupang at a series of promotional fairs in 2018 and early 2019.  Coupang required its suppliers to contractually agree to pay 100% of the discount costs Coupang decided to provide during the event (with Coupang responsible for 0%):



### 3.    Several Suppliers Reported Coupang's Improper Practices to the KFTC

129.    On or around June 5, 2019, LG Household & Healthcare ("LGHH"), a South Korean consumer goods company reported Coupang to the KFTC for violating South Korean antitrust laws.  In its complaint, LGHH accused Coupang of shifting the financial loss incurred from low product sales to LGHH and demanding that it supply the goods to Coupang at lower prices than its rivals or sell the goods to Coupang only.  It further alleged that Coupang forced LGHH to take back over 400,000 won worth of goods after it had ordered them, contrary to the no return clause in its contract, and stopped selling its goods in May 2019 after LGHH refused to comply with Coupang's demands.

130.    Then, in mid-June 2019, WeMakePrice ("WMP"), an e-commerce rival in South Korea, independently reported Coupang to the KFTC over suspected violations of South Korean antitrust laws.  WMP's suspicions were aroused when a large group of business partners primarily comprised of small merchants selling daily necessities suddenly refused to continue supplying

goods to WMP in May 2019, soon after it launched a marketing campaign promising customers cash rewards twice the difference in the price gap between certain goods sold by both WMP and Coupang.  The merchants told WMP that they were "practically forced to pay the losses Coupang incurred" if they did not withdraw from the WMP ad campaign.  WMP ultimately canceled the ad campaign to stem the loss of its business partners.

131.   Beginning on or around June 16, 2019, media sources began reporting on the complaints filed by LGHH and/or WMP.  The KFTC confirmed it was investigating the matters by no later than June 28, 2019.

### 4.   Coupang Forcefully Denied the Allegations

132.   Coupang forcefully denied the allegations of LGHH and WMP that made their way into the public domain.  In response to news articles reporting on the claims lodged by LGHH and WMP, a Coupang spokesperson declared "[t]hat is not how we operate our business" and "we never used illegal means."  The spokesperson also volunteered that "[i]t is impossible for us to pass the costs of discounts to our business partners under our inside policy."

133.   Citing "unnecessary misunderstandings" and "false reports" by LGHH and WMP, on June 28, 2019, Coupang published denials on its online newsroom.  With respect to LGHH's allegations, Coupang claimed that its negotiation over the pricing of goods from LGHH was "normal economic activity," without which customers would pay higher prices, and that its "demand to provide economic benefits" was simply the "sale of legitimate advertising products" permitted by its contract, which it analogized to "selling upcoming movie trailers as ads for a multiplex theater."  As for WMP's allegations, Coupang explained that "even if Coupang loses money, it automatically sets the lowest price" for its customers.  It further stated that this "does not cause suppliers to discontinue sales through competitive channels, but rather promotes price

competition." Coupang flatly denied that it asked suppliers to raise their prices elsewhere, stating "[that] is simply not true."

134.    On July 17, 2019, the KFTC conducted an on-site field inspection at Coupang's head office in Seoul, South Korea, where it collected documents and other evidence.

135.    Nevertheless, Coupang continued to misrepresent its business practices in the SEC filings made for its IPO. For example, the IPO Registration Statement told investors that "[w]e offer opportunities to advertise on our website and mobile applications" and informed investors that it provided the "lowest prices available in the Korean market" not because it coerced suppliers to raise prices elsewhere but because of its "procurement strategy," "cost efficiencies" from its scale, and "the creation of a system that rewards merchants for providing competitive prices."

### 5.    After a Thorough Investigation, the KFTC Fined Coupang for Mistreating Its Suppliers

136.    On August 11, 2021, the Commissioners of the KFTC held a full panel hearing to weigh the evidence collected during its investigation. The hearing was attended by Coupang senior executives, including Hanseung Kang and Sung Hwan Eum.

137.    On August 18, 2021, the KFTC issued a corrective order and fined Coupang approximately $2.8 million for forcing hundreds of suppliers—including large manufacturers such as LGHH, Yuhan Kimberly, Procter & Gamble, and Lego—to comply with unlawful sales and marketing demands that violated South Korea's Monopoly Regulation and Fair Trade Act, and the Act on Fair Transactions in Large Retail Businesses. The KFTC found that, between 2017 and September 2020, Coupang coerced its suppliers to (1) raise the price of products on competing e-commerce sites; (2) purchase advertisements to make up for lost margins; (3) bear the full cost of sale initiatives run by Coupang; and (4) pay sales incentives not specified in the annual sales contract.

138.     According to the KFTC, these findings of improper conduct were "significant" because it was the first time that an online distributor held a superior trade position relative to large manufacturers with popular products.  At the corresponding press briefing, Cho Hong-sun, a senior KFTC official emphasized that "[t]he case is noteworthy as it illustrates that an online retailer is now in a predominant position over large companies," something that the KFTC had only seen before with large department stores and supermarkets.  The KFTC also noted that the punitive fine against Coupang is "meaningful in uncovering and curbing new forms of unlawful trade."

139.     In calculating the appropriate penalty, the KFTC determined that each of the improper practices described above qualified as a "very serious violation" under applicable law given the fact that they were used with multiple counterparties over an extended period of time.  Notably, the KFTC reduced the total penalty by *sixty percent (60%)* because Coupang's liabilities exceeded its assets in 2020.  In other words, the penalty would have been *over $6 million* if Coupang did not have a negative working capital balance in 2020.

140.     In addition, the KFTC directed Coupang to notify all its suppliers that it was ordered by the KFTC to correct its improper practices to avoid further violations of South Korean antitrust laws by publishing such a notice signed by a Representative Director on its supplier-only website and sending a copy to all suppliers by email.

141.     Finally, the KFTC specifically warned that it would continue to monitor e-commerce platforms for antitrust law compliance.  In its original press release, the KFTC cautioned that "[g]oing forward, the [K]FTC plans to keep a close eye on whether unfair trade practices occur in the large-scale distribution industry, regardless of whether they are online or offline, and actively impose sanctions when violations are discovered."  At the corresponding press

briefing, the KFTC emphasized that it will continue to monitor the e-commerce sector, given that more than 70% of South Korea's population now uses online shopping platforms.

142.    In response, Coupang portrayed itself as the victim but issued an apology.  In a statement published on its online newsroom later in the day on August 19, 2021, Coupang remarked that the KFTC's sanctions were "regrettable" given that LGHH was supposedly the entity using its market power to discriminate against Coupang on supply prices.

143.    The story was covered extensively by the media.  Late on the evening of August 18, 2021, *Bloomberg* announced "Coupang Fined 3.3b Won for Violating S. Korean Antitrust Law."  Several publications pointed out that the findings made by the KFTC contributed to a growing body of evidence that Coupang is not the corporate citizen it claims to be.  For example, the *Korea Times* noted on August 19, 2021, that "KFTC's punitive measure adds to controversies surrounding Coupang in relation to corporate responsibility and joint prosperity with society," highlighting that "[t]he company has recently been criticized for poor industrial safety, with a blaze at its warehouse in July and deaths of overworked delivery workers."

144.    Undeterred by the KFTC's fine, several suppliers who provided merchandise that Coupang offers through its Rocket Delivery service, said that, in late 2021 and early 2022, Coupang began demanding that they enter into "verbal contracts" beyond their annual transaction contracts to guarantee a "pure product margin," or PPM, per product, by making up for any margin losses below the minimum level through advertising expenses.

145.    Similarly, CJ CheilJedang, a popular food manufacturer in South Korea, announced in November 2022 that Coupang stopped ordering one of its most popular products after it refused to pay margin rates demanded by the Company.

### B. Coupang Improperly Used Copyrighted Materials From Merchants Selling Goods on Its Platform But Claimed the Practice Benefited the Merchants

#### 1. Coupang Introduced The Item Market and Granted Itself Unrestricted Access to Its Merchants' Material

146.     While Coupang was expanding its direct sales and Rocket Delivery service in 2015 and 2016, it continued to offer a curated selection of special "deals" in its third-party marketplace. This model was not materially different from that already used by e-commerce platforms with established third-party markets, such as Gmarket and 11Street, and, as such, Coupang's marketplace suffered from a weak product assortment. And, like these other sites, Coupang would often yield the same item in a long list of product results due to the nature of the open market.

147.     In an effort to drive more traffic, in May 2016, Coupang decided to remodel its marketplace to phase out its deal business and replace it with a new platform for third-party merchants known as the "Item Market." Unlike other competing online marketplaces, the Item Market system used a single image to represent the same product offered by numerous merchants and selected an "Item Winner" from the group of merchants based on several criteria, including, most notably, price.

148.     Coupang advertised the Item Market system as a tool that was good for both buyers and sellers as it reduced search result clutter, decreased entry costs for small businesses by eliminating the need for expensive marketing or advertising, and promoted low prices.

149.     Like other e-commerce platforms, Coupang prepared and maintained a series of form contracts setting forth the terms and conditions that various constituents must agree to before they can transact with Coupang and/or use its platform, including the terms and conditions for all merchants known as the Terms and Conditions for Marketplace Use and Sales (as amended, the "Seller Terms and Conditions").

150.    Before the introduction of the Item Market system, merchants were individually responsible for managing their own intellectual property, including any copyrighted or protected materials they chose to upload to Coupang's marketplace to advertise their products, including, for example, trade names, logos, text, product images, and the like.   These works require significant time and money to create and can be a valuable attribute in a saturated distributed market where the same product is sold countless times.

151.    By July 2020, Coupang had amended its Seller Terms and Conditions several times. As amended, the Seller Terms and Conditions stated that Coupang can "freely use" protected works provided to it by each seller "regardless of the sales timing and whether or not it is sold" and further specified that "secondary works" generated from the seller's content "belong to [Coupang]."  This right that Coupang granted itself would "survive . . . the termination of these terms and conditions" and required the seller to indemnify Coupang for related liability.

### 2.    Merchants Raised Concerns and Coupang Denied Any Wrongdoing

152.    As demand for e-commerce skyrocketed during the COVID-19 pandemic, the Item Market became a popular platform for small businesses to sell their goods.  By the end of 2020, Coupang's Item Market hosted products from over 200,000 merchants, approximately 70% of which were considered "small businesses" with under $3 million in revenue per year.

153.    But as more small businesses joined—and became reliant on—the Item Market during the early days of the COVID-19 pandemic, a number of them began to notice that Coupang was using images that they created to market their own products to broker sales on behalf of *other* merchants in its Item Market and, thus, maximize Coupang's commissions at their expense.

154.    In July 2020, a group of business owners who participated in Coupang's Item Market reported Coupang to the KFTC for imposing unfair terms and conditions on sellers that

strip them of their protected works, including copyrighted and trademarked materials.  The KFTC is responsible for ensuring that terms and conditions imposed on consumers are fair.

155.    Rather than revise the provisions of its Seller Terms and Conditions on content use to respond to the concerns raised by the merchants who reported the issue to the KFTC, Coupang doubled down on its misappropriation of protected works to maximize its economic gain.

156.    Coupang approved a new version of the Seller Terms and Conditions effective August 1, 2020, which renewed the content use provisions from prior version of that document in full without material modification.

157.    Then, on September 18, 2020, Coupang released a statement in its newsroom, vigorously denying that its Seller Terms and Conditions were improper.  In it, Coupang stated: "Item Market Sales Terms and Conditions do not violate the Fair Trade Act or the Copyright Act." It added that "Sellers voluntarily entered Coupang's item market even though there are many open market channels" and "expressly agree" to the Seller Terms and Conditions which support the Item Market.  It also dismissed the media reports on its Seller Terms and Conditions as "based only on the unilateral claims of parties and agents who are currently preparing a lawsuit against us."

158.    In connection with its IPO, Coupang continued to represent that its Item Winner system was fair and beneficial for third-party merchants.  For example, Coupang proclaimed in its IPO Registration Statement that the technology used to power its Item Market  "helps merchants compete holistically on overall customer experience" and "rewards merchants for providing competitive prices."

**3.    The Market Learned That Coupang Was Improperly Using Protected Trade Content to the Detriment of Small Businesses**

159.    On April 4, 2021, the South Korean broadcast network, MBC, aired a segment on its investigative program "Straight," which featured an interview with a business owner who sold

goods on Coupang's Item Market by the name of Young-ho Jung. Mr. Jung had knowledge of facts that only someone in his position would have, such as his marketing strategy, the base cost of his product, the trademark and brand name he used, and images of his product on Coupang's Item Market. He explained that his sales plummeted and, after investigating, he determined that another seller was offering the same unique jumper that he sourced for 2,600 won less than him. Worst of all, the Item Winner used the photograph he created using a contract worker to model the jumper, with his brand mark still on the image. A price war ensued, which reduced his margin to zero. Mr. Jung was "without words" that someone else was "stealing" the image he worked so hard to create and market his product.

160.     The MBC Straight segment was so scathing that Coupang posted a statement in its newsroom in response to the story on April 6, 2021, in which it declared that "Coupang has not infringed on intellectual property rights such as photos of sellers." It also threatened that it would "take strict action" against MBC "after careful review" of its options.

161.     On the evening of May 3, 2021, a number of civic groups representing the interests of small business owners in South Korea held a press conference at the headquarters of the People's Solidarity for Participatory Democracy ("PSPD") to announce that they too reported Coupang to the KFTC for including excessively disadvantageous content use terms in its Seller Terms and Conditions, which violate South Korea's Act on Terms and Conditions. The groups highlighted the detrimental terms from the Seller Terms and Conditions, and pointed out that Coupang competitor Gmarket considers the use of images by other sellers as an act of copyright infringement. The story received widespread media attention between May 4, 2021, and May 5, 2021. For example, *The JoongAng*, a prominent South Korean newspaper, reported on May 5,

2021, that "Coupang was embroiled in suspicion of copyright theft and unfair terms and conditions."

162.    Immediately after news broke on May 4, 2021, Coupang issued another statement on its newsroom in which it reiterated "Item Market Sales Terms and Conditions do not violate the Fair Trade Act and Copyright Act" and baldly asserted that "[t]he representative image of the product refers to the image of the product itself, which is not subject to copyright by the seller."

163.    On May 10, 2021, however, PSPD issued a response refuting the points made in the statement that Coupang released on May 4, 2021.  Among other things, the response by PSPD explained that promotional photos can qualify as copyrighted work under South Korea's Copyright Act, and referred to "Supreme Court Decision 2005Do3130 Decided December 8, 2006" as one example where South Korea's highest court determined that photographs can gain copyright protection where "creative consideration" is shown.

164.    On July 21, 2021, the KFTC confirmed what the market already knew by then:  the Seller Terms and Conditions forced on small businesses by Coupang imposed "unfair" content use provisions that were "invalid" under South Korea's Copyright Act and Act on the Regulation of Terms and Conditions.  The KFTC required Coupang to modify the provisions that (1) allow Coupang to freely use the seller's content without restriction; and (2) exempt Coupang from legal responsibility for its use of such content.  Indeed, rather than granting Coupang unrestricted access to such content, the KFTC required Coupang to amend its Seller Terms and Conditions to provide that "copyright and ownership of product content provided by sellers are not transferred to [Coupang]" and that, going forward, "the image provided by the seller who has become an Item Winner will be used as a representative image of the same or similar products" absent extraordinary circumstances.

165.    Coupang took corrective action as a result.  It incorporated the revisions ordered by the KFTC in an update to its Seller Terms and Conditions that became effective on September 1, 2021.  At or around the same time, it also began using the image provided by the Item Winner, as opposed to another seller of the same product, in its Item Market.  In response to questions by members of the National Assembly's Political Affairs Committee on October 20, 2021, Hanseung Kang, the CEO of Coupang's South Korea subsidiary, stated that "the terms and conditions have been revised" and, "currently, the representative image is one provided by the Item Winner."

### C.    Coupang Manipulated Its Search Results to Favor Its PB Products Over Those Offered by Third Parties

166.    Since first launching a small number of household goods in 2017, Coupang's PB products have expanded to cover a variety of retail categories and brand names.  To create these PB products, Coupang sources the items and/or raw materials directly from businesses without going through a distributor or supplier, which minimizes the cost profile of such goods.  This not only allows Coupang to generally offer customers its PB items at a lower price than similar brand name goods, but it also presents a greater profit margin for Coupang relative to brand name goods it procures from suppliers for its owned-inventory selection.

167.    Leading up to the IPO in March 2021, Coupang accelerated its efforts to narrow its operating losses and, ultimately, become profitable ahead of the offering.  In doing so, Coupang significantly increased the number of highly profitable PB products in advance of its debut.[3]  By March 2021, Coupang's PB products comprised approximately 16 brands, including Gomgom (food), Comet (household goods), Home Planet (home appliances), and Caret (clothing), and encompassed nearly 4,200 items.

---

[3] In July 2020, Coupang also spun off its PB product business into a separate subsidiary known as Coupang Private Label Businesses ("CPLB").

168.    Between March 11, 2021, and June 28, 2021, Coupang offered its business partners several different advertising services, including homepage advertising and "keyword advertising." Unlike homepage advertising, which places advertisements or offers for various products at the top of certain pages within the Coupang ecosystem, keyword advertising leverages Coupang's search algorithm to expose select products at the top of the search results when consumers use certain keywords in Coupang's search function.

169.    During this same period of time, Coupang's PB products received the same type of exposure in search results as products that utilized keyword advertising.  For example, approximately 5 to 6 of the top 15 results for bottled water and toilet paper were PB products. Excluding third-party goods subject to advertising, nearly all of the top results were PB products.

170.    On June 28, 2021, the KFTC opened an investigation into whether Coupang manipulated its search algorithm to favor its PB products and conducted an on-site field inspection at Coupang's headquarters in Seoul, South Korea, that same day to collect evidence.

171.    On July 4, 2021, the *Korea Herald* revealed that the KFTC was investigating Coupang for manipulating the algorithm for its search function to favor its PB products above others in its online store.  Other publications, including the *Financial Times*, also reported on this news.  Analysts observed that "[the allegations] will definitely worsen Coupang's image.  It is a consumer-facing business.  The company needs to take them seriously and do something to regain consumer trust."

172.    As it became increasingly difficult to favor PB products through the search algorithm, Coupang began to devise new ways to achieve that same result.  In the absence of adjusting the algorithm to proactively favor PB products, products were exposed in Coupang's search results using a number of different criteria, including product reviews, sales performance,

51

user preference, and product information fidelity.  But the most important factor is the quantity and quality of reviews.  In particular, reviews selected as a "best review" have heavy influence on the product's search ranking.  Coupang obviously knew this and used it to its own advantage.

173.   Before July 2021, Coupang provided a service to sellers launching new products known as the "Coupang Experience Group," in which employees and Rocket WOW members were given the opportunity to try the products first and write reviews on them.  Coupang generally charged third-party sellers between 1.1 to 1.5 million won per 10 product reviews for this service.

174.   Recognizing the potential for this activity to influence search rankings for PB products, beginning around July 2021, Coupang began instructing employees to leave positive reviews for certain PB products *without charging CPLB any fee for doing so*.  In particular, employees were told to leave reviews with over 400 words, five or more photographs, and a perfect rating in order to secure a "best review."

175.   At the time of the activity described in the preceding paragraph, Coupang's policy was that any reviews written by its employees must clearly state that "this review was written by a Coupang or Coupang subsidiary employee" or the like, so customers can understand the potential for bias and make an informed decision with their money.  But even with this disclosure, customers remained unaware that Coupang was mobilizing its employees to write reviews, altering the exposure rankings of its PB products.

176.   On September 10, 2021, the KFTC held a symposium entitled "Fairness, Transparency and Competition Issues in Search Algorithms," during which KFTC Vice Chairman Jae-shin Kim announced that e-commerce platforms, such as Coupang would be regulated for prioritizing their own PB products over those of third-party businesses.  Vice Chairman Kim referenced Coupang when attacking e-commerce businesses engaged in improper search algorithm

manipulation and stated: "[W]e have been receiving complaints that major online shopping platforms placed their own private-brand (PB) products in a better place on their page, while pushing sellers' products down to the bottom." This announcement marked a significant expansion of the regulator's ongoing investigation. Later that same day, *Bloomberg* specifically noted that "Kim said there is also a continuing complaint that a major online shopping platform placed their own brand products in a better spot on its website."

177.    In response to the KFTC's tightening regulatory scrutiny, Coupang revised its practices yet again. In or around January 2022, employees and/or affiliates of employees began leaving the types of reviews Coupang previously requested without even identifying themselves as a "review . . . written by a Coupang or Coupang subsidiary employee." There were inexplicable purchasing patterns by users who received a "best review" of a PB product. For example, between January 10, 2022, and March 7, 2022, five users who left a "best review" for a PB product *all* purchased the *same* products as one another on or around the *same day*, including unusually large quantities of face masks, safety gloves, kitchen knives, cat food, table clocks, and device chargers.

178.    On March 14, 2022, PSPD announced that it reported Coupang to the KFTC for mobilizing its employees to issue positive reviews for Coupang's PB products, including reviews since January 2022 that failed to identify the user as a Coupang employee.

179.    Shortly after the PSPD held its press conference on March 15, 2022, Coupang released a statement in its newsroom which asserted that PSPD was making "false claims" and represented that "[a]ll employee reviews must clearly state that they were written by an employee." It added that "Coupang's product reviews are operated fairly and transparently."

180.    Several news outlets reported on these abuses in the following days. Among them, the *Korea Times* published a story on March 17, 2022, which explained that "[i]t is established

through studies that when competing products are similar, consumers tend to prefer brands with good consumer reviews" and "[c]onsumers who bought such products must have felt betrayed by the e-commerce platform [Coupang]."

181.    On March 21, 2022, news broke that the KFTC's Market Surveillance Bureau initiated an investigation into the claims raised by PSPD on March 15, 2022.  Normally, the KFTC assigns investigations to regional offices but will have offices in its headquarters, such as the Market Surveillance Bureau, lead an investigation when the social impact of the case is significant. The KFTC sent investigators to Coupang's headquarters in Seoul, South Korea, on May 17, 2022, to collect evidence relating to review manipulation, including documents.

182.    As of Coupang's most recent quarterly filing on May 10, 2023, the KFTC's investigations remain ongoing.

## IV.    COUPANG DID NOT MAINTAIN REQUIRED CONSUMER DISPUTE RESOLUTION STANDARDS

183.    Before the IPO, and throughout the Class Period, Coupang operated a complaint processing function for direct sales by Coupang as well as a dispute mediation center for transactions between customers and third-party merchants, in recognition of the fact that such disputes arose in the past and would likely continue to arise in the future, particularly as it continued to grow in size.

184.    Before the IPO, and throughout the Class Period, Coupang also maintained a "customer service center" as part of its online store.  The customer service center contained information regarding potential inquiries from customers on a range of topics, including issues that could potentially arise from direct sales by Coupang or sales by third-party merchants.  Before the IPO, however, Coupang did not maintain a written set of standards or procedures for resolving

disputes arising from the use of its online store and, thus, did not make any such standards or procedures available to customers in its customer service center, or anywhere else on its platform.

185.    Before August 2020, the KFTC opened an inquiry into Coupang's compliance with South Korea's Act on the Consumer Protection in Electronic Commerce (the "E-Commerce Act"), including whether it maintained standards and procedures for resolving disputes with its customers.

186.    Despite the pendency of the KFTC's investigation into Coupang's dispute resolution policies, and the absence of any such policy, Coupang repeatedly informed investors throughout the Class Period that it maintained appropriate policies and procedures.  Specifically, in the IPO Registration Statement, and in every periodic report it filed with the SEC thereafter, Coupang represented to investors that "[w]e have policies and procedures to protect both merchants and customers on our marketplace."

187.    On March 6, 2022, the KFTC issued a press release stating Coupang failed to maintain written dispute resolution rules that govern disputes between sellers and buyers accessible to consumers on its online store, in violation of South Korea's E-Commerce Act.  The KFTC also ordered Coupang to take corrective measures.  The KFTC's release noted that Coupang's practice "restricted" customers "from exercising their right to transparently and quickly resolve complaints or disputes experienced in the process of using the platform."

188.    Media sources soon took notice of the KFTC's announcement.  For example, on March 6, 2022, the *JoongAng* reported that the KFTC found that Coupang had "violated the E-Commerce Act and imposed corrective orders." Similarly, on March 7, 2022, the *Korea Financial Times* published an article which reported that Coupang "did not create specific standards for resolving consumer complaints and disputes."

## VIOLATIONS OF THE SECURITIES ACT

189.    The claims addressed in this section (Counts I, II and III) are brought pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act against the Securities Act Defendants on behalf of the Securities Act Class.   These sections of the Securities Act impose liability for any registration statement or prospectus that contains a materially false or misleading statement or omission, or any person who controls such a party, and do not require a showing of fraud or fraudulent intent.   Accordingly, Lead Plaintiffs assert that the Securities Act Defendants are strictly liable for materially false or misleading statements and omissions in the IPO Registration Statement and the S-8 Registration Statement.   In this Section, Lead Plaintiffs expressly disclaim any allegations that could be construed as alleging fraud, scienter, or recklessness in connection with these non-fraud claims.

## I.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE IPO REGISTRATION STATEMENT

190.    On March 11, 2021, Coupang filed the Prospectus deemed to be part of its IPO Registration Statement, and shares of its Class A common stock began trading on the NYSE.   The IPO Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and otherwise failed to make necessary disclosures required under the rules and regulations governing its preparation.

191.    The IPO Registration Statement described Coupang's relationship with its workers as positive:

> Founded in 2010, we are a home-grown technology company that has now become one of the three largest private sector employers in the nation.  We are a significant driver of new economic opportunities for the people of Korea.  As of December 31, 2020, we directly employed over 50,000 employees globally.  **We consider our employee relations to be positive**.

192.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, as explained above, Coupang failed to disclose that it: (i) continued exploiting the physical health of its frontline workers for its own economic gain; and (ii) maintained large fulfillment centers that failed to follow basic fire safety measures.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, severe injury or death, the loss of key assets, diminished business prospects, and/or harm to its reputation and its relationship with frontline workers.

193.    In his letter to investors included in the IPO Registration Statement, Defendant Kim stated:

> We believe it is both our opportunity and responsibility to challenge expectations about important social issues in our community.  In a market where the industry standard is a six-day workweek, we were the first to establish a five-day workweek for our drivers, even as we became the first major service to provide deliveries to customers seven days a week.  We also hire our drivers, Coupang Friends, directly, and provide them with paid time off and full benefits . . . .  We hope such examples demonstrate that innovation can unlock both **a better world for our customers and a better workplace for our employees**.

194.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Coupang failed to disclose that it: (i) continued exploiting the physical health of its frontline workers for its own economic gain; and (ii) maintained large fulfillment centers that failed to follow basic fire safety measures.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, severe injury or death, the loss of key assets, diminished business prospects, and/or harm to its reputation and its relationship with frontline workers.

195.    In his letter to shareholders, Defendant Kim also stated:

**We also support hundreds of thousands of suppliers and merchants who earn their living on Coupang** . . . .  Even during an unprecedented pandemic, as small businesses in the country suffered net losses, small businesses on Coupang saw their sales increase by over 50% through direct access to our services and customers nationwide.

196.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of supporting its suppliers and merchants, Coupang failed to disclose that it: (i) forced suppliers to *raise* the price of their goods on competing platforms to maintain its profit margins on those goods; (ii) forced suppliers to purchase services from Coupang against their will to mitigate its margin losses on their goods; (iii) misappropriated protected trade materials from merchants for its own economic gain; and (iv) manipulated search results to favor its PB products to the detriment of its suppliers and merchants.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and merchants.

197.    The IPO Registration Statement represented that Coupang "offered" its business partners advertising opportunities: "In addition to our e-commerce services, we also have a new offering in the online advertising space.  **We offer opportunities to advertise on our websites and mobile applications**, including through banner advertisements, joint promotions, and other programs."

198.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from "offering" its business partners "opportunities" to advertise on its platform, Coupang failed to disclose that it forced suppliers to purchase services from Coupang against their will, including advertising services, to mitigate its margin losses on their goods.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil

investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and customers.

199.    The IPO Registration Statement also stated that "**[t]he Company receives consideration from suppliers for various programs, including rebates, incentives, and discounts, as well as advertising services** provided on its website and mobile applications."

200.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in telling investors that it received consideration for these services, Coupang failed to disclose that it forced suppliers to purchase services from Coupang against their will, including advertising services, to mitigate its margin losses on their goods.   This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and customers.

201.    In the IPO Registration Statement, Coupang represented that it offered customers the "lowest prices" available in South Korea:

> In addition to superior experience, we believe **we also offer customers the lowest prices for our owned inventory selection**.
>
> *              *              *
>
> **Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items**.

202.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in informing investors that it offered the "lowest prices" in South Korea, Coupang failed to disclose that it forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang

from selling those goods for lower prices on its online store and, thus, maintain its profit margins. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

203.    The IPO Registration Statement also explained that Coupang was able to secure favorable pricing for customers due to its supplier relationships:

> **We have established an extensive network of suppliers** and merchants, **which enables us to** obtain a wide selection of merchandise while **maintaining low prices for customers**. We offer millions of SKUs under our owned-inventory selection, which requires significant procurement expertise from local and international suppliers. **We also source a large proportion of merchandise directly from manufacturers, which can result in better pricing for our customers**.

204.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from using its supplier relationships to secure low prices for customers, Coupang failed to disclose that it forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from selling those goods for lower prices on its online store and, thus, maintain its profit margins. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and customers.

205.    Similarly, the IPO Registration Statement explained:

> Our structural advantages from complete end-to-end integration, investments in technology, and scale economies **generate higher efficiencies that allow us to pass savings to customers in the form of lower prices**. We also source a large portion of merchandise directly from manufacturers, which can contribute **to better pricing for our customers**.

*        *        *

**In addition, cost efficiencies that we drive across our operations and economies generated from scale enable us to pass these savings on to our customers in the form of lower prices**.

206.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from using its supplier relationships to secure low prices for customers, Coupang failed to disclose that it forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from selling those goods for lower prices on its online store and, thus, maintain its profit margins.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

207.    The IPO Registration Statement explained the reasons for Coupang's past results as follows:

> Net retail sales for the year ended December 31, 2020 increased $5,258.0 million, or 90.9% (93.2% on a constant currency basis), as compared to the year ended December 31, 2019.  **The increase was primarily due to a 18.2% growth in our Active Customers in 2020, as well as 61.5% growth (63.5% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a continual increase in product selection and additional offerings provided to our customers**.

> \*        \*        \*

> Net retail sales for the year ended December 31, 2019 increased $1,988.0 million, or 52.3% (61.4% on a constant currency basis), as compared to the year ended December 31, 2018.  **The increase was primarily due to a 34.3% growth in our Active Customers in 2019, as well as 13.4% growth (20.1% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a general increase in product selection, in-stock availability, and offerings provided to our customers**.

208.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in attributing its past results to legitimate business practices, Coupang failed to disclose that it: (i)

forced suppliers to *raise* the price of their goods on competing platforms to maintain its profit margins on those goods; and (ii) forced suppliers to purchase services from Coupang against their will to mitigate its margin losses on their goods.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

209.    Similarly, the IPO Registration Statement also represented:

While we are focused on increasing our owned-inventory selection in these categories, we also expect to increase the number of merchants offering items in these categories in our marketplace. . . .  **Our success in increasing selection, including expansion into new categories, has contributed to the increase in total net revenues in 2020, which was up 93.1% on a constant currency basis over 2019**.

210.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in attributing its past results to legitimate business practices, Coupang failed to disclose that it: (i) forced suppliers to *raise* the price of their goods on competing platforms to maintain its profit margins on those goods; and (ii) forced suppliers to purchase services from Coupang against their will to mitigate its margin losses on their goods.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

211.    In the IPO Registration Statement, Coupang also represented that it provides its customers with personalized product promotions and recommendations:

**We have developed technology that enables us** to increase our operating efficiency through enhanced product merchandising and supply chain management, and **to provide our customers with personalized product promotions and recommendations**.

212.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, contrary to providing "personalized" search results, Coupang failed to disclose that it manipulated search results to favor its PB products.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

213.    In the IPO Registration Statement, Coupang also represented:

**Our search technology produces a simplified experience** that overcomes the lack of standardization and duplicate listings by leveraging our product knowledge graph to show more unique products in search results**, helping customers find, compare, and make purchasing decisions easily**.

*        *        *

The foundation of our search and recommendations is a product knowledge graph that organizes by product, not by seller, which enhances the customer experience. **Search and recommendation results** are aided by deep learning, data analytics, and image recognition among other inputs to **produce greater relevance and personalization**.  **As a result, we believe customers can identify what they want and the best value for that product easier through our tools than those on competitive services** that require customers to sort through multiple sellers to compare offers for a given product.

214.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, contrary to providing "personalized" search results, Coupang failed to disclose that it manipulated search results to favor its own PB products.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

215.    In the IPO Registration Statement, Coupang also represented that it helps third-party merchants to improve and grow their business:

[W]e focus on innovations around our end-to-end integrated network of technology and infrastructure, new offerings, and effective merchant solutions. **These investments help** us deliver superior selection, convenience, and low prices to customers while helping **merchants to improve and grow their businesses**.

216.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of helping merchants grow their businesses, Coupang failed to disclose that it: (i) misappropriated protected trade materials from merchants for its own economic gain; and (ii) manipulated search results to favor its own PB products to the detriment of its merchants. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with merchants.

217.    Similarly, Coupang stated that its matching technology helps third-party merchants enhance demand generation and compete holistically:

**We offer merchants of all sizes effective solutions to improve their customer experience and enhance demand generation.    Our customer-to-product matching technology** ingests millions of new merchant listings daily into our product knowledge graph, and, leveraging machine learning, **provides personalized product exposure to customers based on relevance and predicted customer experience**. **This technology helps merchants compete holistically on overall customer experience**.

\*        \*        \*

**Our matching technology** ingests millions of new merchant listings daily into a product knowledge graph, and, leveraging machine learning, **provides product exposure to customers based on relevance and predicted customer experience**, among other variables.    **This helps high-quality merchants compete holistically on overall customer experience**.    **This results in** lowering barriers to entry for merchants, and **improving experience for customers**, which encourages repeat purchasing that **generates higher sales for merchants**.

218.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of using its technology to help merchants increase sales and compete holistically, Coupang

failed to disclose that it: (i) misappropriated protected trade materials from merchants for its own economic gain; and (ii) manipulated search results to favor its own PB products to the detriment of its merchants.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants.

219.    These statements were also false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, contrary to providing "personalized" search results that help customers find products they want, Coupang failed to disclose that it manipulated search results to favor its own PB products.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

220.    The IPO Registration Statement also informed investors that Coupang uses a system that rewards merchants for providing competitive prices:

> Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items.  **We achieve this through** our diversified procurement strategy, which involves scaled procurement from local and international suppliers, direct sourcing from manufacturers, and **our creation of a system that rewards merchants for providing competitive prices**.

221.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of using its technology to reward merchants, Coupang failed to disclose that it: (i) misappropriated protected trade materials from merchants for its own economic gain; and (ii) manipulated search results to favor its own PB products to the detriment of its merchants.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants.

222.    In the IPO Registration Statement, Coupang also stated "**we have policies and procedures to protect both merchants and customers on our marketplace**."

223.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from having policies and procedures that protected merchants and customers, Coupang failed to disclose that it: (i) imposed terms and conditions on merchants that allowed it to misappropriate protected trade materials from merchants for its own economic gain; and (ii) failed to maintain required dispute resolution procedures accessible to consumers.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

224.    In the IPO Registration Statement, Coupang also represented that it had a culture of customer centricity:

> Since 2013, we have invested billions of dollars to build our owned-inventory selection, proprietary technology, and the largest B2C logistics footprint as compared to other product e-commerce players in Korea. . . .  **Those investments have been guided by our operating principles of putting customers at the center of everything we do** . . . . In our view, **our culture of customer centricity is our most important asset, and it drives us to relentlessly pursue operational excellence and innovation**.

> \*       \*       \*

> We are committed to delivering a "wow" experience to all of our customers every day.  **This commitment drives every aspect of our operations** and pushes us to redefine the standards of e-commerce.

225.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from putting customers at the center of everything it did, Coupang failed to disclose that it: (i) forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from

selling those goods for lower prices on its online store and, thus, maintain its profit margins; (ii) manipulated search results to favor its own PB products; and (iii) failed to maintain required dispute resolution procedures accessible to consumers. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

226. Item 11 of Form S-1 requires SEC registrants to furnish the information called for under Item 303 of SEC Regulation S-K, codified at 17 C.F.R. §229.303, in the section of the prospectus that forms part of the registration statement entitled Management's Discussion and Analysis of Financial Condition and Results of Operations (the "MD&A"). Among other things, Item 303 of Regulation S-K required that Coupang's IPO Registration Statement disclose known trends or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

227. In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties. In 2003, the SEC issued additional interpretative guidance relating to the requirements of Item 303, which provided, in pertinent part:

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication. The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.

228. Thus, the MD&A disclosures in Coupang's IPO Registration Statement were materially false and misleading because they failed to disclose the known uncertainties associated with Coupang's unsafe working conditions and the improper business activities deployed by

Coupang to maximize its profits.  As a result, these were events presenting known trends and uncertainties that were reasonably likely to—and, when they came to fruition, did—adversely affect Coupang's financial condition and results.  The omission of this information violated the disclosure obligation imposed by Item 303.

229.    In addition, Item 3 of Form S-1 requires SEC registrants to furnish the information called for under Item 105 of SEC Regulation S-K, codified at 17 C.F.R. §229.105, in the "Risk Factors" section of the prospectus that forms part of the registration statement.  Item 105 of Regulation S-K required that Coupang's IPO Registration Statement disclose the most significant matters that make an investment in Coupang risky.  Specifically, Item 105 requires registrants to:

> [w]here appropriate, provide under the caption "Risk Factors" a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky.  This discussion must be concise and organized logically.  Do not present risks that could apply generically to any registrant or any offering. Explain how the risk affects the registrant or the securities being offered.  Set forth each risk factor under a subcaption that adequately describes the risk. . . .  The registrant must furnish this information in plain English.

230.    Thus, the disclosures in the Risk Factors section of Coupang's IPO Registration Statement were materially false and misleading because they failed to disclose the known uncertainties associated with Coupang's unsafe working conditions and the improper business activities deployed by Coupang to maximize its profits.

## II.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE S-8 REGISTRATION STATEMENT

231.    On March 18, 2021, Coupang filed the S-8 Registration Statement.  The S-8 Registration Statement expressly incorporated certain past and future SEC filings by Coupang, including the IPO Registration Statement and the Prospectus contained therein, as well as "[a]ll documents filed by [Coupang] pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act on or after the date of this Registration Statement and prior to the filing of a post-effective

amendment to this Registration Statement that indicates that all securities offered have been sold or that deregisters all securities then remaining unsold." As of the filing of this Complaint, the Company has not filed such a post-effective amendment to the S-8 Registration Statement.

232.    The S-8 Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and otherwise failed to make necessary disclosures required under the rules and regulations governing its preparation.

233.    For example, the IPO Registration Statement, which was expressly incorporated by reference in the S-8 Registration, described Coupang's relationship with its workers as positive:

> Founded in 2010, we are a home-grown technology company that has now become one of the three largest private sector employers in the nation. We are a significant driver of new economic opportunities for the people of Korea. As of December 31, 2020, we directly employed over 50,000 employees globally. **We consider our employee relations to be positive**.

234.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, as explained above, Coupang failed to disclose that it: (i) continued exploiting the physical health of its frontline workers for its own economic gain; and (ii) maintained large fulfillment centers that failed to follow basic fire safety measures. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, severe injury or death, the loss of key assets, diminished business prospects, and/or harm to its reputation and its relationship with frontline workers.

235.    In his letter to investors included in the IPO Registration Statement, Defendant Kim stated:

> We believe it is both our opportunity and responsibility to challenge expectations about important social issues in our community. In a market where the industry standard is a six-day workweek, we were the first to establish a five-day workweek

for our drivers, even as we became the first major service to provide deliveries to customers seven days a week. We also hire our drivers, Coupang Friends, directly, and provide them with paid time off and full benefits . . . . We hope such examples demonstrate that innovation can unlock both **a better world for our customers and a better workplace for our employees**.

236. The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Coupang failed to disclose that it: (i) continued exploiting the physical health of its frontline workers for its own economic gain; and (ii) maintained large fulfillment centers that failed to follow basic fire safety measures. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, severe injury or death, the loss of key assets, diminished business prospects, and/or harm to its reputation and its relationship with frontline workers.

237. In his letter to shareholders, Defendant Kim also stated:

**We also support hundreds of thousands of suppliers and merchants who earn their living on Coupang** . . . . Even during an unprecedented pandemic, as small businesses in the country suffered net losses, small businesses on Coupang saw their sales increase by over 50% through direct access to our services and customers nationwide.

238. The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of supporting its suppliers and merchants, Coupang failed to disclose that it: (i) forced suppliers to *raise* the price of their goods on competing platforms to maintain its profit margins on those goods; (ii) forced suppliers to purchase services from Coupang against their will to mitigate its margin losses on their goods; (iii) misappropriated protected trade materials from merchants for its own economic gain; and (iv) manipulated search results to favor its PB products to the detriment of its suppliers and merchants. These practices exposed Coupang to a heightened, but

undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and merchants.

239.    The IPO Registration Statement represented that Coupang "offered" its business partners advertising opportunities: "In addition to our e-commerce services, we also have a new offering in the online advertising space.  **We offer opportunities to advertise on our websites and mobile applications**, including through banner advertisements, joint promotions, and other programs."

240.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from "offering" its business partners "opportunities" to advertise on its platform, Coupang failed to disclose that it forced suppliers to purchase services from Coupang against their will, including advertising services, to mitigate its margin losses on their goods.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and customers.

241.    The IPO Registration Statement also stated that "**[t]he Company receives consideration from suppliers for various programs, including rebates, incentives, and discounts, as well as advertising services** provided on its website and mobile applications."

242.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in telling investors that it received consideration for these services, Coupang failed to disclose that it forced suppliers to purchase services from Coupang against their will, including advertising services, to mitigate its margin losses on their goods.  This practice exposed Coupang to a

heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and customers.

243.    In the IPO Registration Statement, Coupang represented that it offered customers the "lowest prices" available in South Korea:

> In addition to superior experience, we believe **we also offer customers the lowest prices for our owned inventory selection**.

*       *       *

> **Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items**.

244.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in informing investors that it offered the "lowest prices" in South Korea, Coupang failed to disclose that it forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from selling those goods for lower prices on its online store and, thus, maintain its profit margins. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

245.    The IPO Registration Statement also explained that Coupang was able to secure favorable pricing for customers due to its supplier relationships:

> **We have established an extensive network of suppliers** and merchants, **which enables us to** obtain a wide selection of merchandise while **maintaining low prices for customers**.  We offer millions of SKUs under our owned-inventory selection, which requires significant procurement expertise from local and international suppliers.  **We also source a large proportion of merchandise directly from manufacturers, which can result in better pricing for our customers**.

246.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from using its supplier relationships to secure low prices for customers, Coupang failed to disclose that it forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from selling those goods for lower prices on its online store and, thus, maintain its profit margins.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and customers.

247.    Similarly, the IPO Registration Statement explained:

Our structural advantages from complete end-to-end integration, investments in technology, and scale economies **generate higher efficiencies that allow us to pass savings to customers in the form of lower prices**.  We also source a large portion of merchandise directly from manufacturers, which can contribute **to better pricing for our customers**.

*    *    *

**In addition, cost efficiencies that we drive across our operations and economies generated from scale enable us to pass these savings on to our customers in the form of lower prices**.

248.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from using its supplier relationships to secure low prices for customers, Coupang failed to disclose that it forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from selling those goods for lower prices on its online store and, thus, maintain its profit margins.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

73

249.    The IPO Registration Statement explained the reasons for Coupang's past results as follows:

> Net retail sales for the year ended December 31, 2020 increased $5,258.0 million, or 90.9% (93.2% on a constant currency basis), as compared to the year ended December 31, 2019. **The increase was primarily due to a 18.2% growth in our Active Customers in 2020, as well as 61.5% growth (63.5% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a continual increase in product selection and additional offerings provided to our customers**.

*    *    *

> Net retail sales for the year ended December 31, 2019 increased $1,988.0 million, or 52.3% (61.4% on a constant currency basis), as compared to the year ended December 31, 2018. **The increase was primarily due to a 34.3% growth in our Active Customers in 2019, as well as 13.4% growth (20.1% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a general increase in product selection, in-stock availability, and offerings provided to our customers**.

250.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in attributing its past results to legitimate business practices, Coupang failed to disclose that it: (i) forced suppliers to *raise* the price of their goods on competing platforms to maintain its profit margins on those goods; and (ii) forced suppliers to purchase services from Coupang against their will to mitigate its margin losses on their goods. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

251.    Similarly, the IPO Registration Statement also represented:

> While we are focused on increasing our owned-inventory selection in these categories, we also expect to increase the number of merchants offering items in these categories in our marketplace. . . . **Our success in increasing selection, including expansion into new categories, has contributed to the increase in**

74

**total net revenues in 2020, which was up 93.1% on a constant currency basis over 2019**.

252.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in attributing its past results to legitimate business practices, Coupang failed to disclose that it: (i) forced suppliers to *raise* the price of their goods on competing platforms to maintain its profit margins on those goods; and (ii) forced suppliers to purchase services from Coupang against their will to mitigate its margin losses on their goods.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

253.    In the IPO Registration Statement, Coupang also represented that it provides its customers with personalized product promotions and recommendations:

> **We have developed technology that enables us** to increase our operating efficiency through enhanced product merchandising and supply chain management, and **to provide our customers with personalized product promotions and recommendations**.

254.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, contrary to providing "personalized" search results, Coupang failed to disclose that it manipulated search results to favor its PB products.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

255.    In the IPO Registration Statement, Coupang also represented:

> **Our search technology produces a simplified experience** that overcomes the lack of standardization and duplicate listings by leveraging our product knowledge

graph to show more unique products in search results, **helping customers find, compare, and make purchasing decisions easily**.

*    *    *

The foundation of our search and recommendations is a product knowledge graph that organizes by product, not by seller, which enhances the customer experience. **Search and recommendation results** are aided by deep learning, data analytics, and image recognition among other inputs to **produce greater relevance and personalization. As a result, we believe customers can identify what they want and the best value for that product easier through our tools than those on competitive services** that require customers to sort through multiple sellers to compare offers for a given product.

256.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, contrary to providing "personalized" search results, Coupang failed to disclose that it manipulated search results to favor its own PB products. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

257.    In the IPO Registration Statement, Coupang also represented that it helps third-party merchants to improve and grow their business:

[W]e focus on innovations around our end-to-end integrated network of technology and infrastructure, new offerings, and effective merchant solutions. **These investments help** us deliver superior selection, convenience, and low prices to customers while helping **merchants to improve and grow their businesses**.

258.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of helping merchants grow their businesses, Coupang failed to disclose that it: (i) misappropriated protected trade materials from merchants for its own economic gain; and (ii) manipulated search results to favor its own PB products to the detriment of its merchants. These

practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with merchants.

259.    Similarly, Coupang stated that its matching technology helps third-party merchants enhance demand generation and compete holistically:

> **We offer merchants of all sizes effective solutions to improve their customer experience and enhance demand generation.  Our customer-to-product matching technology** ingests millions of new merchant listings daily into our product knowledge graph, and, leveraging machine learning, **provides personalized product exposure to customers based on relevance and predicted customer experience**.  **This technology helps merchants compete holistically on overall customer experience**.

*        *        *

> **Our matching technology** ingests millions of new merchant listings daily into a product knowledge graph, and, leveraging machine learning, **provides product exposure to customers based on relevance and predicted customer experience**, among other variables.  **This helps high-quality merchants compete holistically on overall customer experience**.  **This results in** lowering barriers to entry for merchants, and **improving experience for customers**, which encourages repeat purchasing that **generates higher sales for merchants**.

260.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of using its technology to help merchants increase sales and compete holistically, Coupang failed to disclose that it: (i) misappropriated protected trade materials from merchants for its own economic gain; and (ii) manipulated search results to favor its own PB products to the detriment of its merchants.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants.

261.    These statements were also false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, contrary to providing "personalized" search results that help customers find products they want, Coupang failed to

disclose that it manipulated search results to favor its own PB products.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

262.    The IPO Registration Statement also informed investors that Coupang uses a system that rewards merchants for providing competitive prices:

> Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items.  **We achieve this through** our diversified procurement strategy, which involves scaled procurement from local and international suppliers, direct sourcing from manufacturers, and **our creation of a system that rewards merchants for providing competitive prices**.

263.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of using its technology to reward merchants, Coupang failed to disclose that it: (i) misappropriated protected trade materials from merchants for its own economic gain; and (ii) manipulated search results to favor its own PB products to the detriment of its merchants.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants.

264.    In the IPO Registration Statement, Coupang also stated "**we have policies and procedures to protect both merchants and customers on our marketplace**."

265.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from having policies and procedures that protected merchants and customers, Coupang failed to disclose that it: (i) imposed terms and conditions on merchants that allowed it to misappropriate protected trade materials from merchants for its own economic gain; and (ii) failed to maintain required dispute resolution procedures accessible to consumers.  These practices exposed Coupang

to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

266.    In the IPO Registration Statement, Coupang also represented that it had a culture of customer centricity:

> Since 2013, we have invested billions of dollars to build our owned-inventory selection, proprietary technology, and the largest B2C logistics footprint as compared to other product e-commerce players in Korea. . . .  **Those investments have been guided by our operating principles of putting customers at the center of everything we do** . . . .  In our view, **our culture of customer centricity is our most important asset, and it drives us to relentlessly pursue operational excellence and innovation**.

*      *      *

> We are committed to delivering a "wow" experience to all of our customers every day.  **This commitment drives every aspect of our operations** and pushes us to redefine the standards of e-commerce.

267.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from putting customers at the center of everything it did, Coupang failed to disclose that it: (i) forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from selling those goods for lower prices on its online store and, thus, maintain its profit margins; (ii) manipulated search results to favor its own PB products; and (iii) failed to maintain required dispute resolution procedures accessible to consumers.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

268.    On May 13, 2021, Coupang filed with the SEC a quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q 2021 Form 10-Q") pursuant to Section 13 and/or 15(d)

of the Exchange Act, which the S-8 Registration Statement incorporated by reference.  The 1Q 2021 Form 10-Q stated: "**We have policies and procedures to protect both merchants and customers on our marketplace**."

269.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from having policies and procedures that protected customers, Coupang failed to disclose that it failed to maintain required dispute resolution procedures accessible to consumers.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with customers.

270.    On August 16, 2021, Coupang filed with the SEC a quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q 2021 Form 10-Q") pursuant to Section 13 and/or 15(d) of the Exchange Act, which the S-8 Registration Statement incorporated by reference.  The 2Q 2021 Form 10-Q stated: "**We have policies and procedures to protect both merchants and customers on our marketplace**."

271.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from having policies and procedures that protected customers, Coupang failed to disclose that it failed to maintain required dispute resolution procedures accessible to consumers.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with customers.

272.    On November 12, 2021, Coupang filed with the SEC a quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q 2021 Form 10-Q") pursuant to Section 13 and/or 15(d) of the Exchange Act, which the S-8 Registration Statement incorporated by reference.

The 3Q 2021 Form 10-Q stated: "**We have policies and procedures to protect both merchants and customers on our marketplace**."

273.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from having policies and procedures that protected customers, Coupang failed to disclose that it failed to maintain required dispute resolution procedures accessible to consumers.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with customers.

274.    On March 3, 2022, Coupang filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 Form 10-K") pursuant to Section 13 and/or 15(d) of the Exchange Act, which the S-8 Registration Statement incorporated by reference.  In the 2021 Form 10-K, the Company stated:

> **We also continue to** refine our business intelligence systems to **provide more personalized search results and recommendations to help existing customers find and buy more of what they need on Coupang**.

275.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in stating that it used its resources to provide "more personalized" search results that help customers find what they need, Coupang failed to disclose that it: (i) manipulated search results to favor its own PB products; and (ii) failed to maintain required dispute resolution procedures accessible to consumers.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with customers.

276.    Similarly, the 2021 10-K stated:

We are committed to delivering a "wow" experience to all of our customers every day. **This commitment drives every aspect of our operations** and pushes us to redefine the standards of e-commerce.

277.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from putting customers at the center of everything it did, Coupang failed to disclose that it: (i) manipulated search results to favor its own PB products; and (ii) failed to maintain required dispute resolution procedures accessible to consumers. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with merchants and customers.

278.    With respect to Coupang's merchants, the 2021 10-K provided:

**We offer merchants of all sizes effective solutions to improve their customer experience and enhance demand generation. Our customer-to-product matching technology** ingests millions of new merchant listings daily into our product knowledge graph, and, leveraging machine learning, **provides personalized product exposure to customers based on relevance and predicted customer experience**. **This technology helps merchants compete holistically on overall customer experience**.

279.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in stating that it used its technology to "enhance demand generation" for merchants and help such merchants "compete holistically," Coupang failed to disclose that it manipulated search results to favor its own PB products to the detriment of its merchants. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with merchants.

280.    The 2021 10-K also represented: "**We have policies and procedures to protect** both merchants and **customers on our marketplace**."

281.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from having policies and procedures that protected customers, Coupang failed to disclose that it failed to maintain required dispute resolution procedures accessible to consumers.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with customers.

282.    Item 11 of Form S-1 requires SEC registrants to furnish the information called for under Item 303 of SEC Regulation S-K, codified at 17 C.F.R. §229.303, in the section of the prospectus that forms part of the registration statement entitled Management's Discussion and Analysis of Financial Condition and Results of Operations (the "MD&A").  Among other things, Item 303 of Regulation S-K required that Coupang's IPO Registration Statement disclose known trends or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

283.    In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties.  In 2003, the SEC issued additional interpretative guidance relating to the requirements of Item 303, which provided, in pertinent part:

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication.  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.

284.    Thus, the MD&A disclosures in Coupang's IPO Registration Statement were materially false and misleading because they failed to disclose the known uncertainties associated with Coupang's unsafe working conditions and the improper business activities deployed by

Coupang to maximize its profits. As a result, these were events presenting known trends and uncertainties that were reasonably likely to—and, when they came to fruition, did—adversely affect Coupang's financial condition and results. The omission of this information violated the disclosure obligation imposed by Item 303.

285.    In addition, Item 3 of Form S-1 requires SEC registrants to furnish the information called for under Item 105 of SEC Regulation S-K, codified at 17 C.F.R. §229.105, in the "Risk Factors" section of the prospectus that forms part of the registration statement. Item 105 of Regulation S-K required that Coupang's IPO Registration Statement disclose the most significant matters that make an investment in Coupang risky. Specifically, Item 105 requires registrants to:

> [w]here appropriate, provide under the caption "Risk Factors" a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky. This discussion must be concise and organized logically. Do not present risks that could apply generically to any registrant or any offering. Explain how the risk affects the registrant or the securities being offered. Set forth each risk factor under a subcaption that adequately describes the risk. . . . The registrant must furnish this information in plain English.

286.    Thus, the disclosures in the Risk Factors section of Coupang's IPO Registration Statement were materially false and misleading because they failed to disclose the known uncertainties associated with Coupang's unsafe working conditions and the improper business activities deployed by Coupang to maximize its profits.

## COUNT I

## FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AGAINST THE SECURITIES ACT DEFENDANTS

287.    Lead Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

288.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Securities Act Class against the Securities Act Defendants.

289.    This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 11.  Any allegation or implication of fraud or fraudulent intent is hereby expressly disclaimed and not incorporated by reference in this Count.

290.    The IPO Registration Statement and S-8 Registration Statement contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein.

291.    The Securities Act Defendants were responsible for the contents and dissemination of the IPO Registration Statement.  Coupang is the registrant for the Class A common stock issued pursuant to the IPO Registration Statement and S-8 Registration Statement.  The Securities Act Defendants were responsible for the contents and dissemination of the IPO Registration Statement and the Securities Act Individual Defendants were responsible for the contents and dissemination of the S-8 Registration Statement.  Each of the Securities Act Individual Defendants signed or authorized the signing of the IPO Registration Statement and the S-8 Registration Statement on their own behalf.  The Underwriter Defendants marketed and underwrote the IPO and sold the majority of Coupang Class A common stock issued in the IPO to the Securities Act Class.

292.    As the issuer of the shares, Coupang is strictly liable to the Securities Act Class for the material misstatements and omissions in the IPO Registration Statement and S-8 Registration Statement.  Signatories of the IPO Registration Statement and the S-8 Registration Statement are also strictly liable to the Securities Act Class for such material misstatements and omissions.  None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the IPO Registration Statement were complete, accurate, or non-misleading.  None of the Securities Act Individual Defendants made a reasonable investigation or

possessed reasonable grounds to believe that the statements in the S-8 Registration Statement were complete, accurate, or non-misleading.

293.    Lead Plaintiffs and the members of the Securities Act Class purchased or otherwise acquired Coupang securities pursuant and/or traceable to the IPO Registration Statement and S-8 Registration Statement.

294.    Lead Plaintiffs and the Securities Act Class have sustained substantial damages. The value of Coupang's Class A common stock has declined substantially subsequent to the violations described herein.

## COUNT II

### FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT AGAINST COUPANG, THE SECURITIES ACT INDIVIDUAL DEFENDANTS, AND THE BROKER-DEALER DEFENDANTS

295.    Lead Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

296.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Securities Act Class against Coupang, the Securities Act Individual Defendants, and the Broker-Dealer Defendants.

297.    This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 12(a)(2).  Any allegation or implication of fraud or fraudulent intent is hereby expressly disclaimed and not incorporated by reference in this Count.

298.    Each of the defendants named in this Count were sellers, offerors, or solicitors of purchases of the Company's common stock pursuant to the defective prospectuses which respectively formed in relevant part the IPO Registration Statement.  The actions of solicitation by these defendants include participating in the preparation of the false and misleading prospectuses and marketing the common stock to investors, including members of the Securities Act Class.

299.    The prospectuses contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

300.    Each of the defendants named in this Count owed members of the Securities Act Class who purchased or otherwise acquired Coupang common stock pursuant to the prospectuses issued in connection with the IPO Registration Statement a duty to make a reasonable and diligent investigation of the statements contained in the prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  By virtue of the failure to exercise reasonable care by each such defendant, the prospectuses contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

301.    Members of the Securities Act Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the prospectuses issued in connection with IPO at the time they purchased or otherwise acquired Coupang Class A common stock.

302.    Lead Plaintiffs Teachers' Retirement System of the City of New York, Teachers' Retirement System of the City of New York Variable Annuity Program, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Employees' Retirement System, and New York City Deferred Compensation Plan purchased shares of Coupang's Class A common stock in the IPO pursuant to the Prospectus.

303.    By reason of the conduct alleged herein, the defendants named in this Count violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, members of the Securities Act Class who purchased or otherwise acquired Coupang common stock

pursuant to the prospectuses issued in connection with the IPO sustained substantial damages in connection therewith. Accordingly, members of the Securities Act Class who hold the Class A common stock issued pursuant to the prospectuses issued in connection with the IPO have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Members of the Securities Act Class who have sold their Coupang common stock seek damages to the extent permitted by law.

**COUNT III**

**FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT AGAINST COUPANG AND THE SECURITIES ACT INDIVIDUAL DEFENDANTS**

304. Lead Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

305. This Count is brought under Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Securities Act Class against defendants Coupang and the Securities Act Individual Defendants.

306. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15. Any allegation or implication of fraud or fraudulent intent is hereby expressly disclaimed and not incorporated by reference in this Count.

307. As detailed herein, each of the defendants committed primary violations of the Securities Act by engaging in conduct in contravention of Section 11 of the Securities Act.

308. The Securities Act Individual Defendants were each control persons of Coupang by virtue of their positions as directors, senior officers, and/or significant shareholders of the Company. They each had direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of the Company. The Company also controlled the

Individual Defendants, given the influence and control the Company possessed and exerted over the Individual Defendants and all its employees.

309.    In addition, Defendant Kim beneficially held approximately 76% of the voting power over Coupang following the IPO due to his ownership of Class B common stock.  As a result, Kim was able to exercise significant influence over all matters requiring approval by Coupang's shareholders, including the election of directors and the approval of significant corporate transactions.

310.    By reason of the conduct alleged herein, the Company and the Securities Act Individual Defendants violated Section 15 of the Securities Act, and Lead Plaintiffs and the Securities Act Class have suffered harm as a result.

<u>**VIOLATIONS OF THE EXCHANGE ACT**</u>

## I.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    The IPO Materials

311.    The Class Period begins on March 11, 2021, the day Coupang filed the Prospectus deemed to be part of its IPO Registration Statement, and shares of its Class A common stock began trading on the NYSE.  The IPO Registration Statement described Coupang's relationship with its workers as positive:

> Founded in 2010, we are a home-grown technology company that has now become one of the three largest private sector employers in the nation.  We are a significant driver of new economic opportunities for the people of Korea.  As of December 31, 2020, we directly employed over 50,000 employees globally.  **We consider our employee relations to be positive**.

312.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, as explained above, Coupang failed to disclose that it: (i) continued exploiting the physical health of its frontline workers for its own economic gain; and (ii) maintained large fulfillment centers

that failed to follow basic fire safety measures.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, severe injury or death, the loss of key assets, diminished business prospects, and/or harm to its reputation and its relationship with frontline workers.

313.    In his letter to investors included in the IPO Registration Statement, Defendant Kim stated:

> We believe it is both our opportunity and responsibility to challenge expectations about important social issues in our community.  In a market where the industry standard is a six-day workweek, we were the first to establish a five-day workweek for our drivers, even as we became the first major service to provide deliveries to customers seven days a week.  We also hire our drivers, Coupang Friends, directly, and provide them with paid time off and full benefits . . . .  We hope such examples demonstrate that innovation can unlock both **a better world for our customers and a better workplace for our employees**.

314.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Coupang failed to disclose that it: (i) continued exploiting the physical health of its frontline workers for its own economic gain; and (ii) maintained large fulfillment centers that failed to follow basic fire safety measures.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, severe injury or death, the loss of key assets, diminished business prospects, and/or harm to its reputation and its relationship with frontline workers.

315.    In his letter to shareholders, Defendant Kim also stated:

> **We also support hundreds of thousands of suppliers and merchants who earn their living on Coupang** . . . .  Even during an unprecedented pandemic, as small businesses in the country suffered net losses, small businesses on Coupang saw their sales increase by over 50% through direct access to our services and customers nationwide.

316.     The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of supporting its suppliers and merchants, Coupang failed to disclose that it: (i) forced suppliers to *raise* the price of their goods on competing platforms to maintain its profit margins on those goods; (ii) forced suppliers to purchase services from Coupang against their will to mitigate its margin losses on their goods; (iii) misappropriated protected trade materials from merchants for its own economic gain; and (iv) manipulated search results to favor its PB products to the detriment of its suppliers and merchants.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and merchants.

317.     The IPO Registration Statement represented that Coupang "offered" its business partners advertising opportunities: "In addition to our e-commerce services, we also have a new offering in the online advertising space.  **We offer opportunities to advertise on our websites and mobile applications**, including through banner advertisements, joint promotions, and other programs."

318.     The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from "offering" its business partners "opportunities" to advertise on its platform, Coupang failed to disclose that it forced suppliers to purchase services from Coupang against their will, including advertising services, to mitigate its margin losses on their goods.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and customers.

319.    The IPO Registration Statement also stated that "**[t]he Company receives consideration from suppliers for various programs, including rebates, incentives, and discounts, as well as advertising services** provided on its website and mobile applications."

320.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in telling investors that it received consideration for these services, Coupang failed to disclose that it forced suppliers to purchase services from Coupang against their will, including advertising services, to mitigate its margin losses on their goods.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and customers.

321.    In the IPO Registration Statement, Coupang represented that it offered customers the "lowest prices" available in South Korea:

> In addition to superior experience, we believe **we also offer customers the lowest prices for our owned inventory selection**.

*     *     *

> **Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items**.

322.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in informing investors that it offered the "lowest prices" in South Korea, Coupang failed to disclose that it forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from selling those goods for lower prices on its online store and, thus, maintain its profit margins. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other

criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

323.     The IPO Registration Statement also explained that Coupang was able to secure favorable pricing for customers due to its supplier relationships:

> **We have established an extensive network of suppliers** and merchants, **which enables us to** obtain a wide selection of merchandise while **maintaining low prices for customers**.  We offer millions of SKUs under our owned-inventory selection, which requires significant procurement expertise from local and international suppliers.  **We also source a large proportion of merchandise directly from manufacturers, which can result in better pricing for our customers**.

324.     The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from using its supplier relationships to secure low prices for customers, Coupang failed to disclose that it forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from selling those goods for lower prices on its online store and, thus, maintain its profit margins.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers and customers.

325.     Similarly, the IPO Registration Statement explained:

> Our structural advantages from complete end-to-end integration, investments in technology, and scale economies **generate higher efficiencies that allow us to pass savings to customers in the form of lower prices.**  We also source a large portion of merchandise directly from manufacturers, which can contribute **to better pricing for our customers**.

*     *     *

> **In addition, cost efficiencies that we drive across our operations and economies generated from scale enable us to pass these savings on to our customers in the form of lower prices**.

326.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from using its supplier relationships to secure low prices for customers, Coupang failed to disclose that it forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from selling those goods for lower prices on its online store and, thus, maintain its profit margins. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

327.    The IPO Registration Statement explained the reasons for Coupang's past results as follows:

> Net retail sales for the year ended December 31, 2020 increased $5,258.0 million, or 90.9% (93.2% on a constant currency basis), as compared to the year ended December 31, 2019. **The increase was primarily due to a 18.2% growth in our Active Customers in 2020, as well as 61.5% growth (63.5% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a continual increase in product selection and additional offerings provided to our customers**.
>
> *      *      *
>
> Net retail sales for the year ended December 31, 2019 increased $1,988.0 million, or 52.3% (61.4% on a constant currency basis), as compared to the year ended December 31, 2018. **The increase was primarily due to a 34.3% growth in our Active Customers in 2019, as well as 13.4% growth (20.1% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a general increase in product selection, in-stock availability, and offerings provided to our customers**.

328.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in attributing its past results to legitimate business practices, Coupang failed to disclose that it: (i) forced suppliers to *raise* the price of their goods on competing platforms to maintain its profit margins on those goods; and (ii) forced suppliers to purchase services from Coupang against their

94

will to mitigate its margin losses on their goods. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

329.    Similarly, the IPO Registration Statement also represented:

> While we are focused on increasing our owned-inventory selection in these categories, we also expect to increase the number of merchants offering items in these categories in our marketplace. . . . **Our success in increasing selection, including expansion into new categories, has contributed to the increase in total net revenues in 2020, which was up 93.1% on a constant currency basis over 2019**.

330.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in attributing its past results to legitimate business practices, Coupang failed to disclose that it: (i) forced suppliers to *raise* the price of their goods on competing platforms to maintain its profit margins on those goods; and (ii) forced suppliers to purchase services from Coupang against their will to mitigate its margin losses on their goods. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

331.    In the IPO Registration Statement, Coupang also represented that it provides its customers with personalized product promotions and recommendations:

> **We have developed technology that enables us** to increase our operating efficiency through enhanced product merchandising and supply chain management, and **to provide our customers with personalized product promotions and recommendations**.

332.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because,

contrary to providing "personalized" search results, Coupang failed to disclose that it manipulated search results to favor its PB products.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

333.    In the IPO Registration Statement, Coupang also represented:

> **Our search technology produces a simplified experience** that overcomes the lack of standardization and duplicate listings by leveraging our product knowledge graph to show more unique products in search results**, helping customers find, compare, and make purchasing decisions easily**.

*        *        *

> The foundation of our search and recommendations is a product knowledge graph that organizes by product, not by seller, which enhances the customer experience.  **Search and recommendation results** are aided by deep learning, data analytics, and image recognition among other inputs to **produce greater relevance and personalization**.  **As a result, we believe customers can identify what they want and the best value for that product easier through our tools than those on competitive services** that require customers to sort through multiple sellers to compare offers for a given product.

334.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, contrary to providing "personalized" search results, Coupang failed to disclose that it manipulated search results to favor its own PB products.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

335.    In the IPO Registration Statement, Coupang also represented that it helps third-party merchants to improve and grow their business:

> [W]e focus on innovations around our end-to-end integrated network of technology and infrastructure, new offerings, and effective merchant solutions.  **These investments help** us deliver superior selection, convenience, and low prices to

customers while helping **merchants to improve and grow their businesses.**

336.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of helping merchants grow their businesses, Coupang failed to disclose that it: (i) misappropriated protected trade materials from merchants for its own economic gain; and (ii) manipulated search results to favor its own PB products to the detriment of its merchants.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with merchants.

337.    Similarly, Coupang stated that its matching technology helps third-party merchants enhance demand generation and compete holistically:

> **We offer merchants of all sizes effective solutions to improve their customer experience and enhance demand generation.  Our customer-to-product matching technology** ingests millions of new merchant listings daily into our product knowledge graph, and, leveraging machine learning, **provides personalized product exposure to customers based on relevance and predicted customer experience**.  **This technology helps merchants compete holistically on overall customer experience**.
>
> > \*        \*        \*
>
> **Our matching technology** ingests millions of new merchant listings daily into a product knowledge graph, and, leveraging machine learning, **provides product exposure to customers based on relevance and predicted customer experience**, among other variables.  **This helps high-quality merchants compete holistically on overall customer experience**.  **This results in** lowering barriers to entry for merchants, and **improving experience for customers**, which encourages repeat purchasing that **generates higher sales for merchants**.

338.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of using its technology to help merchants increase sales and compete holistically, Coupang failed to disclose that it: (i) misappropriated protected trade materials from merchants for its own economic gain; and (ii) manipulated search results to favor its own PB products to the detriment

of its merchants.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants.

339.    These statements were also false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, contrary to providing "personalized" search results that help customers find products they want, Coupang failed to disclose that it manipulated search results to favor its own PB products.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

340.    The IPO Registration Statement also informed investors that Coupang uses a system that rewards merchants for providing competitive prices:

> Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items.  **We achieve this through** our diversified procurement strategy, which involves scaled procurement from local and international suppliers, direct sourcing from manufacturers, and **our creation of a system that rewards merchants for providing competitive prices**.

341.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, instead of using its technology to reward merchants, Coupang failed to disclose that it: (i) misappropriated protected trade materials from merchants for its own economic gain; and (ii) manipulated search results to favor its own PB products to the detriment of its merchants.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants.

342.    In the IPO Registration Statement, Coupang also stated "**we have policies and procedures to protect both merchants and customers on our marketplace**."

343.     The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from having policies and procedures that protected merchants and customers, Coupang failed to disclose that it: (i) imposed terms and conditions on merchants that allowed it to misappropriate protected trade materials from merchants for its own economic gain; and (ii) failed to maintain required dispute resolution procedures accessible to consumers.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

344.     In the IPO Registration Statement, Coupang also represented that it had a culture of customer centricity:

> Since 2013, we have invested billions of dollars to build our owned-inventory selection, proprietary technology, and the largest B2C logistics footprint as compared to other product e-commerce players in Korea. . . .  **Those investments have been guided by our operating principles of putting customers at the center of everything we do** . . . .  In our view, **our culture of customer centricity is our most important asset, and it drives us to relentlessly pursue operational excellence and innovation**.
>
> *     *     *
>
> We are committed to delivering a "wow" experience to all of our customers every day.  **This commitment drives every aspect of our operations** and pushes us to redefine the standards of e-commerce.

345.     The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from putting customers at the center of everything it did, Coupang failed to disclose that it: (i) forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from selling those goods for lower prices on its online store and, thus, maintain its profit margins; (ii) manipulated search results to favor its own PB products; and (iii) failed to maintain required

dispute resolution procedures accessible to consumers.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

346.    Item 11 of Form S-1 requires SEC registrants to furnish the information called for under Item 303 of SEC Regulation S-K, codified at 17 C.F.R. §229.303, in the section of the prospectus that forms part of the registration statement entitled Management's Discussion and Analysis of Financial Condition and Results of Operations (the "MD&A").  Among other things, Item 303 of Regulation S-K required that Coupang's IPO Registration Statement disclose known trends or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

347.    In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties.  In 2003, the SEC issued additional interpretative guidance relating to the requirements of Item 303, which provided, in pertinent part:

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication.  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.

348.    Thus, the MD&A disclosures in Coupang's IPO Registration Statement were materially false and misleading because they failed to disclose the known uncertainties associated with Coupang's unsafe working conditions and the improper business activities deployed by Coupang to maximize its profits.  As a result, these were events presenting known trends and uncertainties that were reasonably likely to—and, when they came to fruition, did—adversely

affect Coupang's financial condition and results. The omission of this information violated the disclosure obligation imposed by Item 303.

349. In addition, Item 3 of Form S-1 requires SEC registrants to furnish the information called for under Item 105 of SEC Regulation S-K, codified at 17 C.F.R. §229.105, in the "Risk Factors" section of the prospectus that forms part of the registration statement. Item 105 of Regulation S-K required that Coupang's IPO Registration Statement disclose the most significant matters that make an investment in Coupang risky. Specifically, Item 105 requires registrants to:

> [w]here appropriate, provide under the caption "Risk Factors" a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky. This discussion must be concise and organized logically. Do not present risks that could apply generically to any registrant or any offering. Explain how the risk affects the registrant or the securities being offered. Set forth each risk factor under a subcaption that adequately describes the risk. . . . The registrant must furnish this information in plain English.

350. Thus, the disclosures in the Risk Factors section of Coupang's IPO Registration Statement were materially false and misleading because they failed to disclose the known uncertainties associated with Coupang's unsafe working conditions and the improper business activities deployed by Coupang to maximize its profits.

**B.     March 11, 2011 *Bloomberg Markets* Interview**

351. On March 11, 2021, Bom Kim appeared for an interview on *Bloomberg Markets* in connection with its IPO. The host noted that "you've had had several deaths among delivery and logistics employees who are allegedly overworked, overnight working," and asked "how does the company answer to this issue?" Defendant Kim responded as follows:

> You know it's heartbreaking, it's a tragedy whenever there's a passing of one of our family members, but here's the important context: we have hundreds of thousands of people who work in our operation and the fulfillment and delivery, and we've had one work-related death in the past year. But one is too many, and we have to continue to do better. **We are actually leading the industry on this front** . . . . .

352.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, as explained above, Coupang failed to disclose that it: (i) exploited the physical health of its frontline workers for its own economic gain; and (ii) maintained large fulfillment centers that failed to follow basic fire safety measures. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, severe injury or death, the loss of key assets, diminished business prospects, and/or harm to its reputation and its relationship with frontline workers.

353.    Later during the same interview, the host asked, "I wonder after reports of more than one—several—deaths of your employees what can you do to improve the situation?" In response, Defendant Kim stated:

> As I mentioned, we have to continue to change and make the standards better. **We are raising the bar** and will continue to invest. **We have invested hundreds of millions of dollars in automation that makes** the deliveries not only a better experience for our customers but **the work easier for our employees and we are, we will continue, to create** good jobs, **the best working condition jobs in the country**.

354.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, as explained above, Coupang failed to disclose that it: (i) exploited the physical health of its frontline workers for its own economic gain; and (ii) maintained large fulfillment centers that failed to follow basic fire safety measures. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, severe injury or death, the loss of key assets, diminished business prospects, and/or harm to its reputation and its relationship with frontline workers.

### C.    April 3, 2021 Newsroom Statement

355.    On or around April 3, 2021, Coupang posted on its official website the following statements concerning its employee relations:

> **Coupang pays great attention to the health and welfare of all employees,** and has a great responsibility to protect the safety and health of its employees. **Coupang will continue to lead the courier logistics industry by prioritizing the health and safety of its employees**.  Coupang will continue to make efforts to **create a better working environment by considering the health and safety of workers as the company's core value and first management principle**.

356.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, as explained above, Coupang failed to disclose that it maintained large fulfillment centers that failed to follow basic fire safety measures.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, severe injury or death, the loss of key assets, diminished business prospects, and/or harm to its reputation and its relationship with frontline workers.

### D.    May 4, 2021 Newsroom Statement

357.    On or around May 4, 2021, Coupang posted a statement to its online newsroom, declaring that the Item Winner system allowed sellers to "fairly" compete with one another:

> **Coupang's Item Winner (one product, one page system) is an improved service** that allows consumers to make purchasing decisions based on consumer experience, unlike existing open markets that focus on advertising cost competition**. . . . Through this, sellers can compete fairly without the burden of advertising costs**, and customers can easily find the best products.

358.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in stating that its Item Winner system allowed sellers to compete "fairly," Coupang failed to disclose that it imposed unfair terms and conditions on sellers that allowed it to misappropriate

protected trade materials from merchants for its own economic gain. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with merchants.

359. In that same release, Coupang also stated: "Many sellers have continued to grow sales by entering the item market where they can **compete fairly without advertising costs**."

360. The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in stating that its Item Market provided a platform for sellers to compete "fairly," Coupang failed to disclose that it (i) imposed unfair terms and conditions on sellers that allowed it to misappropriate protected trade materials from merchants for its own economic gain; and (ii) manipulated the search results to favor its own PB products to the detriment of its merchants. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with merchants.

361. Finally, Coupang also declared the following as a matter of fact:

**Item Market Sales Terms and Conditions do not violate the Fair Trade Act and Copyright Act**. . . . The representative image of the product refers to the image of the product itself, which is not subject to copyright by the seller. Coupang clearly guides sellers to upload only product images when registering images, and the detail page screens that sellers individually upload are not shared with other sellers. **Therefore, the claim that Coupang infringes on the copyrights of sellers' images is not true at all**.

362. The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, as explained above, the provisions in Coupang's Seller Terms and Conditions that allowed it to misappropriate protected trade materials from merchants violated South Korea's Copyright Act.

This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with merchants

### E.     May 12, 2021 Quarterly Earnings Call

363.     On May 12, 2021, Coupang hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call"). During this call, Defendant Kim stated: "[T]he most important competitive advantage that Coupang has is really our orientation. We've made—we've always worked backwards from the customer."

364.     The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from "always" working to benefit the customer, Kim failed to disclose that Coupang (i) forced suppliers to *raise* the price of goods on competing platforms to *prevent* Coupang from selling those goods for lower prices on its online store and, thus, maintain its profit margins; (ii) manipulated search results to favor its own PB products; and (iii) failed to maintain required dispute resolution procedures accessible to consumers. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, significant penalties, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

365.     During the same earnings call, Defendant Anand stated as follows in response to a question about the "mix" of owned inventory, or 1P, versus third-party, or 3P, sales:

> [O]n your second question of 1P versus 3P mix change, we continue to see strong growth in both 1P and 3P and there is no material change and mix at this time. So, we are focused on both the services and continue to drive initiatives in each of them. **However, over time, we would become agnostic between our owned inventory and third-party selection**.

366.     The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in stating that Coupang would be "agnostic" about the mix of the sale of its owned inventory

relative to those by third parties, such as CPLB, Anand failed to disclose that Coupang manipulated search results to favor its own PB products to the detriment of its suppliers and merchants. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with suppliers and merchants.

### F.    1Q 2021 Form 10-Q

367.    On May 13, 2021, Coupang filed its 1Q 2021 Form 10-Q with the SEC. The 1Q 2021 Form 10-Q was signed by Defendant Parker on behalf of Coupang. The 1Q 2021 Form 10-Q stated: "**We have policies and procedures to protect both merchants and customers on our marketplace**."

368.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from having policies and procedures that protected customers, Coupang failed to disclose that it failed to maintain required dispute resolution procedures accessible to consumers. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with customers.

### G.    July 2, 2021 Press Release

369.    On or around June 14 and July 2, 2021, Coupang posted on its official website the following statements concerning its relationships with merchants and suppliers:

> **Coupang is focusing its efforts on expanding online sales channels and supporting sales of small and medium-sized businesses in the region**. Coupang will continue to support small and medium-sized businesses in order to revitalize local coexistence and the stagnant local economy.

370.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because,

in stating that it supported sales of small and medium third-party businesses throughout the region, Coupang failed to disclose that it manipulated search results to favor its own PB products to the detriment of its merchants. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

**H.    August 11, 2021 Quarterly Earnings Call**

371.    On August 11, 2021, Coupang hosted an earnings call with investors and analysts to discuss the Company's results for the quarter ended June 30, 2021. During this call, Defendant Kim stated the following:

> We exist to deliver new moments of WOW for customers. **Everything we do at Coupang revolves around wowing our customers.** Our confidence that we'll continue to make investments, to keep chasing the demand, **to make sure that our customer experience is not compromised, that we protect long-term customer trust.** Because -- and we'll continue to do that aggressively, because we know that our investments will pay off over time.

372.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, contrary to doing "everything" for the customer, Kim failed to disclose that Coupang (i) manipulated search results to favor its own PB products; and (ii) failed to maintain required dispute resolution procedures accessible to consumers. These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

373.    On that same call, Defendant Kim also stated that "**Our investments** that continuously strengthen the virtuous cycle across our business **are driving significant growth for merchants and vendors**."

374.     The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in stating that Coupang's investments were driving "significant growth" for its vendors and merchants, Kim failed to disclose that Coupang manipulated search results to favor its own PB products to the detriment of its suppliers and merchants.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with suppliers and merchants.

**I.     2Q 2021 Form 10-Q**

375.     On August 16, 2021, Coupang filed its 2Q 2021 Form 10-Q with the SEC.  The 2Q 2021 Form 10-Q was signed by Defendant Parker on behalf of Coupang.  The 2Q 2021 Form 10-Q stated: "**We have policies and procedures to protect both merchants and customers on our marketplace**."

376.     The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from having policies and procedures that protected customers, Coupang failed to disclose that it failed to maintain required dispute resolution procedures accessible to consumers.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with customers.

**J.     August 19, 2021 Newsroom Statement**

377.     On or around August 19, 2021, Coupang posted on its official website the following statements concerning the KFTC sanctions:

I will tell you about the FTC sanctions.  The essence of this case is that large conglomerate manufacturers discriminated against supply prices in order to check new distribution channels such as Coupang.  In fact, LG Household & Health Care, the No. 1 household goods company in Korea, has used its exclusive supplier position to supply major products to Coupang for a long time at prices higher than

those of other distributors. . . . Coupang has attempted to innovate so that consumers can purchase products faster and cheaper in the distribution market, which has been dominated by chaebols and conglomerates. **At the same time, we have continued to innovate distribution by lowering entry barriers to SMEs [small and medium-sized businesses] and pursuing shared growth**.

378.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from pursuing "shared growth" with third-party merchants, Coupang failed to disclose that it manipulated search results to favor its own PB products to the detriment of its merchants. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants.

**K.    September 16, 2021 Press Release**

379.    On or around September 16, 2021, Coupang posted on its official website the following statements concerning its relationships with merchants and suppliers:

**The "Item Market," which allows fair competition without the burden of advertising costs, was also cited as a reason for being friendly to small business owners.** In order to solve the unfair sales structure centered on advertising cost competition, **Coupang is operating an "Item Market" system that comprehensively evaluates price, delivery, and customer response so that products that consumers will prefer the most are exposed first**.

380.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in stating that its Item Market provided a platform for "fair competition," Coupang failed to disclose that it manipulated search results to favor its own PB products to the detriment of its merchants. This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants.

L.    **November 12, 2021 Quarterly Earnings Call**

381.    On the morning of November 12, 2021, Coupang hosted an earnings call to discuss the Company's results for the quarter ended September 30, 2021.  During this call, Defendant Kim stated:

> Our strategy to build compounding customer loyalty and long-term shareholder value is reflected in our core operating tenants . . . .  One, **we exist to deliver new moments of WOW for customers and create a world where they asked, "How did we ever live without Coupang?"** . . .  Three, **we** . . . **employ technology, process innovation, and economies of scale to create an amazing customer experience and drive operating leverage and significant cash flows over time**.

382.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, contrary to using its technology to enhance the customer experience, Coupang failed to disclose that it: (i) manipulated search results to favor its own PB products; and (ii) failed to maintain required dispute resolution procedures accessible to consumers.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

383.    During the same earnings call, Defendant Anand stated:

> We were less aggressive on customer acquisition this quarter to **improve the experience for existing customers**.  **Prioritizing what's best for customers** drives loyalty and engagement and we believe that is the best long-term approach.

384.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from doing what was "best" for the customer, Coupang failed to disclose that it: (i) manipulated search results to favor its own PB products; and (ii) failed to maintain required dispute resolution procedures accessible to consumers.  These practices exposed Coupang to a heightened, but

undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with merchants and customers.

**M.    3Q 2021 Form 10-Q**

385.    Later on November 12, 2021, Coupang filed its 3Q 2021 Form 10-Q with the SEC. The 3Q 2021 Form 10-Q was signed by Defendant Parker on behalf of Coupang.  The 3Q 2021 Form 10-Q stated: "**We have policies and procedures to protect both merchants and customers on our marketplace**."

386.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from having policies and procedures that protected customers, Coupang failed to disclose that it failed to maintain required dispute resolution procedures accessible to consumers.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with customers.

**N.    February 27, 2022 Newsroom Statement**

387.    On or around February 27, 2022, Coupang posted another statement to its online newsroom concerning its product reviews, which provided:

> **Coupang's product reviews are operated in a fair and transparent manner, and when an employee writes a review, it is clearly stated**.  When partners, including CPLB, launch new products in Coupang, Coupang employees and members are given the opportunity to try the products first, and **reviews are provided to help customers shop**.

388.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, contrary to using product reviews in a "fair" manner or to "help customers shop," Coupang failed to disclose that it used product reviews to favor its own PB products to the detriment of its suppliers, merchants, and customers.  This practice exposed Coupang to a heightened, but

111

undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationships with suppliers, merchants, and customers.

**O.    2021 Form 10-K**

389.    On March 3, 2022, Coupang filed its 2021 Form 10-K with the SEC.  The 2021 Form 10-K was signed by Defendants Kim, Anand, Parker, Mehta, Sun, Warsh, and You.  In the 2021 Form 10-K, the Company stated:

> **We also continue to** refine our business intelligence systems to **provide more personalized search results and recommendations to help existing customers find and buy more of what they need on Coupang.**

390.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in stating that it used its resources to provide "more personalized" search results that help customers find what they need, Coupang failed to disclose that it: (i) manipulated search results to favor its own PB products; and (ii) failed to maintain required dispute resolution procedures accessible to consumers.  These practices exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with customers.

391.    Similarly, the 2021 10-K stated:

> We are committed to delivering a "wow" experience to all of our customers every day.  **This commitment drives every aspect of our operations** and pushes us to redefine the standards of e-commerce.

392.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from putting customers at the center of everything it did, Coupang failed to disclose that it: (i) manipulated search results to favor its own PB products; and (ii) failed to maintain required dispute resolution procedures accessible to consumers.  These practices exposed Coupang to a heightened,

112

but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with merchants and customers.

393.    With respect to Coupang's merchants, the 2021 10-K provided:

**We offer merchants of all sizes effective solutions to improve their customer experience and enhance demand generation**.  Our customer-to-product matching technology ingests millions of new merchant listings daily into our product knowledge graph, and, leveraging machine learning, **provides personalized product exposure to customers based on relevance and predicted customer experience**.  **This technology helps merchants compete holistically on overall customer experience**.

394.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, in stating that it used its technology to "enhance demand generation" for merchants and help such merchants "compete holistically," Coupang failed to disclose that it manipulated search results to favor its own PB products to the detriment of its merchants.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with merchants.

395.    As in its 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, and 3Q 2021 Form 10-Q, the 2021 10-K also represented: "**We have policies and procedures to protect** both merchants and **customers on our marketplace**."

396.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from having policies and procedures that protected customers, Coupang failed to disclose that it failed to maintain required dispute resolution procedures accessible to consumers.  This practice exposed Coupang to a heightened, but undisclosed, risk of governmental and other criminal and civil investigations, and/or harm to its reputation and its relationship with customers.

## II.    THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER

### A.    The Exchange Act Defendants Acted With Scienter When They Represented That Coupang Maintained A Safe Working Environment and Failed to Disclose That Unsafe Working Conditions Continued Unabated

397.    The Exchange Act Defendants were undeniably aware by the start of the Class Period that a series of frontline workers with overnight shifts died throughout 2020 from heart complications, and that the safety and welfare of its frontline workers was under intense public scrutiny and, therefore, needed to be monitored closely.

398.    During CW1's tenure, the standard protocol followed by facility managers was to immediately notify the Environmental, Health and Safety ("EHS") group, as well as its leader, Vice President – ESG & EHS, Ryan Brown, Joe Nortman, and Defendant Anand of any major safety incidents by email, including frontline worker deaths.  CW1 "personally typed in" Anand's name each time the email needed to be sent.  The EHS group, in turn, provided a "red notice" to senior leaders within Coupang, including Anand, for any "serious" safety incidents, including worker deaths.  Each red notice, said CW1, included a pdf or word attachment containing details on the incident.  Asked if Anand and Nortman were aware that many of the workers who died suffered from cardiac issues, CW1 confirmed they did, noting "they were on the emails about it."

399.    In addition, CW1 explained that Anand and Brown held regular meetings to review safety incidents at least twice a month.  In these meetings, facility managers, such as CW1, had to call in to review the recent safety incidents at their facility, such as worker deaths.

400.    Following a string of worker deaths in the logistics industry since the start of the COVID-19 pandemic, including the death of Coupang warehouse worker Deok-joon Jang, South Korea's National Assembly scheduled a parliamentary hearing on labor conditions for October 26, 2020.  It requested Bom Kim to appear on behalf of Coupang.  But Coupang persuaded the

committee holding the hearing to accept Sung Hwan Eum, the head of Human Resources at Coupang Fulfillment Services, instead.

401.    In addition, Defendant Kim faced several lawsuits arising out of the COVID-19 outbreak at the Bucheon facility not long before the IPO.  In June 2020, a civil group filed a complaint against Kim for violating South Korea's infectious disease laws.  In September 2020, a Bucheon warehouse worker support group filed a complaint against Kim and several other Coupang executives alleging that they violated South Korea's infectious-disease and labor safety laws.

402.    South Korea's Labor Ministry also carried out a three-month investigation into Coupang's logistics network beginning in October 2020.  By mid-December 2020, it found that workers needed ***more breaks*** and ***more safety education*** and that ***there was a failure to provide health examinations for daily workers***.  Moreover, the Labor Ministry ***met with Coupang executives*** on or around January 26, 2021, during which it asked them to remedy these problems. In the release announcing the meeting, the Labor Ministry stated that "the people's interest in the unfortunate deaths of logistics workers that have occurred consecutively since last year is higher than ever" and the executives agreed to "reduce the workload of workers at the distribution center and strengthen protective measures."

403.    After KCOMWEL determined that Deok-joon Jang's death was work-related, Coupang senior executive Joe Nortman issued a statement to Coupang's online newsroom personally apologizing for his death.

404.    Soon thereafter, South Korea's National Assembly summoned Bom Kim to appear at a parliamentary hearing on labor conditions scheduled for February 22, 2021.  But rather than attend himself, Joe Nortman, the CEO of Coupang Fulfillment Services, was sent.

405.    Reinforcing the importance of this issue, Bom Kim was told by a host during an interview scheduled on the first day of the Class Period that the recent history of worker deaths among delivery and logistics employees was "***a real concern for U.S. investors***."

406.    Similarly, CW2 participated on weekly calls with a group of about 20 people, including CW2's direct report Rohit Kunal and Defendant Anand.  During these calls, the group discussed that there was high daily turnover among frontline workers, but Anand never asked how Coupang could improve labor conditions.  Instead, he only cared about "dollars and cents."  CW2 added that "everyone knew" about the "brutal working conditions" for frontline workers at Coupang.  CW2 explained that employees justified it as "the Korean way."

407.    As for the Deokpyeong Facility, it was a critically important warehouse for Coupang.  With a total floor area the size of 15 soccer fields, it was one of Coupang's three biggest storage facilities, and it was filled with highly flammable goods.  Before the devastating June 17, 2021 fire, there were numerous facts that put the Exchange Act Defendants on notice of the many violations existing at this critically important facility.

408.    As noted above, a preeminent fire inspection company issued the Fire Inspection Report for the Deokpyeong Facility in February 2021, which identified ***277 problems with the fire safety system***.  CW1 confirmed that "fire safety violations" needed to be included in the notice sent to Anand, Nortman, Brown, and the EHS group described above.  In fact, CW1 recalled that various "fire safety violations" across Coupang's facilities came up "monthly" if not "weekly" through that means.

409.    The findings in the Fire Inspection Report were all the more astonishing because there had already been several fires at the Deokpyeong Facility.  CW1 explained that the Deokpyeong Facility had "numerous fires" before June 2021.  This included a fire that took place

"during construction of new freight elevators," another "caused by an issue with welding" near insulation which caught fire, and several other fires, including "electrical fires." In fact, CW1 recalled that electrical fires were "a regular thing" at the Deokpyeong Facility.

410.    One such other fire in February 2018 received media attention. According to an article published in *E-Daily*, smoke filled a workshop on the third floor of the Deokpyeong Facility on February 17, 2018, after a fire was started by a cigarette but when workers began to leave the workshop they were scolded by the on-site supervisor "go back to your seat and keep working!" One part-time worker present during the fire who spoke with *E-Daily* recounted that the fire was not even completely extinguished when the managers directed the employees to resume work. This worker described the Deokpyeong Facility as a place full of boxes and explained that there was a heightened risk that a bigger fire would spread rapidly and engulf the facility. The worker also noted that Coupang did not train its employees how to evacuate the premises in the event of a fire. It should go without saying that the larger the distribution center, the more thorough fire management and safety training are required. Because hundreds of thousands of paper boxes are usually piled up in large distribution centers, even a small spark can cause a fire to spread in an instant.

411.    Coupang publicly acknowledged the February 2018 fire, and the instruction by management that employees were to disregard the fire and return to work, but in response to reports it vouched that it would strengthen "manager training" moving forward.

412.    CW1 specifically recalls speaking about "two electrical fires" at the Deokpyeong Facility before June 2021 during several different weekly business review (WBR) calls with Joe Nortman. At the very least, Anand would be aware of the electrical fires based on the way fire safety incidents were reported.

413.    Worse still, frontline workers at the Deokpyeong Facility pointed out fire safety issues to management well before the June 17, 2021 fire.  At a press conference held to discuss the June 17, 2021 fire, the Coupang Logistics Center Branch of the Public Transport Workers' Union stated that "even though numerous electrical devices are installed in the distribution center and there is a high risk of fire due to dust accumulation, Coupang's fundamental countermeasures have never been prepared or implemented."  The Union underscored that "workers there had long pointed out the possibility of an electric device there catching fire." In this regard, CW1 was "certain" that Senior Director of Fulfillment Center Automation at Coupang Fulfillment Services, Alexander Samaritoni, communicated concerns about fire safety issues at the Deokpyeong Facility to Joe Nortman before June 17, 2021.

414.    In addition, CW1 confirmed that Deokpyeong's overcapacity problem was a "regular issue" discussed on a "weekly basis" during Weekly Business Review (WBR) meetings with Joe Nortman.  According to CW1, Defendants Anand joined several of these meetings.

415.    Finally, CW1 recalled that, on the day of the June 17, 2021 fire at the Deokpyeong Facility, there were "hundreds of emails going back and forth" about the fire, including a red notice.

**B.    The Exchange Act Defendants Acted With Scienter When They Misrepresented or Failed to Disclose Their Coercive Business Dealings With Third Parties**

416.    On or around September 23, 2019, the KFTC released a written report containing the findings from its investigation.  The written report was addressed to Coupang executives Hanseung Kang and Daejun (DJ) Park.  Both Kang and Park are identified in the IPO Registration Statement as two of Coupang's six highest-level executive officers.

417.    With respect to price increases, the KFTC determined that Coupang pressured a total of over 100 suppliers to raise the price for 360 products on competing sites.  These coercive

118

tactics affected sales of nearly $160 million between 2017 and September 2020. The KFTC reached this determination based on numerous sources of evidence, including: (i) a "*confirming statement from Respondent [Coupang]*"; (ii) Coupang's internal "instructional data" provided to employees; (iii) statements taken from a "Vice President" at Coupang with knowledge of the practices; (iv) statements from "supervisors [at Coupang] of each product category" involved in the practices; (v) several sources of "internal data" secured from Coupang; (vi) the results of a written fact-finding survey, (vii) a full breakdown of sales prices involved; and (viii) a statement from LGHH.

418.    Significantly, the KFTC found that, during its investigation, *Coupang "acknowledged" that it engaged in the improper practices described above, despite its previous denials*. This admission was a significant factor in the KFTC's decision to reduce the amount of penalties imposed on the Company. The KFTC noted that "*the Respondent [Coupang] cooperated with this investigation while consistently acknowledging the fact of the acts from the investigation stage to the deliberation; therefore . . . the first adjustment calculation standard is reduced by 20% and used as the second adjustment calculation standard.*"

419.    With respect to advertising, the KFTC determined that Coupang demanded that 128 suppliers purchase 213 advertisements to compensate Coupang for margin losses on their products caused by its price match system between March 2017 and July 2019. The KFTC reached this determination based on numerous sources of evidence, including: (i) a "*confirming statement from Respondent [Coupang]*"; (ii) statements taken from a "Vice President" at Coupang with knowledge of the practices; (iii) statements from "supervisors [at Coupang] of each product category" involved in the practices; (iv) several sources of "internal data" secured from Coupang; (v) a statement from LGHH; and (vi) details of Coupang's advertising requirements.

420.    Significantly, the KFTC found that, during its investigation, ***Coupang "acknowledged" that it engaged in this practice, despite its previous denials***.  This admission was a significant factor in the KFTC's decision to reduce the amount of penalties imposed on the Company.  The KFTC noted that "***the Respondent [Coupang] cooperated with this investigation while consistently acknowledging the fact of the acts from the investigation stage to the deliberation; therefore . . . the first adjustment calculation standard is reduced by 20% and used as the second adjustment calculation standard.***"

421.    With respect to sales incentive payments, the KFTC determined that Coupang received a total of approximately $7.8 million in "sales incentive" payments from a total of 330 suppliers engaged in direct purchase transactions between January 2017, and June 2019.  No contractual provisions required any of these suppliers to provide such payments.  The KFTC reached this determination after analyzing the relevant contracts and was ***verified in a "confirmation letter" sent by Coupang***.

422.    Significantly, the KFTC found that, during its investigation, ***Coupang "acknowledged" that it engaged in this practice***.  This admission was a significant factor in the KFTC's decision to reduce the amount of penalties imposed on the Company. The KFTC noted that "***the Respondent [Coupang] cooperated with this investigation while consistently acknowledging the fact of the acts from the investigation stage to the deliberation; therefore . . . the first adjustment calculation standard is reduced by 20% and used as the second adjustment calculation standard.***"

423.    With respect to sales promotions, the KFTC found that Coupang coerced 388 suppliers to pay the full cost of sales incentives, totaling over $4 million, which Coupang offered on their products at 11 promotional fairs held between 2018 and 2019.  The KFTC reached this

conclusion after analyzing (i) the plain terms of the relevant contracts; (ii) details of each promotional event secured from Coupang; and (iii) "fair planning" materials received from Coupang.

424.    Significantly, the KFTC found that, during its investigation, ***Coupang "acknowledged" that it engaged in this practice***.  This admission was a significant factor in the KFTC's decision to reduce the amount of penalties imposed on the Company.  The KFTC noted that "***the Respondent [Coupang] cooperated with this investigation while consistently acknowledging the fact of the acts from the investigation stage to the deliberation; therefore . . . the first adjustment calculation standard is reduced by 20% and used as the second adjustment calculation standard.***"

425.    In fact, at the plenary hearing held before all six KFTC Commissioners on August 11, 2021, Coupang's representative not only admitted that Coupang no longer disputed any of the underlying facts but stated that Coupang did not disagree that the acts of (1) pressuring suppliers to purchase advertising against their will to make up for margin losses and (2) requiring sales incentive ***were illegal.***

426.    One of the slides used by the KFTC at the press briefing showed that Coupang actively discussed "negative GP," or negative gross profit, at WBR meetings held during the time period under investigation.  According to Coupang's engineering team, these WBR meetings compiled extensive data for business leaders, including "top line metrics," and became an "essential part of our business."  As noted above by CW1, the WBR meetings were attended by senior executives.

**C.    The Exchange Act Defendants Knew That Coupang Was Misusing the Work of Third-Party Merchants**

427.    According to a confidential witness with first-hand knowledge of the matters discussed herein ("CW3"), Defendant Kim was aware that Coupang's Item Market used a single image to represent the same product sold by other merchants.  CW3 worked as Head of Seller Services and Engineering Head – Ad Platform, Marketplace and Customer Service from June 2017 to April 2021.  In this position, CW3 was responsible for, among other things, engineering the Item Market, and was involved in designing the algorithm that picked the Item Winner.  CW3 reported to Chief Technology Officer Thuan Pham, who reported to Defendant Kim, and CW3 had worked "extensively" with Kim and Anand.  CW3 said that Kim often reached out to ask, "Why is this seller winning this item?"  Through these discussions, Kim was aware of the fact that the Item Winner program used a single image to represent the same product sold by other businesses.  In fact, during these conversations, Kim asked CW3 to explain why a certain image was shown for a specific product.

**D.    The Exchange Act Defendants Acted With Scienter When They Repeatedly Represented That Coupang Maintained Policies and Procedures That Protected Their Customers**

428.    On or around March 28, 2022, the KFTC released a written decision explaining its reasons for the corrective order issued to Coupang for failing to maintain standards and procedures to resolve disputes with consumers who use its online store.  Coupang acknowledged that it lacked standards and procedures to resolve complaints or disputes from consumers who used its online store in response to a KFTC request, dated August 21, 2020, at least *six months before the IPO*.  Moreover, Coupang openly admitted that its conduct was *illegal* under South Korean law in response to a KFTC correspondence on November 25, 2021.  Despite admitting that its practice

broke South Korean law, the improper conduct continued unabated through March 28, 2022, which required the KFTC to issue a corrective order requiring immediate action by Coupang.

### E.   Additional Facts Probative of Scienter

429.   The Exchange Act Individual Defendants acted with scienter because at the time they issued public documents and other statements in Coupang's name, they knew, or with extreme recklessness disregarded the fact that such statements were materially false and misleading or omitted material facts.   The Exchange Act Individual Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

430.   The Exchange Act Individual Defendants received information reflecting the true facts regarding Coupang, its operations and business practices, had control over and/or received the Company's materially misleading misstatements, and/or their associations with the Company made them privy to confidential proprietary information concerning Coupang.   Accordingly, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein.   The Exchange Act Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.   The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Exchange Act Individual Defendants.

431.   These facts, in conjunction with the additional indicia of scienter alleged in ¶ 397 through ¶ 428, collectively support a strong inference that throughout the Class Period, Defendants

knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading.

### 1.    The Operations of Coupang's Logistics Network and Online Store Are At the Core of Its Business

432.    The Exchange Act Defendants' knowledge of the practices discussed herein can be readily inferred from the fact that the smooth operation of its growing end-to-end logistics network and its online store were both critical to Coupang's ability to deliver on its commitment to customers to deliver packages faster than anyone else, as well as its ambitious expansion plans.

433.    As explained above, the Company's end-to-end logistics network of fulfillment centers, distribution warehouses, and last-mile delivery capabilities was the key asset that allowed Coupang to deliver packages faster than anyone else and served as the foundation for new product offerings.  This was no secret.  Coupang explained in the IPO Registration Statement that "our fulfillment and delivery infrastructure . . . is essential to our success" and a "key competitive advantage."  Coupang spent *billions* of dollars building this network between 2013 and 2020.

434.    Coupang also planned to continue spending large sums of money on its distribution infrastructure.  By the start of the Class Period, Coupang had ambitious plans to capture greater market share by attracting new customers and increasing spend from existing customers and, therefore, planned to grow its network of distribution warehouses as well as its last-mile delivery infrastructure.  As such, Coupang admitted in the IPO Registration Statement that its future success depended on its "ability to invest in our infrastructure to cost-effectively meet the demands of our anticipated growth."  To this end, Coupang planned to invest at least *$870 million* to build new fulfillment centers over the next few years, in addition to those already underway.  Defendant Kim boasted on May 12, 2021 that "we plan to build more square footage of infrastructure over the next year than in any year since our inception," growing Coupang's footprint by "over 50%."

435.   As Coupang acknowledged, however, this extensive logistics network cannot operate without a substantial number of frontline workers.   As stated in the IPO Registration Statement, Coupang's extensive network of frontline workers was the "backbone" of its business and key to its "success."   By the end of 2020, the Company directly employed almost 50,000 people, approximately 40,000 of which were frontline workers in its logistics centers and last-mile delivery fleet, making it the third largest employer in South Korea.   But it also planned to create **over 50,000 new jobs** as it continued to grow its logistics network in the future.   As such, Coupang claimed that its "future expenditures throughout Korea for both infrastructure and workforce-related costs will exceed **several billion dollars** over the next several years."

436.   Accordingly, maintaining Coupang's existing frontline workers and attracting more to join as it grew was critical to its success.   Indeed, Coupang acknowledged in its IPO Registration Statement that "[o]ur fulfillment infrastructure requires a substantial number of workers" and a "[f]ailure to hire and retain capable fulfillment, delivery personnel, and other labor support may lead to underperformance of these functions and cause disruption to our business."   As such, it also recognized that "negative publicity related to workforce safety . . .  could have an adverse effect on our business, prospects, financial condition, and results of operations."

437.   That the work environment for its frontline workers was at the core of Coupang's operations is evident from the Exchange Act Defendants' repeated statements before and during the Class Period.   On January 20, 2021, Coupang issued a statement in its newsroom which declared that "we provide the best working environment in the industry."   In the IPO Registration Statement, Defendant Kim included a personal letter to investors in which he stated Coupang's growth allowed it to provide "a better workplace for our employees."   On an interview the same day as the IPO, Defendant Kim acknowledged one worker death, stating "one is too many" and

125

emphasized that Coupang "will continue to create . . . best working condition jobs in the country." On April 3, 2021, Coupang issued another statement in its newsroom, representing that "the health and safety of workers" was "the company's **core value** and **first management principle**."

438.    Similarly, the operation of Coupang's online store is critical to its success. Coupang's online store is the primary means through which it interfaces with retail customers and is the platform that it offers for third-party merchants to sell their goods.  As Coupang described in the IPO Registration Statement, "any significant interruptions or delays in service on our apps or websites, or any undetected errors or design faults, could result in limited capacity, reduced demand, processing delays, and loss of customers, suppliers, or merchants.  If merchants and customers encounter difficulty accessing or using our apps or websites on their mobile devices, or if they choose not to use our apps or websites on their mobile devices, our business, financial condition, and results of operations may be adversely affected.".

439.    In this regard, Coupang has explained that "[t]echnology is central to everything we do" and is used by it to "propel the front-end experience for customers."  In particular, Coupang uses proprietary technology to "produce greater relevance and personalization" in the search results on its online store.

440.    As of the start of the Class Period, Coupang planned to continue relying on this proprietary technology going forward.  In the IPO Registration Statement, Coupang disclosed that one of the "key elements of our growth strategy" was to implement "further innovation and improvements to our customers' shopping experience," including by continuing to "refine our business intelligence systems to provide more personalized search results and recommendations" in its online store.

441.    Given the importance of the design and function of Coupang's online store to its success, it should come as no surprise that Defendant Kim regularly asked CW3 "why is this seller winning this item?" and asked CW3 to "explain the reason for it."  According to CW3, Kim was known to "investigate" the operation of the Item Winner System whenever he received a complaint about it.

442.    The importance of the design and layout of Coupang's online store is displayed by the Exchange Act Defendants' repeated statements during the Class Period.  For example, in the IPO Registration Statement, Coupang, Kim, and Anand explained that its proprietary "matching technology" helps improve the "customer experience" by providing "personalized product exposure." On Coupang's first earnings call following the IPO, held on May 12, 2021, Kim attributed Coupang's success, in part, to its unique "customer experience" and Anand told investors that the "customer experience" continued to be a "focus" for Coupang.

443.    The statements by Kim and Anand on these topics provide strong evidence that the Exchange Act Individual Defendants were receiving specific information about the operations of Company's logistics network and online store.  Alternatively, if the Exchange Act Individual Defendants were not knowledgeable about these matters (of which they spoke in detail), such recklessness readily satisfies the scienter requirement.

### 2.    The Existence of Numerous Governmental Investigations into Coupang Is Indicative of Scienter

444.    As detailed above, numerous governmental investigations into Coupang—and feedback from those bodies—should have alerted Defendants to carefully evaluate and monitor Coupang's labor problems and improper business practices.

445.    For example, the KFTC opened several investigations into Coupang's improper business practices.  By June 28, 2019, the KFTC confirmed that it was investigating Coupang for

anticompetitive conduct reported to it by LGHH and WMP earlier that month.  The KFTC even conducted on-site visits at Coupang's offices in July 2019 and October 2020 to collect evidence, including documents as well as testimony from senior management.  In addition, a group of business owners reported Coupang to the KFTC in July 2020 for imposing unfair terms and conditions on merchants that strip them of their protected works.  The KFTC is also investigating Coupang for manipulating its search algorithm to favor its PB products.  The investigation commenced on or around June 28, 2021, when the KFTC conducted another site visit at Coupang's headquarters.  This investigation is particularly notable because the KFTC had recently fined Naver, an e-commerce rival, approximately $23 million in October 2020 for manipulating its search algorithm to favor its items.  While this investigation was pending, the KFTC held a symposium on transparency in search algorithms on September 10, 2021, during which a top KFTC official stressed the "importance" of exposure ranking and stated that the KFTC planned to "strictly" regulate companies that manipulate algorithms to favor their own products.

446.    Coupang was also the subject of a three-month investigation by the Labor Ministry between October 2020 and December 2020, as a result of which the Labor Ministry determined that Coupang's frontline workers needed ***more breaks*** and ***more safety education***.  Moreover, the Labor Ministry ***met with Coupang executives*** on or around January 26, 2021 and directed them to remedy these problems.  Even after that, an official with the Labor Ministry stated publicly by no later than March 9, 2011—a mere ***two days before the IPO***—that "[w]e are watching the company's [Coupang's] labor environment with concern."

447.    Before the start of the Class Period, Coupang executives were subject to intense scrutiny by lawmakers for the Company's labor practices following a series of worker deaths in 2020, including the death of Coupang warehouse worker Deok-joon Jang.  In advance of the

parliamentary hearing scheduled for October 26, 2020, lawmakers met with Jang's bereaved parents, who provided them with evidence regarding his working conditions.  At the hearing, lawmakers grilled Coupang Fulfillment Services executive Sung Hwan Eum about work conditions at Coupang's warehouses and presented him with various forms of evidence regarding work intensity of Jang's position, including text messages from his phone.

448.    At another parliamentary hearing held on February 22, 2021, and attended by Coupang Fulfillment Services CEO, Joe Nortman, lawmakers blasted Coupang for "obstruct[ing]," rather than "supporting," KCOMWEL claims by its frontline workers. Lawmakers presented Nortman with medical evidence showing the degeneration of Jang's muscle health as a frontline worker at a Coupang warehouse and the number of work-related accidents at Coupang.   Nortman apologized for the death of Jang and vowed to "improve the working environment" for frontline workers.  He reiterated Coupang's refrain that "safety is the top priority for Coupang" and promised to "do our best to prevent such a recurrence as much as possible."

### 3.    Coupang's Efforts to Cover Up Its Misdeeds Are Strong Evidence of Scienter

449.    Coupang worked intensely to cover up its misconduct, including by repeatedly denying allegations of poor labor conditions and improper business practices during the Class Period.

450.    At the government hearing held on October 26, 2020, at which the death of Deok-joon Jang was addressed, Eum denied a direct question regarding whether Coupang "covered up" work-related injuries.  One lawmaker informed Eum that she received evidence that ***Jang was told not to call 911*** when he was injured on the job in April 2020, and rhetorically asked Eum "do you know what perjury is?" and "why are you lying?"  Eum was promoted from head of Human Resources to Chief People Officer shortly after the hearing.

451.    Coupang also issued several statements in its online newsroom before and during the Class Period, which vigorously denied claims of workplace intensity raised by the media.  For example, on January 20, 2021, Coupang issued a statement from its newsroom acknowledging recent claims that "the work intensity of the Coupang Logistics Center staff increased due to the increased volume" during the pandemic but it categorically denied those charges, stating "this is not true."  It also warned that Coupang will "strongly respond to false claims and slander."  Two days after MBC aired a segment on Coupang's labor conditions on February 21, 2021, Coupang issued similar denials in its newsroom, denying that it was "requiring heavy work for fast service" and claiming that its "rocket delivery service is," instead, "possible thanks to large-scale employment and investment."  On April 3, 2021, the Coupang newsroom issued another statement in response to a story by the *Financial Times* from March 2021 reporting that at least eight Coupang workers died from overwork in the past year alone.  Coupang attempted to deflect scrutiny, posturing that "cardiac and cerebrovascular disorders . . .  are the 2nd and 4th leading causes of death in Korea" and reasoned that "[i]f three out of [Coupang's] 51,000 employees, as of the end of 2020, died from cardiovascular diseases, *the number of deaths caused by ischemic heart diseases and cerebrovascular diseases in Coupang is lower than the national average even if taking the gender and age of the population into account*." (emphasis in original).

452.    Perhaps most alarming of all, CW1 explained that Coupang implemented a new policy to destroy all emails more than one year old "right after" the fire at the Deokpyeong Facility.  According to CW1, emails were preserved for a longer period before the fire at the Deokpyeong Facility.  This unscrupulous policy change weighs heavily in favor of an inference of scienter.

453.    Coupang likewise denied that its business practices with suppliers or Item Winner system were improper.  For instance, Coupang responded to media inquiries regarding the claims

by LGHH and WMP in June 2019, proclaiming "[t]hat is not how we operate business" and "[i]t is impossible for us to pass the costs of discounts to our business partners under our inside policy." On June 28, 2019, Coupang labeled the claims raised by LGHH and WMP as "false reports" and flatly denied that it asked suppliers to increase prices on competing platforms, stating "[that] is not true." Additionally, on September 18, 2020, Coupang insisted that "Item Market Sales Terms and Conditions do not violate the Fair Trade Act and Copyright Act." The KFTC later determined that none of these statements were true.

454.    Coupang also resisted requests from South Korean lawmakers to participate in a parliamentary hearing on KFTC regulation scheduled for October 5, 2021. After canceling at the last minute, Hanseung Kang, CEO of Coupang's South Korea subsidiary, appeared at a general meeting of the National Assembly on October 20, 2021 along with the Commissioner of the KFTC. At this meeting, one lawmaker commented that, after they asked Kang to appear as a witness, he received "a lot of phone calls" asking the National Assembly to "please cancel, please postpone" and observed "I have a preconceived notion that there must be something wrong."

**4.     Kim and Anand Enriched Themselves Through the Sale of Inflated Stock**

455.    Defendants Kim and Anand were motivated to engage in a fraudulent course of conduct so that they could sell their own shares of Coupang Class A common stock at artificially inflated prices during the Class Period.

456.    Defendant Kim sold 1,200,000 shares in the IPO for ***$42 million***, when he was in possession of negative material non-public information. The timing and amount of this sale by Kim was suspicious and unusual in that he has ***never made any other stock sales*** and he decided to sell in the IPO, at a time of peak demand for the Company's newly-issued shares.

457.    Defendant Anand sold 160,000 shares on August 16, 2021, for $5,332,800, and sold 350,000 shares on December 14, 2021, for $9,576,000, for total proceeds of ***$14,908,800***, when he was in possession of negative material non-public information.  The timing and amount of these two sales by Anand are suspicious and unusual in that he has ***never made any other stock sales***. The sale on August 16, 2021, was purportedly made to satisfy tax obligations incurred upon the settlement of restricted stock units (RSUs) that vested, and the sale on December 14, 2021, was purportedly made to satisfy exercise costs and tax obligations incurred with the exercise of certain stock options held by Anand.  But neither of those explanations minimize the suspicious nature of the sales.  Tax obligations are not incurred on RSUs until the holder voluntarily elects to "settle" the instruments.  As a corporate executive, Anand was restricted from selling any shares during the Lock-Up Period, which expired on August 13, 2021.  Three days before the expiration of the Lock-Up Period, several top Coupang executives attended the KFTC's full panel hearing on its investigation into its anticompetitive practices with suppliers.  Anand elected to settle his RSUs days after the Lock-Up Period expired ***before the KFTC announced the results of its investigation on August 19, 2021***.  Similarly, nothing required Anand to exercise his options on December 14, 2021.  In addition, the underlying options that Anand exercised had fixed strike prices between $1.93 and $1.99, none of which were tied to the price of Coupang's Class A common stock.

### 5.    The Announcement of Kim's Resignation in the Immediate Aftermath of the June 2021 Fire Further Supports an Inference of Scienter

458.    Coupang conducts operations in South Korea through its wholly-owned subsidiary Coupang Corp. (a/k/a Coupang Co., Ltd.).  As of the start of the Class Period, Defendant Kim held the title of Inside Director and Chairman of Coupang Corp.'s Board of Directors.  Kim had served in this role since 2013.  As recent as May 31, 2021, Coupang Corp. made corporate filings with

relevant government authorities, including the Financial Supervisory Service, which represented that Defendant Kim continued to serve as one of its Inside Directors.

459.    At approximately 11:00 a.m. on the morning of June 17, 2021 in South Korea, less than six hours after the fire broke out at the Deokpyeong Facility earlier that day, Coupang released a statement to the media which advised that Defendant Kim resigned from his position as Inside Director and Chairman of Coupang Corp.'s Board of Directors.  The statement provided that Kim stepped down in order to concentrate on "global management following the listing [of Coupang] on the New York Stock Exchange."  News sources, however, were quick to note the link between the announcement and the fire.  For example, the *Korea Herald* observed that "the announcement of Kim's decision to step down . . . came at the height of criticism over a fire at its [Coupang's] distribution center."  Several other publications, including *Yonhap News Agency*, also pointed out that South Korea's National Assembly recently enacted a law that subjects CEOs to severe punishment for serious workplace disasters, and "Kim's resignation may be related to an attempt to save him from possible prosecution."

460.    Kim's departure from Coupang Corp. on the heels of the workplace disaster at the Deokpyeong Facility is highly suspicious and constitutes further evidence of his scienter.

### 6.    Coupang's Remedial Actions Further Support an Inference of Scienter

461.    The Company's implementation of remedial actions also supports a strong inference of scienter.  The extent and breadth of these actions reveal the severity of Coupang's labor and safety violations and anticompetitive practices.  Such actions would not have been taken in the instance of mere negligence or even gross negligence.  Accordingly, the Company's "remedial actions" strongly suggest an inference of scienter.

462.    In late April 2021, approximately a month after the death of the Coupang Friend who showed heart abnormalities during his initial health exam, Coupang launched Coupang Care,

which is a paid health promotion program that allows frontline workers, including fulfillment center workers and parcel delivery drivers, with relatively high health indicators such as blood pressure to get as many as four weeks paid time off to focus on their health.

463.   The Company also took action to improve the fire safety conditions of its warehouse facilities.  On June 20, 2021, Coupang issued a statement on its newsroom by Hanseung Kang in response to the fire at the Deokpyeong Facility, in which he acknowledged that more safety measures were needed and committed to conduct fire inspections at all Coupang distribution sites.  As such, Coupang implicitly acknowledged that the fire safety measures at those facilities were sufficient.  According to CW1, after the fire at the Deokpyeong Facility, it was also regularly discussed on safety calls with other facility managers and Anand that no more than one plug should be used for each electrical socket and to avoid "daisy chaining" cords.

464.   In addition, Coupang announced on December 24, 2021, that it entered into an agreement with KT Songpa to establish an integrated management system that can remotely check and manage fire receiver information installed in each distribution center by Coupang.  According to the release, KT's system provides "real-time information such as firefighting facility status and fire detection," which would allow Coupang to "prevent fires in advance and minimize human and material damage in the event of an accident."  Of course, the need for such a system meant that Coupang did not have one in place before December 24, 2021.  In other words, it did not have a system which provided "real-time information" to "prevent fires in advance and minimize human and material damage" at the time of the fire at the Deokpyeong Facility.

### 7.   Defendants Kim and Anand Are Hands-On Managers

465.   According to CW1, both Kim and Anand were known for "micro-managing" the matters they worked on.  With respect to Anand, CW1 indicated that "he wanted to know everything" about the matters he worked on.  As for Kim, CW1 similarly observed that he was

"very involved in everything" he did, adding that it was not uncommon for Kim to "go into the warehouses" to speak with managers there.

466.    The observations from CW1 are corroborated by statements from a former Coupang executive with first-hand knowledge of Kim excerpted in an article published by the *Asia Times* on May 17, 2021, which indicate that Kim exhibited signs of an autocratic leadership style. According to the former executive, during a managerial discussion on compensation for delivery drivers, a mid-level manager was asked to present on the complexities of the situation. After his presentation, Kim thanked him and the executive left.  "But just after the man had left the room, he started shouting at the HR manager saying, 'I told you that around this table I only want the top guys!'" the former Coupang executive recalled.  Kim declared "Don't waste my time on low-level guys!"  According to the former executive, "decision-making was centered almost entirely around Kim."

467.    The dual-class structure of Coupang's common stock is also indicative of Kim's autocratic leadership style.  By structuring the Corporate Conversion to provide Kim with exclusive ownership of all outstanding shares of Class B common stock, and vesting those shares with *twenty nine times* the voting power of Class A common stock, the dual class voting structure ensured that Kim maintained control over the Company and its affairs in a manner that was disproportionate with his economic stake.  As such, Coupang acknowledged in the IPO Registration Statement that this "will limit or preclude your ability to influence corporate matters for the foreseeable future."

### 8.    Coupang Is a Highly Scrutinized Company

468.    Coupang is the largest e-commerce platform in South Korea.  Because of this, the Company's business practices have drawn intense public interest on numerous fronts—something that was well-known, or should have been known, to members of senior management, including

the Individual Defendants.   Throughout the Class Period, reporters and financial analysts frequently published articles and reports regarding the Company's business practices and growth, as well as the Company's labor problems and alleged violations of applicable laws *vis-à-vis* its dealings with its suppliers and merchants.  The Company was, or should have been, acutely aware that these matters were important to the public at large.  And, as a company hyper-focused on maintaining a certain image, it is reasonable to infer that Coupang and its executive management team were closely tracking the same issues that had piqued the interest of so many outside of Coupang, including the media.

469.    Ultimately, when viewed collectively, Lead Plaintiffs' allegations support a strong inference of fraudulent intent on the part of the Exchange Act Defendants or, at the very least, that their conduct was highly unreasonable and an extreme departure from standards of ordinary care. In either case, Lead Plaintiffs have adequately pleaded scienter.

## III.    LOSS CAUSATION

470.    During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Coupang securities, and operated as a fraud or deceit on Class Period purchasers of Coupang securities, by misrepresenting the Company's business and prospects and failing to disclose the adverse facts detailed herein.  Lead Plaintiffs and members of the Exchange Act Class purchased or otherwise acquired Coupang securities throughout the Class Period at prices that were inflated by the fraud described herein.

471.    The truth regarding the Exchange Act Defendants' fraud was revealed to the market in a series of disclosures on March 24, 2021, March 25, 2021, April 4, 2021, May 4, 2021, May 10, 2021, June 22, 2021, July 6, 2021, August 11, 2021, August 18, 2021, September 10, 2021, November 12, 2021, March 6, 2022, and March 15, 2022.  When the Exchange Act Defendants'

prior misrepresentations, omissions, and fraudulent conduct were disclosed and/or became known to the market on each of these dates, the price of Coupang securities declined significantly as the prior artificial inflation came out of Coupang's stock price. The Exchange Act Defendants' misstatements and omissions were the proximate cause of those stock price declines. As a result of their purchases of Coupang securities during the Class Period, and the later revelation of the Exchange Act Defendants' fraud, Lead Plaintiffs and the other members of the Exchange Act Class suffered economic loss, *i.e.*, damages under the federal securities laws.

472. The declines in the price of Coupang common stock after each of the corrective disclosures came to light were a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market, and/or were materializations of the risks that Defendants downplayed or concealed from investors.

473. Soon after market open on March 24, 2021, news broke that a Coupang Friend in his early 40s died his second day on the job earlier that day next to his company-issued car in Incheon, South Korea. As the *Korea Herald* commented in a report the next morning, "[t]he courier's death immediately triggered speculation that he may have become the latest delivery worker to die from apparent overwork." After the close of trading on March 24, 2021, media sources published an official statement from Coupang revealing that the deceased courier was allowed to begin delivering packages even though he displayed "heart-related abnormalities" during his initial medical examination. On this news, Coupang's stock dropped from $46.00 on March 23, 2021, to close at $43.70 on March 25, 2021, representing a decline of 5%.

474. On April 4, 2021, the owner of a small business appeared on MBC's investigative program "Straight" and revealed how Coupang was using the trade material that he spent time and

money to create to advertise and secure sales for other merchants in its Item Market. On this news, Coupang stock declined from $47.31 to close at $45.94 on April 5, 2021, or 2.0%.

475.    After market close on May 3, 2021, a number of civic groups announced that they reported Coupang to the KFTC for requiring small business owners to hand over their protected trade materials in its Seller Terms and Conditions. On this news, Coupang's stock declined from $42.06 to close at $41.49 on May 4, 2021, representing a drop of 1.3%.

476.    On May 10, 2021, PSPD issued a release refuting various points made by Coupang about its Sellers Terms and Conditions, including, in particular, that photographs created for advertising purposes can be protected by law under South Korea's Copyright Act, contrary to Coupang's assertions. On this news, Coupang's stock dropped from $38.93 to close at $37.07 on May 10, 2021, representing a decline of 4.8%.

477.    Beginning on June 22, 2021, and continuing for several days thereafter, news reports revealed that Coupang was facing a growing consumer boycott, with users deleting their Coupang accounts and encouraging others to do so, in response to details about the fire safety failings at the Deokpyeong Facility. The boycott reached its peak on June 25, 2021. On this news, Coupang stock declined $2.62, or 6.55%, from the close of trading on June 22, 2021, to the close of trading on June 25, 2021. According to *Bloomberg*, after the close of trading on June 22, 2021, option contracts rose to three times the 20-day average. By June 24, 2021, options trading surged to *fifteen times* the 20-day average, with puts being the most active contract.

478.    On July 4, 2021, news broke that the KFTC was investigating Coupang for manipulating its search algorithm to favor its PB products. On this news, Coupang's stock price dropped $0.51 per share, or 1.3 percent, to close at $39.95 per share on July 6, 2021, the next trading day. On July 14, 2021, Deutsche Bank downgraded Coupang from "buy" to "hold."

Among other things, Deutsche Bank pointed out that "Coupang is being probed over allegations it manipulated search algorithms to prioritize its own products over those of suppliers."

479.    Meanwhile, the damage caused to the Company by the June 2021 fire at the Deokpyeong Facility was still being revealed.  In its second quarter 2021 earnings release, published after the market closed on August 11, 2021, Coupang reported a $518.6 million loss for the quarter, which it attributed primarily to almost $300 million in inventory and equipment losses due to the fire at the Deokpyeong Facility in June 2021.  On this news, Coupang's stock price dropped $3.07 per share, or 8.3%, to close at $34.13 per share on August 12, 2021.  Securities analysts specifically attributed the loss to the fire at the Deokpyeong Facility.  For example, Deutsche Bank Research reported on August 12, 2021, that the "296m of the drop was due to its warehouse fire, which impacted inventory and fixed assets."  Samsung Securities also noted that Coupang's "operated losses widened y-y [year-over-year] due to a one-off cost (related to a logistics center fire in June)."

480.    After the close of the market on August 18, 2021, the KFTC announced that it fined Coupang nearly $3 million and issued it a corrective order for forcing hundreds of its suppliers to raise the price of products at competing businesses or purchase products and services from Coupang against their will to make up for margin losses caused by Coupang's price match system.  On this news, Coupang stock dropped $1.24 per share, or 2.0%, to close at $31.73 per share on August 19, 2021.

481.    Before market open on September 10, 2021, a KFTC representative announced that it had received numerous complaints that Coupang manipulated its search algorithm to improperly prioritize its own products over those of third-party sellers.  On this news, Coupang stock dropped $0.27 per share, or 0.9 percent, to close at $29.98 per share on September 10, 2021.

482.    Soon after market open on November 12, 2021, Coupang held its earnings call for the quarter ended September 30, 2021, during which Defendant Kim disclosed that higher costs were attributable to "inefficiency" and hiring troubles caused by the June 2021 fire at the Deokpyeong Facility.  On this news, Coupang's stock price dropped $2.61 per share, or 8.9 percent, to close at $26.58 per share on November 12, 2021.  Analysts covering Coupang took note of this in their corresponding reports.  For example, UBS noted that the supply shortage during the quarter was due to the "loss of one of [Coupang's] largest fulfilment centre to a fire in June." Similarly, BofA Global research advised that Coupang's supply issues were "exacerbated by the loss of one of largest fulfillment centers to a fire in June."

483.    On March 6, 2022, the KFTC announced that it issued a corrective order to Coupang for failing to maintain written dispute resolution policies accessible to customers on its platform in violation of South Korea's Electronic Commerce Act.  On this news, Coupang's stock declined $1.38, or 6.5%, to close at $19.72 at the close of trading on March 7, 2022.  On March 9, 2022, UBS published a note in which it observed that "Coupang shares have fallen 58% since its IPO in March 2021."  Among other things, it attributed that drop to "regulatory risks" arising from "online platform regulations."

484.    After market close on March 14, 2022, PSPD announced that it reported Coupang to the KFTC for manipulating product reviews for its PB products to ensure they receive more exposure in its search results and published findings supporting its claim.  On this news, Coupang's stock declined $0.67 to close at $15.45 on March 15, 2022, representing a decline of 4.1%.

485.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant losses and damages.

## IV.   PRESUMPTION OF RELIANCE

486.   Lead Plaintiffs and the Exchange Act Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine established in *Basic v. Levinson*, 485 U.S. 224 (1998), and the presumption of reliance for omissions set forth in *Affiliate Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

487.   The presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)   the Exchange Act Defendants made public misrepresentations or failed to disclose material facts necessary to make the statements that were made not misleading during the Class Period;

(b)   the misrepresentations and/or omissions were material;

(c)   the Company's Class A common stock traded in an efficient market;

(d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's Class A common stock; and

(e)   Lead Plaintiffs and other members of the Exchange Act Class purchased Coupang securities between the time Defendants misrepresented or failed to disclose material facts necessary to make the statements that were made not misleading and the time the true facts were disclosed, without knowledge of the misrepresented and/or omitted facts.

488.   At all relevant times, the market for Coupang's common stock was efficient for the following reasons, among others:

(a)   Coupang's Class A common stock met the requirements for listing on the NYSE, a highly efficient and automated market;

(b)   as a regulated issuer, Coupang filed periodic public reports with the SEC;

141

(c)    throughout the Class Period, Coupang's Class A common stock was highly liquid, with an average daily trading volume of 8,377,044 shares;

(d)    Coupang regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e)    Coupang was followed by numerous securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(f)    unexpected company-specific news was reflected and incorporated into the stock price for Coupang's Class A common stock.

489.    As a result of the foregoing, the market for Coupang securities promptly digested current information regarding Coupang from publicly available sources and reflected such information in Coupang's securities prices.  Under these circumstances, all purchasers of Coupang securities during the Class Period suffered similar injury through their purchase of Coupang securities at artificially inflated prices and the presumption of reliance applies.

490.    In addition, a presumption of reliance is also appropriate under *Affiliated Ute* because the claims asserted herein are grounded in material omissions.  As this action involves Defendants' failure to disclose material adverse information regarding Coupang's business operations and financial performance—information that the Exchange Act Defendants were obligated to disclose in light of the statements they made on these very topics and/or applicable SEC rules and regulations—positive proof of reliance is not a prerequisite to recovery.

## V.    NO SAFE HARBOR

491.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein.

492.    None of the statements alleged herein to be false or misleading are forward-looking statements.  Rather, the statements alleged herein to be false or misleading all relate to facts and conditions existing at the time the statements were made.  None of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

493.    To the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Indeed, as set forth above, given the then-existing facts contradicting Defendants' statements, the boilerplate and generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.  In addition, the safe harbor does not apply because, at the time each purportedly "forward looking statement" was made, the speaker knew that the forward-looking statement was false or misleading when made, and/or the forward-looking statement was authorized or approved by an executive officer of Coupang who knew that the statement was materially false or misleading when made.

494.    Moreover, to the extent Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because

they did not disclose that Defendants were actually engaged in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining the hypothetical nature of such disclosures. In other words, the supposed "risks" that Defendants attempted to warn about had already materialized.

## COUNT IV

## FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST COUPANG AND THE EXCHANGE ACT INDIVIDUAL DEFENDANTS

495. Lead Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

496. This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of the Exchange Act Class against Coupang and the Exchange Act Individual Defendants.

497. As alleged herein, throughout the Class Period, the Exchange Act Defendants, individually and in concert, disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

498. The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)        engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Coupang securities during the Class Period.

499.     As set forth above, the Exchange Act Individual Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiffs and the other members of the Exchange Act Class, or acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Coupang personnel to members of the investing public, including Lead Plaintiffs and the other members of the Exchange Act Class.

500.     Coupang is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

501.     As a result of the foregoing, the market price of Coupang securities was artificially inflated during the Class Period.  Lead Plaintiffs and Exchange Act Class members relied on the integrity of the market price for Coupang securities during the Class Period and paid prices for Coupang securities that were artificially inflated as a result of the false and misleading statements described herein.  Lead Plaintiffs and the Exchange Act Class members would not have purchased Coupang securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the misleading statements and/or the material adverse information which the Exchange Act Defendants did not disclose.

502.     As a direct and proximate result of Exchange Act Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of Coupang securities during the Class Period.

503.    By reason of the foregoing, Defendants Coupang, Kim, and Anand are liable to Lead Plaintiffs and members of the Exchange Act Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT V**

**FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE EXCHANGE ACT INDIVIDUAL DEFENDANTS**

504.    Lead Plaintiffs repeat, and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

505.    This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of the Exchange Act Class against the Exchange Act Individual Defendants. During the Class Period, the Exchange Act Individual Defendants directed involvement in the day-to-day operations of Coupang, and conducted and participated, directly and indirectly, in the conduct of Coupang's business affairs.  Because of their positions of power and control, they knew of or recklessly disregarded the adverse non-public information about Coupang's business practices.

506.    The Exchange Act Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be false or misleading prior to and/or shortly after those statements were made, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

507.    By virtue of their positions of control and authority as senior officers and/or directors, the Exchange Act Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Coupang, including the contents of public statements during the Class Period.

508.    In addition, Defendant Kim beneficially held approximately 76% of the voting power over Coupang following the IPO due to his ownership of Class B common stock.  As a result, Kim was able to exercise significant influence over all matters requiring approval by Coupang's shareholders, including the election of directors and the approval of significant corporate transactions.

509.    The Exchange Act Individual Defendants, therefore, were "controlling persons" of Coupang within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Coupang securities.

510.    By reason of such conduct, the Exchange Act Individual Defendants are liable to Lead Plaintiffs and members of the Exchange Act Class for violations of Section 20(a) of the Exchange Act.

## CLASS ACTION ALLEGATIONS

511.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of (a) the Exchange Act Class; and (b) the Securities Act Class. Excluded from the Classes are Defendants, members of the immediate family of any Defendant who is an individual, any person who was an officer or director of Coupang during the Class Period, any entity in which any such excluded party has or had a controlling interest or which is related to or affiliated with any excluded party, and their legal representatives, heirs, successors, or assigns of any such excluded party.

512.    The members of the Classes are so numerous and geographically dispersed that joinder is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Coupang's Class A common stock actively traded on the NYSE.  Indeed, Coupang and the Selling Stockholders sold over 130

million shares of Coupang's Class A common stock into the open market less than a week into the Class Period. While the exact number of members of the Classes is unknown at this time, and can only be ascertained through discovery, Lead Plaintiffs believe there are thousands of members in the proposed Classes. Record owners and other members of the Classes may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

513.    Lead Plaintiffs' claims are typical of the claims of the members of the Classes. All members of the Classes were similarly affected by Defendants' wrongful conduct in violation of the Exchange Act and/or the Securities Act, as complained of herein.

514.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class action and securities litigation. Lead Plaintiffs have no interests antagonistic to, or in conflict with, those of the Classes.

515.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes, including:

(a)    whether Defendants violated the Securities Act or the Exchange Act, or both;

(b)    whether Defendants misrepresented material facts, including whether the IPO Registration Statement and S-8 Registration Statement misrepresented material facts in violation of the Securities Act;

(c)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in the circumstances under which they were made, not misleading, including whether the IPO Registration Statement and the S-8 Registration Statement omitted

material facts necessary in order to make the statements made, in the circumstances under which they were made, not misleading;

(d)      whether, with respect to the Exchange Act claims only, the Exchange Act Defendants knew or recklessly disregarded that their statements were false or misleading;

(e)      whether the price of Coupang securities was artificially inflated; and

(f)      the extent of injuries sustained by the Classes and the appropriate measure of damages.

516.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other reasons, joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to redress the wrongs done to them individually.  There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment against Defendants as follows:

A.      Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as class representatives and Lead Plaintiffs' counsel as lead counsel under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding Lead Plaintiffs and the Classes compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C.      Awarding Lead Plaintiffs and the Classes their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D.    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: May 22, 2023                              **POMERANTZ LLP**

By:    _/s/ Jeremy A. Lieberman_____
Jeremy A. Lieberman
Emma Gilmore
Justin D. D'Aloia
Dolgora Dorzhieva

600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
egilmore@pomlaw.com
jdaloia@pomlaw.com
ddorzhieva@pomlaw.com

*Counsel for Lead Plaintiffs, and*
*Lead Counsel for the Classes*