**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE COUPANG, INC. SECURITIES
LITIGATION

Case No. 1:22-cv-07309-VSB

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ..................................................................................................................... 3

      A.    Coupang's Business .............................................................................................. 3

      B.    Plaintiffs' Five Theories of Fraud ...................................................................... 3

              1.    Coupang's Working Conditions ............................................................ 4

              2.    Coupang's Alleged Exploitation of Suppliers .................................... 4

              3.    Coupang's Alleged Use of Copyrighted Materials ............................. 5

              4.    Coupang's Purported Manipulation of Search Results ....................... 6

              5.    Coupang's Written Dispute Resolution Standards ............................. 7

      C.    Corrective Disclosures ........................................................................................ 7

ARGUMENT ........................................................................................................................... 8

I.      THE AMENDED COMPLAINT FAILS TO STATE A SECURITIES FRAUD
      CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT ................................. 8

      A.    The Amended Complaint Fails To Identify Any Material
            Misleading Statements Or Omissions ................................................................ 8

              1.    The Amended Complaint Fails To Identify Any Misleading
                    Statements or Omissions Concerning Coupang's Working
                    Conditions ............................................................................................. 9

              2.    The Amended Complaint Fails To Identify Any Misleading
                      Statements or Omissions Concerning Coupang's
                      Relationships with Merchants, Suppliers, and Customers .................. 15

              3.    The Amended Complaint Fails to Plead an Actionable
                    Omission Under Item 303 or Item 105 ................................................ 27

      B.    The Amended Complaint Fails To Plead A Strong Inference Of
             Scienter ................................................................................................................ 29

               1.    The Amended Complaint Fails to Allege Motive and
                    Opportunity ........................................................................................... 29

               2.    The Amended Complaint Fails to Allege Strong
                    Circumstantial Evidence of Conscious Misbehavior or
                    Recklessness ......................................................................................... 31

      C.    The Amended Complaint Does Not Adequately Allege Loss
             Causation ............................................................................................................. 40

               1.    Purported Disclosures Concerning Health and Safety ........................ 41

        2.      Purported Disclosures Regarding Relationships with Suppliers, Merchants, and Customers..........................................43

II.     THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER SECTIONS 11 AND 12(a)(2) OF THE SECURITIES ACT ........................................... 45

     A.     Plaintiffs Fail To Adequately Allege Any Materially Misleading Statements Or Omissions Under Both Rule 9(b) and Rule 8................................45

     B.     Nearly All Securities Act Claims Are Time-Barred .............................................46

     C.     Plaintiffs Lack Standing To Pursue Claims Under Section 12(a)(2)....................47

III.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY ............................................................................................... 48

CONCLUSION.............................................................................................................. 48

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson* v. *Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)........................................................................40

*Amgen Inc.* v. *Conn. Ret. Plan & Tr. Funds*,
568 U.S. 455 (2013).....................................................................................8

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)...................................................................................46

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).......................................................................3, 29

*In re Axis Capital Holdings Ltd.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006)........................................................46

*In re Bank of America AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013)............................................12, 17, 21

*In re Bausch & Lomb, Inc. Sec. Litig.*,
592 F. Supp. 2d 323 (W.D.N.Y. 2008).....................................................41

*Blackmoss Invests. Inc.* v. *ACA Capital Holdings, Inc.*,
2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .............................................28

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004).......................................................30

*In re Carnival Corp. Sec. Litig.*,
2022 U.S. Dist. LEXIS 58526 (S.D. Fla. Mar. 30, 2022).........................15

*Cent. States, Se. & Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*,
543 F. App'x 72 (2d Cir. 2013) .................................................41, 44, 45

*In re CitiGroup Inc. Bond Litig.*,
723 F. Supp. 2d 568 (S.D.N.Y. 2010)......................................................47

*In re Citigroup Sec. Litig.*,
2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .........................................27

*City of Coral Springs Police Officers' Ret. Plan* v. *Farfetch Ltd.*,
565 F. Supp. 3d 478 (S.D.N.Y. 2021).......................................................46

*City of N. Miami Beach Police Officers' and Firefighters' Ret. Plan* v. *Nat'l Gen. Holding Corp.*,
2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ........................................................38

*City of Omaha Police and Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020).................................................................30

*City of Pontiac Policemen's and Firemen's Ret. Sys.* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014)...............................................................................18

*City of Roseville Emps.' Ret. Sys. Ret. Sys.* v. *EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011).................................................................28

*City of Westland Police & Fire Ret. Sys.* v. *Metlife, Inc.*,
129 F. Supp. 3d 48 (S.D.N.Y. 2015)...................................................................22

*City of Westland Police & Fire Ret. Sys.* v. *MetLife, Inc.*,
928 F. Supp. 2d 705 (S.D.N.Y. 2013).................................................................48

*Cortina* v. *Anavex Life Sciences Corp.*,
2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ....................................................36

*Cox* v. *Blackberry Ltd.*,
660 F. App'x 23 (2d Cir. 2016) ..........................................................................38

*Das* v. *Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018).................................................................37

*ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase, Co.*,
553 F.3d 187 (2d Cir. 2009)...........................................................................8, 29

*Emps. Ret. Sys. of City of Providence* v. *Embraer S.A.*,
2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) ........................................12, 14, 21

*Foley* v. *Transocean Ltd.*,
861 F. Supp. 2d 197 (S.D.N.Y. 2012).............................................................13, 15

*Fransico* v. *Abengo, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020).................................................................35

*Freidus* v. *Barclays Bank PLC*,
734 F.3d 132 (2d Cir. 2013)...........................................................................46, 47

*Gagnon* v. *Alkermes PLC*,
368 F. Supp. 3d 750 (S.D.N.Y. 2019).................................................................29

*Garnett* v. *RLX Tech. Inc.*,
632 F. Supp. 3d 574 (S.D.N.Y. 2022).................................................................28

*In re GeoPharma, Inc. Sec. Litig.*,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006).........................................................................33, 35, 38

*Gillis* v. *QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016).......................................................................................10

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................ *passim*

*Gregory* v. *ProNAi Therapeutics, Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018).......................................................................................27

*Hammerstone NV, Inc.* v. *Hoffman*,
    2010 WL 882887 (S.D.N.Y. Mar. 10, 2010) ..........................................................................31

*Hensley* v. *IEC Elecs. Corp.*,
    2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014).........................................................................37

*Jacobowitz* v. *Range Resources Corp.*,
    596 F. Supp. 3d 659 (N.D. Tex. 2022) ....................................................................................23

*Janbay* v. *Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ......................................................41, 42, 44, 45

*Jiajia Luo* v. *Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020).......................................................................................19

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001).....................................................................................................31

*Kang* v. *PayPal Inc.*,
    620 F. Supp. 3d 884 (N.D. Cal. 2022) ...............................................................................15, 18

*Karolyi* v. *Loma Negra Compania Industrial Argentina Sociedad Anonima*,
    613 F. Supp. 3d 795 (S.D.N.Y. 2020).......................................................................................17

*Kusnier* v. *Virgin Galactic Holdings, Inc.*,
    2022 WL 16745512 (E.D.N.Y. Nov. 7, 2022)........................................................................10

*In re Lehman Bros. Mort.-Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011).....................................................................................................49

*Lentell* v. *Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)...............................................................................................40, 45

*Lewis* v. *YRC Worldwide Inc.*,
    2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) .......................................................................27

*In re Lions Gate Ent. Corp. Sec. Litig.*,
　　165 F. Supp. 3d 1 (S.D.N.Y. 2016)......................................................16

*Lipow* v. *Net1 UEPS Techs., Inc.*,
　　131 F. Supp. 3d 144 (S.D.N.Y. 2015).................................................38

*Loos* v. *Immersion Corp.*,
　　762 F.3d 880 (9th Cir. 2014) ............................................................44

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
　　616 F. App'x 442 (2d Cir. 2015) ......................................................47

*Malin* v. *XL Capital Ltd.*,
　　499 F. Supp.2d 117 (D. Conn. 2007), ...............................................35

*Maloney* v. *Ollie's Bargain Outlet Holdings, Inc.*,
　　518 F. Supp. 3d 772 (S.D.N.Y. 2021)................................................38

*Marcu* v. *Cheetah Mobile Inc.*,
　　2020 WL 4016645 (S.D.N.Y. Jul. 16, 2020) ....................................19

*Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*,
　　2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) .........................13, 17, 32

*Miller* v. *Lazard, Ltd.*,
　　473 F. Supp. 2d 571 (S.D.N.Y. 2007)................................................14

*In re Nokia Ojy (Nokia Corp.) Sec. Litig.*,
　　423 F. Supp. 2d 364 (S.D.N.Y. 2006)................................................28

*Novak* v. *Kasaks*,
　　216 F.3d 300 (2d Cir. 2000)..............................................................31

*O'Keefe* v. *Ogilvy & Mather Worldwide, Inc.*,
　　2006 WL 3771013 (S.D.N.Y. Dec. 18, 2006) .....................................3

*ODS Capital LLC* v. *JA Solar Holdings Co. Ltd.*,
　　2020 WL 7028639 (S.D.N.Y. Nov. 30, 2020)....................................13

*Olkey* v. *Hyperion 1999 Term Trust, Inc.*,
　　98 F.3d 2 (2d Cir. 1996)....................................................................18

*In re Omnicom Grp., Inc. Sec. Litig.*,
　　597 F.3d 501 (2d Cir. 2010)..........................................41, 43, 44, 45

*Ong* v. *Chipotle Mexican Grill, Inc.*,
　　294 F. Supp. 3d 199 (S.D.N.Y. 2018)..........................................10, 11

*Oregon Public Emps.' Ret. Fund* v. *Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ................................................................40

*In re Peabody Energy Corp. Sec. Litig.*,
    2022 WL 671222 (S.D.N.Y. Mar. 7, 2022) ........................................10

*Penn. Pub. Sch. Emps.' Ret. Sys.* v. *Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012)..................................................48

*Pirnik* v. *Fiat Chrysler Autos., N.V.*,
    2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017) .......................................35

*Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ....................................................................9

*In re Qudian Sec. Litig.*,
    2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) ...................................21

*Ramzan* v. *GDS Holdings Ltd.*,
    2020 WL 1689772 (S.D.N.Y. Apr. 7, 2020).......................................37

*In re Rhodia S.A. Sec. Litig.*,
    531 F. Supp. 2d 527 (S.D.N.Y. 2007)..................................................43

*Richman* v. *Goldman Sachs, Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)..............................................9, 19

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)................................................................46

*Sachsenberg* v. *IRSA Inversiones y Representaciones Sociedad Anónima*,
    339 F. Supp. 3d 169 (S.D.N.Y. 2018)..................................................37

*Schiro* v. *Cemex, S.A.B. de C.V.*,
    438 F. Supp. 3d 194 (S.D.N.Y. 2020)..................................................23

*Singh* v. *Cigna Corporation*,
    918 F.3d 57 (2d Cir. 2019).................................................11, 16, 26

*Sjunde AP-Fonden* v. *Goldman Sachs Grp., Inc.*,
    545 F. Supp. 3d 120 (S.D.N.Y. 2021)................................... *passim*

*Slayton* v. *American Exp. Co*,
    604 F.3d 758 (2d Cir. 2010)...........................................................29, 31

*Steinberg* v. *Ericsson LM Tel. Co.*,
    2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ....................................32

*In re Synchrony Fin. Sec. Litig.*,
     988 F.3d 157 (2d Cir. 2021) ...................................................................26

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
     531 F.3d 190 (2d Cir. 2008) ...................................................................29

*In re Teva Sec. Litig.*,
     2023 WL 3186407 (D. Conn. May 1, 2023) ...........................................39

*In re Time Warner Sec. Litig.*,
     9 F.3d 259 (2d Cir. 1993) .........................................................................9

*In re Travelzoo Inc. Sec. Litig.*,
     2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013) ........................................34

*In re Wachovia Equity Sec. Litig.*,
     753 F. Supp. 2d 326 (S.D.N.Y. 2011) ..........................................13, 34, 37

*Waters* v. *General Elec. Co.*,
     2010 WL 3910303 (S.D.N.Y. Sep. 29, 2010) ........................................42

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
     504 F. Supp. 3d 224 (S.D.N.Y. 2020) .....................................................48

*Woolgar* v. *Kingstone Cos., Inc.*,
     477 F. Supp. 3d 193 (S.D.N.Y. 2020) .............................................31, 39

*Youngers* v. *Virtus Investment Partners Inc.*,
     195 F. Supp. 3d 499 (S.D.N.Y. 2016) .....................................................38

**Statutes**

15 U.S.C. § 77k(a) ..............................................................................................45

15 U.S.C. § 77l(a) ..............................................................................................45

15 U.S.C. § 78u–4 ......................................................................................*passim*

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j ....................................*passim*

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t .................................8, 48

Section 11 of the Securities Act, 15 U.S.C. § 77k ...................................45, 46

Section 15 of the Securities Act, 15 U.S.C. § 77o ...................................8, 48

**Other Authorities**

17 C.F.R. § 229.303 ...........................................................................................27

## PRELIMINARY STATEMENT

Plaintiffs' Amended Complaint ("AC") is a classic scattershot pleading, a sleight of hand using sheer mass and length to distract from its lack of substance. The AC stiches together *five* distinct theories of fraud, no fewer than *thirteen* disparate corrective disclosures, and nearly a *dozen* cursory theories of scienter. As we demonstrate below, Plaintiffs' fraud claims under Section 10(b) of the Exchange Act should be dismissed with prejudice because Plaintiffs fail to plead three essential elements: (i) a material misstatement or omission, (ii) scienter, and (iii) loss causation.

*First*, each of Plaintiffs' five theories of fraud fails to allege false and misleading statements to the market, and can be dismissed on that basis alone. Plaintiffs identify more than 100 alleged statements they contend are false, nearly all of which are highly generic statements describing Coupang's "support" for "suppliers and merchants," "strategy of providing the lowest prices," and "culture of customer centricity." While the reasons that this collection of statements are not actionable are numerous, the legal analysis required to dismiss them is simple. Many of the alleged misstatements center on conduct that precedes the class period. Many concern conduct that *Plaintiffs themselves allege* was fully disclosed to the market and that were the subject of explicit risk disclosures. Nearly every statement is immaterial puffery, a protected forward-looking statement, or a sincerely-held opinion. In many instances, the challenged statements suffer from multiple of these flaws. And even if the challenged statements *were* actionable, none is rendered misleading by the allegations in the AC, which concern two isolated safety incidents over a one-year period and a handful of unrelated regulatory investigations concerning conduct about which Defendants never spoke to the market.

*Second*, Plaintiffs' attempt to plead scienter is equally deficient. The AC offers a theory of motive supported by stock sales that are in no way suspicious; the CEO sold less than one percent of his stock in the IPO, and the CFO in fact *increased* his holdings. The AC also pleads no specific

facts identifying any information that was conveyed to or known by any Defendant contradicting any public statement. Instead, the balance of the scienter theories, one more cursory than the next, allege that Defendants *must have known* their statements were false based on the existence of the government inquiries themselves and Coupang's denial of wrongdoing (which Plaintiffs label a "cover up"). But a good faith denial of wrongdoing does not support an inference of scienter, absent specific facts showing knowledge of concrete information contrary to Coupang's statements to the markets. Plaintiffs' circumstantial allegations fall woefully short of the law's high bar.

*Third*, and finally, Plaintiffs identify alleged corrective disclosures that are just as contrived as the alleged false statements they purport to correct, and the AC thus fails to plead loss causation. One alleged disclosure coincided with a share price *increase* of 1.5%, and another is so de minimis—a stock drop of just 0.2%—that it cannot constitute a corrective disclosure as a matter of law. Others are concocted based on minor, cumulative disclosures *days* after the disclosure of the event at issue in Plaintiffs' AC, where the information was already in the market. Other disclosures are based on external events such as customer complaints that do not reveal any alleged wrongdoing at all.

Relatedly, Plaintiffs' Securities Act claims fail because they challenge the very same statements discussed above, which are not pleaded to be false. These claims are also overwhelmingly time-barred because the facts underlying the claims—including nearly every alleged corrective disclosure on which Plaintiffs rely—were publicly known more than one year before this lawsuit was filed.

For all of these reasons, and others discussed below, the AC should be dismissed with prejudice.

# BACKGROUND[1]

## A.   Coupang's Business

Coupang, Inc. ("Coupang") went public through an IPO on March 11, 2021. AC ¶ 56. Since going public, Coupang's annual revenue has nearly doubled, and its gross profit has more than doubled. *Compare* Ex. 2 at 4, *with* Ex. 3 at 44. Coupang has subsidiaries in six countries, including South Korea.

Coupang is the largest product e-commerce company in South Korea. Ex. 2 at 4. Coupang operates an online retail store that offers products for sale directly to Coupang's 17.9 million customers, including both Coupang's own products and those sold by the hundreds of thousands of third-party merchants who sell on Coupang's platform. Ex. 4 at 20–21. To effectuate Coupang's fast delivery process, Coupang operates a distribution network of logistics centers and delivery drivers. AC ¶ 3. As of December 31, 2020, Coupang's network included over 100 fulfillment and logistics centers in 30 different cities. Ex. 2 at 4. As of that date, Coupang employed "close to 50,000 employees" and used thousands of vehicles to deliver millions of items every day. *Id.* at 4, 127.

## B.   Plaintiffs' Five Theories of Fraud

Plaintiffs allege that over approximately one year, from March 11, 2021 through March 14, 2022 (the "class period"), Defendants made materially misleading statements and omissions that concealed five wholly unrelated categories of alleged wrongdoing.

---

[1]   The background, accepted as true only for purposes of this motion to dismiss, is drawn from the AC and documents it quotes, cites, or references, as well as documents legally required to be filed with the SEC. *See ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court may take notice of the existence of publicly available materials and "widely known adjudicative facts not subject to reasonable dispute." *O'Keefe* v. *Ogilvy & Mather Worldwide, Inc.*, 2006 WL 3771013, at *1 (S.D.N.Y. Dec. 18, 2006). With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability. All emphasis is added unless otherwise indicated. Citations to exhibits refer to exhibits attached to the Declaration of Daniel S. Sinnreich in support of Defendants' Motion to Dismiss (the "Sinnreich Declaration").

### 1.      Coupang's Working Conditions

*First*, Plaintiffs allege that Defendants misled investors about Coupang's commitment to worker safety by stating that "we consider our employee relations to be positive," and that Coupang was "prioritizing the health and safety of its employees." AC ¶ 95; *see* Ex. 1 rows 1–5. Plaintiffs allege that these and similar statements were revealed to be false because, on March 23, 2021, a Coupang employee with pre-existing "heart-related abnormalities" died on his second day of work, and on June 17, 2021, just one of Coupang's 100 logistics facilities experienced a fire in which no employees were injured. AC ¶¶ 96–97; 116–17. Plaintiffs do not allege that Defendants guaranteed that Coupang would never experience safety incidents. To the contrary, Coupang expressly disclosed in its IPO registration statement that its "business and the infrastructure on which [its] business relies is vulnerable to damage or interruption from . . . fires," and that its business could be "adversely affected from an accident [or] safety incident" or "negative publicity related to workforce safety." Ex. 2 at 40–41, 48–49. Plaintiffs also allege that other Coupang employees experienced health issues *before* the class period and that one of Coupang's logistics centers experienced a COVID-19 outbreak in 2020. AC ¶¶ 78–79; 86–88. But plaintiffs do not allege that this conduct was concealed from investors; rather, Plaintiffs allege that these events received "intense market scrutiny" and "intense public scrutiny" *before the IPO*. *See id.* ¶¶ 74–75, 86.

### 2.      Coupang's Alleged Exploitation of Suppliers

*Second*, Plaintiffs challenge Defendants' statements that Coupang "offer[s] opportunities to advertise on [its] website," and provides the "lowest prices available in the Korean market" because of its "procurement strategy." AC ¶ 135; Ex. 1 rows 6–15. Plaintiffs do not allege that these statements were false, but instead that they misled investors because they concealed that Coupang engaged in various supposed anticompetitive practices, such as requiring suppliers to raise prices on competitor's websites and "forc[ing]" suppliers to make incentive payments. *Id.* ¶¶

4

125–27. Plaintiffs rely principally on an investigation by Korea's Fair Trade Commission (the "KFTC") into these allegations, which resulted in a $2.8 million fine. *Id.* ¶ 137. But the KFTC investigation was publicly announced long before the class period and concerned conduct that occurred from 2017 to 2020—before the class period began and the alleged misstatements were made. *See id.* ¶¶ 125–27. Moreover, Coupang disclosed the KFTC investigation in its IPO Registration Statement and warned investors that the outcome was "uncertain" and could result in "fines," Ex. 2 at 13, 41, as eventually turned out to be the case.

### 3.   Coupang's Alleged Use of Copyrighted Materials

Plaintiffs' third theory concerns Coupang's online Marketplace. When consumers search for goods on the Marketplace, the product with the best quality and price is displayed as the top result—the "Item Winner"—along with an image of that product. AC ¶¶ 147–48. If the winning merchant did not provide Coupang with an image of the product, Coupang may display an image of the same product provided by a different merchant; this allows small businesses to use the Marketplace without paying for expensive marketing. *See id.* Plaintiffs allege that this practice violates Korean copyright law, but acknowledge that the practice was *publicly disclosed* before and throughout the class period in Coupang's "Sales Terms and Conditions." AC ¶¶ 151, 155–57; Ex. 5 at 18; Ex. 6 at 17; Ex. 7 at 18. Plaintiffs nonetheless allege that Defendants lied to investors when they defended the practice and stated Coupang's view that its "Item Market Sales Terms and Conditions do not violate the Fair Trade Act and Copyright Act," *id.* ¶ 162, and that Coupang's "technology helps merchants compete holistically on overall customer experience," *id.* ¶ 158; Ex. 1 rows 16–23. Plaintiffs allege that, months later, the KFTC "confirmed" that this practice was "invalid under South Korea's Copyright Act and Act on the Regulation of Terms and Conditions," and told Coupang to "amend its Seller Terms and Conditions." AC ¶¶ 164–65. Notably, Plaintiffs mischaracterize the KFTC Press Release on which they rely, which did ***not*** adjudicate any

violations of the Copyright Act. *See* Ex. 8.[2] In any event, Plaintiffs plead no facts suggesting that any Defendant did not believe this practice was lawful when the challenged statements were made or had access to any facts or legal analysis contradicting their views. Plaintiffs also ignore Coupang's disclosure that the "Korean government has recently focused on addressing copyright . . . infringement in Korea," and Coupang maybe be subjected "to sanctions, fines, or other penalties." Ex. 2 at 50.

### 4.    Coupang's Purported Manipulation of Search Results

*Fourth,* Plaintiffs challenge high-level statements about Coupang's technology and website search function, such as "[w]e have developed technology that enables us to increase our operating efficiency," AC ¶ 211, and "[s]earch and recommendation results are aided by deep learning, data analytics, and image recognition," *id.* ¶ 213; *see* Ex. 1 rows 24–42. Once again, Plaintiffs do not allege that any of these statements are actually false. Instead, they allege that these statements concealed Coupang's supposed practice of manipulating search results to favor Coupang's private-label products. AC ¶ 174. In support of this theory, Plaintiffs cite the bare fact that the KFTC began an investigation into this issue in June 2021. AC ¶¶ 170–71, 176. Plaintiffs do not allege that this investigation resulted in any charges or determinations of wrongdoing. Plaintiffs also allege that, "beginning around July 2021," unspecified Coupang employees began leaving an unspecified number of positive reviews for unspecified Coupang products. AC ¶¶ 173–74, 177. Plaintiffs allege that this constitutes securities fraud simply because the KFTC is purportedly investigating

---

2    The KFTC Press Release on which Plaintiffs appear to rely did not *adjudicate* any wrongdoing or issue any corrective order, fine, sanctions, or other judgment. It reported, instead, on changes that had already been made to a provision in Coupang's terms and conditions granting it unrestricted use of seller content. These changes were consistent with the KFTC's view that such clauses are "unreasonably unfavorable to customers" and thus "invalid" under "Article 6 of the Act on Terms and Conditions." Ex. 8 at 5. The KFTC did **not** express any view that Coupang's terms and conditions somehow violated the "Copyright Act," notwithstanding its reference to copyright laws in its discussion of the Act on Terms and Conditions. *See id.*

the issue and the investigation is "ongoing." AC ¶¶ 178–82.

### 5.    Coupang's Written Dispute Resolution Standards

Finally, in just a few paragraphs of what appears to be an afterthought theory, Plaintiffs allege that, on March 6, 2022, the KFTC issued a "corrective order to Coupang for failing to maintain written dispute resolution policies accessible to customers on its platform." AC ¶ 183–88. Plaintiffs allege *no* additional facts about this alleged infraction, and do not allege that any Defendant ever spoke about this policy. Instead, they allege that this supposed conduct rendered false certain highly generic statements, such as: "We have policies and procedures to protect both merchants and customers on our marketplace." *Id.* at ¶ 186; Ex. 1 rows 43–49. Notably, the AC discusses *several* "policies and procedures" that Coupang maintains to protect merchants and consumers, including a "dispute mediation center for transactions between customers and third-party merchants" and a "customer services center." *Id.* ¶¶ 183–84.

### C.    Corrective Disclosures

Plaintiffs allege that the "truth . . . was revealed to the market in a series" of *thirteen* "disclosures" during the class period. AC ¶ 471. The alleged disclosures include, among other things, reports that business owners or civic groups complained about Coupang's practices, that unspecified individuals boycotted Coupang following the facility fire, and that the KFTC had initiated investigations into certain conduct described above. AC ¶¶ 471–84. Plaintiffs seek to recover investment losses from stock drops that coincided with these thirteen alleged "disclosures," some of which were as small as 0.2%. A chart listing the alleged corrective disclosures and stock drops is appended as Exhibit 23 to the Sinnreich Declaration.

***

Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 against Coupang, CEO Bom Kim, and CFO Gaurav Anand;

and under Section 20(a) of the Exchange Act against Kim and Anand. Plaintiffs also assert claims under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") against Coupang; Kim, Anand, former Chief Accounting Officer Michael Parker, and Coupang's directors (collectively, the "Individual Defendants"), and the underwriters of Coupang's IPO[3]; and under Section 15 of the Securities Act against Coupang and the Individual Defendants.

## ARGUMENT

## I.   THE AMENDED COMPLAINT FAILS TO STATE A SECURITIES FRAUD CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT

To state a claim for a violation of Section 10(b) and Rule 10b-5, plaintiffs must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc.* v. *Conn. Ret. Plan & Tr. Funds*, 568 U.S. 455, 460–61 (2013). Plaintiffs' Section 10(b) claim should be dismissed because the AC fails to adequately plead three essential elements of that claim: (i) a material misstatement or omission, (ii) scienter, and (iii) loss causation.

### A.   The Amended Complaint Fails To Identify Any Material Misleading Statements Or Omissions

Under Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), plaintiffs must "state with particularity the circumstances constituting fraud," including by "specify[ing] each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase, Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Plaintiffs must also specifically identify "the omitted facts

---

[3] The underwriter Defendants are Citigroup Global Markets Inc., HSBC Securities (USA), Inc., Deutsche Bank Securities Inc., UBS Securities LLC, Mizuho Securities USA LLC, and CLSA Limited. CLSA Limited has not been served with the AC.

that are necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." *Kleinman* v. *Elan Corp. plc*, 706 F.3d 145, 152 (2d Cir. 2013).

Moreover, and particularly relevant here, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). "[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead." *Richman* v. *Goldman Sachs*, *Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012). There must be a close relationship between an alleged misstatement and any omitted facts; an "attenuated" relationship is insufficient. *See Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*, 11 F.4th 90, 103 n.4 (2d Cir. 2021).

Plaintiffs offer *five* discrete theories of fraud in the AC, each an exercise in improper fraud-by-hindsight seeking to capitalize on a negative business development. None comes close to meeting these rigorous pleading standards.

### 1.   The Amended Complaint Fails To Identify Any Misleading Statements or Omissions Concerning Coupang's Working Conditions

Plaintiffs first allege that Defendants' high-level statements about Coupang's "positive" employee relations and commitment to employee safety were misleading because, during the class period, there was a fire at one of Coupang's 100 logistics facilities, and one of Coupang's 50,000 employees died on his second day of work. *See* AC ¶¶ 71–118. Specifically, Plaintiffs challenge statements that Coupang "prioritiz[es] the health and safety of its employees," AC ¶ 355; "hope[d]" to "unlock both a better world for [its] customers and a better workplace for [its] employees," AC ¶ 313; and "will continue . . . to create good jobs, the best working condition jobs in the country," AC ¶ 353; *see* Ex. 1 rows 1–5. These broad, aspirational statements are not rendered false by the two isolated incidents alleged, unfortunate as they may have been.

***First***, each of these statements is inactionable puffery or corporate optimism. "[G]eneral and self-congratulatory statements about [a company's] commitment to safety are precisely the type of puffery that this and other circuits have consistently held to be inactionable." *See In re Peabody Energy Corp. Sec. Litig.*, 2022 WL 671222, at *3, 13 (S.D.N.Y. Mar. 7, 2022) (dismissing statements including that company "maintains constant vigilance toward safety" and that "[s]afety is [the company's] first value, integrated into all areas of our business"); *Ong* v. *Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 219, 232 (S.D.N.Y. 2018) (statements regarding commitments to "food safety" are not actionable because they are "couched . . . in aspirational terms").[4]

Several challenged statements, including that Coupang "will continue . . . to create good jobs" and "hope[s]" to "create a better world," are also forward-looking statements protected by the PSLRA safe harbor. *See* Ex. 1 rows 2–5. A forward-looking statement is not actionable if it is "[i] accompanied by meaningful cautionary language *or* [ii] is immaterial *or* [iii] the plaintiff fails prove that it is made with actual knowledge that it was false or misleading.'" *Gillis* v. *QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 579 (S.D.N.Y. 2016) (emphasis in original). Here, all three prongs are satisfied. Each forward-looking statement in Coupang's SEC filings and investor calls is accompanied by meaningful cautionary language.[5] Each is immaterial puffery. *See infra* pp. 26–27. And, as explained in detail below, *see infra* p. 27–28, 31–38, Plaintiffs fail to allege that any challenged statement was made with "actual knowledge" of its falsity. *Gillis*, 197 F. Supp. 3d at 580.

***Second***, even if the challenged statements could theoretically be actionable, they are not

---

[4]  *Accord Kusnier* v. *Virgin Galactic Holdings, Inc.*, 2022 WL 16745512, at *11 (E.D.N.Y. Nov. 7, 2022) (dismissing statement that company had an "uncompromising commitment to safety").

[5]  *See, e.g.*, Ex. 2 at 40–41, 48–49, 64–65; Ex. 13 at 5–6; Ex. 14 at 4; Ex. 15 at 4; Ex. 25 at 57, 63; Ex. 26 at 47, 59, 64–65; Ex. 27 at 59, 64–65; Ex. 28 at 31, 35; Ex. 29 at 4.

here because Coupang warned the market of the risks. It never assured investors that it had a flawless safety record or that safety incidents like a fire or a tragic employee death would never occur. To the contrary, Coupang warned that "[its] business and the infrastructure on which [its] business relies is vulnerable to damage or interruption from . . . fires," and that such "unanticipated problems at our facilities . . . could result in disruptions, outages, and other performance and quality problems." Ex. 2 at 40–41. Similarly, it warned that the business could be "adversely affected from an accident [or] safety incident," could be "forced to bear substantial losses from an accident or safety incident resulting from [its] fulfillment or last mile delivery activities," and that "negative publicity related to workforce safety . . . could have an adverse effect on [its] business, prospects, financial condition, and results of operations." Ex. 2 at 48–49.

The Second Circuit's decision in *Singh* v. *Cigna Corporation*, 918 F.3d 57 (2d Cir. 2019) is illustrative. There, plaintiffs alleged that defendants' statements regarding their commitment to compliance with all "applicable regulations" were misleading because a regulator later found that the company had committed several violations. *Id.* at 60–61. The Second Circuit affirmed dismissal because defendants' statements were "framed by acknowledgements of the complexity and numerosity of applicable regulations," which "suggests caution (rather than confidence) regarding the extent of [defendant's] compliance." *Id.* at 64. The same reasoning requires dismissal here. Coupang repeatedly disclosed the risk of fire and workplace safety incidents. No reasonable investor would have understood Defendants to guarantee that no safety incidents would occur in the future. *See Ong*, 294 F. Supp. 3d at 232 (dismissing statements regarding a commitment to food safety, notwithstanding a food-borne illness outbreak, because challenged statements "did not amount to a guarantee with regard to the efficacy of Chipotle's food-safety practices").

In urging a contrary conclusion, Plaintiffs focus on the fact that *before* the class period, a

small number of Coupang's workers died after experiencing cardiac issues and Coupang faced backlash for purported mishandling of a COVID-19 outbreak. *See* AC ¶¶ 78, 86–90. But Plaintiffs do not allege that these incidents were concealed from investors. To the contrary, Plaintiffs allege that there were highly public allegations that the pre-class period worker deaths were tied to their workloads which "kept Coupang in the news," AC ¶¶ 78, 85, and that Korean government officials made public statements regarding Coupang's COVID-19 outbreak before the IPO, *see* AC ¶ 90. Indeed, Defendant Kim specifically *acknowledged* a "work-related death in the past year" in a challenged statement. AC ¶ 351. The challenged statements could not have misled investors about pre-class period incidents that were matters of public record. *See In re Bank of America AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (holding that "alleged omissions did not mislead investors" where pre-class period information "was in the public domain").[6]

**Third**, Plaintiffs' allegations fail because they plead no facts suggesting that the two isolated safety incidents discussed in the AC—a fire at the Deokpyeong fulfillment center, and the heart attack death of a recent hire with a pre-existing heart condition—reflected a lack of commitment to workplace safety or employees.

Deokpyeong Fire. Plaintiffs principally rely on two confidential witnesses ("CWs"), neither of whom provides relevant, firsthand knowledge of the facility fire. CW1 alleges that the Deokpyeong warehouse exceeded its storage capacity and that items were placed in aisles, in front of doors, and outside the facility. *See* AC ¶ 102. But Plaintiffs fail to plead facts demonstrating that capacity issues caused the facility fire. These allegations are also not based on CW1's firsthand knowledge because CW1 did not even work at the Deokpyeong facility. *Id.* Rather, CW1 claims

---

[6]   Moreover, the pre-class period allegations about supposed COVID-19 outbreaks are wholly irrelevant because there is no allegation that any such alleged misconduct continued into the class period. *See Emps. Ret. Sys. of City of Providence* v. *Embraer S.A.*, 2018 WL 1725574, at *11 (S.D.N.Y. Mar. 30, 2018).

that he "regularly spoke about safety incidents at his facility and those at other facilities with senior executives," not that he observed them directly. *Id.* Courts routinely discount CW allegations where the "information attributed to them was sourced secondhand and lacked sufficient independent corroboration." *Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *11 (S.D.N.Y. Mar. 30, 2021); *see also ODS Capital LLC* v. *JA Solar Holdings Co. Ltd.*, 2020 WL 7028639, at *9 (S.D.N.Y. Nov. 30, 2020) (discrediting CW allegations based on "secondhand accounts in which they heard about [relevant information] from a colleague").

CW1's allegations are also not tied to any specific time period, much less the time of the fire. This "renders the task of matching CW allegations to contrary public statements all but impossible, since allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants at the time of an alleged misstatement." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011). CW1 also recalls that Coupang management regularly met to discuss "safety incidents," although he does not recall any specific incidents discussed. AC ¶¶ 398–99. This does not render any statement misleading; rather, it *supports* Defendants' statements that Coupang was committed to workplace safety. *See Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 211 (S.D.N.Y. 2012) (company's commission of a safety audit showed that a challenged statement that company would address safety problems was true).

CW2's allegations are even less relevant. CW2 merely recalls that Coupang "struggled with capacity restraints following the Deokpyeong Facility fire." AC ¶ 110. But these allegations shed no light on the facility conditions *before* the fire and have no bearing on whether Defendants' statements regarding a commitment to health and safety were false or misleading.

Plaintiffs also rely on a pre-class period report that allegedly showed several defects with the fire system at the Deokpyeong facility. *See* AC ¶ 104. But Plaintiffs plead no facts

13

demonstrating that the defects existed several months later at the time of the facility fire (rather than being remediated following the inspection), or that the supposed defects contributed to the fire. *See City of Providence*, 2018 WL 1725574, at *11. Indeed, while a firefighter tragically died in the fire, the AC does not allege that *any employee* sustained *any injury* in the fire, which implies that Coupang's systems for alerting and evacuating employees were effective during the incident.

Plaintiffs further reference media reports pre-dating the class period in which anonymous employees purportedly discussed a practice at the facility of ignoring the fire alarm. *See* AC ¶ 103. But there are no particularized facts discussing who these employees are, whether they are reliable, whether this supposed practice continued into the class period, and the extent to which it contributed to the fire. Plaintiffs who rely on media reports "are not otherwise relieved of their burden to adequately identify and link the sources with the allegations of misconduct derived from the sources," and cited reports "still must indicate particularized facts about Defendants' conduct in order to support the Plaintiffs' claims." *See Miller* v. *Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007). These vague allegations fail in that task. Accordingly, Plaintiffs have failed in their task to connect the fire to the challenged statements about employee health and safety.

<u>Employee Death</u>. Plaintiffs also point to an employee death that took place on March 24, 2021, as evidence of Coupang's lack of commitment to employee safety. There are, however, no factual allegations suggesting that Coupang's conduct caused (or contributed to) the employee's death. And such an inference would be wholly implausible. Plaintiffs *concede* that the employee had a pre-existing health condition and was only on his *second* day on the job. AC ¶ 117.

If anything, Plaintiffs' allegations strongly imply that Coupang *was* committed to employee safety. The AC alleges that Coupang conducted "legally mandated pre-employment health screenings," AC ¶ 114, and that new employees were "assigned less delivery volume than

other employees," AC ¶¶ 115, 117. Plaintiffs also concede that the employee who died was undergoing a "thorough medical check-up because he showed heart-related abnormalities in his initial medical examination." AC ¶ 117. Again, this suggests Coupang acted in *accordance* with its stated commitment to employee health and safety. *See Foley*, 861 F Supp. 2d at 211. There are no allegations tying this employee's death to any particular failure at Coupang, much less one that renders misleading generalized statements about a commitment to employee health and safety.

  **Fourth**, and critically, even if Plaintiffs had adequately alleged that Coupang's conduct contributed to two discrete, isolated incidents (which they do not), they still would not state a claim because, as logic would dictate, in order to sustain a claim for *securities fraud* against the company, Plaintiffs must "adequately allege a systemic organizational disregard for" employee safety. *See In re Carnival Corp. Sec. Litig.*, 2022 U.S. Dist. LEXIS 58526, at *56 (S.D. Fla. Mar. 30, 2022) (allegations about discrete regulatory violations did not render misleading statements about commitment to regulatory compliance). Plaintiffs allege that, in a one-year period, just one facility (out of 100) had a fire, that fire did not result in *any* employee injuries, and one employee (out of 50,000) died on his second day of work. AC ¶¶ 53, 116. Plaintiffs do not allege that Coupang's health and safety practices violated any law or regulation and come nowhere near pleading the type of company-wide, systemic disregard for stated commitments that courts have found adequate in comparable securities fraud cases. *See Kang* v. *PayPal Inc.*, 620 F. Supp. 3d 884, 899 n.2 (N.D. Cal. 2022) (allegations of "specific legal violations" were not "frequent or widespread enough to render the statements [about commitment to compliance] misleading").

   **2. The Amended Complaint Fails To Identify Any Misleading Statements or Omissions Concerning Coupang's Relationships with Merchants, Suppliers, and Customers**

  Plaintiffs' remaining theories seize on a handful of Korean regulatory investigations that largely occurred and were disclosed *before the class period*, and attempt to shoehorn them into a

theory of securities fraud by alleging that their mere existence renders misleading Coupang's high-level statements about its business relationships with suppliers, merchants, and customers. But the Second Circuit has rejected such "creative attempt[s] to recast . . . regulatory violations" as securities fraud. *Singh*, 918 F.3d at 59–61. Setting aside their prior disclosure, each theory fails <u>both</u> because the AC does not adequately allege that Coupang engaged in misconduct, <u>and</u> because, even if it did, the alleged misconduct would not render any challenged statement false.

### (a)   Coupang's Price-Matching System and Supposed Exploitation of Suppliers

Plaintiffs first allege that, *before the class period*, Coupang pressured suppliers to purchase ads from Coupang and to raise prices on competing platforms, which allowed Coupang to offer a guarantee where it matched prices on competitors' websites. Plaintiffs chiefly rely on the fact that the KFTC investigated these allegations and, in August 2021, issued a "corrective order" and a $2.8 million fine to Coupang. AC ¶ 137. This conduct allegedly rendered misleading Defendants' high-level statements about Coupang's suppliers and business, including that Coupang "support[ed] hundreds of thousands of suppliers," AC ¶ 315, "offer[ed] opportunities to advertise," *id.* ¶ 317, "receiv[ed] consideration from suppliers," *id.* ¶ 319, had a "strategy [of] providing the lowest prices," *id.* ¶ 321, and had a "culture of customer centricity," *id.* ¶ 344; Ex. 1 rows 6–15.

This theory fails because the alleged misconduct significantly pre-dates the class period. Plaintiffs' factual allegations discuss Coupang's conduct between 2017 and 2019, *see* AC ¶¶ 119–31, and the KFTC press release announcing the sanction makes clear on the first page that it concerns conduct only "[f]rom 2017 to September 2020." Ex. 9 at 1. Such a gap between the alleged misconduct and the class period renders it immaterial. *See In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 17 (S.D.N.Y. 2016) (noting plaintiffs' failure to allege how omitted information before the class period "would have been material during the Class Period"). Even

more critically, Plaintiffs do not allege that this pre-class period conduct was concealed from investors. The AC confirms that media began reporting on these issues—and the KFTC publicly confirmed its investigation—as early as June 2019, *years* before the IPO. *See* AC ¶¶ 130–191. Because "[d]efendants cannot be held liable for failing to disclose . . . publicly available information," *Bank of Am. AIG Disclosure*, 980 F. Supp. 2d at 576, this stale alleged misconduct cannot give rise to a securities fraud claim.

Plaintiffs halfheartedly allege that this conduct continued during the class period. *See* AC ¶¶ 144–45. But no well-pleaded facts support this contention. The AC identifies *one supplier* who allegedly "announced"—eight months *after the class period*—that Coupang stopped ordering *one* of its products because the supplier refused to pay "margin rates demanded by Coupang." AC ¶ 145. Plaintiffs do not explain how this allegation relates to the conduct investigated by the KFTC, nor plead particular facts corroborating this vague allegation or identifying *any* other suppliers who raised similar concerns. And the press release announcing the KFTC's fine does not allege that *any* misconduct continued past "September 2020"—*six months* before the class period. Ex. 9. Accordingly, the "amended complaint sets forth . . . no reason to infer that the underlying conduct, if it occurred, is continuing, to [Coupang's] knowledge." *Karolyi* v. *Loma Negra Compania Industrial Argentina Sociedad Anonima*, 613 F. Supp. 3d 795, 804 (S.D.N.Y. 2020).[7]

The fact that the KFTC levied a comparatively small fine against Coupang does not render any of the challenged statements misleading. *See* AC ¶ 137. Coupang affirmatively *disclosed* the existence of the investigation in its registration statement, stated that the outcome was "uncertain," and warned that "any judgment, ruling, fine, penalty or injunctive relief" could "negatively affect

---

[7] *See Menora Mivtachim*, 2021 WL 1199035, at *12 (where "allegations contain no details at all" about the misconduct during the class period, court cannot infer that conduct continued unchanged into the class period)

our business, results of operations, and financial condition." Ex. 2 at 40. And Coupang further warned that it "could be adversely affected by unfavorable . . . interpretations of existing laws, rules, and regulations . . . including those relating to . . . Internet advertising and price display." Ex. 2 at 46. Because Defendants "warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed," the challenged statements are not materially false or misleading. *Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996); *see City of Pontiac Policemen's and Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (company "complied with its disclosure obligations under [Second Circuit] case law" by disclosing existence of DOJ investigation).

*In re Avon Products, Inc. Securities Litigation* is instructive. 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009). In that case, plaintiffs alleged that the issuer concealed its "unethical" marketing practices, such as pressuring sales associates to buy unused products and pay for the shipping costs on any returns. *Id.* at *4–6. The court dismissed the claims because, as here, there were multiple media reports about the alleged misconduct and the issuer had disclosed the existence of a related lawsuit in its SEC filings. *Id.* at *25.

To the extent Plaintiffs allege Coupang had an affirmative obligation to disclose the alleged misconduct, they are wrong. A public company has no duty to disclose alleged, uncharged, unadjudicated conduct that is the subject of a government investigation where no violations have been found, much less charged. *See City of Pontiac*, 752 F.3d at 184 (explaining that "disclosure is not a rite of confession," and "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing"); *PayPal*, 620 F. Supp. 3d at 897 (issuer "had no obligation or requirement to elaborate on any alleged non-compliance because it had not yet been found to be non-compliant"). Coupang disclosed the existence of the KFTC inquiry and declined to predict an outcome; the securities laws do not require any more.

18

Nor does the alleged misconduct render any statement false. To the extent any challenged statements contain objective, verifiable statements of fact, Plaintiffs do not allege that they are false. For example, Plaintiffs do not allege that Coupang *did not* "offer opportunities to advertise" or "receive consideration from suppliers." *See* AC ¶¶ 317, 319. Instead, Plaintiffs' theory is that merely by mentioning words like "suppliers," Coupang assumed a duty to disclose the alleged anticompetitive conduct discussed in the AC. But it is well-settled that "revealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead." *See Richman*, 868 F. Supp. 2d at 274. None of the generic, high-level statements here implicated the alleged anticompetitive conduct—or even mentioned the price-matching guarantee—and none obligated Coupang to "confess" to uncharged wrongdoing, particularly where Plaintiffs do not even allege facts suggesting that Coupang believed it to be wrongful. *See Jiajia Luo* v. *Sogou, Inc.*, 465 F. Supp. 3d 393, 409–10 (S.D.N.Y. 2020) (holding that general statements regarding compliance with the law did not give rise to a duty to disclose the specific inadequacy of compliance mechanisms).

Plaintiffs also allege that statements attributing Coupang's "lowest prices" to its "procurement strategy" and "cost efficiencies" were misleading because alleged anticompetitive conduct also contributed to low prices. AC ¶¶ 135, 325, 340. This theory fails because Plaintiffs do not allege the significance of the allegedly anticompetitive conduct to Coupang's sales numbers and ability to maintain low prices. In *Marcu* v. *Cheetah Mobile Inc.*, 2020 WL 4016645, at *5 (S.D.N.Y. Jul. 16, 2020), for example, plaintiffs alleged that the issuer's statement that it generated marketing revenues "primarily by referring user traffic and selling advertisements" was misleading because the issuer's revenue was generated in part by fraud. The court rejected this theory because the challenged statement did not "rule out other factors playing a role in generating revenue," and

19

because "the Complaint does not include a single allegation about the significance of the [fraud] scheme" to the issuer's "overall revenues." *Id.* Plaintiffs' allegations suffer from the same flaws.

### (b) Coupang's Supposed Use of Copyrighted Materials From Merchants In The Item Market

Plaintiffs next attempt to manufacture a fraud claim by concocting a confusing theory involving Coupang's "Item Market." The Item Winner system uses a single image to represent the same product offered on Coupang's Marketplace by several different merchants, even if the marketing image was provided by a merchant other than the top search result, or "Item Winner." AC ¶ 147; *supra* p.5. Plaintiffs allege that using one merchant's marketing image when a different merchant is the Item Winner violates Korea's Copyright Act, *see* AC ¶¶ 159–165, and therefore that it rendered misleading statements that Coupang "support[s] . . . merchants," "focus[es] on innovations around . . . effective merchant solutions," and has "policies and procedures to protect both merchants and customers in our marketplace." AC ¶¶ 315, 335, 342; *see* Ex. 1 rows 16–23.

Once again, Plaintiffs plead no facts suggesting that *any* of this conduct was concealed from investors. The AC *concedes* that this practice was disclosed in Coupang's publicly available Seller Terms and Conditions, which stated as early as July 2020 that Coupang can "freely use" any protected images on its website, and that any "secondary works" that were generated from the seller's images "belong to [Coupang]." AC ¶ 151. Plaintiffs further concede that in September 2020—still months before the Class Period—Coupang released a public statement responding to "media coverage" of this issue, explaining that "[s]ellers . . . expressly agree to the sharing of images in accordance with the operational structure of the Item Market," and that sellers further "expressly agree that the images provided will be shared as representative images for similar products." AC ¶ 157; Ex. 10. As above, "Defendants cannot be held liable for failing to disclose

publicly available information." *Bank of Am. AIG Disclosure*, 980 F. Supp. 2d at 576.[8]

Plaintiffs allege the KFTC "confirmed" during the class period that the practice was "invalid under South Korea's Copyright Act and Act on the Regulation of Terms and Conditions," and required Coupang to "amend its Seller Terms and Conditions" and modify this practice. *See* AC ¶¶ 164–65. As a threshold matter, this allegation is not accurate: the KFTC did ***not*** determine that this practice violated the Copyright Act. Ex. 8 at 5; *supra* pp. 5–6. And although the KFTC viewed this practice as "unreasonably unfavorable to customers" under the Terms and Conditions Act, the resolution involved Coupang amending one provision of its *public* Terms and Conditions, demonstrating, yet again, that the complained-of practice was *publicly displayed* on Coupang's website and known to merchants and investors. Ex. 8 at 5. Thus, Plaintiffs' theory is not that Coupang concealed *the practice* of using marketing images for different Item Winners, but instead that Coupang failed to *confess* to its alleged "invalid[ity]" before the KFTC concluded its investigation. As shown above, however, the securities laws do not require such confessions. *See Emps.' Ret. Sys. of Providence*, 2018 WL 1725574, at *4 (S.D.N.Y. Mar. 30, 2018) (dismissing complaint "premised on the faulty notion that [defendant] was required to disclose details of the FCPA violations and admit that it had engaged in wrongdoing—before it had even been charged and before the investigations were even complete"); *supra* p. 18.[9]

Nor can Plaintiffs argue that Defendants guaranteed perfect compliance with copyright laws; to the contrary, aside from the already-disclosed risk that adverse legal interpretations may harm Coupang, *see supra* p. 6, the risk of copyright enforcement was specifically disclosed in the

---

[8]  *See In re Qudian Sec. Litig.*, 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019) (finding alleged misrepresentations about activity that violated Chinese regulations "inactionable as a matter of law" where the information was "publicly known at the time of the IPO, as reflected in several newspaper articles").

[9]  *Accord Société Générale Sec. Servs., GbmH*, 2018 WL 4616356, at *5 (N.D. Ill. Sept. 26, 2018) ("What [plaintiff] is really asking is that Caterpillar be required to admit liability for uncharged, unadjudicated claims while the investigation into its tax position was ongoing. That sort of confession of guilt is not required.").

Registration Statement, which warned that "[t]he Korean government has recently focused on addressing copyright . . . infringement in Korea," and Coupang may be subjected "to sanctions, fines, or other penalties." Ex. 2 at 50; *see also supra* p. 6. That alone defeats this theory.

In any event, Coupang's purported copyright violations do not render misleading Defendants' high-level statements about Coupang's technology and merchants. Plaintiffs do not allege that any of these statements is false, and none mentions or otherwise implicates copyright law or the practice of using one merchant's product image for a different Item Winner. Ex. 1 rows 16 – 23. None is a misleading "half-truth" by omission. *See supra* pp. 5–6.

Plaintiffs also challenge a statement that Coupang issued on May 4, 2021, in response to criticism from civic groups about this practice. *See* AC ¶¶ 161–62. Coupang expressed its view that the "Item Market Sales Terms and Conditions do not violate the Fair Trade Act and Copyright Act," and that the Item Winner service permitted sellers to "compete fairly without the burden of advertising costs." AC ¶¶ 357, 359, 361. Plaintiffs do not allege that this statement was false because the KFTC *did not find violations* of the "Fair Trade Act" or "Copyright Act." *See* Ex. 8. In any event, Plaintiffs allege no specific facts that Coupang did not subjectively believe this statement. Nor would these statements be rendered false *even if* the KFTC later took a different view. The Seller Terms and Conditions were public, and Defendants had no duty to negatively characterize their conduct at a time when it is not alleged that they subjectively disbelieved its legality, and no violations had been charged or adjudicated. *See supra* p. 18. Courts reject claims where issuers defend conduct that is under investigation even if a regulator or court later reaches a different determination. *See, e.g.*, *City of Westland Police & Fire Ret. Sys.* v. *Metlife, Inc.*, 129 F. Supp. 3d 48, 60 n.51, 81–82 (S.D.N.Y. 2015) (statements that allegations of illegal conduct were "without merit" were not misleading despite regulator's later finding to the contrary);

*Jacobowitz* v. *Range Resources Corp.*, 596 F. Supp. 3d 659, 674–75 (N.D. Tex. 2022) (company's settlement and payment of a civil penalty "does not render false or misleading its prior statements that it believed it was in 'substantial compliance' with relevant regulations").

### (c)   Coupang's Supposed Manipulation of Search Results

Plaintiffs next allege that Defendants concealed from investors that (i) Coupang manipulated the search function on its website to favor its own proprietary products over products offered by third-party merchants and (ii) in late 2021, Coupang instructed its employees to leave positive reviews for its own products. AC ¶¶ 166–82. Plaintiffs allege that this conduct rendered misleading unrelated, high-level statements about Coupang's technology and search tools, including that Coupang has "developed technology that enables [it] to increase [its] operating efficiency," AC ¶ 211, that "search and recommendation results are aided by deep learning, data, analytics, and image recognition among other inputs," *id.* ¶ 213, and that "Coupang is focusing its efforts on expanding online sales channels and supporting sales of small and medium-sized businesses in the region," *id.* ¶ 369; *see also* Ex. 1 rows 24–42.

The AC contains no well-pleaded facts supporting its theory that Coupang manipulated search results to favor its own products. There are no allegations about *who* engaged in this conduct, *when* it occurred, or *how* the manipulation supposedly worked. *See Schiro* v. *Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 199 (S.D.N.Y. 2020) (rejecting bribery theory with "no factual allegations of exactly who made the payments, to whom the payments were made, when the payments were made, or how the payments were made"). Instead, Plaintiffs rely almost exclusively on the allegation that the KFTC announced an investigation into this issue on June 28, 2021. AC ¶¶ 170–71, 176. But Plaintiffs do not allege that the KFTC (or any court) determined that Coupang engaged in any wrongdoing, and, as discussed above, the mere existence of a government investigation cannot support a misstatements claim. *See supra* p. 18. Plaintiffs also *do not allege*

23

that this conduct had begun at the time of the IPO; thus, this theory cannot render misleading *any* challenged statement in Coupang's registration statement. Ex. 1 rows 24–42.

The *only* supposedly corroborating allegation is the entirely unremarkable fact that, between March and June 2021, approximately one-third of the top 15 results for bottled water and toilet paper on Coupang's site were purportedly Coupang products. AC ¶ 169. There are no particularized allegations suggesting manipulation caused that result, or that such a result reflects an unusual concentration of Coupang products. Nor do Plaintiffs plead similar facts about any other products. This vague allegation fails to support Plaintiffs' theory of misconduct.

Plaintiffs' allegations concerning employee-written product reviews are similarly bereft of supporting facts. The AC alleges in vague terms that, "beginning around July 2021, Coupang began instructing employees to leave positive reviews" for certain first-party products. AC ¶ 174. But Plaintiffs fail to identify a *single person* who gave or received such an instruction, a *single instance* of this practice occurring, or a *single review* skewed by the practice. *See* AC ¶¶ 173–74. Moreover, Plaintiffs concede that Coupang *disclosed* which reviews were employee-written. AC ¶ 175. Plaintiffs do not allege that this policy was violated in 2021, meaning the alleged misconduct was once again not concealed and cannot support a misstatements claim. *Supra* pp. 16–17.

Plaintiffs then allege that, "around January 2022," an unspecified number of employees began leaving an unspecified number of reviews without disclosing that they were employee-written. AC ¶ 177. Again, however, Plaintiffs fail to identify *a single employee* who engaged in this supposed practice or a *single instance* of it occurring. Instead, Plaintiffs allege that Coupang was accused of this practice, prompting the KFTC to open an investigation. AC ¶¶ 178–81. The AC acknowledges Coupang's denial of wrongdoing and does not allege that the investigation has resulted in any charge or determination of wrongdoing. AC ¶¶ 179, 181–82. A government

investigation alone cannot support a misstatements claim. *Supra* p. 18. And even if this practice occurred, it is immaterial as a matter of law—the very documents Plaintiffs rely on confirm that only *0.02%* of Coupang's product reviews are employee-written. Ex. 11. Plus, Plaintiffs *concede* that the supposed review misconduct did not begin until "July 2021," meaning that it cannot render misleading any statements made before that date, including in the IPO offering materials.

Alternatively, even if Coupang *did* what is alleged, it would not render any challenged statement misleading. To the extent any statements refer to the search function at all, they are general statements touting the existence of the function and its utility to users. *E.g.*, AC ¶ 213. None discusses how the search algorithm works or whether it accounts for a product being proprietary. As with Plaintiffs' other theories, merely mentioning the phrase "search technology" did not impose an affirmative obligation on Defendants to reveal *all facts* about Coupang's search algorithm. *Supra* p. 25. And with respect to employee reviews, Plaintiffs point to Coupang's statement that "when an employee writes a review, it is clearly stated." AC ¶ 387. This statement does not *conceal* the practice of employee-written reviews—it *acknowledges* it. And, as discussed above, there are no well-pleaded facts demonstrating this policy was violated. *Supra* pp. 23–24.

### (d)   Coupang's Supposed Failure to Maintain Written Dispute Resolution Standards

Finally, buried in the AC is a fifth, throwaway theory of fraud concerning Coupang's supposed failure to maintain written dispute resolution standards. *See* AC ¶¶ 183–88. Plaintiffs allege that, in August 2020, prior to the IPO, the KFTC opened an inquiry into whether Coupang maintained appropriate standards and procedures for resolving disputes with its customers. AC ¶ 185. Plaintiffs then reference a KFTC press release from March 6, 2022, in which it stated that seven e-commerce platforms (including Coupang) had failed to "provide adequate dispute resolution standards," and ordered each platform to take corrective measures within 60 days. Ex.

12 at 7; AC ¶¶ 187, 222. Plaintiffs plead *no other facts* about this alleged violation.

This purported violation does not contradict any challenged statement. Plaintiffs seize principally on Coupang's highly-generic statement that "we have policies and procedures to protect both merchants and customers on our marketplace." AC ¶ 186. The Second Circuit held in *Singh* that a nearly identical statement—that the issuer had "established policies and procedures to comply with applicable requirements"—was a "textbook example of puffery" and not actionable. 918 F.3d at 63. Moreover, Plaintiffs' own allegations make clear that Coupang **did have** such policies and procedures, including "a dispute mediation center" and a "customer services center" which "contained information regarding potential inquiries from customers on a range of topics." AC ¶¶ 183–84. The other challenged statements about Coupang's "culture of customer centricity," AC ¶¶ 224, 371, *see also* Ex. 1 rows 43–49, are also classic examples of puffery and not contradicted by the supposed violation. *See SAIC*, 818 F.3d at 97 (statement regarding company's "culture of . . . customer satisfaction" is non-actionable puffery); *infra* pp. 27–28. And, as with Plaintiffs' other theories, Coupang had no affirmative duty to disclose or confess to this supposed violation before the KFTC issued its press release. *Supra* p. 18.

### (e) Most Challenged Statements Are Puffery, Opinions, Or Protected By The PSLRA Safe Harbor

Nearly every challenged statement about Coupang's relationships with suppliers and merchants is not actionable because it is puffery, protected by the PSLRA safe harbor, or a sincerely-held opinion.

Most challenged statements are inactionable puffery because they are "vague positive statements regarding a corporate entity's . . . business practices." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021). *See* Ex. 1. Courts routinely dismiss securities claims based on statements similar to those about Coupang's "strategy of . . . lowest prices," "policies and

procedures to protect . . . customers," "technology" that enables "operating efficiency," and "culture of customer centricity." *See, e.g.*, *Lewis* v. *YRC Worldwide Inc.*, 2020 WL 1493915, at *13 (N.D.N.Y. Mar. 27, 2020) ("Our pricing strategy remains focused on profitability while delivering award winning customer service."); *Gregory* v. *ProNAi Therapeutics, Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018) (assertions that company's "technology, knowledge, experience, and scientific resources provide [it] with competitive advantages"); *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023) (descriptions of company's "policies and procedures," including systems "designed to protect" the company); *supra* p. 10.

Several challenged statements, including that Coupang will "continue to make investments . . . to make sure that our customer experience is not compromised," AC ¶ 371, are also forward-looking statements protected by the PSLRA safe harbor. *See* Ex. 1. Each statement made in an earnings call or SEC filing is accompanied by meaningful cautionary language[10] and Plaintiffs fail to plead actual knowledge of any statement's falsity, *infra* p. 28. Many challenged statements, such as "we believe customers can identify what they want and the best value for [a given] product," AC ¶ 213, are also opinions that are not actionable because Plaintiffs fail to allege that they were subjectively disbelieved or that the speakers omitted material facts about their inquiry into the opinion. *See Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176, 184, 194 (2015); *see also* Ex. 1.

>    **3.    The Amended Complaint Fails to Plead an Actionable Omission Under Item 303 or Item 105**

*Item 303*: Plaintiffs also allege that Coupang violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, which requires disclosure of "known" trends or uncertainties that "have had

---

[10]   *See supra* p. 10; *see also, e.g.*, Ex. 2 at 13, 41, 46, 50.

or that the registrant reasonably expects will have" a material effect on "net sales or revenues or income from continuing operations." *See* AC ¶¶ 228, 284, 384. These allegations fail.

Plaintiffs vaguely allege that the sum total of their various fraud theories add up to concealment of a "known uncertainty" that has a *material* impact on Coupang's financials. But, likely due to Coupang's business success since its IPO, Plaintiffs never attempt to quantify the impact of their fraud theories on Coupang's overall business—a fatal defect. *See In re Nokia Ojy (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 408 (S.D.N.Y. 2006) (dismissing claim where plaintiffs did not "approximate the magnitude or degree of the alleged misstatements in relation to Nokia's total financial picture"). Moreover, "Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the [issuer] defendant had *actual knowledge* of the purported trend" or uncertainty. *Blackmoss Invests. Inc.* v. *ACA Capital Holdings, Inc.*, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010). As discussed *infra* pp. 31–40, Plaintiffs fail to plead that any Exchange Act Defendant acted even recklessly, and thus cannot satisfy the more stringent "actual knowledge" requirement of Item 303. *See SAIC*, 818 F.3d at 95.

***Item 105***: Item 105 requires disclosure of the "most significant risk factors" associated with an offering. *Wandel*, 590 F. Supp. 3d at 646. Plaintiffs must plead that Coupang "actually knew about, but did not disclose," *id.*, a "risk factor that could seriously affect its present or future business," *Garnett* v. *RLX Tech. Inc.*, 632 F. Supp. 3d 574, 598 (S.D.N.Y. 2022). Just as with Item 303, Plaintiffs fail to show *actual knowledge* of any undisclosed risk. *Infra* pp. 31–40. Nor could they because, as described *supra* pp. 5–6, the Registration Statement provided ample warnings about the potential for safety incidents or adverse enforcement determinations from Korean

authorities.[11]

**B.     The Amended Complaint Fails To Plead A Strong Inference Of Scienter**

Under the PLSRA, a complaint must plead "with particularity facts" raising a "strong inference" that defendants acted with "an intent to deceive, manipulate, or defraud." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase, Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Unlike the typical Rule 12(b)(6) motion, under the PSLRA, the scienter analysis is comparative; scienter is pleaded only "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Slayton* v. *American Exp. Co*, 604 F.3d 758, 766 (2d Cir. 2010). For a corporate defendant, plaintiffs must plead scienter as to "someone whose intent could be imputed to the corporation." *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

In order to satisfy this stringent burden, Plaintiffs must allege specific, particularized facts either "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The AC fails to meet either standard and should be dismissed with prejudice.

**1.     The Amended Complaint Fails to Allege Motive and Opportunity**

The AC alleges no plausible "motive" for the alleged fraud. Plaintiffs' only attempt to establish a motive are *three* stock sales by only two of the Individual Defendants during the year-long class period. Stock sales are only an indicia of scienter if they are unusual in timing or amount. *Gagnon* v. *Alkermes PLC*, 368 F. Supp. 3d 750, 772–73 (S.D.N.Y. 2019). Common sense—and

---

[11]  Plaintiffs' Item 105 claims also fail for the same reasons that their Section 10(b) claims fail. *See City of Roseville Emps.' Ret. Sys.* v. *EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011).

the law—dictates that the allegations here fail to support Plaintiffs' desired inference.

Plaintiffs allege Bom Kim sold 1,200,000 shares for $42 million in the IPO. Mr. Kim made no other sales during the class period, and retained beneficial ownership of 174,802,990 shares.[12] AC ¶ 61, 65; Ex. 16. It would be absurd to infer that Mr. Kim's stock sales represented evidence he knew a massive fraud was artificially inflating the value of Coupang stock, while he nevertheless retained more than 99% of his shares. Mr. Kim's actions are more consistent with the inference that he had confidence in Coupang's future prospects. *See Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011) ("It defies reason that an entity looking to profit on a fraudulently inflated stock price would hold close to ninety percent of its shares as share price fell, *while knowing that the information illuminating the fraud was seeping into the market.*") (emphasis in original).[13]

The facts alleged as to Defendant Anand are even weaker. Plaintiffs allege Mr. Anand sold 160,000 shares on August 16, 2021, and another 350,000 shares on December 14, 2021, for a total of 510,000 shares. AC ¶ 457. However, Mr. Anand's Coupang holdings *increased* over the class period by over 65,000 shares. Ex. 17; Ex. 18. A defendant's increased holdings are "wholly inconsistent with fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004); *Glaser*, 772 F. Supp. 2d at 592–93 (same).

Plaintiffs' cursory allegations that Mr. Anand's stock sales were "suspicious," AC ¶ 457, should also be rejected. Plaintiffs intimate that the August sale was suspicious because Mr. Anand attended a *public* KFTC hearing concerning competition issues, but allege *no facts* that he had

---

[12]   Mr. Kim's remaining stock ownership is in Class B Common Stock. Each Class B share is convertible into 29 shares of Class A Common Stock upon the option of the holder and has no expiration date. Ex. 16.

[13]   Moreover, it is not suspicious for a company's founder and CEO to sell shares during an IPO. *See City of Omaha Police and Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 420 (S.D.N.Y. 2020).

non-public information prior to selling his shares. And as to the December sale, Plaintiffs allege

simply that "nothing required" it, *id.*, turning their pleading burden on its head—it is *Plaintiffs'*

burden to allege specific facts that the sales demonstrate indicia of scienter, not Defendants' burden

to justify them. *Woolgar* v. *Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 235 (S.D.N.Y. 2020). In

fact, Mr. Anand reported the relevant sales "were effected to satisfy certain tax obligations" related

to the vesting of certain restricted stock units (RSUs). Ex. 17; 18. Plaintiffs ask the Court to ignore

this fact because RSUs purportedly do not incur tax liability "until the holder voluntarily elects to

'settle' the instrument." AC ¶ 457. This is not true; RSUs incur tax liability when they vest, which

is why courts routinely hold that stock sales to satisfy RSU tax liability do not support scienter.

*See Hammerstone NV, Inc.* v. *Hoffman*, 2010 WL 882887, at *9–10 (S.D.N.Y. Mar. 10, 2010)

(rejecting scienter where defendant sold "little more than 10%" of his holdings "and did so for the

stated purpose of 'satisfy[ing] tax liabilities associated with the vesting of restricted stock'").

## 2. The Amended Complaint Fails to Allege Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

To allege "conscious misbehavior or recklessness," Plaintiffs must plead facts indicating

Defendants' "actual intent" or "a state of mind approximating actual intent, and not merely a

heightened form of negligence." *Novak* v. *Kasaks*, 216 F.3d 300, 310, 312 (2d Cir. 2000). Where,

as here, "motive is not apparent . . . the strength of circumstantial allegations must be

correspondingly greater." *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). The AC fails to

establish a "cogent and compelling" inference of scienter by offering a grab-bag of theories that

are impermissibly vague and often concern pre-class period events. *Slayton,* 604 F.3d at 766. *None*

identifies *any information* contradicting *any* challenged statement, much less information that was

conveyed to or known by any Individual Defendant. There are no allegations identifying any

specific meeting, call, or email in which any specific safety incident or regulatory violation was

discussed. And although the AC relies on three CWs, none recalls conveying *any* contrary facts to the Individual Defendants, and nearly all CW allegations are so vague as to timing that it is impossible to know if they concern any events during the class period. These allegations come nowhere near meeting the exacting pleading standard of the PSLRA. *See Steinberg* v. *Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (rejecting scienter allegation where "the Complaint fails to identify any reports Defendants . . . saw, or any conversations in which they were provided information, that was inconsistent in any way with their public statements").

### (a)    Plaintiffs fail to plead a strong inference of scienter about worker health and safety

Plaintiffs rely heavily on allegations that CW1 and others allegedly notified Mr. Anand and other management of unspecified and undated "serious" safety incidents by email, and that there were bimonthly meetings to discuss safety incidents. AC ¶¶ 398–99. Plaintiffs further allege CW2 participated in weekly calls with Mr. Anand to discuss the alleged high turnover rate among frontline workers; that "everyone knew" about Coupang working conditions; that prior to the IPO several Coupang employees testified before the Korean government; and that Kim faced (public) lawsuits arising out of a COVID-19 outbreak at a logistics facility. *Id.* ¶¶ 401, 404, 406.

None of this suffices to plead scienter with particularized facts. While the CWs state management *would be* informed of "major safety incidents," the AC does not identify a single safety incident *actually* reported to management, much less one that contradicts the highly generic public statements about commitment to worker safety that Plaintiffs challenge here. *See Menora Mivtachim*, 2021 WL 1199035, at *11–12 (S.D.N.Y. Mar. 30, 2021) (discounting CW allegations that were "vague on the details on any *specific transaction* in the Class Period"). Indeed, the allegations here are far more attenuated than those rejected by the Second Circuit in *Jackson* v.

*Abernathy*, where plaintiffs presented sworn testimony of high-ranking company officials that they presented adverse data "to senior management." 960 F.3d 94, 97 (2d Cir. 2020). The court held that even those allegations were "not sufficiently *particularized* to raise a strong inference of scienter." *Id.* at 99. Here, Plaintiffs do not identify *any* specific information that *any* CW conveyed to *any* Individual Defendant, much less information contradicting any public statement.

The AC thus falls back on allegations about worker safety incidents that occurred *before* the class period. But there are no allegations any Defendant concealed any pre-class period safety incidents—nor could there be, as the AC itself pleads that they were the subject of media reports, regulatory inquiries, lawsuits, and official Coupang statements. *Id.* ¶¶ 400–05. *Glaser*, 772 F. Supp. 2d at 588 ("[P]laintiffs cannot rely on information generally known or available to the public to support circumstantial scienter allegations."). And Defendants' awareness of safety incidents *before* the class period does not mean they knew about any relevant safety incidents *during* the class period, much less safety incidents sufficiently widespread to render Defendants' general statements misleading. In fact, Plaintiffs do not allege that *any* of the pre-class period health and safety issues remained and were not remedied prior to the start of the class period.[14] *See In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 450 (S.D.N.Y. 2006) (rejecting scienter when "plaintiffs fail to explain why any alleged omission *prior* to the class period adequately alleges scienter as to a statement *during* the class period.") (emphases in original).

With respect to the Deokpyeong Facility fire, Plaintiffs point to fire safety notifications that "needed to be" included in notices sent to senior management, and allege that CW1 is "certain" other nonspecific concerns were elevated to a non-defendant manager. AC ¶¶ 408, 413. These

---

[14]   The AC points to several examples of Coupang quickly and efficiently *fixing* issues it identified during the class period. AC ¶¶ 461–464. These facts *cut against* scienter because they are consistent with Coupang's stated commitment to workplace safety. *See Glaser*, 772 F. Supp. 2d at 589 ("[C]onsistency between defendants' corporate activities and public statements will cut against the inference of scienter."); *infra* pp. 39–40.

allegations cannot satisfy Plaintiffs' burden. The CWs do not purport to have firsthand knowledge of any specific information ever communicated to any Defendant, much less information contradicting any public statement. *See Jackson*, 960 F.3d at 97; *In re Travelzoo Inc. Sec. Litig.*, 2013 WL 1287342, at *9 (S.D.N.Y. Mar. 29, 2013) (rejecting scienter when "Plaintiffs fail to identify whether any of the Individual Defendants accessed" the relevant information).[15] Plaintiffs also improperly focus on pre-class period events, including the fire safety report from February 2021, and CW1's recollections of "numerous fires" prior to the class period. AC ¶¶ 408–09; 412–13. There are no allegations that any fire safety issues remained during the class period, let alone any facts sufficient to infer any Individual Defendants' knowledge. *Glaser*, 772 F. Supp. 2d at 587.

### (b)   Plaintiffs fail to plead a strong inference of scienter about business dealings with merchants and suppliers

Plaintiffs' allegations about alleged anticompetitive conduct show, *at best*, Coupang's acknowledgment of wrongdoing *before* the IPO and class period. Plaintiffs rely on a *September 2019* KFTC report concerning conduct that occurred even earlier. AC ¶¶ 416–24. They allege "the KFTC determined that Coupang pressured a total of over 100 suppliers to raise the price for 360 products on competing sites," *id.* ¶ 417, and that the KFTC noted that Coupang "acknowledged" improper practices and "cooperated" with the investigation. *Id.* ¶ 418–24. Plaintiffs also allege that, in a 2021 hearing concerning the same conduct, a Coupang representative "admitted that Coupang no longer disputed any of the underlying facts." *Id.* ¶ 425. Even assuming Plaintiffs properly alleged that Coupang executives were aware of purportedly "illegal" conduct prior to the September 2019 report—which they do not—that has no bearing on whether any Defendant knew his statements *during the class period* were misleading. That is particularly true here because there

---

[15]   The confidential witness allegations are also impermissibly vague because they are "undated or pegged to an indefinite time period." *In re Wachovia*, 753. F. Supp. 2d at 352.

is no allegation Defendants concealed any alleged pre-class period misconduct from investors. *In re GeoPharma*, 411 F. Supp. 2d at 450; *supra* p. 33.

> **(c)**     **Plaintiffs fail to plead a strong inference of scienter about the use of copyrighted material**

Plaintiffs also fail to raise a strong inference any Individual Defendant knew, or recklessly ignored, any information contradicting their statements concerning the use of copyrighted material. Plaintiffs rely principally on CW3, who recalls having "discussions" with Defendant Kim. AC ¶ 427. As with other CW allegations, these are impermissibly vague. CW3 does not describe *any* specific discussion, much less one illustrating Kim was aware the Item Winner sometimes used copyrighted images from competitors.[16] Plaintiffs' most specific allegation on this point is that, "during these conversations, Kim asked CW3 to explain why a certain image was shown for a specific product." *Id.* Plaintiffs fail to provide *any* allegations concerning what CW3 said in response to this question or indicating that Kim, or any Defendant, was informed from CW3 or anyone else that the image used might be copyrighted, *much less* that this practice violated copyright law or contradicted *any* of Kim's public statements. Indeed, there are *no* allegations that alleged illegality was discussed with Kim, much less that he tried to conceal it from investors. As "confidential source allegations must show that individual defendants *actually possessed* the knowledge highlighting the falsity of public statements," these allegations are insufficient. *Pirnik* v. *Fiat Chrysler Autos., N.V.*, 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017) (emphasis in original); *see also Malin* v. *XL Capital Ltd.*, 499 F. Supp.2d 117, 141 (D. Conn. 2007) (rejecting scienter allegations for failure to allege that confidential witnesses "communicated any of the

---

[16]   CW3's allegations should also be discounted because CW3 was employed with Coupang from June 2017 through April 2021, only the *final month* of which was during the class period. AC ¶ 427. Plaintiffs do not allege *when* CW3's "discussions" took place, and the most logical inference is that they occurred well before the class period. *See Fransico* v. *Abengo, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) (discounting allegations of confidential witnesses when they were not employed during the class period).

alleged problems . . . to any of the Individual Defendants or that the Individual Defendants otherwise knew about these issues"), *aff'd*, F. App'x 400 (2d Cir. 2009).

> **(d)      Plaintiffs fail to plead a strong inference of scienter about Coupang's dispute resolution policies**

Plaintiffs' allegations regarding Defendants' interactions with the KFTC concerning Coupang's dispute resolution policies lack the specificity required by the PSLRA and Rule 9(b). Plaintiffs allege that Coupang, in response to a KFTC request dated August 21, 2020, acknowledged a lack of certain dispute resolution standards. AC ¶ 428. Plaintiffs also allege that Coupang, in response to KFTC correspondence from November 25, 2021, admitted some kind of unspecified "conduct" was illegal. *Id*. Plaintiffs then allege, without any further description or support, that the unspecified "improper conduct continued unabated" through March 2022. *Id.* It is entirely unclear from the AC what Coupang is alleged to have admitted to and when these admissions supposedly occurred. And, there are no pleaded facts supporting Plaintiffs' conclusory statement that Coupang continued to engage in unspecified conduct it knew was illegal. AC ¶ 428. This is exactly the type of ambiguous and superficial pleading the PSLRA was meant to rein in. *Cortina* v. *Anavex Life Sciences Corp.*, 2016 WL 7480415, at *4 (S.D.N.Y. Dec. 29, 2016). Nor do Plaintiffs allege any Individual Defendant or senior executive participated in the KFTC inquiry or was aware of these issues during the class period. *Glaser*, 772 F. Supp. 2d at 587.

> **(e)      Plaintiffs' "Additional Facts Probative of Scienter" Are Impermissibly Vague and Conclusory**

Unable to find any specific evidence of scienter, Plaintiffs turn to a grab-bag of eight additional, unsubstantiated, circumstantial theories. As this Court held in *Cheng* v. *Canada Goose Holdings Inc.*, such a "hodgepodge of circumstantial evidence . . . fails to indicate that Defendants had any specific contradictory information in their possession when they made their statements . . . and amount[s] to little more than a suggestion that 'Defendants must have known' their

statements were false when they made them, which is clearly insufficient" to plead scienter. 2021 WL 3077469, at *11 (S.D.N.Y. July 19, 2021) (Broderick, J.).

*Core Operations*: Plaintiffs attempt to invoke the disfavored "core operations" doctrine by alleging that Defendants must have known facts contradicting their statements because Coupang's "logistics network" and "online store" were "critical to Coupang's ability to deliver on its commitment to customers." AC ¶ 432. But this catch-all doctrine cannot "independently" establish scienter. *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011). Indeed, "there is considerable doubt whether [it] survived enactment of the PSLRA, and many courts have held that it is no longer valid." *Hensley* v. *IEC Elecs. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014); *Sachsenberg* v. *IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 183 (S.D.N.Y. 2018) (similar).

Plaintiffs also confuse the "operations" at issue. Even if "logistics" were a "core operation," that does not mean senior executives had knowledge about alleged inadequate fire safety protocols in one of Coupang's many warehouses. Even if the "online store" were a core operation, that does not mean senior executives knew every detail about the function of the search algorithm. When the "operations" are properly defined, none is so critically important that knowledge of adverse facts can be imputed to senior management. *See Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 816–17 (S.D.N.Y. 2018) ("Even if integrity could be a core operation, Defendants' knowledge of the company's general commitment to integrity would not put it on notice of any unlawful bribe.").

The contention that Defendants must have known contrary facts because they spoke generally about logistics and the online store conflates falsity with scienter, which are two distinct elements of fraud. *See Ramzan* v. *GDS Holdings Ltd.*, 2020 WL 1689772, at *5 (S.D.N.Y. Apr. 7, 2020). And, contrary to Plaintiffs' claim that Defendants spoke "in detail" about these business

functions, AC ¶ 443, the actual challenged statements are all very high-level and general. *See, e.g.*, AC ¶ 442 (alleging Anand said Coupang aims to improve the "customer experience" by providing "personalized product exposure"). These bland, undescriptive, prototypical corporate statements are insufficient to impute knowledge of any specific contrary facts. *Cox* v. *Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) (holding allegations defendants "monitored" a certain aspect of the business are inadequate where "the Complaint fails to allege any particularized facts suggesting that defendants actually possessed information contradicting their public statements.").[17]

*Government Investigations*: Plaintiffs next allege the existence of governmental investigations into Coupang supports a finding of scienter. AC ¶¶ 445-48. Most of the investigations Plaintiffs identify concern conduct predating the class period and are irrelevant. *In re GeoPharma*, 411 F. Supp. 2d at 450. Plaintiffs point to only a single investigation that began during the class period and allegedly concerned class period conduct, namely, the 2021 KFTC investigation into Coupang's search algorithm. AC ¶ 445. But the AC does not plead that investigation resulted in any adverse findings or that any Individual Defendant is a subject of the investigation. And courts routinely hold that "knowledge of the existence of an investigation is not sufficient to support an inference of scienter," because it does not demonstrate any defendant thought the underlying conduct was wrongful. *Youngers* v. *Virtus Investment Partners Inc.*, 195 F. Supp. 3d 499, 517 (S.D.N.Y. 2016); *see Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("[T]he government investigations cannot bolster allegations of scienter that

---

[17]  Plaintiffs also assert two close cousins of the "core operations" doctrine. *First*, they allege (with no facts) that scienter can be inferred because Coupang is supposedly a "highly scrutinized" company focused on maintaining its image. AC ¶¶ 468–69. *Second*, they allege (with no facts) that Defendants Kim and Anand were "hands-on" managers, citing vague statements that Mr. Kim was a "micro-manag[er]" and an "autocrat[]" who only met with "top guys," the latter allegation contradicting the former. AC ¶¶ 465–67. Courts routinely reject scienter allegations focused on a defendant's management style. *See Maloney* v. *Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (rejecting allegation of "hands-on management style"); *City of N. Miami Beach Police Officers' and Firefighters' Ret. Plan* v. *Nat'l Gen. Holding Corp.*, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021) (rejecting allegation that "executive defendants are 'closely involved' in running their business").

do not exist, and as currently pled, the government investigations are just that, investigations.").

*Alleged Cover Ups*: Plaintiffs use the nefarious term "cover up" to describe Defendants' denials of wrongdoing. AC ¶¶ 449–54. But Plaintiffs plead no facts suggesting that any Defendant *did not believe* their statements denying wrongdoing, and the denials themselves—made before Coupang had been charged with any violation—cannot satisfy scienter. *In re Teva Sec. Litig.*, 2023 WL 3186407, at *44 (D. Conn. May 1, 2023) (rejecting scienter when "based on the information he had, [the Defendant] did not believe there was any wrongdoing."). The allegation that a Korean lawmaker accused a non-defendant Coupang witness of lying during a pre-class period hearing is too vague and untethered to this case to plead scienter. AC ¶ 450. And Plaintiffs' invocation of Coupang's implementation of a *one-year* auto-delete policy—with no allegation that any particular evidence was destroyed, or that this was unusual or inconsistent with industry standards—may support an inference of a conspiracy theory, but not a cogent inference of scienter. *Id.* ¶ 452.

*Kim's Resignation*: That Defendant Kim resigned from the Board of Directors of non-Defendant "Coupang Corp." six hours after a fire broke out in the Deokpyeong Facility on June 17, 2021 does not support a compelling inference of scienter either. AC ¶ 459. The premise of Plaintiffs' allegation is wrong; documents filed with the Korean government *before the fire*, which are subject to judicial notice, demonstrate Mr. Kim retired on *May 31*. Ex. 19 at 4. Moreover, it is black-letter law that "resignations of corporate executives are insufficient alone to establish an inference of scienter" as "there are any number of reasons that an executive might resign, most of which are not related to fraud." *Woolgar*, 477 F. Supp. 3d at 240.[18]

*Coupang's Remedial Actions*: While Plaintiffs take issue with certain remedial actions

---

[18] This reasoning applies with even greater force here where Mr. Kim *did not even depart from the issuer-defendant* and remains Coupang's CEO and chairman. In fact, even Plaintiffs acknowledge there was a non-fraudulent rationale—Mr. Kim wanted to spend more time on the global management of Coupang, the actual defendant here, following its listing on the New York Stock Exchange. AC ¶ 459.

Coupang took in response to various unfortunate events, AC ¶¶ 462–64, these allegations cut strongly *against* scienter as they are all examples *demonstrating* Defendants' stated commitment to worker health and safety. *Glaser*, 772 F. Supp. 2d at 588. Coupang's efforts to *improve* workers' conditions and safety protocols following negative safety events does not show Defendants knew the existing protocols were insufficient prior to these events. A more compelling inference is that Defendants took these issues seriously, sought to learn from mistakes, and were committed to improving worker safety.

### C.    The Amended Complaint Does Not Adequately Allege Loss Causation

Plaintiffs' Section 10(b) claims must also be dismissed because Plaintiffs do not adequately allege loss causation. Under the PSLRA, the "subject of the fraudulent statement or omission" must be "the cause of the actual loss suffered." *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). Plaintiff must plead "their share's price fell significantly after the truth became known through an express, corrective disclosure, or through events constructively disclosing the fraud like the materialization of the risk concealed." *Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020).[19]

Consistent with their kitchen-sink approach, Plaintiffs allege a series of *13 separate disclosures* between March 24, 2021, and March 14, 2022, that purportedly revealed the "truth" of Defendants' fraud. AC ¶¶ 471–84. None satisfies loss causation. Instead, each runs afoul of one or more basic loss causation principles, including (i) that "a statement must reveal some then-undisclosed *fact* with regard to the specific misrepresentation in the complaint," *Cent. States, Se. & Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013);

---

[19]   While the Second Circuit has not determined whether the heightened pleading standard of the PSLRA applies to loss causation, courts, including the Ninth Circuit, have noted the pleading standard for loss causation is "heightened" in the Second Circuit. *See Oregon Public Emps.' Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Regardless of the standard the Court applies, Plaintiffs' allegations fall short.

(ii) the disclosure of already public information—including "a negative journalistic characterization of previously disclosed facts"—cannot satisfy loss causation, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); (iii) mere disagreements with customers or "questions and speculation by analysts and commentators does not reveal any truth about an alleged fraud," *Janbay* v. *Canadian Solar, Inc.*, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012); and (iv) the "materialization of a known risk" or a risk that "necessarily was clear to the market," cannot satisfy loss causation, *Sjunde AP-Fonden* v. *Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 146, 148 (S.D.N.Y. 2021) (Broderick, J.).

## 1.   Purported Disclosures Concerning Health and Safety

<u>Employee Death</u>. Plaintiffs allege that shortly after the market opened on March 24, 2021, "news broke" concerning the death of a Coupang employee, AC ¶ 473, and Coupang's share price declined 4.8%, Ex. 23 at 1. Plaintiffs provide no details about this unspecified "news" and do not allege that any March 24 reports connected this incident in any way to conduct by Coupang. Plaintiffs' oblique reference to such "news" does not reveal any fraud or correct any alleged misstatement and cannot satisfy loss causation. *See Cent. States*, 543 F. App'x at 75. Plaintiffs also allege that, one day later, a *Korea Herald* report discussed "speculation" that the death "may have" been related to "overwork." AC ¶ 473. Such "speculation by analysts or commentators does not reveal any 'truth'" and cannot satisfy loss causation. *Janbay*, 2012 WL 1080306, at *16. That is particularly true here, where Defendants warned investors about the risk of such "safety incidents" and "negative publicity related to workplace safety." *Supra* pp. 10–12. Moreover, Coupang's share price declined *only 0.2%* following this March 25 report. Ex. 23 at 1. Small declines of "less than 1%" cannot satisfy loss causation as a matter of law. *See In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 347 (W.D.N.Y. 2008).

<u>Deokpyeong Facility Fire</u>. The Deokpyeong Facility fire began on June 17, 2021. AC ¶ 97.

News of the fire and the firefighter who died in the incident were widely reported in the media on June 18, 2021, Ex. 20, and Coupang issued several statements about the fire on June 18, 19, and 20, 2021. *See* AC ¶ 100. Plaintiffs do *not* allege, however, that any of this news constituted a corrective disclosure. In fact, Coupang's share price *rose* after the fire was widely reported in the media. Ex. 22. Instead, Plaintiffs seek to capitalize on *later* stock drops that cannot possibly satisfy loss causation. Plaintiffs allege that, "beginning on June 22, 2021, and continuing for several days thereafter, news reports revealed that Coupang was facing a growing consumer boycott." AC ¶ 477. But Coupang's share price *rose 1.5%* on June 22, Ex. 23 at 2, severing any possible loss causation argument. *See Waters* v. *General Elec. Co.*, 2010 WL 3910303, at *8 (S.D.N.Y. Sep. 29, 2010) (no loss causation "when the stock price *increased* after an announcement revealing an alleged fraud"). Plaintiffs allege that boycotts continued through June 25, and that each of these dates was a corrective disclosure, but these were "substantially similar to the previous disclosures" and cannot satisfy loss causation. *Goldman Sachs*, 545 F. Supp. 3d at 148. In any event, the fact that unspecified consumers boycotted Coupang plainly does not reveal the "truth" about Coupang's supposed lack of commitment to employee safety. *Janbay*, 2012 WL 1080306, at *16.

Plaintiffs also seek to recover for stock drops following Coupang's 2Q21 earnings release on August 11, 2021, which disclosed approximately $300 million in inventory and equipment losses from the fire, and Coupang's 3Q21 earnings call on November 12, 2021, which attributed certain increased costs to the fire. AC ¶¶ 479, 482. By the time of these announcements, however, the June 2021 fire was old news and its impact was long-reflected in Coupang's share price. The disclosure of the precise monetary impact of the fire on Coupang's quarterly earnings cannot satisfy loss causation. *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007) ("Disclosure of financial losses generally—even if those financial losses are a result of the specific

concealed fact—is not sufficient."). Moreover, Plaintiffs claim the fire manifests securities fraud because of alleged misstatements about Coupang's health and safety commitment—*not* about business implications of fires. As to that, Defendants amply warned about the risks of "disruptions, outages, and other performance and quality problems" following a fire, *supra* pp. 10–12, and there was widespread news coverage of the business disruption caused by the fire, Ex. 20, well before the alleged corrective disclosure. *See Goldman Sachs*, 545 F. Supp. 3d at 148.

### 2. Purported Disclosures Regarding Relationships with Suppliers, Merchants, and Customers

Supplier Exploitation. Plaintiffs allege that the "truth" about Coupang's supposed anticompetitive conduct with suppliers was revealed when the KFTC issued a "corrective order" and a $2.8 million fine to Coupang on August 18, 2021, which allegedly caused a 2% stock drop. AC ¶ 480. This disclosure cannot satisfy loss causation because it was cumulative of public information; Plaintiffs themselves allege that the KFTC "released a written report" in September 2019—*years earlier*—revealing precisely the same conclusions about precisely the same conduct. *See* AC ¶¶ 416–24 (discussing the KFTC's conclusions that Coupang pressured suppliers to raise prices on competing sites, compensate Coupang for margin losses, and pay sales incentives). *See Omnicom*, 597 F.3d at 512. The disclosure is also inadequate because Coupang expressly disclosed the KFTC investigation and said that its outcome was "uncertain" and could result in fines. Ex. 2 at 13, 41. *See Goldman Sachs*, 545 F. Supp. 3d at 148.

Copyright Violations. Plaintiffs allege the "truth" about Coupang's supposed copyright violations was revealed when, on April 4, 2021, a single small business owner appeared on a television program and complained about the practice of using one merchant's marketing images for a different "Item Winner." AC ¶ 474. Plaintiffs *concede*, however, that this practice was publicly disclosed before and throughout the class period, *supra* pp. 10–12, and a "negative

journalistic characterization of previously disclosed facts" cannot satisfy loss causation. *Omnicom*, 597 F.3d at 512. Moreover, the subjective negative view of *one* merchant cannot "reveal any 'truth' about an alleged fraud." *Janbay*, 2012 WL 1080306, at *16; *see Cent. States*, 543 F. App'x at 75. Defendants also warned investors about the risk of copyright enforcement. *Supra* pp. 10–12.

Plaintiffs then allege two additional, substantially similar corrective disclosures: (i) a May 3, 2021 announcement from unspecified "civic groups" that they "reported" Coupang's practice to the KFTC, AC ¶ 475, and a May 10, 2021 press release from a civic group disagreeing with Coupang's opinion about the legality of the practice, AC ¶ 476. Both alleged disclosures fail for substantially the same reasons as the April 4 disclosure. *Supra* pp. 43–44. And, even if the April 4 disclosure could satisfy loss causation (and it doesn't), the May 3 and May 10 disclosures cannot because they are cumulative and reveal no new facts about Coupang's supposed copyright violations. *Goldman Sachs*, 545 F. Supp. 3d at 148.

<u>Search Results</u>. Plaintiffs allege the "truth" about Coupang manipulating search results was revealed on July 4, 2021, when the KFTC announced an investigation into such conduct and Coupang's share price declined 1.3%. AC ¶ 478. But the "announcement of an investigation, standing alone, is insufficient to establish loss causation." *Loos* v. *Immersion Corp.*, 762 F.3d 880, 883 (9th Cir. 2014); *see Janbay*, 2012 WL 1080306, at *15 ("The announcement of an SEC subpoena or an internal investigation is itself insufficient to plead loss causation."). Plaintiffs also seek to recover losses from a 0.9% stock drop on September 10, 2021, following a disclosure that the KFTC had received unspecified complaints about this issue. AC ¶ 481. This disclosure is cumulative of the KFTC investigation announcement and clearly cannot satisfy loss causation. *See Goldman Sachs*, 545 F. Supp. 3d at 148. Plaintiffs also do not distinguish Coupang's 0.9% stock drop from the 0.8% decline in the S&P 500 and Russel 3000 on the same date, Ex. 24, defeating

loss causation. *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

Separately, Plaintiffs allege a March 14, 2022 announcement from a civic group that it "reported Coupang to the KFTC for manipulating product reviews" constitutes a corrective disclosure. AC ¶ 484. As discussed *supra* p. 24, however, Defendants publicly disclosed that employees wrote certain product reviews, and this announcement did not reveal any new "facts" to the market. *Omnicom*, 597 F.3d at 510. Additionally, the view of a non-governmental civic group "does not reveal any 'truth' about an alleged fraud." *See Janbay*, 2012 WL 1080306, at *16.

Dispute Resolution. Finally, Plaintiffs allege the "truth" about Coupang's failure to maintain dispute resolution policies was revealed on March 6, 2022, when the KFTC issued a corrective order. AC ¶ 483. But Defendants never spoke about this issue, and the alleged disclosure does not correct any challenged statement. *Cent. States*, 543 F. App'x at 75.

## II.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER SECTIONS 11 AND 12(a)(2) OF THE SECURITIES ACT

Plaintiffs allege that a subset of the statements that violate Section 10(b) of the Exchange Act also violate Section 11 and Section 12(a)(2) of the Securities Act because they appeared in the IPO offering documents. Section 11 of the Securities Act creates liability for an issuer, the underwriters of an offering, and signatories to a registration statement, for material misstatements or omissions in the registration statement. *See* 15 U.S.C. § 77k(a). Section 12(a)(2) of the Securities Act creates liability for certain "sellers" in a securities offering for material misstatements or omissions in a prospectus. *See* 15 U.S.C. § 77l(a). Plaintiffs' Securities Act claims fail because they do not adequately allege any material misstatements or omissions, they are time-barred, and they fail to satisfy certain statutory standing requirements.

### A.   Plaintiffs Fail To Adequately Allege Any Materially Misleading Statements Or Omissions Under Both Rule 9(b) and Rule 8

Claims under Sections 11 and 12(a)(2) are subject to the heightened pleading standard of

Rule 9(b) "when the claim[s] sound[] in fraud." *See Rombach* v. *Chang*, 355 F.3d 164, 167 (2d Cir. 2004). Here, Plaintiffs' Section 10(b) claims and Securities Act claims are based on an alleged unified course of conduct and all sound in fraud. In fact, "every statement that Plaintiffs allege[d] to be false or misleading under the Securities Act [were] also allege[d] to be false and misleading for the same reasons under the Exchange Act." *See City of Coral Springs Police Officers' Ret. Plan* v. *Farfetch Ltd.*, 565 F. Supp. 3d 478, 492 n.3 (S.D.N.Y. 2021); *compare* AC ¶¶ 190–230 (Section 11), *and* ¶¶ 231–286 (Section 12(a)(2)), *with* ¶¶ 311–350 (Section 10(b)). Although Plaintiffs "expressly disclaim" allegations of "fraud or fraudulent intent" with respect to the Securities Act claims, *see* AC ¶¶ 189, 289, 297, 306, courts in this Circuit "have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient" to avoid the application of Rule 9(b). *In re Axis Capital Holdings Ltd.*, 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006); *see Farfetch*, 565 F. Supp. 3d at 492 n.3 (similar). As discussed *supra* pp. 8–28, Plaintiffs fail to plead a material misstatement or omission under Rule 9(b). But even if Rule 9(b) did not apply, the Securities Act claims would still fail to plausibly identify any material misrepresentations or omissions under Rule 8. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

### B.      Nearly All Securities Act Claims Are Time-Barred

"Claims under [Sections] 11 and 12(a)(2) are subject to a one-year statute of limitations which commences upon 'the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.'" *Freidus* v. *Barclays Bank PLC*, 734 F.3d 132, 138 (2d Cir. 2013) (quoting 15 U.S.C. § 77m). Claims brought more than one year following an alleged corrective disclosure are time-barred as a matter of law because the "corrective disclosure date is the same as the constructive notice date—or date on which the claim should have been discovered through reasonable diligence." *Freidus*, 734 F.3d at 138 (citing *Amorosa* v. *AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011)).

The initial complaint in this action was filed on August 26, 2022. ECF No. 1. Accordingly, Securities Act claims that accrued prior to August 26, 2021 are time-barred. Plaintiffs allege that the "truth" about Defendants' misstatements "was revealed to the market" prior to that date for four of their five theories of liability. AC ¶ 471. Specifically, Plaintiffs allege that the "truth" was "revealed" about Coupang's lack of commitment to employee safety no later than March 24, 2021 (employee death), *id.* ¶ 473, or June 22, 2021 (facility fire), *id.* ¶ 477; Coupang's exploitation of suppliers no later than August 18, 2021 (KFTC fine), *id.* ¶ 480; Coupang's copyright infringement no later than May 2021 (civic groups accuse Coupang of violations), *id.* ¶¶ 474–76; and Coupang's manipulation of search results no later than July 4, 2021 (KFTC investigation announcement), *id.* ¶ 478. Accordingly, all Securities Act claims premised on Plaintiffs' first four theories of liability are time-barred and must be dismissed. *See Freidus*, 734 F.3d at 138.[20]

### C.   Plaintiffs Lack Standing To Pursue Claims Under Section 12(a)(2)

Plaintiffs also lack statutory standing to pursue Section 12(a)(2) claims. Investors have standing under Section 12 only if they purchased shares directly from a defendant in an offering. *Freidus*, 734 F.3d at 141. Here, although Plaintiffs allege that they purchased Coupang shares "in" the IPO, AC ¶ 302, they do not allege that any Plaintiff purchased shares directly from any Defendant. This is inadequate. *See In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 585 (S.D.N.Y. 2010) (no Section 12(a)(2) standing where complaint did not "identify a particular purchase from a particular defendant pursuant to a particular prospectus").

The Section 12(a)(2) claims must be dismissed against the Individual Defendants—

---

[20]   To the extent Plaintiffs allege that certain *additional* corrective disclosures about these theories occurred within one year of the filing of this lawsuit, that does not change the outcome. Plaintiffs allege that the "truth" about these theories was revealed by disclosures before August 26, 2021; indeed, Plaintiffs are pursuing fraud claims based on those disclosures. Thus, the pre-August 26 disclosures were "sufficient to allow plaintiffs to discover the facts underlying the cause of action" for those four theories, triggering the limitations clock for each. *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 447 (2d Cir. 2015).

Coupang officers and directors—for the additional reason that they are not "sellers" within the meaning of the statute. Defendants are "statutory sellers" under Section 12(a)(2) "only if they (1) directly passed title to the securities, or (2) solicited the purchase of securities." *City of Westland Police & Fire Ret. Sys.* v. *MetLife, Inc.*, 928 F. Supp. 2d 705, 720 (S.D.N.Y. 2013). The AC contains no allegations that any Individual Defendant engaged in any such conduct. *See id.* (dismissing Section 12(a)(2) claims where complaint was "largely silent as to the role played by the Individual and Director Defendants in the solicitation of the securities at issue"). Additionally, the mere fact that the Individual Defendants signed the IPO registration statement, AC ¶¶ 22–30, is insufficient to plead liability under Section 12(a)(2). *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 245 (S.D.N.Y. 2020).

## III.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY

Plaintiffs assert control person claims under Section 20(a) of the Exchange Act against Kim and Anand, and under Section 15 of the Securities Act against Coupang and the Individual Defendants. The control person claims should be dismissed because Plaintiffs fail to allege a primary violation of the Exchange Act or Securities Act. *Penn. Pub. Sch. Emps.' Ret. Sys.* v. *Bank of Am. Corp.*, 874 F. Supp. 2d 341, 368 (S.D.N.Y. 2012). Additionally, Plaintiffs fail to adequately allege that any Defendant culpably participated, as required, because they plead no individualized facts demonstrating that any control Defendant acted with "a culpable state of mind" akin to scienter.[21] *See id.*; *supra* pp. 28–40.

## CONCLUSION

For all of the above reasons, the Court should dismiss the AC with prejudice.

---

[21] Courts are split as to whether "culpable participation" is a required element for a Section 15 claim. *See In re Lehman Bros. Mort.-Backed Sec. Litig.*, 650 F.3d 167, 186 (2d Cir. 2011).

Dated:   New York, New York
         July 28, 2023

PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP


By:   */s/ Andrew J. Ehrlich*
         Andrew J. Ehrlich
         Brette Tannenbaum
         Daniel S. Sinnreich

1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000
aehrlich@paulweiss.com
btannenbaum@paulweiss.com
dsinnreich@paulweiss.com

*Counsel for Coupang, Inc., Bom Suk Kim,
Gaurav Anand, Michael Parker, Matthew
Christensen, Lydia Jett, Neil Mehta, Benjamin
Sun, Kevin Warsh, and Harry You*


SHEARMAN & STERLING LLP

By:   */s/ Daniel C. Lewis*
         Daniel C. Lewis
         Elizabeth J. Stewart

599 Lexington Avenue
New York, New York 10022
(212) 848-4000
daniel.lewis@shearman.com
elizabeth.stewart@shearman.com

*Counsel for Citigroup Global Markets Inc.,
HSBC Securities (USA), Inc., Deutsche Bank
Securities Inc., UBS Securities LLC, and
Mizuho Securities USA LLC*

*As to Section II only.