UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                        :
NEW YORK CITY PUBLIC PENSION         :
FUNDS, *individually and on behalf of all*   :
*others similarly situated*, *et al*.,            :
                                                        :                    22-CV-7309 (VSB)
                                Plaintiffs,    :
                                                        :          **OPINION & ORDER**
              - against -                        :
                                                        :
COUPANG, INC., *et al*.,                      :
                                                        :
                              Defendants.  :
                                                        :
--------------------------------------------------------X

<u>Appearances</u>:

Jeremy Alan Lieberman
Emma Gilmore
Justin D. D'Aloia
Dolgora Dorzhieva
Pomerantz LLP
New York, NY
*Counsel for Lead Plaintiffs the New York City Public Pension Funds, and Lead Counsel for the Proposed Class*

Andrew James Ehrlich
Brette Morgan Tannenbaum
Daniel Shiah Sinnreich
Paul, Weiss, Rifkind, Wharton & Garrison LLP
New York, NY
*Counsel for Defendants Coupang, Inc. and the Individual Defendants*

Daniel Craig Lewis
Elizabeth Stewart
Allen Overy Shearman Sterling US LLP
New York, NY
*Counsel for the Underwriter Defendants*

<u>VERNON S. BRODERICK</u>, <u>United States District Judge</u>:

In March 2021, Defendant Coupang, Inc. ("Coupang" or the "Company"), an e-commerce company, conducted the largest initial public offering ("Initial Public Offering" or "IPO") on Wall Street in half a decade.  In this putative class action, lead plaintiffs, the New York City Public Pension Funds[1] ("Plaintiffs"), allege that Coupang, its founder, executives, and board members, and the underwriters of the IPO are liable under the Securities Act and the Exchange Act for various statements and omissions of Coupang and its executives regarding Coupang's business practices during and after the IPO.

Before me is Defendants' motion to dismiss Plaintiffs' amended complaint.  Because I conclude that none of the challenged statements and omissions is materially misleading and that the Securities Act claims are time barred, Defendants' motion to dismiss is GRANTED.

## I.    **Factual Background**[2]

### A.    *Coupang's IPO*

"Coupang is the largest e-commerce business in South Korea."  (Am. Compl. ¶ 42.)  It is sometimes "referred to as the 'Amazon of South Korea.'"  (*Id.*)  Defendant Beomseok Kim ("Kim") founded Coupang in May 2010, and since then has served as the Company's Chief Executive Officer and as a Director on the Company's Board of Directors.  (*Id.* ¶¶ 22, 43.)  Coupang rapidly expanded after its inception, and "[b]y the end of 2020, it employed nearly

---

[1] The "New York City Public Pension Funds" refers collectively to the Teachers' Retirement System of the City of New York, the New York City Employees' Retirement System, the New York City Police Pension Fund, the New York City Fire Department Pension Fund, the Board of Education Retirement System of the City of New York, the New York City Deferred Compensation Plan, and the Teachers' Retirement System of the City of New York Variable Annuity Program.  (*See* Doc. 50 at 1.)

[2] These facts are drawn from Plaintiffs' amended complaint.  (Doc. 50 ("Am. Compl." or "Amended Complaint").)  I assume the truth of the facts herein for purposes of resolving Defendants' motion to dismiss.  *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).  Nothing in this Opinion & Order should be construed as a factual finding.

50,000 workers in South Korea" and "operated over 100 fulfillment and logistics centers" in the country. (*Id.* ¶ 53.)

Other Coupang executives and Board members are also named as defendants. Defendant Gaurav Anand ("Anand") worked for Coupang in various financial roles since January 2017 and served as Coupang's Chief Financial Officer ("CFO") beginning in December 2020. (Am. Compl. ¶ 23.) Defendant Michael Parker ("Parker") served as Coupang's Chief Accounting Officer from October 2019 to September 2022. (*Id.* ¶ 24.) Defendant Matthew Christensen ("Christensen") served as a Director on the Coupang Board from at least March 2021 to June 2021. (*Id.* ¶ 25.) Defendant Lydia Jett ("Jett") served as a Director on the Coupang Board from at least March 2021 to October 2021, (*id.* ¶ 26), and Defendants Niel Mehta ("Mehta"), Benjamin Sun ("Sun"), Kevin Warsh ("Warsh"), and Harry You ("You") were all Directors on the Coupang Board at the time of the IPO in March 2021. (*Id.* ¶¶ 27–30.) Defendants Christensen, Jett, Mehta, Sun, Warsh, and You are referred to herein as the "Director Defendants." (*Id.* ¶ 41.) Collectively with Defendants Kim, Anand, and Parker, these executives and Director Defendants are referred to as the "Individual Defendants."

In early 2021, Coupang commenced an Initial Public Offering in the United States. (*See* Am. Compl. ¶ 56.) On February 12, 2021, Coupang publicly filed a Registration Statement for the IPO on Form S-1 (the "IPO Registration Statement") with the Securities and Exchange Commission ("SEC"). (*Id.*) The IPO Registration Statement covered the issuance of up to 120 million shares of Coupang Class A common stock. (*Id.*) Following amendments on March 1, 2021 and March 9, 2021, the IPO Registration Statement became effective at 4:00 p.m. Eastern Time on March 11, 2021. (*Id.*) On that date, Coupang filed another registration statement on Form S-1MEF (the "MEF Registration Statement"), which incorporated the IPO Registration

Statement and added another 10 million shares of Class A common stock to the IPO for an aggregate of 130 million shares. (*Id.* ¶ 58.)

Coupang conducted its IPO between March 11 and March 15, 2021. (Am. Compl. ¶ 60.) Coupang offered the 130 million shares of Class A common stock at $35 per share, which meant its IPO was "the largest IPO on Wall Street since . . . 2014" and that Coupang was valued at "over $60 billion." (*Id.*) On March 11, 2021, the first day of the IPO, Coupang's share price was $63.50 when the stock market opened, "implying an enterprise value on a fully diluted basis of $114 billion." (*Id.*) Before the market opened on March 18, 2021, Coupang filed an S-8 Registration Statement (the "S-8 Registration Statement") for just under 30 million shares of Coupang Class A common stock that the Company had previously issued to some of its employees, making these employee common stock shares freely tradeable. (*See id.* ¶ 69.)

Each of the Individual Defendants signed the IPO Registration Statement, the MEF Registration Statement, and the S-8 Registration Statement. (Am. Compl. ¶¶ 22–30, 58.) Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") "acted as an underwriter for Coupang's IPO and served as the representative of the underwriting syndicate for Coupang's IPO." (*Id.* ¶ 31.) Defendants Allen & Company LLC ("Allen"); J.P. Morgan Securities LLC ("JPM"); Citigroup Global Markets Inc. ("Citi"); HSBC Securities (USA), Inc. ("HSBC"); Deutsche Bank Securities Inc. ("Deutsche Bank"); UBS Securities LLC ("UBS"); Mizuho Securities USA LLC ("Mizuho"); and CLSA Limited ("CLSA") also served as underwriters for Coupang's IPO.[3] (*Id.* ¶¶ 32–39.) Collectively, Goldman Sachs, Allen, JPM, Citi, HSBC,

---

[3] CLSA "is not a broker-dealer registered with the SEC and agreed to not offer or sell any shares of the . . . common stock that it purchased in connection with the IPO in the United States." (Am. Compl. ¶ 39.)

Deutsche Bank, UBS, Mizuho, and CLSA are referred to as the "Underwriter Defendants."  The

Underwriter Defendants, except for CLSA, are referred to as the "Broker-Dealer Defendants."

Plaintiffs in this action purchased or acquired Coupang Class A common stock between

March 11, 2021 and March 14, 2022—that is, during the IPO and over the following year.  (Am.

Compl. ¶ 1.)  On March 15, 2022, Coupang's share price was $15.45, (*id*. ¶ 484), about 75%

lower than the IPO-opening high of $63.50, (*see id.* ¶ 60).  New York City Public Pension Funds

were appointed as Lead Plaintiffs on March 21, 2023.  (*See* Doc. 40.)

### B.  *Coupang's Business Practices and Alleged Deception*

In their approximately 150-page, 516-paragraph Amended Complaint, Plaintiffs allege

that Coupang made false or misleading statements in the IPO Registration Statement, S-8

Registration Statement, and in various statements made between March 11, 2021 and March 14,

2022.  (*See* Am. Compl. ¶¶ 6, 62, 189, 232.)  The allegations relate to five aspects of Coupang's

business; I discuss the allegations related to each of the five aspects below.

### 1.  Working Conditions

Coupang depended on an "extensive end-to-end logistics network" in order to deliver

packages from its warehouses to consumers and to retain its position as the largest e-commerce

company in South Korea.  (Am. Compl. ¶ 71.)  Coupang's warehouse workers and delivery

drivers comprise the "backbone" of this network; Coupang calls some of these frontline workers

"Coupang Friends."  (*Id*. ¶ 72.)  The vast majority—approximately 90%—of Coupang's frontline

workers were "non-regular employees," that is, employees hired on a fixed-term contract basis or

"day-to-day employees hired the night before through mobile employment applications."  (*Id*.

¶ 75.)  Plaintiffs' Amended Complaint focuses on three categories of purported worker-safety

issues at Coupang.

a.  <u>Cardiac Stress</u>

Between March 12, 2020 and March 6, 2021—the year before the IPO—eight Coupang frontline workers died from heart conditions.  (Am. Compl. ¶ 78.)  For example, on October 12, 2020, a 27-year-old worker had a heart attack in his shower shortly after finishing an overnight shift at a Coupang warehouse, and on November 10, 2020, a 50-year-old maintenance worker in another Coupang warehouse died from a heart attack after moving heavy equipment and having worked 81 hours that week.  (*Id.*)  These and other allegedly work-related deaths "kept Coupang in the news" in the lead up to Coupang's IPO.  (*Id.*)  Indeed, "'kwarosa' is a Korean term that refers to sudden death from heart failure or stroke due to strenuous work," and "cardiac disorders are the second leading cause of death in South Korea."  (*Id.*)  With regard to two of the deaths, Coupang pointed out that the men were contractors and not employees, and with regard to the other deaths, the Amended Complaint alleges that "Coupang skirted responsibility by highlighting its work standards and arguing that there was no causal connection between the death and the employee's workload."  (*Id.* ¶ 79.)

By March 11, 2021—the date Coupang's IPO launched—the Company "required all new parcel delivery drivers to undergo [a] legally mandated pre-employment health screening, through which it would receive, among other things, information on the heart function of the applicant."  (Am. Compl. ¶ 114.)  A confidential witness ("CW1") who was a "Director [of] Fulfillment Center Operations at Coupang" disclosed that if a new hire had an "at-risk medical condition[], including 'high blood pressure,'" Coupang would "assign[] the individual to a 'light' position and inform[] them that they needed to undergo a 'follow-up' health screening to confirm the condition was brought back under control."  (*Id.* ¶¶ 102, 115.)

On March 24, 2021, Korean media reported "that a Coupang Friend in his early 40s was found unconscious earlier that day next to his company-issued car . . . and pronounced dead on the way to the hospital." (Am. Compl. ¶ 116.) An article in the *Korea Herald* stated that "'[t]he courier's death immediately triggered speculation that he may have become the latest delivery worker to die from apparent overwork.'" (*Id.* (alteration in original).) Coupang's media response stated that "'in general, new employees are assigned less delivery volume than other employees,'" and that the now-deceased Coupang Friend "was undergoing a 'thorough medical check-up' because he showed 'heart-related abnormalities in his initial medical examination.'" (*Id.* ¶ 117.) A Korean media outlet later noted that "'[s]ome are raising issues with the placement of employees with abnormal [heart] findings,'" and a union official characterized Coupang's labor practices as "'problematic.'" (*Id.* ¶ 118 (alterations in original).)

b. COVID-19

In May 2020, there was an outbreak of COVID-19 in Coupang's warehouse in Bucheon, South Korea, a "windowless" facility with a staff of over 1,000 Coupang Friends that is "used to house fresh food." (Am. Compl. ¶ 87.) On May 24, 2020, Korean health authorities recommended Coupang "shut down the facility for a thorough remediation" after tracing a case of COVID-19 to the Bucheon warehouse. (*Id.*) Coupang declined to follow the recommendation, and another worker who worked the evening shift on May 24, 2020 tested positive on May 25, 2020. (*Id.*) After even more Bucheon employees tested positive for COVID-19 on May 26, 2020, Coupang shut down the facility. (*Id.*) Eventually, "there were at least 152 cases of COVID-19 traced back to the Bucheon warehouse." (*Id.* ¶ 89.)

c.  Warehouse Fire

Coupang's Deokpyeong warehouse in Incheon, South Korea was one of the Company's largest and "most important fulfillment centers."  (Am. Compl. ¶¶ 96–97.)  The facility lacked air conditioning, so Coupang "placed rotating fans on the top of product shelves throughout the facility during the warmer summer months."  (*Id*. ¶ 101.)  Additionally, workers in the facility stated in online reviews that there was "an exceptional amount of 'dust' in the work environment."  (*Id*.)  The conditions at the warehouse, including the dust, "heightened" the "risk of an electrical fire."  (*Id*.)  A February 2021 fire inspection logged 277 defects with the Deokpyeong warehouse's fire systems, including problems with the sprinklers and fire detectors and missing fire extinguishers.  (*Id*. ¶ 104.)

On the morning of June 17, 2021, an electrical wire running to one of the fans in the Deokpyeong warehouse caught fire.  (Am. Compl. ¶ 97.)  The fire quickly engulfed its surroundings.  (*Id*.)  The warehouse's fire alarm system detected the fire approximately nine minutes after it started, but a worker in the warehouse's control room silenced the alarm six seconds after it went off; this action deactivated "visual alarms, emergency broadcasting, sprinkler valves," and other fire safety systems.  (*Id*. ¶ 98.)  As the fire continued to spread, it triggered more alarms, but a control-room worker deactivated the system six times in a row after the alarms activated.  (*Id*.)  The fire department did not receive word of the fire until twenty minutes after it started.  (*Id*.)  Once the firefighters arrived on the scene, the fire had grown so large that it took 667 firefighters and 255 pieces of firefighting equipment 6 days to fully extinguish the blaze.  (*Id*. ¶ 99.)  Ultimately, the Deokpyeong fire destroyed the entire warehouse, and took the life of one firefighter.  (*Id*.)  A manager in the warehouse later told Korean media that because the fire safety system frequently malfunctioned, "the standard

practice was to press the key that reset the system whenever the fire alarm went off." (*Id*. ¶ 103 (emphasis omitted).) A warehouse worker also stated that "managers informed workers to pay no attention to" fire alarms in the facility. (*Id*. (emphasis omitted).)

The Deokpyeong fire, combined with the existing controversy regarding Coupang's workplace safety issues, sparked online "outrage" in Korea. (Am. Compl. ¶ 108.) A movement for Coupang users to "to delete their Coupang accounts" began to spread, "using the hashtag #LeaveCoupang." (*Id*. (emphasis omitted).) The fire also "cost Coupang millions of dollars in lost inventory, equipment, and other charges." (*Id*. ¶ 109 (emphasis omitted).)

### 2. Supplier Coercion

Most of Coupang's revenue comes from its sales of goods that it purchases in bulk from suppliers and resells directly to consumers. (*See* Am. Compl. ¶ 120.) This part of Coupang's business is called "owned-inventory" sales. (*Id*.) According to Coupang, "its business model is founded on the principle that customers should not be forced to choose between quick delivery, low prices, and broad selection." (*Id*. ¶ 121.) "Beginning in or around 2016, Coupang internally began implementing a price match system known as 'lowest price matching' or 'dynamic pricing.'" (*Id*. ¶ 122.) In other words, Coupang would automatically "match or beat the price for the same [owned-inventory] item on competing platforms." (*Id*.)

Coupang received a lower and sometimes negative gross profit on price-matched goods. (Am. Compl. ¶ 123.) So, in 2017, it began imposing certain demands on its suppliers to minimize its losses. (*Id*. ¶¶ 124–25.) First, Coupang asked its suppliers to raise the price they charged on competing platforms for products that Coupang automatically price matched. (*Id*. ¶ 125.) That way, the price that Coupang had to match would rise, as would Coupang's profit margin. (*See id*.) Second, Coupang "demanded that suppliers purchase advertising from

Coupang to make up for [profit] margin losses" on price-matched products.  (*Id*. ¶ 126.)  Third, Coupang "demanded that suppliers provide it with 'sales incentive' payments" if Coupang sold a high volume of the supplier's goods, but these incentive obligations were not in the suppliers' contracts with Coupang.  (*Id*. ¶ 127.)  Fourth, in connection with a series of Coupang sales that the Company ran in 2018 and 2019, Coupang imposed a contractual requirement on participating suppliers to cover the spread between the product's non-discounted price and the sale price.  (*Id*. ¶ 128.)  Coupang directly or impliedly threatened its suppliers that it would stop selling their products if they did not go along with these demands.  (*Id*. ¶¶ 125–28.)

In June 2019, a consumer goods company and an e-commerce rival both reported Coupang to the Korean Fair Trade Commission ("KFTC") for violating South Korean antitrust laws.  (Am. Compl. ¶¶ 129–30.)  Korean media reported these complaints and subsequent developments, and Coupang issued statements denying that it engaged in anticompetitive or otherwise illegal behavior.  (*Id*. ¶¶ 131–33.)  Following an investigation and hearing, on August 18, 2021, the KFTC "issued a corrective order and fined Coupang approximately $2.8 million" for the practices described above.  (*Id*. ¶¶ 136–37.)  One August 19, 2021 report on the KFTC order in the *Korea Times* noted that "'KFTC's punitive measure adds to controversies surrounding Coupang in relation to corporate responsibility and joint prosperity with society.'" (*Id*. ¶ 143.)

Following this antitrust enforcement action, several Coupang suppliers claimed that in "late 2021 and early 2022, Coupang began demanding that they enter 'verbal contracts'" to purchase advertising from Coupang to make up for margin losses on certain products.  (Am. Compl. ¶ 144.)  Another supplier "announced in November 2022 that Coupang stopped ordering

one of its most popular products after it refused to pay margin rates" that Coupang demanded. (*Id*. ¶ 145.)

### 3. Intellectual Property Misappropriation

Coupang operated a marketplace for third-party merchants in addition to selling its own inventory to consumers. (Am. Compl. ¶ 146.) In May 2016, Coupang revamped its third-party marketplace to improve its standing among its competitors. (*Id*. ¶ 147.) Coupang called the new third-party marketplace the "Item Market." (*Id*.) In the previous Coupang third-party marketplace, each third-party seller's listing of a particular item had its own product page, meaning that searching for one product could yield many nearly identical results. (*See id*. ¶ 146.) The new Item Market introduced a concept called the "Item Winner." (*Id*. ¶ 147.) Coupang configured its system to select a single Item Winner for a given product based on various criteria, including price. (*Id*.) The Item Market would then display a single image of the Item Winner, rather than a long list of search results. (*Id*.)

To sell on the Item Market, merchants had to agree to a form "Seller Terms and Conditions" contract with Coupang. (Am. Compl. ¶ 149.) Prior to the Item Market, the terms of this contract made each merchant "individually responsible for managing [its] own intellectual property," which included product "logos, text, product images, and the like." (*Id*. ¶ 150.) By July 2020, the terms of the form contract changed to provide that Coupang could "'freely use'" merchants' intellectual property "'regardless of the sales timing and whether or not [a given item] is sold,'" and that "'secondary works' generated from [a merchant's] content 'belong[ed] to Coupang.'" (*Id*. ¶ 151.) Following this change, Coupang began using merchant images interchangeably resulting in the image for an Item Winner product possibly coming from a merchant other than the one whose product was selected as the Item Winner. (*Id*. ¶ 153.) This

practice angered "a group of" merchants on the Item Market, who in July 2020 reported Coupang

to the KFTC "for imposing unfair terms and conditions on sellers that strip them of their

protected works, including copyrighted and trademarked materials." (*Id*. ¶ 154.) In April 2021,

a Korean broadcast network aired an interview with a sweater merchant on the Item Market who

lost business to a competing merchant marketing the same sweater. (*Id*. ¶ 159.) Coupang

displayed the interviewed merchant's images to users on the Item Market when they bought the

cheaper sweater. (*Id*.) The following month, on May 3, 2021, "a number of civic groups

representing the interests of small business owners" held a press conference "to announce that

they too reported Coupang to the KFTC" in connection with Coupang's Item Market practices,

asserting they were illegal under Korean law. (*Id*. ¶ 161.) On July 21, 2021, the KFTC

determined that Coupang's Item Market practices violated Korean intellectual property law, and

ordered Coupang to return to the practice of displaying the selling merchant's images on the Item

Winner page. (*Id*. ¶ 164.) Coupang indicated that it complied with the order on October 21,

2021. (*Id*. ¶ 165.)

### 4. Manipulated Search Results

In addition to selling owned-inventory merchandise that it purchased from suppliers,

Coupang also sold private brand ("PB") items. (Am. Compl. ¶¶ 42, 166.) PB merchandise was

more profitable for Coupang relative to owned-inventory merchandise, because Coupang

acquired PB merchandise "directly" from manufacturers rather than "through a distributor or

supplier." (*Id*. ¶ 166.) "Leading up to the IPO in March 2021 . . . Coupang significantly

increased the number of highly profitable PB products" that it offered. (*Id*. ¶ 167.)

"Between March 11, 2021, and June 28, 2021, Coupang offered its business partners

several different advertising services, including homepage advertising and 'keyword

advertising.'" (Am. Compl. ¶ 168.) "[K]eyword advertising leverage[d] Coupang's search algorithm to expose select products at the top of the search results when consumers use certain keywords in Coupang's search function." (*Id.*) The PB products on Coupang's website between March 11 and June 28, 2021 received the "same" level of product exposure that a third-party business would receive if it purchased "keyword advertising" for its products to appear in Coupang's search results. (*Id.* ¶ 169.) "On June 28, 2021, the KFTC opened an investigation into whether Coupang manipulated its search algorithm to favor PB products and conducted an on-site field inspection at Coupang's headquarters . . . the same day." (*Id.* ¶ 170.) On July 4, 2021, multiple news outlets including the *Korea Herald* and the *Financial Times* reported on the KFTC investigation. (*Id.* ¶ 171.)

At some point, "it became increasingly difficult" for Coupang "to favor PB products through [its] search algorithm." (Am. Compl. ¶ 172.) Therefore, "beginning around July 2021, Coupang began instructing [its] employees to leave positive reviews for certain PB products," a service for which Coupang charged third-party sellers. (*Id.* ¶¶ 173–74.) These reviews disclosed to customers that they were written by Coupang employees, but Plaintiffs note that "customers remained unaware that Coupang was mobilizing its employees to write reviews." (*Id.* ¶ 175.)

During a September 10, 2021 KFTC symposium about "Search Algorithms," KFTC Vice Chairman Jae-shin Kim "announced that e-commerce platforms, such as Coupang[,] would be regulated for prioritizing their own PB products over those of third-party businesses." (Am. Compl. ¶ 176.) A *Bloomberg* article about the symposium stated that the Vice Chairman Kim noted "'a continuing complaint that a major online shopping platform placed their own brand products in a better spot on its website.'" (*Id.*)

"In response to the KFTC's tightening regulatory scrutiny, . . . [i]n or around January 2022," Coupang employees and affiliates stopped labeling their reviews on PB products as employee reviews.  (Am. Compl. ¶ 177.)  Additionally, "between January 10 and March 7, 2022, five users who left a 'best review'"—a review selected by other Coupang users as high-quality— "for a PB product all purchased the same products as one another on or around the same day, including unusually large quantities" of certain commonly-purchased items.  (*Id*. (emphasis omitted).)

On March 14, 2022, a supplier submitted a complaint to the KFTC regarding Coupang's employee-written product reviews.  (Am. Compl. ¶ 178.)  News media reported on the KFTC complaint in the following days.  (*Id*. ¶ 180.)  On March 21, 2022, the media reported that the KFTC was investigating the March 14 complaint.  (*Id*. ¶ 181.)  On May 21, 2022, KFTC investigators collected evidence related to the complaint from Coupang's headquarters.  (*Id*.)

### 5.  Missing Dispute Resolution Standards

Plaintiffs assert that Coupang made deceptive statements regarding its dispute-resolution practices.  (Am. Compl. ¶ 186.)  Before Coupang's IPO and through at least March 6, 2022, the Company provided "a complaint processing function for direct sales as well as a dispute mediation center for transactions between customers and third parties."  (*Id*. ¶¶ 183, 187.)  Additionally, Coupang "maintained a 'customer service center'" containing answers to frequently asked questions.  (*Id*. ¶ 184.)

"Before August 2020, the KFTC opened an inquiry into Coupang's compliance with South Korea's . . . E-Commerce Act."  (Am. Compl. ¶ 185.)  The E-Commerce Act requires online retailers to "maintain[] standards and procedures for resolving disputes with [their] customers."  (*Id*.)  The KFTC investigated Coupang because it "did not maintain a written set of

standards or procedures for resolving disputes arising from the use of its online store."  (*Id.*
¶ 184.)  "On March 6, 2022, the KFTC issued a press release stating Coupang failed to maintain
written dispute resolution rules that govern disputes between sellers and buyers accessible to
consumers on its online store, in violation of South Korea's E-Commerce Act.  The KFTC also
ordered Coupang to take corrective measures."  (*Id.* ¶ 187.)  Multiple media outlets reported on
the KFTC's enforcement action.  (*Id.* ¶ 188.)

## II.    <u>Procedural History</u>

Plaintiff David Choi initiated this putative class action on August 26, 2022 by filing a
complaint, asserting claims under the Securities Act of 1933 against Coupang, the Individual
Defendants, Goldman Sachs, Allen, and JPM.  (*See* Doc. 1.)  Thereafter, various parties sought
appointment as Lead Plaintiff and Lead Counsel.  (*See* Doc. 40 at 2–6 (discussing competing
motions).)  On March 21, 2023, I appointed the New York City Public Pension Funds as Lead
Plaintiffs and Pomeranz LLP as Lead Counsel.  (Doc. 40 at 11.)

On May 24, 2023, Plaintiffs filed the Amended Complaint.  (*See* Doc. 50.)[4]  The
Amended Complaint asserts five Counts that:  (1) Coupang, the Individual Defendants, and the
Underwriter Defendants violated Section 11 of the Securities Act, 15 U.S.C. § 77k, (Am. Compl.
¶¶ 287–94); (2) Coupang, the Individual Defendants, and the Broker-Dealer Defendants violated
Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), (*id.* ¶¶ 295–304); (3) Coupang and
the Individual Defendants violated Section 15 of the Securities Act, 15 U.S.C. § 77o, (*id.* ¶¶ 304–
10); (4) Coupang, Kim, and Anand violated Section 10(b) of the Exchange Act, 15 U.S.C.
§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, (*id.* ¶¶ 495–503); and

---

[4] Plaintiffs previously filed the Amended Complaint on May 22, 2023, but the Clerk of Court rejected the filing as
deficient.  (*See* Doc. 43.)

(5) Coupang, Kim, and Anand violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a),

(*id*. ¶¶ 504–10).

On July 28, 2023, Defendants moved to dismiss the Amended Complaint in its entirety,

(Doc. 69), filing a supporting memorandum of law, (Doc. 70 ("MTD Mem.")), and supporting

declaration and exhibits, (Doc. 71).[5]  On October 3, 2023, Plaintiffs filed a memorandum of law

in opposition to Defendants' motion, (Doc. 78 ("Opp'n")), along with a supporting declaration

and exhibits, (Doc. 79).  Defendants replied on November 17, 2023.  (Doc. 85 ("Reply").)  The

parties also submitted various letters dated July 15, 2024, (Doc. 87 ("Pl. 1st Ltr.")), August 8,

2024, (Doc. 88 ("Def. 1st Ltr.")), August 12, 2024, (Doc. 89 ("Def. 2d Ltr.")), August 14, 2024

(Doc. 90 ("Pl. 2d Ltr.")), August 19, 2024, (Doc. 91 ("Def. 3d Ltr.")), June 5, 2025, (Doc. 92

---

[5] On July 27, 2023, Shearman & Sterling LLP filed a Notice of Appearance on behalf of all Underwriter Defendants, except CLSA.  (Docs. 65–66.)  On May 3, 2024, Allen Overy Shearman & Sterling US LLP ("A&O Shearman") filed a Notice of Change of Firm Name and Email Addresses on behalf of all Underwriter Defendants, including CLSA.  (Doc. 86.)  Although the motion to dismiss and supporting memorandum of law do not list Goldman Sachs, Allen, JPM, or CLSA as moving to dismiss the Amended Complaint, (Docs. 69–70), the reply memorandum of law is signed by Shearman & Sterling LLP as "Counsel for the Underwriter Defendants," (Doc. 85).  The Plaintiffs do not argue that Goldman Sachs, Allen, JPM, or CLSA did not move to dismiss along with the other Defendants.  On August 27, 2025, A&O Shearman filed a letter in response to my order seeking clarification of whether A&O Shearman represents CLSA and whether the motion to dismiss was filed on behalf of all Underwriter Defendants.  (Doc. 96–97.)  A&O Shearman represented that (i) although CLSA was not served with the Amended Complaint, "the arguments supporting defendants' motion to dismiss apply equally to CLSA" and (ii) the motion to dismiss was "intended to be submitted on behalf of" the served underwriter defendants, i.e. all Underwriter Defendants except for CLSA.  (Doc. 97.)  As discussed *infra* § IV.D, because Plaintiffs' claims against CLSA "suffer from the same deficiencies as against the other defendants, the Court will treat the instant motion as if it were brought on behalf of all defendants."  *Woodward v. Perez*, No. 12-CV-8671, 2014 WL 4276416, at *1 n.1 (S.D.N.Y. Aug. 29, 2014) (dismissing claims against unserved defendant and collecting cases); *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 463 n.2 (S.D.N.Y. 2014) ("Defendant ADVFN and Defendant Doe have not yet been served. However, because Plaintiffs' claims against InvestorsHub and Defendant Doe suffer from the same deficiencies as against InvestorsHub Defendants, the Court will treat the instant motion as if it were brought on behalf of all defendants."), *aff'd sub nom. Salvani v. InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015) (summary order); *Garcia v. City of New York*, No. 15-CV-7470, 2017 WL 1169640, at *1 n.1 (S.D.N.Y. Mar. 28, 2017) ("Although Rojas and Larson have yet to be served, because Plaintiffs' claims against them are the same as the claims against Ovando and Smyth and suffer from the same deficiencies, the Court will treat the instant motion as if it were brought on behalf of all Defendants.").

("Pl. 3d Ltr.")), June 13, 2025, (Doc. 93 ("Def. 4th Ltr.")), and June 24, 2025, (Doc. 95 ("Pl. 4th Ltr.")), regarding orders in various KFTC proceedings.[6]

### III.    <u>Legal Standard</u>

"A motion to dismiss is designed to test the legal sufficiency of the complaint." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) (internal quotation marks omitted).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility thus depends on a host of considerations:  the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (citation omitted).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  A complaint need not make

---

[6] I do not consider Plaintiffs' letter submissions, (*see* 1st–4th Pl. Ltrs.), in resolving the motion to dismiss.  In the submissions, Plaintiffs requests that I take judicial notice of various Korean regulatory activities taken subsequent to the briefing of the pending motion.  (*See id.*)  When considering a motion to dismiss, however, a court may take judicial notice "of the *fact* that press coverage, prior lawsuits, or regulatory filings contain[s] certain information, without regard to the truth of their contents," *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (emphasis in original), or "relevant matters of public record" that are "'not subject to reasonable dispute,'" *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (quoting Fed. R. Evid. 201(b)).  Since I cannot consider the various Korean regulatory matters identified by Plaintiffs for the truth of their contents, they are not material to my consideration in connection with the instant motions.  In any case, the findings of Korean authorities that certain of Defendants' conduct may have violated Korean law does not have a bearing on whether Defendants' statements violated the securities laws of the United States.

"detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

## IV.   <u>Discussion</u>

### A. *Exchange Act Claims*

I first address Defendants' motion to dismiss Count IV, for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Count V, for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). "Section 10(b) makes it unlawful 'to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.'" *Novak v. Kasaks*, 216 F.3d 300, 305 (2d Cir. 2000) (alterations adopted) (quoting 15 U.S.C. § 78j(b)). Rule 10b-5 specifies that the statute prohibits, among other things, "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id*. (quoting 17 C.F.R. § 240.10b-5). Section 20(a) imposes "'joint[] and several[]'" liability on a "'person who . . . controls any person'" who violated Section 10(b). *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 241 (S.D.N.Y. 2020) (quoting 15 U.S.C. § 78t(a)).

To state a claim based on "material misrepresentations or omissions in violation of [Section] 10(b) and Rule 10b-5," Plaintiffs must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks omitted). "To state a claim under Section 20(a), a plaintiff must show (1) 'a primary violation by the controlled person,' (2) 'control of the primary violator by the defendant,' and (3) 'that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Woolgar*, 477 F. Supp. 3d at 241 (quoting *ATSI Commc'n., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)).

Additionally, Plaintiffs "'must satisfy the heightened pleading requirements of" the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b) "by stating with particularity the circumstances constituting fraud." *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (citation omitted). As to the misleading-statement element, the "complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Id*. at 305 (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99 (citation omitted). As to the scienter element, Plaintiffs must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u–4(b)). Although a court ordinarily draws all reasonable inferences in

Case 1:22-cv-07309-VSB    Document 98    Filed 09/10/25    Page 20 of 83

favor of the plaintiff, the PSLRA "establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pens. Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (internal quotation marks omitted).

Defendants argue that Plaintiffs have not plausibly alleged the material-misrepresentation, scienter, or loss-causation elements of Section 10(b) and Rule 10b-5 violations and have not established control-person liability under Section 20(a). I address these contentions in turn.

## 1. Materially False or Misleading

The Amended Complaint asserts that Defendants' various statements regarding Coupang's business and operations were actionably misleading because in making the statements, Defendants "failed to disclose" the unflattering facts necessary to make the statements true. (*E.g.*, Am. Compl. ¶ 312 ("The statements in [Coupang's IPO Registration Statement] were false and misleading . . . because . . . Coupang failed to disclose . . ."); *see also id.* ¶¶ 314–88 (asserting same failure-to-disclose theory for other statements).)

Section 10 "do[es] not create an affirmative duty to disclose any and all material information." *Siracusano*, 563 U.S. at 44. "A company has no duty to disclose information 'merely because a reasonable investor would very much like to know' that information." *S.C. Ret. Sys. Grp. Trust v. Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) (summary order) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). "Such a duty may arise expressly, pursuant to a statute or regulation, or implicitly as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12-CV-0256, 2015 WL 5311196, at *9

(S.D.N.Y. Sept. 11, 2015) (internal quotation marks omitted).  Indeed, "once a party chooses to speak, it has a 'duty to be both accurate and complete.'"  *Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010) (quoting *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002)).

In addition to prohibiting outright "false statements or lies," Section 10(b) and Rule 10b-5 support liability based on such "half-truths" in certain circumstances.  *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024).  "Half-truths . . . are 'representations that state the truth only so far as it goes, while omitting critical qualifying information.'"  *Id.* (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016)).  "A classic example of an actionable half-truth in contract law is the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property."  *Id.* (internal quotation marks omitted).

To evaluate whether a half-truth is "inaccurate, incomplete, or misleading" within the meaning of the Exchange Act, courts examine the "'context and manner of presentation'" of the challenged statement.  *Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 347 (S.D.N.Y. 2024) (quoting *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010)).  "The ultimate question" is "'whether a 'reasonable investor could have been misled to believe something in contradiction to the omitted facts.'"  *Id.* (quoting *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 569 (S.D.N.Y. 2011)).

Three corollaries to these general rules are also relevant.  First, a statement is not actionable if "a reasonable investor would interpret [it] as puffery or . . . not conveying any specific message."  *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 315 (S.D.N.Y. 2024) (citations omitted).  For instance, "'[g]eneral declarations

about the importance of acting lawfully and with integrity' are inactionable puffery, especially when expressed in aspirational terms." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021) (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019)).

Second, a statement of opinion is generally not actionable unless (1) it "is not 'honestly held' or omits facts about the speaker's basis for holding that view, and [(2)] those facts conflict with what a reasonable investor would understand from the statement itself." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)). Put another way, "statements of opinion are not actionable unless subjectively false—the speaker does not believe what he says—or objectively false—the speaker misrepresents or omits existing material facts in support of his belief." *Woolgar*, 477 F. Supp. 3d at 224 (internal quotation marks omitted and alterations adopted). That is because "a reasonable investor expects that opinion statements rest on some meaningful inquiry, fairly align with the information in the [speaker]'s possession at the time, and do not reflect baseless, off-the-cuff judgments." *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 43 (2d Cir. 2025) (internal quotation marks omitted). "In assessing what a reasonable investor would expect, the Supreme Court has stressed the importance of context, such as 'the customs and practices of the relevant industry' and whether the opinion was expressed in a formal statement such as an S.E.C. filing or instead was a 'baseless, off-the-cuff judgment, of the kind that an individual might communicate in daily life.'" *San Antonio*, 723 F. Supp. 3d at 315 (quoting *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020)) (citation modified).

Third, "[a] securities fraud claim for misrepresentations or omissions does not lie when the company disclosed the very risks about which a plaintiff claims to have been misled." *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 493 (S.D.N.Y. 2021) (quoting *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 308 (S.D.N.Y. 2020)) (citation modified). "When evaluating whether a company provided sufficient disclosures, the Court should consider not only the disclosures the company makes, but also 'information already in the public domain and facts known or reasonably available to the shareholders.'" *In re Dynagas*, 504 F. Supp. 3d at 307–08 (quoting *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993)) (citation modified). "The overarching inquiry is whether the total mix of information made available to investors sufficiently disclosed the purported risk." *Id.* (internal quotation marks omitted).

With these rules and corollaries in mind, I next examine whether any of the statements Plaintiffs identify are actionably deceptive, proceeding by subject matter. I conclude that none of the statements Plaintiffs identify were actionably misleading.

a. Working Conditions

In light of the working conditions that frontline workers at Coupang faced—the worker deaths, the warehouse inspection issues and subsequent warehouse fire, and the COVID-19 preparedness discussed *supra* § I.B.1—Plaintiffs assert that the following statements in Coupang's IPO and S-8 Registration Statements were actionably misleading:

> Founded in 2010, we are a home-grown technology company that has now become one of the three largest private sector employers in the nation. We are a significant driver of new economic opportunities for the people of Korea. As of December 31, 2020, we directly employed over 50,000 employees globally. **We consider our**

**employee relations to be positive.** (Am. Compl. ¶ 311.)[7]

> We believe it is both our opportunity and responsibility to challenge expectations about important social issues in our community.  In a market where the industry standard is a six-day workweek, we were the first to establish a five-day workweek for our drivers, even as we became the first major service to provide deliveries to customers seven days a week.  We also hire our drivers, Coupang Friends, directly, and provide them with paid time off and full benefits . . . . We hope such examples demonstrate that innovation can unlock both **a better world for our customers and a better workplace for our employees.** (*Id*. ¶ 313.)

Plaintiffs also challenge the following portions of Defendant Kim's March 11, 2021 interview on

*Bloomberg Markets*:

> [W]e have hundreds of thousands of people who work in our operation and the fulfillment and delivery, and we've had one work-related death in the past year.  But one is too many, and we have to continue to do better.  **We are actually leading the industry on this front.** (*Id*. ¶ 351.)

> [W]e have to continue to change and make the standards better.  **We are raising the bar** and will continue to invest.  **We have invested hundreds of millions of dollars in automation that makes** the deliveries not only a better experience for our customers but **the work easier for our employees and we are, we will continue, to create** good jobs, **the best working condition jobs in the country**. (*Id*. ¶ 353.)

Additionally, Plaintiffs challenge the statement posted on Coupang's website following the

worker death in Incheon:

> **Coupang pays great attention to the health and welfare of all employees,** and has a great responsibility to protect the safety and health of its employees.  **Coupang will continue to lead the courier logistics industry by prioritizing the health and safety of its employees.  Coupang will continue to make efforts to create a better working environment by considering the health and safety of workers as the company's core value and first management principle.** (*Id*. ¶ 355.)

These statements are not actionably misleading, as a reasonable investor would not

interpret them to convey "definite and verifiable" information.  *San Antonio*, 732 F. Supp. 3d at

---

[7] The bold emphasis in statements quoted from the Amended Complaint in this Opinion & Order were bolded in that document.

316.  Phrases like "we consider our employee relations to be positive," "a better workplace for

our employees," "[w]e have invested hundreds of millions of dollars in automation that makes . .

. the work easier for our employees and we are, we will continue, to create good jobs, the best

working condition jobs in the country," and "Coupang will continue to make efforts to create a

better working environment by considering safety of workers as the company's core values and

first management principle" are broad and non-specific, especially given that Coupang employed

over 50,000 employees at the time the statements were made.  (Am. Compl. ¶¶ 311, 313, 353,

355.)  *Cf. San Antonio*, 732 F. Supp. 3d at 315 (finding statements that "the supply-chain team

has 'done a great job of managing' and 'handl[ing]' risks" and "all of our employees are

embracing E[nvironmental] S[ocial and] G[overnance reporting]" and "[o]ne of the key aspects

of ESG is managing risks" were not specific enough to convey verifiable information).  Even

assuming—as Plaintiffs contend—that a reasonable investor would understand the statements to

refer to Coupang's warehouse and delivery workers, the terms "positive," "a better world," "a

better workplace," "raising the bar," "the best working condition jobs," and creating "a better

working environment by considering the health and safety of workers as the company's core

value and first management principle," (Am. Compl. ¶¶ 311, 313, 353, 355), are "vague

corporate-speak that no reasonable investor would rely on in any significant way," *Coral

Springs*, 565 F. Supp. 3d at 494 (internal quotation marks omitted); *see also id*. (explaining that a

statement Defendant "is 'a technology company at its core'" was vague and therefore not

actionable); *JP Morgan*, 553 F.3d at 205–06 (statements that Defendant "had 'risk management

processes that are highly disciplined and designed to preserve the integrity of the risk

management process'" and "would 'continue to reposition and strengthen its franchises with a

focus on financial discipline'" were not actionable for vagueness (alterations adopted)).

Plaintiffs do not allege that Defendant Kim's statement that Coupang was "leading the industry" in preventing "work-related death[s]" is literally false, (Am. Compl. ¶ 351); instead, they plead it was actionably misleading because it omits that Coupang "(i) exploited the physical health of its frontline workers for its own economic gain; and (ii) maintained large fulfillment centers that failed to follow basic fire safety measures." (*Id*. ¶ 352.)  Plaintiffs put forth this theory of deception as to all of the workplace-related statements.  (*See id*. ¶¶ 312, 314, 354, 356.)  It fails here because a reasonable investor would understand Defendant Kim's comments about Coupang's workplace issues—and the other challenged statements—as corporate spin about a difficult situation rather than a guarantee that Coupang had no workplace safety issues.  *Cf. Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (dismissing claim based on aspirational statements about food safety because the "statements did not amount to a guarantee with regard to the efficacy of [the defendant's] food-safety practices").  Although Defendant Kim also represented that Coupang was "continu[ing] to change and make the standards better" by investing in "automation that makes . . . the work easier for our employees," (Am. Compl. ¶ 353), these statements as well are "too aspirational and general to be actionable," *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 83 (S.D.N.Y. 2017).  Indeed, in the IPO and S-8 Registration Statements, Coupang preceded its purportedly misleading statements with phrases such as "[w]e consider" and "[w]e hope."  (Am. Compl. ¶¶ 311, 313.)  Couching these statements in "aspirational . . . qualifiers" diminishes their ability to mislead a reasonable investor.  *City of Pontiac Policemen's and Firemen's Ret. System v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).

Additionally, with regard to the worker deaths, the Amended Complaint alleges that "[i]n the year before the IPO, a series of deaths by young and middle-aged employees," discussed

*supra* § I.B.1.a, "kept Coupang in the news for overworking its frontline workers." (Am. Compl. ¶ 78.) Following the IPO, the March 24, 2021 death of a Coupang worker "'immediately triggered speculation'" in the media that his death may have been related to "'apparent overwork.'" (*Id*. ¶ 116.) In other words, information related to the deaths of Coupang's employees was available to investors in media reports. Thus, given the "total mix of information made available to investors," *In re Dynagas*, 504 F. Supp. 3d at 318 (internal quotation marks omitted), Coupang's statements concealed nothing—the purported demands it placed on its frontline workers and the apparent results of those demands were plain for all to see, and Plaintiffs do not argue otherwise.

With regard to the Deokpyeong facility, by painting with a broad brush and keeping to generalities, Defendants did not create a "duty to disclose" that would trigger an obligation "to tell the whole truth." *Roofers Loc.*, 751 F. Supp. 3d at 347 (quoting *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)). Plaintiffs cite to *Meyer v. JinkoSolar Holdings Co.*, as providing an instructive example: "One cannot . . . disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors." 761 F.3d at 251; *see also* Opp'n 14. In *JinkoSolar*, the Second Circuit held that it was misleading for a company to make detailed, comforting statements about how it handled environmental compliance while at the same time withholding that, at the very moment it spoke, the company had known, ongoing issues "prevent[ing] substantial violations of" particular environmental regulations. 761 F.3d at 251. Plaintiffs seize on this example, noting that an inspection of the Deokpyeong warehouse fire systems found numerous faults just months before a catastrophic fire destroyed the facility. (*See* Opp'n 14; Am. Compl. ¶ 104.) However, the

hypothetically actionable half-truth in *JinkoSolar* was specific—"business's peculiar risk of fire" and "installation of a comprehensive sprinkler system to reduce fire danger." 761 F.3d at 251. Here, by contrast, the statements at issue are not specific. For example, one representative challenged statement is that "Coupang [would] continue to make efforts to create a better working environment by considering the health and safety of workers as the company's core value and first management principle." (Am. Compl. ¶ 355.) This statement says nothing about a sprinkler system, the Deokpyeong warehouse, or any Coupang facility—it is instead a general statement about Coupang's "working environment." (*Id*.) Coupang's general risk disclosure that its "business . . . is vulnerable to damage or interruption from catastrophic occurrences, such as earthquakes, floods, fires, power loss, telecommunication failures, terrorist attacks, criminal acts, sabotage, other intentional acts of vandalism and misconduct, geopolitical events, including those related to hostilities between North Korea and Korea, disease, such as the COVID-19 pandemic," (*see* Doc. 71-2 ("S-1 Stm.") at 8),[8] did not specify, as in the *JinkoSolar* example, that it took certain mitigation measures in response to a "peculiar risk of fire" in the Deokpyeong facility, 761 F.3d at 251. Instead, Coupang's general risk disclosure contained a laundry list of business vulnerabilities and did not specify any particular location within Coupang's business. The other challenged statements are similarly too broad and general to have triggered a duty for Coupang to disclose the details of the Deokpyeong warehouse inspection. For example, the statements "employee relations," "a better world . . . a better workplace," "hundreds of thousands

---

[8] Pincites to this document refer to PDF pagination. I may consider the document in resolving the motion to dismiss because it is incorporated within the complaint by reference. *See In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 2000) ("On a motion to dismiss a complaint brought under the securities laws, the Court may properly consider documents, such as the prospectus at issue, which are incorporated into the complaint by reference."); *Fernandes v. Centessa Pharm. PLC*, No. 22-CV-8805, 2024 WL 3638254, at *12 (S.D.N.Y. Aug. 2, 2024) ("[A]s the Registration Statement is clearly integral to the complaint, the Court considers it in evaluating the motion to dismiss.").

of people who work in our operation . . . [w]e are actually leading the industry on this front," and

"the best working condition jobs in the country," (Am. Compl ¶¶ 311, 313, 351, 353), do not

reference any specific risk of warehouse fires that would trigger a duty to disclose the specific

safety risks at the Deokpyeong warehouse or indeed at any specific Coupang facility.

Plaintiffs, citing *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65 (S.D.N.Y. 2017),

point out that "statements that may be seen as puffery 'in isolation' take on increased importance

if 'made repeatedly in an effort to reassure the investing public about matters particularly

important to the company and investors.'"  (Opp'n 9 (quoting *In re BHP*, 276 F. Supp. 3d at 79

(internal quotation marks omitted)).  In *In re BHP*, however, the challenged statements

"contain[ed] quite specific representations or guarantees of some concrete fact or outcome," for

instance that the defendant's "operations [were] required to have systems in place to identify and

effectively manage foreseeable crises and emergencies," that the defendant "undert[ook] annual

assessments to verify that critical controls are effective," and that it "interacted with [its] whole

workforce to reaffirm [its] commitment to their safety and wellbeing."  267 F. Supp. 3d at 79 &

n.4.  Coupang's challenged statements, by contrast, do not refer to any specific "systems,"

"assessments," or "interactions," instead invoking the nebulous concepts of employee relations

and a better workplace that a reasonable investor would understand and view to be "aspirational"

rather than communicating particulars.  *Id*.  Plaintiffs' other citations on this point are similarly

inapposite.  *See In re Petrobas*, 116 F. Supp. 3d at 372, 372, 381 (concluding that a company's

"statements regarding its general integrity and ethical soundness" were not puffery given the

company's extensive involvement "at the center of a multi-year, multi-billion dollar bribery and

kickback scheme"); *In re Turquoise Hill Resources Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 222

(S.D.N.Y. 2022) (explaining that a defendant's "statement about 'progress'" was not puffery

because, in context, the statement falsely "reassured investors that" a specific construction project "was not substantially impaired by any delay"); *Cheng v. Canada Goose Holdings Inc.*, No. 19-CV-8204, 2021 WL 3077469, at *7 (S.D.N.Y. July 19, 2021) ("The challenged statements at issue are not merely generic corporate expressions of optimism; they conveyed material information about Defendants' then-current inventory levels and demand and Defendants' reasons, at that time, for building inventory.").

Plaintiffs also argue that the statements are not puffery because, in some instances, when challenged "statements discuss safety and the business operates in an industry in which safety is a particular concern, statements touting safety may not be puffery." *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 373–74 (E.D.N.Y. 2022) (citing *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223 (S.D.N.Y. 2012); *In re Vale S.A. Sec. Litig.*, No. 19-CV-526, 2020 WL 2610979 (E.D.N.Y. May 20, 2020)); *see also In re BHP*, 276 F. Supp. 3d at 80 (noting "that safety was obviously a major concern to [defendants] and investors"). (*See* Opp'n 10.)  However, "to the extent [safety-related] statements contain purely aspirational language, such language is inactionable," *Kusnier*, 639 F. Supp. 3d at 374 (internal quotation marks omitted), and Coupang's statements of "hope" and its perception of "employee relations" as "positive," (Am. Compl. ¶¶ 313, 311) are aspirational, not factual.

In short, Plaintiffs fail to plausibly allege that the statements related to Coupang's working conditions are actionably misleading.

### b.  Supplier Coercion

Plaintiffs allege that various of Defendants' statements related to its controversial price-matching system and its relationship with third-party suppliers generally were actionably

misleading.  These statements include those made in Defendant Kim's letters to investors in the

March 11, 2021 IPO Registration Statement and March 18, 2021 S-8 Registration Statement:

> **We . . . support hundreds of thousands of suppliers and merchants who earn their living on Coupang** . . . Even during an unprecedented pandemic, as small businesses in the country suffered net loses, small businesses on Coupang saw their sales increase by over 50% through direct access to our services and customers nationwide.  (Am. Compl. ¶ 315.)

Coupang's March 11, 2021 IPO Registration Statement and March 18, 2021 S-8 Registration

Statement also included the following allegedly deceptive statements:

> In addition to our e-commerce services, we also have a new offering in the online advertising space.  **We offer opportunities to advertise on our websites and mobile applications.**  (*Id.* ¶ 317.)

> **[T]he Company receives consideration from suppliers for various programs, including rebates, incentives, and discounts, as well as advertising services** provided on its website and mobile applications.  (*Id.* ¶ 319.)

> In addition to superior experience, we believe **we also offer customers the lowest prices for our owned inventory selection** . . . **Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items.**  (*Id.* ¶ 321.)

> **We have established an extensive network of suppliers** and merchants, **which enables us to** obtain a wide selection of merchandise while **maintaining low prices for customers.**  We offer millions of SKUs under our owned-inventory selection . . . **We also source a large proportion of merchandise directly from manufacturers, which can result in better pricing for our customers.**  (*Id.* ¶ 323.)

> Our structural advantages from complete end-to-end integration, investments in technology, and scale economies **generate higher efficiencies that allow us to pass savings to customers in the form of lower prices.**  We also source a large portion of merchandise directly from manufacturers, which can contribute **to better pricing for our customers** . . . **In addition, cost efficiencies that we drive across our operations and economies generated from scale enable us to pass these savings on to our customers in the form of lower prices.**  (*Id.* ¶ 325.)

> [Coupang's growth in retail sales in the calendar year 2020 was] **driven by a continual increase in product selection and additional offerings provided to our customers**.  (*Id.* ¶ 327.)

[Coupang's growth in retail sales in the calendar year 2019 was] **driven by a general increase in product selection, in-stock availability, and offerings provided to our customers**. (*Id*.)

While we are focused on increasing our owned-inventory selection in these categories, we also expect to increase the number of merchants offering items in these categories in our marketplace . . . **Our success in increasing selection, including expansion into new categories, has contributed to the increase in total net revenues in 2020.** (*Id*. ¶ 329.)

[Coupang's] investments [in product selection, technology, and logistics] **have been guided by our operating principles of putting customers at the center of everything we do** . . . In our view, **our culture of customer centricity is our most important asset, and it drives us to relentlessly pursue operational excellence and innovation** . . . We are committed to delivering a "wow" experience to all of our customers every day. **This commitment drives every aspect of our operations** and pushes us to redefine the standards of e-commerce. (*Id*. ¶ 344.)[9]

Additionally, in a May 12, 2021 quarterly earnings call, Defendant Kim stated:

The most important competitive advantage that Coupang has is really our orientation. We've made—we've always worked backwards from the consumer. (*Id*. ¶ 363 (alteration adopted).)

Plaintiffs argue that these statements are actionably deceptive because they did not disclose Coupang's alleged practices—designed to reduce Coupang's profit-margin losses on discounted products—of requiring suppliers to raise prices on competing platforms and to purchase advertising or other services from Coupang. (Am. Compl. ¶¶ 316, 318, 320, 322, 324, 326, 328, 330, 345, 364.) According to Plaintiffs, these practices "exposed Coupang to a heightened, but undisclosed, risk of governmental . . . investigations" and associated reputational harms. (*Id*.)

These statements are not actionable. First, none of the statements are "literally false." *See Coral Springs*, 565 F. Supp. 3d at 494. Plaintiffs do not allege, for example, that Coupang

---

[9] The last two sentences of this statement also appeared in Coupang's 2021 Form 10-K filed on March 3, 2022. (*Id*. ¶¶ 389, 391.)

does not "offer opportunities to advertise," "receive[] consideration from suppliers," or "source a large proportion of [its] merchandise directly from manufacturers." (Am. Compl. ¶¶ 317, 319, 323.) Similarly, Plaintiffs do not allege that the statements of opinion, (*see id.* ¶¶ 321, 344), were "objectively" or "subjectively" false, as required for them to be actionable, *Woolgar*, 477 F. Supp. 3d at 224 (internal quotation marks omitted).

Second, other of the statements are non-actionable puffery. For example, that Coupang "support[ed]" its "suppliers" or those pertaining to the Company's "structural advantages," "operating principles," "culture of customer centricity," "operational excellence and innovation," or that it has "always worked backwards from the customer." (Am. Compl. ¶¶ 315, 325, 344, 363.) Plaintiffs cite *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006) in support of their contention that Coupang's "boast[ing]" was actionably misleading. (Opp'n 17.) However, the court in *Marsh* concluded that statements touting an insurance broker's "culture of excellence, . . . dedication to client service[,] and commitment to building values to shareholders amount[ed] to no more than puffery." 501 F. Supp. 2d at 475. It is true that the court also concluded that it was misleading for the broker to state that it was "developing the most cost-effective responses to the risks they face" and "seeking the best terms, conditions, and process" for its clients in light of the fact that the company employed a bid-rigging system engineered to offer inflated insurance quotes under the guise of a competitive bidding process and "regardless of whether . . . more favorable terms" were available. *Id.* at 462–63, 475–76 (emphasis omitted). However, Coupang's statement that it "provide[d] the lowest prices available in the Korean market" for many of its items, (Am. Compl. ¶¶ 243, 321),[10]

---

[10] This statement is also preceded by the qualifiers "we believe" and "[o]ur strategy is . . ." (Am. Compl. ¶¶ 243, 321.)

is different, because there is no allegation here that better prices were available on the Korean market for any of the items Coupang sold or that the prices were the result of a rigged pricing scheme. *Marsh & Mclennan* is therefore inapposite.

Third, certain of the statements pertain to the reasons—an "extensive network of suppliers," "scale economies," "cost efficiencies," "continual increase in product selection[,] additional offerings," "in-stock availability," and "expansion into new categories"—that, according to Coupang, explained its positive economic results. (Am. Compl. ¶¶ 323, 325, 327, 329.) According to Plaintiffs, on the other hand, these statements were misleading because they omitted mention of the challenged practices that may have also been a source of Coupang's growth. (*See* Opp'n 15–19.) "[A] statement may be misleading if it describes the factors that influence the reported [financial or economic] figures but omits the fact that one such factor is the alleged misconduct." *Marcu v. Cheetah Mobile Inc.*, No. 18-CV-11184, 2020 WL 4016645, at *4 (S.D.N.Y. July 16, 2020); *see also id.* (collecting cases). For example, it may be actionably misleading for a company to report that an increase in revenue was due to organic demand for the company's superior product, when in fact the only reason anyone bought the company's product was because of a bribery or kickback scheme. *See, e.g.*, *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 443–44 (S.D.N.Y. 2018) (statements that company's "competitive strengths" caused it to obtain contracts in a "competitive bidding process" against "some of the largest contractors in the world" were misleading because the company "fail[ed] to disclose that an additional reason for its success was its illegal bribery scheme"); *see also In re VEON Ltd. Sec. Litig.*, No. 15-CV-8672, 2017 WL 4162342, at *6–7 (S.D.N.Y. Sept. 19, 2017) (finding statements actionable where they disclosed legitimate reasons for growing revenues but omitted information about bribery); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758–61

(S.D.N.Y. 2017) (statements actionable where they disclosed favorable commercial purchases but omitted information about bribery). "[P]laintiffs who assert claims rooted in a failure to disclose misconduct—as [p]laintiffs do here—must plead with sufficient specificity how the alleged omissions are sufficiently connected to Defendants' existing disclosures to make those public statements misleading." *Marcu*, 2020 WL 4016645, at *3–4 (internal quotation marks omitted and alterations adopted) (omissions not actionable where allegedly misleading statements described topics "unrelated to a scheme to fraudulently garner referral bonuses from advertisers").

Here, as Plaintiffs concede, the Amended Complaint "does not plead that the [challenged] pricing practices had a significant impact on Coupang's sales." (Opp'n 18.) Without information about the true effect of the alleged anticompetitive conduct on Coupang's revenues, it is difficult to determine whether the implication of Coupang's statements—"that any unstated factors" such as anticompetitive conduct "played a minor role relative to the stated factors"— was misleading or not. *Marcu*, 2020 WL 4016645, at *5. The challenged statements "did not, explicitly or implicitly, rule out other factors playing a role in generating revenue." *Id.*; *cf. DoubleLine*, 323 F. Supp. 3d at 443–44 (explaining that the defendant's statements "would suggest to an ordinary investor that [the company] faced increasingly stiff competition," thereby "plac[ing] in issue the reasons for [the company's] success amidst such competition"). These realities, especially given the vagueness of the statements, mean that Coupang would not have misled a reasonable investor by omitting to mention the alleged anticompetitive dealings with its suppliers.

Fourth, the statements are not actionably misleading even if I accept Plaintiffs' strained contention, (*see* Opp'n 17–19), that Coupang triggered a duty to disclose omitted facts about its

35

supplier-relations practices because the statements "put the circumstances surrounding the means by which [the company] generated revenue . . . in play" or "at issue." *Marcu*, 2020 WL 4016645, at *5 (internal quotation marks omitted).  (*See also* Opp'n 18 ("[T]he duty to disclose here did not arise merely because Coupang made merely [*sic*] passing references to 'suppliers,' but because it made *specific representations* on the very matters impacted by Coupang's improper acts." (citation omitted)).)  Plaintiffs' argument fails because Coupang's risk disclosures and the timing of its challenged practices mean that "the total mix of information made available to investors sufficiently disclosed the purported risk[s]." *In re Dynagas*, 504 F. Supp. 3d at 313 (internal quotation marks omitted).  For one, "media sources began reporting" in June 2019 that some of Coupang's suppliers had filed complaints with the KFTC.  (Am. Compl. ¶¶ 129–31.)  Thus, investors would have been aware of the complaints and underlying conduct— the very thing Plaintiffs allege was concealed—during and after the 2021 IPO.  *Cf. In re Avon Prods., Inc. Sec. Litig.*, No. 05-CV-6803, 2009 WL 848017, at *24–25 (S.D.N.Y. Feb. 23, 2009) (dismissing securities fraud claim because "the filing of a lawsuit" and a subsequent "series of stories in the media" meant that the allegedly concealed conduct was in fact "presumptive knowledge in the pertinent financial market"), *report and recommendation adopted*, 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009).  In addition, Coupang reported the underlying KFTC investigation in the risk-disclosure section of its IPO Registration Statement, expressly noting that the outcome of the proceeding was "inherently uncertain" and could harm Coupang's business in various ways.  (*See* S-1 Stm. 8.)  Thus, the KFTC's August 18, 2021 corrective order and fine would have come as no surprise.[11]  (*See* Am. Compl. ¶ 137.)  Although more suppliers

---

[11] In some instances, a company may mislead-by-omission by failing to disclose its knowledge that its conduct is illegal.  *Cf. In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926, 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018) ("Mylan never affirmatively represented that the EpiPen was classified correctly; indeed, it warned investors that the

alleged that Coupang demanded they purchase advertising or "pay margin rates" following the KFTC's order, (*id*. ¶¶ 144–45), Coupang disclosed the risk that it could be "subject to" claims related to "antitrust and fair trade matters" in the IPO Registration Statement as well, (S-1 Stm. 7–8)—in other words, the very claims that were subsequently made by other suppliers.

For these reasons, Plaintiffs have failed to plausibly allege that the challenged statements regarding Coupang's alleged coercion of its suppliers were actionably misleading.

### c.  Intellectual Property Misappropriation

Next, Plaintiffs argue that various of Coupang and Defendant Kim's statements on its behalf were actionally misleading because the statements "failed to disclose" that Coupang "misappropriated protected trade materials from merchants for its own economic gain," exposing Coupang to a risk of related litigation, government investigation, and reputational harms.  (Am. Compl. ¶¶ 316, 336, 338, 341, 360; *see id.* ¶¶ 343, 358, 360, 362 (alleging that Coupang "imposed . . . terms and conditions . . . that allowed it to misappropriate protected trade materials").)  I have already determined *supra* §§ IV.A.1.a–b that the statement in Defendant Kim's March 11, 2021 letter that Coupang "support[s] . . . suppliers and merchants," (Am. Compl. ¶ 315), is too vague to be actionable.  Plaintiffs also challenge the following statements in the March 11, 2021 IPO Registration Statement and March 18, 2021 S-8 Registration Statement as deceptive with regard to Coupang's intellectual-property practices:

> [W]e focus on innovations around our end-to-end integrated network of technology and infrastructure, new offerings, and effective merchant solutions. **These investments help** us deliver superior selection, convenience, and low prices to customers while helping **merchants to improve and grow their businesses**. (*Id.* ¶ 335 (alteration in original).)
>
> **We offer merchants of all sizes effective solutions to improve their customer**

---

EpiPen rebate rate was subject to error.  Because Mylan warned investors that its rebate rate could be incorrect, Mylan's statements could mislead a reasonable investor only as to Mylan's *knowledge about* EpiPen's alleged misclassification—not the fact of misclassification alone." (emphasis in original)).

experience and enhance demand generation. **Our customer-to-product matching technology** ingests millions of new merchant listings daily into our product knowledge graph, and, leveraging machine learning, **provides personalized product exposure to customers based on relevance and predicted customer experience. This technology helps merchants compete holistically on overall customer experience.** (*Id.* ¶ 337.) [12]

**Our matching technology** ingests millions of new merchant listings daily into a product knowledge graph, and, leveraging machine learning, **provides product exposure to customers based on relevance and predicted customer experience**, among other variables. **This helps high-quality merchants compete holistically on overall customer experience. This results in** lowering barriers to entry for merchants, and **improving experience for customers**, which encourages repeat purchasing that **generates higher sales for merchants**. (*Id.*)

Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items. **We achieve this through** our diversified procurement strategy, which involves scaled procurement from local and international suppliers, direct sourcing from manufacturers, and our **creation of a system that rewards merchants for providing competitive prices**. (*Id.* ¶ 340.)

**[W]e have policies and procedures to protect both merchants and customers on our marketplace.** (*Id.* ¶ 342.) [13]

Additionally, on May 4, 2021—the day after the civic groups representing small businesses launched their media campaign against the Item Market—Coupang posted the following statements on the Newsroom section of its website:

**Coupang's Item Winner (one product, one page system) is an improved service** that allows consumers to make purchasing decisions based on consumer experience, unlike existing open markets that focus on advertising cost competition . . . **Through this, sellers can compete fairly without the burden of advertising costs**, and customers can easily find the best products. (*Id.* ¶ 357.)

Many sellers have continued to grow sales by entering the item market where they can **compete fairly without advertising costs**. (*Id.* ¶ 359.)

**Item Market Sales Terms and Conditions do not violate the Fair Trade Act and Copyright Act** . . . The representative image of the product refers to the image of the product itself, which is not subject to copyright by the seller. Coupang clearly

---

[12] This statement also appeared in Coupang's 2021 Form 10-K filed on March 3, 2022. (*Id.* ¶¶ 389, 391.)

[13] This statement also appeared in Coupang's SEC Form 10-Q filings for the first three quarters of 2021, and in Coupang's 2021 Form 10-K. (*Id.* ¶ 395.)

guides sellers to upload only product images when registering images, and the detail page screens that sellers individually upload are not shared with other sellers. **Therefore, the claim that Coupang infringes on the copyrights of sellers' images is not true at all.** (*Id.* ¶ 361.)

These statements are not actionable. The conduct Plaintiffs assert was concealed—that Coupang might use a supplier's images on another supplier's Item Winner page—was disclosed to the public both in Coupang's freely available Supplier Terms and Conditions—as noted by Plaintiffs in their Amended Complaint—and in Coupang's September 2020 media statements regarding controversy over the allegedly concealed practice. (*See* Am. Compl. ¶ 151 (alleging that Coupang's July 2020 Seller Terms and Conditions stated that Coupang could "'freely use' protected works provided to it by each seller 'regardless of the sales timing and whether or not [the product] is sold'"); *id.* ¶ 154 ("In July 2020, a group of business owners who participated in Coupang's Item Market reported Coupang to the KFTC for imposing unfair terms and conditions on sellers that strip them of their protected works"); *id.* ¶ 157 (outlining Coupang's September 18, 2020 media statement "denying that its Seller Terms and Conditions were improper").) Plaintiffs' "allegation is simply that [Defendants] did not sufficiently flagellate itself about the impact of these DISCLOSED facts. But there is no requirement that it do so." *Diabat v. Credit Suisse Grp. AG*, No. 23-CV-5874, 2024 WL 4252502, at *85 (S.D.N.Y. Sept. 19, 2024) (citation omitted). Thus, to the extent Plaintiffs argue that Coupang did not disclose its alleged misappropriation and the associated risks, the argument fails because "the total mix of information made available to investors sufficiently disclosed the purported risk[s]." *In re Dynagas*, 504 F. Supp. 3d at 313 (internal quotation marks omitted).

Plaintiffs, in response, claim that even if Coupang disclosed its practices, it "did *not* inform sellers that their creative works would be used in a manner that violated Korean law." (Opp'n 20.) Plaintiffs also stress that in May 2021, Coupang denied that its practices violated

Korean law, (*id.*; *see also* Am. Compl. ¶ 162), even though the KFTC determined in July 2021

that Coupang's practices were "'unfair'" and "'invalid' under South Korea's Copyright Act and

Act on the Regulation of Terms and Conditions," (*id*. ¶ 164).[14]  Contrary to Plaintiffs' statement

that the denial "was a certitude of fact," (Opp'n 21), the "context" of the statement makes clear

that Coupang was expressing its opinion, *San Antonio*, 723 F. Supp. 3d at 315 (internal quotation

marks omitted)—Coupang issued the denial about the legality of its Item Market practices in

response to a civic group's challenge to Coupang's seller-intellectual-property practices and

months before the KFTC issued its ruling, (*see* Am. Compl. ¶¶ 161–64).  *Cf. Richman v.

Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012) ("[D]efendants are not

bound to predict as the imminent or likely outcome of [] investigations that indictments of the

company and its chief officers [will] follow." (internal quotation marks omitted and alterations

adopted)); *City of Pontiac*, 752 F.3d at 184 ("[C]ompanies do not have a duty to disclose

uncharged, unadjudicated wrongdoing." (internal quotation marks omitted)).  Coupang also

included the reasons behind its position that its conduct was lawful.  (*See* Am. Compl. ¶¶ 161–

62.)  "A statement of opinion or belief about legal compliance" is generally not misleading

unless it "did not rest on some meaningful legal inquiry."  *City of Westland Police & Fire Ret.

Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 81 (S.D.N.Y. 2015).  Here, Coupang included the

reasoning behind its belief that its practices were legal—that "[t]he representative image of the

product refers to the image of the product itself, which is not subject to copyright by the seller."

(Am. Compl. ¶¶ 162, 361.)  Coupang's language is a variation of the statement *Omnicare*

recognized as an "unadorned statement of opinion about legal compliance: 'We believe our

---

[14] I take no position on the parties' dispute regarding the actual determinations of the Korean authorities.  (*See* Mem. 21; Opp'n 21.)

compliance is lawful.'"  575 U.S. at 188.  Plaintiffs do not allege enough facts to support the

inference that, when Coupang made the statement that it believed it was complying with

applicable laws, Coupang did not actually believe that fact, *see id.* at 184, or that Coupang made

this statement without undertaking "some meaningful legal inquiry," *id.* at 188.  Nor do Plaintiffs

assert sufficient allegations that Coupang "omit[ted] material facts about [its] inquiry into or

knowledge concerning [that] statement of opinion," or that "those facts [would] conflict with

what a reasonable investor would take from the statement itself."  *Id.* at 189.  In this

circumstance, the securities laws do not prohibit a company from publicly taking a litigation

position that a tribunal may later reject.  "[B]y itself, the fact that instances of non-compliance

with state and federal laws were later uncovered . . . does not automatically make a prior

statement of belief regarding legal compliance actionable under *Omnicare*."  *In re Lottery.com,*

*Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 552 (S.D.N.Y. 2024) (internal quotations omitted).

Plaintiffs fail to state a claim based on these statements as well.

### d.  Manipulated Search Results

Next, Plaintiffs assert that certain of Coupang's statements were misleading in omitting

that Coupang "manipulated search results to favor its [private brand] products to the detriment of

its suppliers and merchants."  (Am. Compl. ¶ 316; *see also id.* ¶¶ 332, 334, 336, 338, 339, 341,

345, 360, 364, 366, 370, 372, 374, 378, 380, 382, 384, 388, 390, 392, 394 (same).)  Plaintiffs

again assert that Defendant Kim's March 11, 2021 letters to investors included in the IPO

Registration Statement and March 18, 2021 S-8 Registration Statement were deceptive as to

Coupang's search-result practices by noting that Coupang "support[s] hundreds of thousands of

suppliers and merchants who earn their living on Coupang."  (*Id.* ¶ 315.)  As in the intellectual-

property context, Plaintiffs claim that the statements about Coupang's "innovations around [its]

end-to-end integrated network of technology and infrastructure," (*id.* ¶ 335), "offer[ing]
merchants of all sizes effective solutions to improve their customer experience," (*id.* ¶ 337),
"creation of a system that rewards merchants for providing competitive prices," (*id.* ¶ 340), and
that "sellers" on Coupang "can compete fairly without advertising costs," (*id.* ¶ 359), are
misleading in the search-result context as well.

Plaintiffs further allege that the following statements in Coupang's March 11, 2021 IPO
Registration Statement and March 18, 2021 S-8 Registration Statement are deceptive in relation
to the Company's search-result practices:

> **We have developed technology that enables us** to increase our operating
> efficiency through enhanced product merchandising and supply chain management,
> and **to provide our customers with personalized product promotions and
> recommendations.** (*Id.* ¶ 331.)

> **Our search technology produces a simplified experience** that overcomes the lack
> of standardization and duplicate listings by leveraging our product knowledge
> graph to show more unique products in search results, **helping customers find,
> compare, and make purchasing decisions easily.** (*Id.* ¶ 333.)

> The foundation of our search and recommendations is a product knowledge graph
> that organizes by product, not by seller, which enhances the customer experience.
> **Search and recommendation results** are aided by deep learning, data analytics,
> and image recognition among other inputs to **produce greater relevance and
> personalization. As a result, we believe customers can identify what they want
> and the best value for that product easier through our tools than those on
> competitive services** that require customers to sort through multiple sellers to
> compare offers for a given product. (*Id.*)

> **[Coupang's] investments [in product selection, technology, and logistics] have
> been guided by our operating principles of putting customers at the center of
> everything we do** . . . In our view, **our culture of customer centricity is our most
> important asset, and it drives us to relentlessly pursue operational excellence
> and innovation.** . . . We are committed to delivering a "wow" experience to all of
> our customers every day. **This commitment drives every aspect of our
> operations** and pushes us to redefine the standards of e-commerce. (*Id.* ¶ 344.)[15]

---

[15] The last two sentences of this statement also appeared in Coupang's 2021 Form 10-K filed on March 3, 2022. (*Id.*
¶¶ 389, 391.)

Additionally, during a May 12, 2021 quarterly earnings call, Defendant Kim stated:

> The most important competitive advantage that Coupang has is really our orientation. We've made—we've always worked backwards from the customer. (*Id*. ¶ 363.)

> [W]e continue to see strong growth in both [PB and owned-inventory sales] and there is no material change and mix at this time. So, we are focused on both the services and continue to drive initiatives in each of them. **However, over time, we would become agnostic between our owned inventory and third-party selection.** (*Id*. ¶ 365.)

On June 14 and again on July 2, 2021, Coupang posted the following statement on its website:

> **Coupang is focusing its efforts on expanding online sales channels and supporting sales of small and medium-sized businesses in the region.** Coupang will continue to support small and medium-sized businesses in order to revitalize local coexistence and the stagnant local economy. (*Id*. ¶ 369.)

During an August 11, 2021 quarterly earnings call, Defendant Kim stated:

> We exist to deliver new moments of WOW for customers. **Everything we do at Coupang revolves around wowing our customers.** Our confidence that we'll continue to make investments, to keep chasing the demand, **to make sure that our customer experience is not compromised, that we protect long-term customer trust.** Because—and we'll continue to do that aggressively, because we know that our investments will pay off over time. (*Id*. ¶ 371.)

> **Our investments** that continuously strengthen the virtuous cycle across our business **are driving significant growth for merchants and vendors.** (*Id*. ¶ 373.)

On August 19, 2021, Coupang posted the following statement to its website in connection with

the KFTC's activities in the e-commerce space:

> Coupang has attempted to innovate so that consumers can purchase products faster and cheaper in the distribution market, which has been dominated by chaebols[16] and conglomerates. **At the same time, we have continued to innovate distribution by lowering entry barriers to SMEs [small and medium-sized businesses] and pursuing shared growth.** (*Id*. ¶ 377.)

Coupang posted another statement to its website on September 16, 2021:

---

[16] As the context suggests, a "chaebol" is a "Korean conglomerate." *Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 629 (S.D.N.Y. 2005).

> **The "Item Market," which allows fair competition without the burden of advertising costs, was also cited as a reason for being friendly to small business owners.** In order to solve the unfair sales structure centered on advertising cost competition, **Coupang is operating an "Item Market" system that comprehensively evaluates price, delivery, and customer response so that products that consumers will prefer the most are exposed first.** (*Id.* ¶ 379.)

During a November 12, 2021 quarterly earnings call, Defendant Kim stated:

> Our strategy to build compounding customer loyalty and long-term shareholder value is reflected in our core operating tenets . . . **One, we exist to deliver new moments of WOW for customers and create a world where they asked, "How did we ever live without Coupang?"** . . . Three, we **. . . employ technology, process innovation, and economies of scale to create an amazing customer experience and drive operating leverage and significant cash flows over time.** (*Id.* ¶ 381.)

In the same call, Anand—the Coupang CFO—stated:

> We were less aggressive on customer acquisition this quarter to **improve the experience for existing customers. Prioritizing what's best for customers** drives loyalty and engagement and we believe that is the best long-term approach. (*Id.* ¶ 383.)

Coupang posted the following statement to its website on February 27, 2022:

> **Coupang's product reviews are operated in a fair and transparent manner, and when an employee writes a review, it is clearly stated.** When partners, including [the supplier who later complained to the KFTC], launch new products in Coupang, Coupang employees and members are given the opportunity to try the products first, and reviews are provided to help customers shop. (*Id.* ¶ 387.)

In Coupang's SEC Form 10-K for 2021, filed March 3, 2022, the Company stated:

> **We also continue to** refine our business intelligence systems to **provide more personalized search results and recommendations to help existing customers find and buy more of what they need on Coupang.** (*Id.* ¶ 389.)

Like the statement in Defendant Kim's letter that Coupang "support[s] hundreds of thousands of suppliers and merchants who earn their living on Coupang," (*id.* ¶ 315), many of the challenged statements are too general to be actionable for omitting information about search results, (*see id.* ¶ 335 ("investments help us deliver superior selection"), *id.* ¶ 340 ("our

diversified procurement strategy . . . our creation of a system that rewards merchants for providing competitive prices"), *id*. ¶ 344 ("our culture of customer centricity is our most important asset, and it drives us to relentlessly pursue operational excellence and innovation"), *id*. ¶ 363 ("we've always worked backwards from the customer"), *id*. ¶ 369 ("focusing its efforts on expanding online sales channels and supporting sales of small and medium-sized businesses in the region"), *id*. ¶ 371 ("[e]verything we do at Coupang revolves around wowing our customers"), *id*. ¶ 373 ("investments . . . driving significant growth"), *id*. ¶ 377 ("continued to innovate distribution . . . and pursuing shared growth"), 381 ("we exist to deliver new moments of WOW for customers"), *id*. ¶ 383 ("[w]e were less aggressive on customer acquisition this quarter to improve the experience for existing customers. Prioritizing what's best for customers")). Since Coupang did not speak "about [the] particular topic" of search results in these instances, it had no affirmative "duty to tell the whole truth" concerning the topic of search results. *JinkoSolar*, 761 F.3d at 250 (internal quotation marks omitted).

There is a subset of the challenged statements, however, that does address Coupang's "search technology." (Am. Compl. ¶ 333; *see also id*. ¶ 331 ("technology that . . . provide[s] our customers with personalized product promotions and recommendations"), *id*. ¶ 337 ("customer-to-product matching technology"), *id*. ¶ 379 ("Coupang is operating an 'Item Market' system . . . so that products that consumers will prefer the most are exposed first"), *id*. ¶ 389 ("search results").) Relatedly, some statements address the "mix" between Coupang's private brand and owned-inventory sales, (*id*. ¶ 365), and "Coupang's product reviews" being "fair and transparent," (*id*. ¶ 387).

Despite addressing Coupang's search technology, this subset of statements is also not actionable. Although Plaintiffs assert that these statements were misleading because Coupang

omitted that it "manipulated search results to favor its [private brand] products," (*e.g.*, Am. Compl. ¶ 332), the Amended Complaint does not allege that any overt manipulation occurred until July 2021 at the earliest, (*id.* ¶ 174).  The statements Plaintiffs identify that predate July 2021, (*see id.* ¶¶ 331, 333 (challenging statements from February 12, 2021 IPO Registration Statement)), cannot have been misleading as to conduct that had not yet occurred.  To the extent that the Amended Complaint insinuates that Coupang manipulated search results before that date because a high proportion of results in certain categories was private brand products, (*see id.* ¶ 169), it fails to plead "with particularity the circumstances" of the alleged manipulation, Fed. R. Civ. P. 9(b).

The Amended Complaint does plead that, in July 2021, Coupang began a campaign to have its employees leave reviews on its private brand products to boost their prominence in search results.  (Am. Compl. ¶ 174.)  Plaintiffs' theory is not that Coupang made misleading statements because it concealed that Coupang employees were writing reviews—to the contrary, Plaintiffs plead that until "January 2022" each of these reviews was labeled as a Coupang employee review.  (*Id.* ¶¶ 175, 177.)  Rather, the theory is that Coupang concealed that it was "mobilizing its employees to write reviews," (*id.* ¶ 175), that would "artificially elevat[e] the ranking of its [private brand] products," (Opp'n 22).  According to Plaintiffs, it was misleading for Coupang to suggest in July 2021 that its "'Item Market' system . . . comprehensively evaluates price, delivery, and customer response so that products that consumers will prefer the most are exposed first" in search results, (Am. Compl. ¶ 379).  The statement on its face is not misleading—the concept of "products that consumers will prefer the most" is indefinite such that it is impossible to falsify whether such products are "exposed first."  (*Id.*)  *See San Antonio*, 732 F. Supp. 3d at 316 (explaining that a statement is not puffery if it is "definite and verifiable").  It

was not misleading for Coupang not to mention that it was "mobilizing" employees to write reviews for private brand products—after all, Coupang already disclosed its use of employee-written reviews and permitted suppliers to purchase products that were subject to employee-written product reviews through the "Coupang Experience Group."  (Am. Compl. ¶¶ 173, 175.) A reasonable investor considering the statement within this "broader frame," *Omnicare*, 575 U.S. at 190, therefore would understand that Coupang-employee-written reviews are not organic, but rather, in some circumstances, are akin to paid advertising.

Later, in February 2022, Coupang stated that its "product reviews are operated in a fair and transparent manner, and when an employee writes a review, it is clearly stated."  (Am. Compl. ¶ 387.)  The statement also reiterated that "Coupang employees" sometimes wrote reviews for certain products.  (*Id.*)  Plaintiffs argue, (*see* Opp'n 22), that it was outright false to state that employee reviews are labeled as such because "[i]n or around January 2022, employees and/or affiliates of employees began leaving" employee reviews "without even identifying themselves as" employees of Coupang or one of its subsidiaries.  (Am. Compl. ¶ 177.)  However, Plaintiffs must "plead with particularity sufficient facts to support their contention" that any challenged statement was "misleading," including pleading with particularity the "facts of the underlying . . . conduct" that made the statement misleading.  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 464 (2d Cir. 2019); *see also Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020) ("Because Cemex's statements were materially misleading only if bribes were actually paid, Plaintiffs must plead sufficient facts describing the essential elements of the alleged bribery.").  Plaintiffs' allegations do not meet this standard.[17]  Pleading that "employees

---

[17] Defendants persuasively argue that none of the allegations regarding Coupang employee reviews of private brand products are sufficiently particular to survive dismissal.  (*See* Mem. 23–25.)  I decline to address this contention, however, because I conclude that even if Coupang did direct employees to leave reviews on private brand products, Coupang's challenged statements were not misleading.

and/or affiliates" left reviews that were not identified as employee reviews, (Am. Compl. ¶ 177), does not identify the reviews or "who" posted them, *Schiro*, 438 F. Supp. 3d at 199.  The Amended Complaint also fails to allege "how" Coupang purportedly directed employees to leave unlabeled reviews, instead resting on the types of "'[b]lanket allegations'" that are insufficient to meet the particularity standard.  *Id.*  (quoting *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 632 (S.D.N.Y. 2017)).  The allegations relating to the "inexplicable purchasing patterns" of "five users who left a 'best review' for a [private brand] product" do not cure these deficiencies, because they do not identify the specific five users, do not identify the reviews in question, and do not establish that the users left these reviews at the direction of Coupang.  (Am. Compl. ¶ 177.)  In sum, Plaintiffs do not establish it was false to state that "when [a Coupang] employee writes a review, it is clearly stated."  (*Id.* ¶ 387.)  As discussed, given the context of the challenged statements, it was not misleading to omit that Coupang employees may have written reviews in order to boost Coupang's private brand products in search results.

Plaintiffs fail to state a claim based on this category of statements.

### e.  Missing Dispute Resolution Standards

Next, Plaintiffs assert that some of the statements challenged for the foregoing reasons, (*see* Am. Compl. ¶¶ 342, 344, 363, 371, 381, 383, 389), were also misleading because they omitted that Coupang "failed to maintain [legally] required dispute resolution procedures accessible to consumers," exposing Coupang to heightened but undisclosed risks of regulatory enforcement and reputational harms, (*id.* ¶ 343; *see also id.* ¶¶ 345, 364, 372, 382, 384, 390).  I have already explained that these statements are inactionable puffery.  *See supra* §§ IV.A.1.b–d.  None of the statements mention dispute resolution, and most of them do not even discuss Coupang's procedures, so as to trigger any duty for Coupang to discuss their dispute resolution

standards in any detail.  *See, e.g.*, *JinkoSolar*, 761 F.3d at 250.  The statement that Coupang has

"policies and procedures to protect both merchants and consumers" does mention "procedures,"

(Am. Compl. ¶ 342 (emphasis omitted)), but as Defendants point out, (Mem. 26), the Second

Circuit has held that "simple and generic assertions about having 'policies and procedures'" are

not materially misleading, *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019).

       The statements in this category are not materially misleading.

### f.   Item 105 and Item 303 Liability

       Finally, Plaintiffs assert that Coupang's risk disclosures were misleading under SEC

Regulation S-K Items 105, *see* 17 C.F.R. § 229.105 ("Item 105"), and 103, *see* 17 C.F.R. §

229.303 ("Item 303").  (*See* Am. Compl. ¶¶ 226–30.)  "Item 105 . . . requires that [a company's]

offering documents 'provide under the caption Risk Factors a discussion of the material factors

that make an investment in the registrant or offering speculative or risky' and 'explain how each

risk affects the registrant or the securities being offered.'"  *In re Hub Cyber Sec. Ltd.*, No. 23-

CV-5764, 2025 WL 872078, at *16 (S.D.N.Y. Mar. 20, 2025) (quoting 17 C.F.R. § 229.105).

"Item 303 requires companies to disclose 'known trends or uncertainties that have had or that are

reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or

income from continuing operations' in periodic filings with the SEC."  *Macquarie*, 601 U.S. at

257 (quoting 17 C.F.R. § 229.303(b)(2)(ii)).

       Plaintiffs plead that the Securities Act Defendants—defined in the Amended Complaint

as the Underwriter Defendants, Securities Act Individual Defendants, and Coupang, (Am.

Compl. ¶ 41)— are liable under Items 105 and 303 because Coupang "failed to disclose the

known uncertainties associated with Coupang's unsafe working conditions and the improper

business activities deployed by Coupang to maximize its profits," (*id.* ¶¶ 228, 230, 284, 286,

348, 350).  Any claims based on Items 105 and 303 do not survive dismissal of the Plaintiffs'

underlying securities claims.  In response to Defendants' assertion that dismissal of these claims

is warranted, (Mem. 27–29), Plaintiffs perfunctorily state in a footnote that "[f]or all the reasons

stated above, Plaintiffs also allege violations of Items 105 and 303 of Regulation S-K," (Opp'n

25 n.17).  This footnote appears at the end of the section of the brief arguing that Plaintiffs have

adequately pled material misstatements and omissions.  (*See id*.)  By failing to meaningfully

address Defendants' arguments regarding Items 105 and 303, Plaintiffs abandoned these claims.

*E.g.*, *Campbell v. Whole Foods Mkt. Grp., Inc.*, 516 F. Supp. 3d 370, 393 (S.D.N.Y. 2021)

("Plaintiff has abandoned this claim by failing to brief the issue in response to Defendant's

motion to dismiss."); *Milestone Aviation Grp. Ltd. v. DSV Air & Sea Inc.*, No. 24-CV-3136, 2025

WL 846142, at *2 n.2 (S.D.N.Y. Mar. 18, 2025) ("An argument is forfeited . . . 'where it has not

been sufficiently argued in the briefs, such as when it is only addressed in a footnote.'" (quoting

*City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011)).

Even if Plaintiffs had not abandoned these claims, they fail on the merits.  For the Item

105 claim to survive dismissal, the Amended Complaint must plead that Coupang's IPO and S-8

Registration Statements were not "accurate and sufficiently candid."  *Sharma v. Rent the

Runway, Inc.*, 751 F. Supp. 3d 82, 118 (E.D.N.Y. 2024) (internal quotation marks omitted).  I

have already explained that the statements in these documents were not materially misleading,

"thus the Item 105 claim is not actionable" based on the statements in the IPO and S-8

Registration Statements.  *Id*.; *see also Carpenter v. Oscar Health, Inc*., No. 22-CV-3885, 2025

WL 722729, at *7 (S.D.N.Y. Mar. 6, 2025) ("Plaintiffs' failure to plead any actionable

misstatements or omissions in the Registration Statement [] dooms their Regulation S-K claim").

For the Item 303 claim to survive dismissal, Plaintiffs must plead that Defendants had "reason to believe that a known trend"—here Coupang's purported unsafe working conditions and improper business practices—would "materially affect [the company's] investments and revenues." *Vaccaro v. New Source Energy Partners L.P.*, No. 15-CV-8954, 2016 WL 7373799, at *5 (S.D.N.Y. Dec. 19, 2016). "Put differently, 'the essential obligation imposed by Item 303 is to explain in the prospectus if there has been an important change in the company's business or environment that significantly or materially decreases the predictive value of the reported results so as to prevent the latest reported results from misleading potential investors.'" *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 (S.D.N.Y. 2021) (quoting *Lowinger v. Pzena Inv. Mgmt., Inc.*, 341 F. App'x 717, 720 (2d Cir. 2009) (summary order)) (citation modified).

Here, as discussed, Coupang disclosed the general risks that legal claims regarding "worker safety," the KFTC investigations into its business practices, and general risk of "catastrophic occurrences, such as . . . fires," would have on its bottom line.  (S-1 Stm. 7–8.) Plaintiffs cannot base their Item 303 claims on these general disclosures, because "the challenged risk was exactly what was disclosed" and was therefore "already part of the 'total mix' of information already available to the market." *Kusnier*, 639 F. Supp. 3d at 379 (quoting *Litwin*, 634 F.3d at 718, and citing *In re Philip Morris Int'l Inc. Sec. Litig.*, No. 18-CV-8049, 2020 WL 5632901, at *5 (S.D.N.Y. Sept. 21, 2020)).

Instead, Plaintiffs must "proffer[] undisclosed facts," and allege that Defendants had reason to believe that they "altered the potential future impact of operations in a way that was not already conveyed." *Id*.  Coupang's prospectus did not disclose the hundreds of violations in the February 2021 fire inspection of the Deokpyeong warehouse in the months leading up to the catastrophic June 2021 blaze that destroyed the facility.  (*See* Am. Compl. ¶¶ 102–05.)  Even

assuming Coupang's management knew about the results of the fire inspection, *see infra*

§ IV.A.2.b.ii, omitting the results from the prospectus is insufficient to create Item 303 liability

because Plaintiffs do not allege that Coupang's management knew there was "a fairly substantial

probability" that any risk of fire would "materialize" in a way that would cause "a material

impact" to Coupang's finances. *Willard*, 527 F. Supp. 3d at 619 (quoting *In re BHP*, 276 F.

Supp. 3d at 88 (citation modified)); *see also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d

Cir. 2016) (explaining that Item 303 liability "requires the registrant's actual knowledge of the

relevant trend or uncertainty"). The Amended Complaint "does not plead facts demonstrating

that the internal problems"—such as the allegedly unsafe working conditions—"threatened the

Company's financial performance earlier than was disclosed to the market." *In re Vroom, Inc.

Sec. Litig.*, No. 21-CV-2477, 2025 WL 862125, at *39 (S.D.N.Y. Mar. 18, 2025). Furthermore,

Plaintiffs refer generally to Coupang's statements in the Management's Discussion and Analysis

disclosures, (Am. Compl. ¶¶ 228, 284, 348), and Risk Factors in Coupang's Registration

Statement, (*id*. ¶¶ 230, 286, 350), "but they fail to plead a particular statement rendered

misleading." *San Antonio*, 732 F. Supp. 3d at 317; *see also Macquarie*, 601 U.S. at 265 (holding

that "failure to disclose information required by Item 303 can support a Rule 10b–5(b) claim

only if the omission renders affirmative statements made misleading."). The mere fact that the

risk materialized into a fire that purportedly "led to an enormous loss in Coupang's revenues,"

(Am. Compl. ¶ 8), is insufficient; "[i]t has been established for nearly a half century that a

plaintiff cannot establish 'fraud by hindsight,'" *Diesenhouse v. Soc. Learning & Payments, Inc.*,

No. 20-CV-7436, 2022 WL 3100562, at *7 (S.D.N.Y. Aug. 3, 2022) (quoting *Denny v. Barber*,

576 F.2d 465, 470 (2d Cir. 1978)); *see also id.* (collecting cases).

       Plaintiffs' claims premised on Items 105 and 303 fail.

### 2.  Scienter

Additionally, Plaintiffs have not established that Defendants acted with scienter in making the challenged statements.  "To satisfy this element," of their Exchange Act claims, "Plaintiffs must 'plead [a] factual basis which gives rise to a strong inference of fraudulent intent.'"  *Coral Springs*, 565 F. Supp. 3d at 486 (quoting *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 27 (2d Cir. 2014) (summary order)).  Plaintiffs may meet this burden by showing "either (1) a 'motive and opportunity to commit the fraud,' or (2) 'strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Woolgar*, 477 F. Supp. 3d at 232 (quoting *Blanford*, 794 F.3d at 306).  "[T]he scienter requirement is met 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).  "When determining whether Plaintiffs alleged a strong inference of scienter, a court must consider 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'"  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 418 (S.D.N.Y. 2020) (quoting *Tellabs*, 551 U.S. at 323 (emphasis in original)).

As a preliminary matter, in a case such as this one "involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible."  *Id.* (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009)); *accord C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG*, No. 12-CV-4924, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013) ("Scienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading."), *aff'd sub nom.*, *Westchester Teamsters Pension Funds v. UBS AG*, 604 F.

App'x 5 (2d Cir. 2015) ; *The Penn. Ave. Funds v. Inyx Inc*., No. 08-CV-6857, 2010 WL 743562, at *12 (S.D.N.Y. Mar. 1, 2010) ("'[G]roup pleading' of scienter . . . runs afoul of the PSLRA's requirement that a plaintiff 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" (quoting 15 U.S.C. § 78u–4(b)(2)).  Plaintiffs assert their Exchange Act claims against Coupang and against Defendants Kim and Anand— referred to in the Amended Complaint as the "Exchange Act Defendants"—and against Defendants Kim and Anand—referred to in the Amended Complaint as the "Exchange Act Individual Defendants."  (Am. Compl. ¶ 41.)  Plaintiffs also assert their Securities Act claims against Defendants Kim, Anand, Parker, Christensen, Jett, Mehta, Sun, Warsh, and You— referred to as the "Securities Act Individual Defendants."  (*Id*.)  However, "[g]roup pleading, by which allegations are made against families of affiliated entities is simply insufficient to withstand review on a motion to dismiss."  *Brown v. Dolce & Gabbana USA Inc*., No. 24-CV-3807, 2025 WL 1919549, at *8 (S.D.N.Y. July 11, 2025) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, No. 12-CV-1667, 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014) (collecting cases)); *accord Targum v. Citrin Cooperman & Co., LLP*, No. 12-CV-6909, 2013 WL 6087400, at *6 (S.D.N.Y. Nov. 19, 2013) (finding group pleading inadequate where complaint treated two defendants as a "unit").  In addition to the improper attempt to group-plead the scienter requirement, the Amended Complaint fails to allege facts that several of the Individual Defendants were "sufficiently involved with [Coupang's] daily affairs" and "makes no showing that the [Director Defendants] were corporate insiders or involved in [Coupang's] day-to-day operations."  *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014) (citation omitted). Instead, Plaintiffs merely allege that the Director Defendants signed Coupang's IPO and S-8 Registration Statements, (*see* Am. Compl. ¶¶ 22–30), that contain the allegedly fraudulent

statements, without attempting to link the Director Defendants with any of the alleged fraudulent statements.[18]

Moreover, when a defendant is a corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *City of Omaha*, 450 F. Supp. 3d at 424 (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). Such persons include "an individual defendant who made the challenged misstatement" and "the other officers or directors who were involved in the dissemination of the fraud." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). "In exceedingly rare instances, a statement may be so 'dramatic' that collective corporate scienter may be inferred" even without identifying "the individuals responsible for the challenged statement." *Id.* at 98–99 (quoting *Dynex*, 531 F.3d at 195–96).[19] As set forth in this section, Plaintiffs have failed to establish a strong inference of scienter as to the Individual Defendants. Nor do Plaintiffs allege any statement "so 'dramatic' that collective corporate scienter may be inferred." *See id.* at 99 (quoting *Dynex*, 531 F.3d at 195–96).

I conclude that Plaintiffs have failed to establish scienter under either available theory.

### a.   Motive and Opportunity

Plaintiffs argue that the timing of Defendant Kim's and Anand's respective sales of shares in Coupang stock in relation to the challenged statements demonstrates sufficient motive and opportunity to establish scienter. (*See* Opp'n 25–37.) "'Insider sales may contribute to an

---

[18] I note that Defendants Kim and Anand also signed Coupang's IPO and S-8 Registration Statements. (Am. Compl. ¶¶ 22–23.)

[19] For instance, "[s]uppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Dynex*, 531 F.3d at 195–96 (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).

inference of scienter where a plaintiff can show that the trading activity was unusual,' such as where a 'stock sale is made at a time or in an amount that suggests that the seller is maximizing personal benefit from inside information.'" *Coral Springs*, 565 F. Supp. 3d at 487 (quoting *City of Omaha,* 450 F. Supp. 3d at 419) (alterations adopted).  "To determine whether trading is unusual or suspicious, a court examines the following factors:  '(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.'" *In re Plug Power, Inc. Sec. Litig*., No. 21-CV-2004, 2022 WL 4631892, at *13 (S.D.N.Y. Sept. 29, 2022) (citing *Villare v. Abiomed, Inc*., No. 19-CV-7319, 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 21, 2021)).

Here, as to Defendant Kim, Plaintiffs' theory of scienter rests on his sale of 1,200,000 shares of Coupang stock during the IPO and the fact that he made no other sales during the Class Period.  (*See* Opp'n 35–36; Am. Compl. ¶ 456.)  Plaintiffs emphasize that Kim made $42 million in this transaction "after he and Anand secured favorable IPO pricing by infusing the IPO materials with misstatements."  (Opp'n 35.)  However, "executive stock stales, standing alone, are insufficient to support a strong inference of fraudulent intent."  *Coral Springs*, 565 F. Supp. 3d at 486 (internal quotation marks omitted).  Further, as Plaintiffs concede, the sale represented only 1% of Defendant Kim's total holdings of Coupang stock.  (Opp'n 36.)  "[C]ourts of this district have held that insider sales that represent less than ten percent of that insider's total holdings are insufficiently unusual to permit an inference of scienter."  *In re AXIS Cap. Holdings*

*Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595 (S.D.N.Y. 2006) (internal quotation marks omitted); *see, e.g.*, *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (finding stock sales of 22.5% of holdings did not constitute strong inference of scienter); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) (finding that stock sales of 17.4% of an individual's holdings were "insufficient to establish motive"); *In re Farfetch Ltd. Sec. Litig.*, No. 19-CV-08657, 2021 WL 4461264, at *5 (S.D.N.Y. Sept. 29, 2021) (finding the defendants' stock sales of 4% and 20% of their holdings "cannot plausibly be characterized as unusual"), *aff'd sub nom. IAM Nat'l Pension Fund v. Farfetch Ltd.*, No. 21-2752-CV, 2023 WL 2879304 (2d Cir. Apr. 11, 2023). "Even if [] [D]efendant [Kim] had sold off [a] greater portions of [his] holdings, Plaintiffs would still need to plausibly allege that the sales are connected to some kind of plan to defraud, for example by alleging that the timing of the sales matches up with the alleged material false statements or omissions." *In re Farfetch*, 2021 WL 4461264, at *6 (citing *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 586 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)). "Though the proceeds of the alleged stock sales are, by any measure, considerable, more is required in order for these trades to give rise to a strong inference that [Kim] acted with an intent to deceive through [his] public statements during the Class Period." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 585.

Plaintiffs fail to allege facts showing that the timing of Defendant Kim's sales were suspicious. With regard to timing, Plaintiffs assert that the timing of Kim's sale was "suspicious and unusual" because Kim "never made any other stock sales and he decided to sell in the IPO." (Am. Compl. ¶ 456 (emphasis omitted).) "However, prior to the IPO, which began the class period, there was simply no market for [Coupang] shares." *In re MINISO Grp. Holding Ltd. Sec. Litig.*, No. 22-CV-9864, 2024 WL 759246, at *18 (S.D.N.Y. Feb. 23, 2024), *reconsideration*

*denied*, 2025 WL 965688 (S.D.N.Y. Mar. 30, 2025).  Additionally, the fact that Kim sold his

shares "only in [a] public offering[] cuts against an inference of scienter, because it suggests a

motive that is 'generally possessed by most corporate directors and officers.'"  *City of Omaha*,

450 F. Supp. 3d at 420 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)); *see also*

*Stein v. Tangoe, Inc.*, No. 13-CV-00286, 2014 WL 12767210, at *17 (D. Conn. Sept. 30, 2014)

(finding that "[n]othing . . . appear[ed] inappropriate about the timing of the [stock] sales" by a

CEO and CFO "around the time of the IPO and the secondary offering" because "it would not be

unexpected to see sales at these times" "since executives can otherwise be restricted temporally

from making stock sales"); *see id.* ("Moreover, given the allegations in the Complaint that the

IPO was initially conducted to generate funds, it is completely normal that the executives would

sell large amounts of stock around the time of the IPO and the secondary offering so as to

generate capital by selling ownership interests in the company."); *Lozada v. TaskUs, Inc.*, 710 F.

Supp. 3d 283, 320–21 (S.D.N.Y. 2024) (holding that the co-founders' sale of stock following an

IPO was not unusual because, among other reasons, "their sales did not shortly precede a

negative announcement involving the company," and finding that "the more plausible inference .

. . is that, as co-founders of a highly successful company,  these individuals reasonably sought to

profit from that success in the IPO and SPO" and "[a]ny inference of fraudulent motive is

undercut by the fact that [the co-founders] retained significant ownership stakes in the company

after the two offerings").  As former Judge Richard Holwell has observed, "[i]t defies reason that

an entity looking to profit on a fraudulently inflated stock price would hold close to ninety

percent of its shares as share prices fell, while knowing that the information illuminating the

fraud was seeping into the market."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y.

2011) (emphasis omitted).  Plaintiffs have not plausibly alleged that "the trading activity was

unusual" in "amount" or in "tim[ing]" so as to "suggest[ ] that the seller is maximizing personal benefit from inside information." *City of Omaha*, 450 F. Supp. 3d at 419 (citations omitted).

With regard to Defendant Anand, on August 13, 2021—the day the lock-up period expired on his shares—the CFO sold 160,000 shares of Coupang stock, garnering approximately $5.3 million. (Am. Compl. ¶ 457.) The Amended Complaint pleads that this sale "was purportedly made to satisfy tax obligations incurred upon the settlement of restricted stock units (RSUs) that vested." (*Id*.) Additionally, on December 14, 2021, Anand sold 350,000 shares of stock in exchange for approximately $9.5 million; this sale "was purportedly made to satisfy exercise costs and tax obligations incurred with the exercise of certain stock options held by Anand." (*Id*.) Specifically, Plaintiffs concede that Anand used the proceeds from the December sale to finance his purchase of 576,750 additional shares of Coupang by way of options at fixed prices of between $1.93 and $1.99. (*Id.*) At the time of Anand's purchase of the 576,750 shares, Coupang stock was publicly trading between $26.65 and $27.78. (*See* Opp'n 36.) Thus, all told, Defendant Anand increased the number of Coupang shares he held during the relevant time period. (*See* Mem. 30.)

These allegations are also insufficient to raise a strong inference of fraudulent intent. Plaintiffs note that Anand's August sales occurred "days after several executives," including the Chief Executive Officer of Coupang's Korean subsidiary, "attended the KFTC's full panel hearing" regarding Coupang's purported supplier coercion "but before the KFTC released its findings." (Opp'n 35.) Further, Anand's December sales occurred "shortly after Coupang admitted to the KFTC behind closed doors that its failure to maintain requisite dispute resolution standards was 'illegal' but before the KFTC took any action publicly." (*Id*. 35–36.) It is true that "[t]rades that are made a short time," that is, days or weeks, "before a negative public

announcement . . . may be suspiciously timed." *See Woolgar*, 477 F. Supp. 3d at 235 (internal

quotation marks omitted).  Even assuming Anand knew about the non-public KFTC matters prior

to his sales, his overall holdings of Coupang stock increased during the relevant time period, so

this is not a case of "insiders . . . rush[ing] to cash out before the fraud was revealed and stock

prices plummeted." *Id*. (quoting *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444–45 (S.D.N.Y.

2005)); *see also City of Omaha*, 450 F. Supp. 3d at 420 (determining that a complaint had not

established scienter in part because the defendants' "stock holdings actually increased during the

Class Period").  As previously noted, it is not reasonable to infer that Anand sought to increase

his holdings of Coupang if he believed any fraud was about to be uncovered.  *See Glaser*, 772 F.

Supp. 2d at 593.  Plaintiffs identify no other information "[a]s to the amount or other

circumstances surrounding" Anand's sales to suggest "such activity was 'unusual.'" *Woolgar*,

477 F. Supp. 3d at 235.  "In addition, no other Individual Defendant is even alleged to have sold

stock during the Class Period." *Glaser*, 772 F. Supp. 2d at 592; *see, e.g.*, *Acito v. IMCERA Grp.,*

*Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (finding that an allegation that one outside director selling less

than 11% of his stock was insufficient to plead scienter where no other insiders sold shares).

Plaintiffs have not established scienter under a motive-and-opportunity theory as to Anand either.

### b.  Conscious Misbehavior or Recklessness

To establish conscious misbehavior or recklessness, as relevant here, Plaintiffs must show

that Defendants:  "(1) benefitted in a concrete and personal way from the purported fraud; (2)

engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting

that their public statements were not accurate; or (4) failed to check information they had a duty

to monitor." *Woolgar*, 477 F. Supp. 3d at 237 (quoting *Blanford*, 794 F.3d at 306).  "Plaintiffs

must specifically identify the reports or statements that are contradictory to the statements made,

or must provide specific instances in which Defendants received information that was contrary to their public declarations." *Glaser*, 772 F. Supp. 2d at 589 (internal quotation marks and emphasis omitted).  "To prevail on a recklessness approach in the context of a case based on an omissions theory of falsity, a plaintiff in this Circuit must establish both that the defendant breached a 'clear duty to disclose' the omitted facts and that the breach involved 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Roofers*, 751 F. Supp. 3d at 353 (quoting *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213 (2d Cir. 2020)).  Additionally, "plaintiffs cannot rely on information generally known or available to the public to support . . . circumstantial scienter allegations." *Glaser*, 772 F. Supp. 2d at 589 (citing *In re Sec. Cap. Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 595–96 (S.D.N.Y. 2010)); *accord In re Xunlei Ltd. Sec. Litig.*, No. 18-CV-467, 2019 WL 4276607, at *12 (S.D.N.Y. Sept. 10, 2019) (explaining that a public notice "cannot support an inference of scienter because it was publicly available").  "[T]he recklessness required to plead scienter is conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." *Woolgar*, 477 F. Supp. 3d. at 237 (internal quotation marks and emphasis omitted).  In line with the parties' briefing, my analysis proceeds by the topic of the challenged statements.

i.    *Worker Deaths*

Plaintiffs assert that Coupang, Kim, and Anand "were undeniably aware by the start of the Class Period" of the string of Coupang worker deaths during 2020, "and that the safety and welfare of its frontline workers was under intense public scrutiny and, therefore, needed to be monitored closely."  (Am. Compl. ¶ 397.)  However, these worker deaths were a matter of public

knowledge and, indeed, a source of contentious public debate.  Therefore, the allegation that Defendants knew about the worker deaths cannot "support circumstantial scienter."  *Glaser*, 772 F. Supp. 2d at 589.  This is the case because "Plaintiffs [would have been] just as aware of the [worker deaths] as they allege Defendants were, but they did not act on that information to sell their stock."  *In re Sec. Cap.*, 729 F. Supp. 2d at 596.[20]

The only allegation related to nonpublic information is that when a confidential witness ("CW1")[21] was "[a]sked if Anand and [another executive] were aware that many workers who died suffered from cardiac issues, CW1 confirmed they did, noting 'they were on the emails about it.'"  (Am. Compl. ¶ 398.)  This allegation does not support scienter because it does not refer to a "specific instance[]" where Anand received this information, *Glaser*, 772 F. Supp. 2d at 588, nor have Plaintiffs identified public statements by Anand that were contrary to this information.

ii.    *Deokpyeong Fire*

Plaintiffs' allegations regarding the fire in the Deokpyeong facility relate primarily to Anand.  Specifically, according to CW1, Anand received safety-related reports sent to Coupang's Environmental, Health and Safety ("EHS") group.  (Am. Compl. ¶ 398.)  CW1 stated that "fire safety violations needed to be included" in these reports, and that "various fire safety violations across Coupang's facilitates came up monthly if not weekly through that means."  (*Id*. ¶ 408.)

---

[20] The fact that Kim was "familiar[] with the topic" of worker deaths, (Opp'n 29 (citation modified)), does not support an inference of scienter here—Kim's statement during the Bloomberg interview regarding the worker deaths, (*see* Am. Compl. ¶¶ 351, 353), simply reiterated Coupang's previously-stated position that many of the deaths of its workers were not related to working at Coupang.

[21] CW1 was the "Director – Fulfillment Center Operations at Coupang from January 2019 to December 2021," and "regularly spoke about safety incidents" at Coupang's facilities with Anand and other executives as part of his job responsibilities.  (Am. Compl. ¶ 102.)  I credit CW1's allegations, because CW1's "position[] and[] job responsibilities are described sufficiently to indicate a high likelihood that [CW1] actually knew facts underlying [his] allegations."  *Glaser*, 772 F. Supp. 2d at 590.

Additionally, CW1 discussed "two electrical fires at the Deokpyeong Facility before June 2021" several times with another Coupang executive.  Plaintiffs therefore plead that "[a]t the very least, Anand would be aware of the[se previous] electrical fires based on the way fire safety incidents were reported," presumably through the EHS reports.  (*Id.* ¶ 412.)  Plaintiffs further allege that Anand "joined several . . . meetings" during which others discussed "Deokpyeong's overcapacity problems."  (*Id.* ¶ 413.)

With regard to Defendant Kim, the CW1 stated "it was not uncommon for Kim to 'go into [Coupang's] warehouses' to speak with managers there."  (Am. Compl. ¶ 465.)  Additionally, Plaintiffs allege that "less than six hours after the fire broke out at the Deokpyeong Facility, . . . Kim resigned from his position as Inside Director and Chairman of Coupang['s] Board of Directors."  (*Id.* ¶ 459.)

These allegations related to Anand establish only that he would have been generally aware of safety issues at Coupang's various facilities, including Deokpyeong, because he regularly received safety reports.  Plaintiffs stress that the Deokpyeong facility in particular was a concern because the February 2021 fire inspection "identified 277 problems with the fire safety system" at that warehouse.  (Am. Compl. ¶ 408 (emphasis omitted).)  Even assuming the report is a "red flag" that "would place a reasonable party in [Anand's] position on notice of wrongdoing," the Amended Complaint does not actually allege that Anand received the February 2021 report or that he became specifically aware of the report.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (internal quotation marks omitted); *see also id.* ("[S]cienter cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information").  Courts require "specific allegations of

various reasonably available facts, or red flags, that should have put the officers on notice that the public statements were false." *Id.* (internal quotation marks omitted); *see also id.* ("In this case, there was certainly a monster under the bed; the question is whether anyone had a reason to look there.")  Plaintiffs simply plead that the reports Anand received contained general information about "fire safety violations" across the entire Company, (*id.*), and that he "joined several" meetings discussing "Deokpyeong's overcapacity problem," (*id.* ¶ 414).  By failing to "specifically allege" that Anand received the February 2021 report or otherwise became aware of its contents, *Glaser*, 772 F. Supp. 2d at 589, Plaintiffs cannot establish that Anand was "conscious" of it such that he was reckless for failing to report it, *Woolgar*, 477 F. Supp. 3d. at 237; *see also Police & Fire Ret. Sys. v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 233–34 (S.D.N.Y. 2009) (declining to infer scienter from individual defendants' positions within the company where plaintiffs did not point to defendants' access to specific information contradicting their public statements).

Plaintiffs cite various cases suggesting that awareness of similar "red flags" can raise an inference of scienter.  (*See* Opp'n 27–28.)  However, these cases identified much more involvement by defendants in those cases than Anand is alleged to have been involved here.  *See In re Refco*, 503 F. Supp. 2d at 650 (drawing strong inference of scienter given defendant's role as "Secretary of . . . the entity most deeply implicated in the [concealed] fraudulent transactions" who "signed an agreement" with "one of the third-party intermediaries for the fraudulent loans"—all of which "could be read to suggest that he was not only involved with the day-to-day operations of [the entity], but in particular in dealings with the third party that facilitated the fraud"); *Pirnik v. Fiat Chrysler Autos., N.V.*, No. 15-CV-7199, 2017 WL 5312182, at *2 (S.D.N.Y. Nov. 13, 2017) (same for defendants' "specific written exchanges," meeting, and

phone call regarding the purported wrongdoing); *Speakes v. Taro Pharm. Indus., Ltd.*, No. 16-CV-8318, 2018 WL 4572987, at *9 (S.D.N.Y. Sept. 24, 2018) (same for allegations that defendants attended meetings and directly communicated with a confidential witness on the topic of the purported wrongdoing).

The allegations for Defendant Kim are weaker than those related to Anand.  Kim is not alleged to have received any safety reports.  Without more specific factual details, it is not plausible to infer from Kim's purported general practice of visiting Coupang warehouses that he would have surmised there were safety issues so egregious that he had a duty to disclose them, let alone specific fire related concerns related to Coupang's warehouses, including the Deokpyeong facility.  Plaintiffs, citing *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017) and *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013), contend that Kim's resignation in the wake of the fire raises a strong inference of scienter.  I need not consider Defendants' factual dispute with this assertion to reject Plaintiffs' argument.  (*See* Mem. 39 (asserting that Kim retired in May 2021).)  "[T]he timing and circumstances of individual defendants' resignations may add some further weight to an overall inference of scienter," *In re Eletrobras*, 245 F. Supp. 3d at 469 (internal quotation marks omitted), but are "insufficient standing alone" to raise such an inference, *Van Dongen*, 951 F. Supp. 2d at 474 (internal quotation marks omitted).

### iii.    *Supplier Relations*

According to the Amended Complaint, on September 23, 2021,[22] the KFTC issued a written report and fined Coupang for various coercive practices it imposed on its suppliers.  (Am.

---

[22] The Amended Complaint incorrectly identified the report as being dated September 23, 2019, (Am. Compl. ¶ 416), although the report is dated September 23, 2021, (Doc. 79-25).  *See 380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp.2d 199, 215 (S.D.N.Y. 2008) ("Where the plaintiff's allegations are contradicted by a document that the complaint incorporates by reference, the document controls.").

Compl. ¶¶ 416–26; Opp'n 32 n.25.)  The KFTC report noted that Coupang "cooperated with [the] investigation" and "consistently acknowledge[ed] the fact of the acts" under investigation. (Am. Compl. ¶ 424 (emphasis omitted).)  Additionally, at a KFTC hearing regarding the investigation in August 2021, a Coupang representative "no longer disputed" that the challenged practices "were illegal."  (*Id.* ¶ 425 (emphasis omitted).)  Plaintiffs argue that these allegations establish a strong inference of scienter as to Coupang because they represent admissions of wrongdoing attributable to the Company and inconsistent with the Company's public statements. (Opp'n 31–32.)  Plaintiffs also assert that the "existence of numerous governmental investigations into Coupang is indicative of scienter."  (Am. Compl. ¶¶ 444–48 (capitalization altered); *see also* Opp'n 33.)

"[K]nowledge of the existence of an investigation is not sufficient" on its own "to support an inference of scienter."  *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 517 (S.D.N.Y. 2016) (collecting cases).  "[T]he existence of government investigations may sometimes be probative of scienter with regard to post-investigation conduct."  *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 258 (S.D.N.Y. 2012) (emphasis omitted).  For instance, there may be a strong inference of scienter when an investigation has become "a final determination" of unlawful behavior, but the company's general statements may imply legal uncertainty.  *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926, 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018).

Here, Coupang made its challenged statements in March and May 2021.  *See supra* § IV.A.1.b.  However, Coupang's purported admissions of wrongdoing occurred during the August 11, 2021 hearing, and the KFTC issued its findings of wrongdoing in September 2021. (Am. Compl. ¶¶ 416, 425; Opp'n 32 n.25.)  Although Plaintiffs also plead that Coupang made its

purported admissions "during [KFTC's] investigation," (Am. Compl. ¶¶ 418, 420, 422, 424), this general assertion is not sufficiently particular to satisfy the PSLRA. Thus, even assuming that the admissions in the KFTC report were "contradictory" to the challenged statements, Plaintiffs have not established that this information was "available to the defendants [] at the same time they made their misleading statements." *Glaser*, 772 F. Supp. 2d at 588 (internal quotation marks and emphasis omitted). Further, although Plaintiffs allege that Defendants Kim and Anand signed the IPO and S-8 Registration Statements, which disclosed the existence of the KFTC investigation, they offer no allegations as to Kim's and Anand's respective knowledge of the challenged practices. *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 222 (E.D.N.Y. 2022) (finding that plaintiffs failed to plead scienter where plaintiffs cited "nothing more concrete to support that officer and director defendants, who either made or signed the Registration Statement containing the statements at issue, knew about the contradictory data"); *see also In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 161 (S.D.N.Y. 2021) ("Allegations regarding a defendant's title, Board membership, and/or signatures on documents — such as the Offering Documents — are plainly insufficient to allege scienter as to each defendant."). Vaguely pleading that "senior executives" "attended" meetings where some of the challenged practices were discussed, (Am. Compl. ¶ 426), is insufficiently particular to satisfy the PSLRA—particularly where the allegation is merely that unspecified "senior executives" attended the meetings and CW1 does not specifically allege that CW1 attended meetings with any of the Individual Defendants in which the alleged issues were discussed. *See Jackson v. Halyard Health, Inc.*, No. 16-CV-05093, 2018 WL 1621539, at *8–9 (S.D.N.Y. Mar. 30, 2018) (noting that plaintiffs failed to allege either that defendants "*personally* received" a damaging report about a subpar product or that confidential

witnesses "attended meetings with any of the Individual Defendants where the alleged issues were discussed" in holding there was insufficient circumstantial evidence of scienter).

                iv.    *Intellectual Property Misappropriation*

Plaintiffs' sole allegation regarding Defendants' scienter in discussing Coupang's purported misappropriation of intellectual property in the Item Market is that "Defendant Kim was aware that Coupang's Item Market used a single image [from one merchant] to represent the same product sold by other merchants."  (Am. Compl. ¶ 427.)  This allegation does not establish that Kim also knew that displaying a single image was illegal, which is the basis for Plaintiffs' challenge to this set of statements.  As discussed *supra* § IV.A.1.c, the mechanics of the Item Winner system were public knowledge.  (*See id.* ¶¶ 151, 154.)  Kim's awareness of these mechanics coupled with his knowledge related to a single image does not establish a strong inference of scienter.  *See Glaser*, 772 F. Supp. 2d at 588 ("[P]laintiffs cannot rely on information generally known or available to the public to support to support circumstantial scienter allegations"); *In re Sec. Cap.*, 729 F. Supp. 2d at 595–96 ("Any allegation that Defendants' statements and omissions were made recklessly because Defendants were aware of the housing market crisis fails . . . Plaintiffs were just as aware of the housing market crisis as they allege Defendants were, but they did not act on that information to sell their stock as the price declined.").

                v.    *Search Manipulation and Dispute Resolution*

Plaintiffs assert that (1) a June 2021 KFTC investigation into Coupang's purported manipulation of search results to favor its own private-label products and (2) Coupang's admissions and participation in the KFTC's August 2020 – March 2022 investigation into its dispute-resolution procedures each raise a strong inference of scienter.  (Opp'n 34–35; Am.

Compl. ¶¶ 170, 428.)  However, Plaintiffs do not allege that Kim, Anand, or any other executive were aware of or participated in either the purported manipulation of search results to favor Coupang's PB products or the KFTC's investigations.  (*See* Am. Compl. ¶¶ 170–81; *id.* ¶ 428.) To the extent Plaintiffs seek to hold Coupang liable for failing to disclose this information, they cannot, as they do not plead "scienter for a certain individual" or that "a sufficiently senior director or officer of the corporation with some oversight over the public-facing misrepresentation had [] knowledge [that the statement was misleading] and did not intervene." *City of Omaha*, 450 F. Supp. 3d at 424.  This failure to disclose is not an "exceedingly rare instance[]" where the challenged statements are "so 'dramatic' that collective corporate scienter may be inferred." *Jackson*, 960 F.3d at 99 (quoting *Dynex*, 531 F.3d at 195–96).

vi.    <em>Additional Scienter Allegations</em>

Plaintiffs assert three other circumstances which they claim raise a strong inference of scienter.  First, Plaintiffs assert that "Coupang worked intensely to cover up its misconduct, including by repeatedly denying allegations of poor labor conditions and improper business practices" and by "implement[ing] a new policy to destroy all emails more than one year old 'right after' the fire at the Deokpyeong Facility."  (Am. Compl. ¶¶ 449, 452.)  As discussed, like any statement, a denial of wrongdoing can raise a strong inference of scienter if the speaker, among other things, "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Woolgar*, 477 F. Supp. 3d at 237 (quoting *Blanford*, 794 F.3d at 306).  Finding scienter based on a denial itself would read out the scienter requirement from the Exchange Act.  *See In re Omega Healthcare Invs., Inc. Sec. Litig.*, 375 F. Supp. 3d 496, 511 (S.D.N.Y. 2019) ("[W]e decline to infer scienter from an arguably material omission, in the face of allegations that cut against such

69

an inference, and in the absence of valid motive allegations, because such an inference would expand the anti-fraud provisions of the securities laws beyond their intended scope." (internal quotation marks and alterations omitted)).

With regard to the document retention issue, Plaintiffs cite no authority suggesting that implementing a generally applicable one-year document-retention policy raises an inference of scienter.  (*See* Opp'n 30; *see also* Am. Compl. ¶ 452.)  In the cited authorities, there was an inference of scienter when "employees were told to destroy materials relating to" an SEC investigation, *Youngers*, 195 F. Supp. 3d at 517, or when a defendant made "efforts to destroy documents" that were evidence of his money laundering, *SEC v. Duncan*, No. 08-CV-1323, 2009 WL 10670521, at *11 (C.D. Cal. July 6, 2009).  These cases involve allegations that are plainly distinguishable from the allegations here.  Moreover, Plaintiffs do not allege that Defendants destroyed, or attempted to destroy, relevant documents.

Second, Plaintiffs allege that Coupang's decisions to launch "a paid health promotion program" for frontline workers after the March 2021 worker death and to "conduct fire inspections" and "establish an integrated [fire] management system" at Coupang facilities after the warehouse fire support an inference of scienter.  (Am. Compl. ¶¶ 462–64.)  Plaintiffs reason that "[s]uch actions would not have been taken in the instance of mere negligence or even gross negligence." (*Id.* ¶ 463.)  This is not the law, which "is clear that remedial efforts are 'a prudent course of action that weakens rather than strengthens an inference of scienter.'" *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15-CV-6034, 2016 WL 5794774, at *23 (S.D.N.Y. Sep. 30, 2016) (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010)).

70

Finally, Plaintiffs assert that an inference of scienter "is buttressed by the core operations doctrine."  (Opp'n 31.)  "The core operations doctrine permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business," which can "include matters critical to the long term viability of the company and events affecting a significant source of income."  *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (internal quotation marks omitted).  "However, that an allegedly fraudulent statement concerned 'core operations,' standing alone, is insufficient to support strong circumstantial evidence of scienter."  *Glaser*, 772 F. Supp. 2d at 595.  "Rather, the 'core operations' doctrine bolsters the strength of the inference of scienter when plaintiffs have already adequately alleged facts indicating that defendants might have known their statements were false."  *Id*. (citations omitted); *see also, e.g.*, *Woolgar*, 477 F. Supp. 3d at 239 (explaining that the "core operations doctrine . . . does not independently establish scienter" and collecting cases). Because I find that Plaintiffs' allegations do not establish a strong inference of scienter, the core operations doctrine does not apply here.

### 3.  Loss Causation

Defendants argue that Plaintiffs have also not established the loss-causation element of the Exchange Act claims.  (*See* Mem. 40–45.)  However, because I conclude Plaintiffs have not established the material-misrepresentation or scienter elements of these claims, I need not consider loss causation.  *See Ong*, 294 F. Supp. 3d at 239 ("[B]ecause all of Plaintiffs' claims inadequately plead either a material misstatement or omission, or facts giving rise to a strong inference of scienter, the Court need not reach the issue of loss causation."); *In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, No. 14-CV-4471, 2016 WL 922711, at *9 (S.D.N.Y. Mar. 7, 2016) (collecting cases).

71

### 4.   Control Person Liability

For the reasons set forth above, Plaintiffs fail to state a Section 10(b) or Rule 10b-5

claim.  Without "an underlying primary violation" of the Exchange Act, Plaintiffs' "claim for

Section 20(a) control person liability . . . also fails."  *Woolgar*, 477 F. Supp. 3d at 241 (collecting

cases).

### B.   *Securities Act Claims*

I next address Defendants' motion to dismiss Counts I, II, and III of the Amended

Complaint, which assert violations of Sections 11, 12(a)(2), and 15 of the Securities Act.  Section

11 supplies a private "right of action for 'any person' acquiring a security offered pursuant to a

misleading registration statement."  *Coral Springs*, 565 F. Supp. 3d at 491 (quoting 15 U.S.C.

§ 77k(a)) (citation modified).  "Section 12(a)(2) imposes liability in similar circumstances

where . . . the sale was effectuated by means of a prospectus or oral communication."  *In re*

*China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 414 (S.D.N.Y. 2013) (internal quotation

marks omitted).  Section 15 imposes liability on a person who "had control over" an individual

who committed "an underlying primary violation" of Sections 11 or 12(a)(2).  *In re Axis Cap.*,

456 F. Supp. 2d at 599 (internal quotation marks omitted).  To allege a primary violation of

Sections 11 or 12(a), "a plaintiff need show that a registration statement:  (1) contained an untrue

statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3)

omitted to state a material fact necessary to make the statement therein not misleading."  *Coral*

*Springs*, 565 F. Supp. 3d at 491 (internal quotation marks omitted).  As explained below,

Plaintiffs' Securities Act claims fail for the same reasons as their Exchange Act claims.

### 1. Materially False or Misleading Statements or Omissions

Plaintiffs' Securities Act claims are based on the same statements that underlie their Exchange Act claims. The materially-misleading inquiry under the Securities Act—"[w]hether the defendants' representations . . . would have misled a reasonable investor"—"is the same . . . as it is under [S]ection 10(b) of the Exchange Act." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 376 (S.D.N.Y. 2011) (quoting *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)). Because none of the challenged statements are materially false or misleading under Section 10(b) of the Exchange Act or Rule 10b-5 promulgated thereunder, *see supra* § IV.A.1, there is no primary violation under Sections 11 and 12(a), and no control-person liability under Section 15. *Cf. Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 38 (2d Cir. 2018) (summary order) (affirming dismissal of Securities Act claims because they were not materially misleading under the Exchange Act); *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14-CV-9826, 2017 WL 95176, at *5 (S.D.N.Y. Jan. 10, 2017) ("[T]he Exchange Act claims fail for the same reasons as the Securities Act claims.").

I disagree with Plaintiffs that a different pleading standard applies to the Securities Act claims. It is true that unlike the Exchange Act claims, "[i]ntent is not an element" of Plaintiffs' Securities Act claims, "as Section 11 and 12(a) provide for strict liability" for materially misleading statements. *Coral Springs*, 565 F. Supp. 3d at 491 (citing *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004)). Thus, "[o]rdinarily, Rule 8 [of the Federal Rules of Civil Procedure] applies to [Securities Act] claims." *In re China Valves*, 979 F. Supp. 2d at 414 (citation omitted). However, "the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims" that "are premised on allegations of fraud." *Rombach*, 355 F.3d at 171. Determining whether a claim is "'premised on allegations of fraud,'" "is not a formalistic

inquiry," *City of Omaha*, 450 F. Supp. 3d at 401 (quoting *Rombach*, 355 F.3d at 171).  "[C]ourts must consider whether 'the wording and imputations of the complaint are classically associated with fraud,'" *id*. (quoting *Rombach*, 355 F.3d at 172), or if instead the allegations "draw[] a distinction between negligence and fraud," *In re Wachovia*, 753 F. Supp. 2d at 374 (citation omitted).

Here, the same failure-to-disclose theory underlies Plaintiffs' Securities Act and Exchange Act claims.  (*Compare* Am. Compl. ¶ 192 (statement misleading under Securities Act because it "failed to disclose" certain facts); *id*. ¶¶ 194–286 (same), *with id.* ¶ 312 ("The statements in [Coupang's IPO Registration Statement] were [misleading under the Exchange Act] because . . . Coupang failed to disclose . . ."); *see also id.* ¶¶ 314–88 (asserting same failure-to-disclose theory for other statements).)  Even if a plaintiff's pleading "separate[s] [its] claims under the Exchange Act from those under the Securities Act into different sections in the Complaint" and "expressly disclaim[s] any allegation of fraud as to their Securities Act claims," Rule 9 applies "so long as the [plaintiff's] theories of liability are the same under both statutes." *City of Omaha*, 450 F. Supp. 3d at 402 (collecting cases); *accord City of Pontiac*, 752 F.3d at 183 (concluding that "[Securities Act] claims sound in fraud" because "they are identical to plaintiffs' tax fraud claims"); *Coral Springs*, 55 F. Supp. 3d at 491 n.3 ("Every statement that Plaintiffs allege to be false or misleading under the Securities Act they also allege to be false and misleading for the same reasons under the Exchange Act.").  In other words, Plaintiffs do not identify distinct factual allegations that support their Securities Act claims.  Plaintiffs' Securities Act claims sound in fraud and therefore fail.

Additionally, I note that although Plaintiffs argue that Rule 8 should apply, they do not explain how applying the relaxed pleading standard would lead to a different conclusion than the

heightened Rule 9 standard.  (*See* Opp'n 42–43.)  In any case, the Securities Act claims fail

under either Rule 9(b) or Rule 8.  "As discussed at length above, none of the statements or

omissions alleged to be false or misleading are alleged to be so as a matter of law.  That remains

true under Rule 8.  Although under Rule 8 the statements challenged as fraudulent before need

not be pleaded with heightened particularity, [here I find] that the statements were also

insufficiently false or misleading or were otherwise protected.  Thus, Plaintiffs fail to state a

claim under Rule 8 for the Section 11[,] 12(a)(2)[, and 15] violations regardless of the first two

prongs required to establish a *prima facie* case."  *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc*.,

No. 21-CV-4390, 2023 WL 3569068, at *18 (S.D.N.Y. May 19, 2023); *see also Pitman v.

Immunovant, Inc.*, No. 21-CV-918, 2024 WL 1342737, at *11 (E.D.N.Y. Mar. 29, 2024)

("Plaintiff's failure to 'allege[ ] misrepresentations or omissions for securities law purposes'

cannot be saved by the application of Rule 8" (citation omitted) (alteration in original)).

### 2.  The Parties' Remaining Arguments

Because the Securities Act claims fail on the merits as Plaintiffs fail to adequately allege

material misrepresentations or omissions, I need not address Defendants' additional arguments

that some of the claims are time barred or that Plaintiffs lack statutory standing to pursue them.

(*See* Mem. 46–48.)  *See, e.g.*, *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 173 (2d Cir. 2021)

(declining to address timeliness of Securities Act claims that failed on the merits); *Fitzgerald v.

Citigroup, Inc.*, No. 03-CV-4305, 2007 WL 582965, at *11 (S.D.N.Y. Feb. 23, 2007) (declining

to address statutory-standing issue after dismissing Securities Act claim on other grounds).

However, I will briefly address whether or not certain the Securities Act claims are time barred.

Even assuming, *arguendo*, that Plaintiffs have pled a Section 11 or Section 12(a)(2) claim, these claims are time barred.[23]  In general, the statute of limitations is an affirmative defense.  Nevertheless, it is well established that "a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citation omitted).

Claims under Sections 11 and 12(a)(2) of the Securities Act must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . ."  15 U.S.C. § 77m.  Phrased differently, Section 11 and Section 12(a)(2) claims "are barred if brought more than one year after actual or constructive notice of the claim."  *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011) (summary order) (citing 15 U.S.C. § 77m).  Accordingly, for Plaintiffs' Securities Act claims to be considered timely, Plaintiffs must have either (1) discovered Defendants' misrepresentations or omissions, or (2) have been able to discover the misrepresentations or omissions with "reasonable diligence," on or after the claims were brought on August 26, 2022.[24]  *See* 15 U.S.C. § 77m.  "A securities-law violation is discovered when the

---

[23] Because I find that this action should be dismissed for failure to state a claim under the Exchange Act or Securities Act, I need not consider Defendants' argument that Plaintiffs do not have standing to pursue claims under Section 12(a)(2).  (Mem. 47–48.)

[24] The Second Circuit has not yet decided whether an "inquiry notice" or "discovery rule" applies to Securities Act claims.  *See In re Magnum Hunter*, 616 F. App'x 442, 447 (2d Cir. 2015) (summary order) ("We have never considered whether *Merck* abrogates this circuit's existing 'inquiry notice' rule in favor of the discovery rule in Securities Act claims, an issue that divides the district courts in this circuit.")); *see also Chen v. X Fin.*, No. 19-CV-6908, 2022 WL 765417, at *5–6 (E.D.N.Y. Mar. 13, 2022) (describing the split in authority).  "[W]hile the Second Circuit has not resolved whether inquiry notice continues to apply to Securities Act claims, other courts in this Circuit have applied the standards articulated in *Merck* and *City of Pontiac* to Securities Act claims, such as those alleged by Plaintiffs, under Sections 11, 12(a)(2), and 15."  *Chen*, 2022 WL 765417, at *6 (collecting cases).  "The Court need not resolve that question here because 'even if we were to resolve it in plaintiff['s] favor,' the Company's 'public disclosures . . . would have led a reasonably diligent plaintiff to have discovered the facts underlying his claim.'"  *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 399 n.4 (S.D.N.Y. 2022) (quoting *In re Magnum*, 616 F. App'x at 447).

plaintiff learns sufficient information about the violation to plead it in a complaint with enough

detail and particularity to survive a Federal Rule of Civil Procedure 12(b)(6) motion to

dismiss." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873

F.3d 85, 119 (2d Cir. 2017) (internal quotation marks and alterations omitted) (citing *City of*

*Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)).  "A plaintiff is

charged with knowledge of any fact that 'a reasonably diligent plaintiff would have

discovered.'"  *Nomura*, 873 F.3d at 119 (2d Cir. 2017) (quoting *Merck & Co., Inc. v. Reynolds*,

559 U.S. 633, 653 (2010)).  Accordingly, "the limitations period commences . . . when [ ] a

reasonable investor conducting such a timely investigation would have uncovered the facts

constituting a violation." *MBIA*, 637 F.3d at 174; *see also Merck*, 559 U.S. at 653 (same).  To

trigger the statute of limitations, "disclosures do not have to perfectly match the allegations that a

plaintiff chooses to include in its complaint." *Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp.

3d 635, 640–41 (S.D.N.Y. 2017) (internal quotation marks omitted).  Instead, they must "relate .

. . directly to the misrepresentations and omissions the [p]laintiffs later allege in their action

against the defendants." *Staehr v. Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 427 (2d Cir.

2008); *see also Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138 (2d Cir. 2013) (finding claims

were time barred where "corrective disclosures provided precisely the information [the

defendant] should have disclosed earlier such that [the plaintiffs] should have discovered their

alleged claims on the dates of those disclosures" (internal quotation marks and emphasis

omitted)); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 302 (S.D.N.Y. 2014)

("Even if plaintiffs were correct that the 2012 disclosures did not include every problem that the

company ultimately disclosed, the statute of limitations for Securities Act claims is not somehow

tolled until the appearance of disclosures that perfectly match the allegations that a plaintiff

77

chooses to include in its complaint."), *aff'd*, 616 F. App'x 442 (2d Cir. 2015); *Pa. Pub. Sch.*
*Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 368 (S.D.N.Y. 2012) (finding that
plaintiffs "need not have notice of all the misconduct it alleges in the Complaint to trigger" the
limitations period).

Plaintiffs cite various news reports, investigations and findings by Korea's Labor
Ministry and KFTC, and comments by Coupang in its online newsroom that Plaintiffs allege
should have led Defendants to disclose facts necessary to make certain statements true.
"However, those same news reports and public comments should have put the plaintiffs on notice
of the alleged violations underlying their securities claims." *Dagan Invs., LLC v. First High-Sch.*
*Educ. Grp. Co.*, No. 22-CV-3831, 2023 WL 8452223, at *5 (S.D.N.Y. Dec. 6, 2023) (citation
omitted); *see also Haping v. 17 Educ. & Tech. Grp. Inc*., No. 22-CV-09843, 2023 WL 8716895,
at *14 (S.D.N.Y. July 20, 2023) ("Defendants argue, and the Court agrees, that if the various
public comments that Plaintiffs cite should have allowed [Defendants] to predict and disclose the
July 2021 Ban in its . . . registration statements, those same public comments . . . also should
have put Plaintiffs on notice of their claims here."); *Yaroni*, 600 F. Supp. 3d at 400 (finding that
plaintiffs had sufficient information to assert claims regarding material weaknesses in internal
controls where the company disclosed "the 'facts' comprising the core' of Plaintiff's claims")
(quoting *NECA-IBEW Pension Tr. Fund v. Lewis*, 607 F. App'x 79, 81 (2d Cir. 2015) (summary
order)).  Indeed, several of the news reports, investigations, and comments cited by Plaintiffs
were made before the March 11, 2021 IPO Registration Statement and March 18, 2021 S-8
Registration Statement became effective and before the IPO.  (*E.g.*, Am. Compl. ¶¶ 74–85
(section titled "Coupang's unsafe working environment had been the subject of intense market
scrutiny before the IPO" (capitalization altered)); *id.* ¶ 86 (Coupang's safety practices "were the

subject of extensive public scrutiny not long before its IPO"); *id.* ¶ 108 (news regarding the

Deokpyeong Facility fire "sparked outrage among the public"); *id.* ¶¶ 129–33 ("media sources

began reporting" in June 2019 that some of Coupang's suppliers had filed complaints with the

KFTC alleging that Coupang violated Korea's antitrust laws and Coupang issued statements

denying that it engaged in anticompetitive or otherwise illegal behavior); *id.* ¶¶ 159–65 ("the

market learned that Coupang was improperly using protected trade content" [title of section] in

April 2021 due to a segment aired by a South Korean broadcast network, Coupang's statements,

which "received widespread media attention between May 4, 2021, and May 5, 2021"

(capitalization altered)); *id.* ¶ 164 ("[o]n July 21, 2021 the KFTC confirmed what the market

already knew by then:  the Seller Terms and Conditions forced on small businesses by Coupang

imposed 'unfair' content use provisions that were 'invalid' under" Korean law); *id.* ¶¶ 170–71 (in

July 2021, several publications began reporting "that the KFTC was investigating Coupang for

manipulating the algorithm for its search function to favor its PB products")).  This action was

not commenced until August 26, 2022, more than one year after several of the alleged corrective

disclosures.  (*See id.* ¶ 471 (alleging that the "truth . . . was revealed to the market in a series of

disclosures" between March 2021 and March 2022).)  Moreover, having alleged that various

frauds were revealed to the market by Coupang's corrective disclosures—such as the corrective

disclosures on March 25, 2021, (*id.* ¶¶ 117, 471), May 4, 2021 (*id.* ¶¶ 162, 471), August 11,

2021, (*id.* ¶¶ 111, 471, 479)—more than one year before the action was commenced in August

2022, Plaintiffs cannot also maintain that it was not on constructive notice by those dates.  *See*

*Yaroni*, 600 F. Supp. 3d at 396 ("Where, as here, the company issues a disclosure that a plaintiff

relies on to demonstrate that the registration statement contained misstatements or omissions,

'[t]he corrective disclosure date is the same as the constructive notice date for purposes of limitations.'") (citing *Amorosa*, 409 F. App'x at 416).

Therefore, Plaintiffs claims under Sections 11 and 12(a)(2) are time barred and must be dismissed.[25]

### C. *Leave to Amend*

In a footnote on the final page of its opposition brief, Plaintiffs ask for leave to amend in the event that I grant Defendants' motion, without indicating how the Amended Complaint's defects would be cured by a further amendment. (Opp'n 48 n.42.) Defendants do not appear to assert a position on whether leave to amend should be granted. Although leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend," *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (internal quotation marks omitted); *see also In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006) ("It is within the [district] court's discretion to deny leave to amend implicitly by not addressing the request [for leave to amend] when leave is requested informally in a brief filed in opposition to a motion to dismiss."), *abrogated on other grounds by F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013). Because Plaintiffs "made only a perfunctory request for leave to amend anew in the event of dismissal" and did not "identif[y] any concrete amendments or additions, let alone ones that might cure the deficiencies in their claims," I deny Plaintiffs' request to amend. *Liau v. Weee! Inc.*, No. 23-CV-1177, 2024 WL 729259, at *7 (S.D.N.Y. Feb. 22, 2024); *see also Gregory v. ProNAi*

---

[25] "Because Section 15 claims are derivative, the one-year statute of limitations under Section 13, applicable to Section 11 [and Section 12(a)(2)] claims, also applies to Section 15 claims. . . . Accordingly, as the Court has found Plaintiffs' Section 11 [and Section 12(a)(2)] claim[s] to be untimely, Plaintiffs' Section 15 claim is likewise untimely." *Cf. Chen*, 2022 WL 765417, at *10; *see, e.g.*, *Yaroni*, 600 F. Supp. 3d at 404 (dismissing Section 15 claim where primary claim under the Securities Act was barred by the statute of limitations).

*Therapeutics Inc.*, 757 F. App'x 35, 39 (2d Cir. 2018) (summary order) (affirming denial

of leave to amend their securities fraud action where "plaintiffs sought leave to amend in

a footnote at the end of their opposition to defendants' motion to dismiss" and "included no

proposed amendments"); *Abira Med. Lab'ys, LLC v. Cigna Health & Life Ins. Co.*, No. 24-2837-

CV, 2025 WL 1443016, at *3 (2d Cir. May 20, 2025) (summary order) (affirming the denial of

leave to amend where plaintiff requested to amend its complaint in a footnote in opposition to the

motion to dismiss, did not file a motion for leave to amend, and did not "provide details

regarding any new facts it would allege").  Moreover, because "the problems with Plaintiff[s']

claims are substantive" and the Securities Act claims are dismissed as time barred, "amendment

would be futile." *Yaroni*, 600 F. Supp. 3d at 404 (denying leave to amend securities fraud

complaint after finding Plaintiff failed to plausibly allege a material misstatement or omission

that was not time barred); *see also Haping*, 2023 WL 8716895, at *14 (recommending that leave

to amend be denied after finding that "Plaintiffs' [Securities Act] claims should be dismissed as

time-barred" and thus "amending the FAC would be futile").

### D.  *Securities Act Claim Against CLSA*

The Amended Complaint asserts claims against Citi, HSBC, Deutsche Bank, UBS,

Mizuho and CLSA as defendants for the first time.  (*See* Am. Compl.)  The only claim brought

against CLSA is a claim under Section 11 of the Securities Act.  (*See* Am. Compl. ¶¶ 287–294.)

On September 15, 2023, I so-ordered the parties' stipulation in which counsel for Citi, HSBC,

Deutsche Bank, UBS, and Mizuho agreed to accept service of the summons and Amended

Complaint on behalf of those defendants.  (Doc. 77.)  CLSA was not included in the list of newly

added defendants that agreed to accept service through counsel.  (*Id.*)  The Amended Complaint

was filed on May 24, 2023, (Doc. 50), and "thus the 90-day period to serve [CLSA pursuant to

Fed. R. Civ. P. 4(m)] has long expired." *Cox v. City of New Rochelle*, No. 17-CV-8193, 2020 WL 5774910, at *8 (S.D.N.Y. Sept. 28, 2020). To date, Plaintiffs have not filed a proof of service upon CLSA, although an electronic summons was issued on May 25, 2023, (Doc. 62), and despite A&O Shearman's letter in which it represented, among other things, that CLSA was not served with the Amended Complaint, (Doc. 97). "Ordinarily, I would direct that the action be dismissed against Defendant [CLSA] without prejudice unless Plaintiff[s], within thirty days, either (1) files proof of service with the Clerk of the Court, or (2) shows cause in writing why a further extension of the time limit for service is warranted. But here [I have already found above] that Plaintiff[s] cannot assert a viable claim . . . and that finding would apply equally to a claim against [CLSA]. Under these circumstances, it is appropriate for [me] to dismiss Plaintiffs['] claims as to [CLSA] *sua sponte*." *Palompelli v. Smith*, No. 20-CV-8070, 2022 WL 624421, at *6 (S.D.N.Y. Mar. 3, 2022) (internal quotation marks omitted); *see also Cox*, 2020 WL 5774910, at *9 ("[A]s to the Unserved Defendants, while Rule 4(m) permits a court to dismiss claims against unserved defendants without prejudice where, as here, 'the same grounds for dismissal of the served Defendants warrants dismissal of the SAC as to the Unserved Defendants[,]' dismissal with prejudice is appropriate." (alterations adopted) (quoting *Cartwright v. D'Alleva*, No. 17-CV-5953, 2018 WL 9343524, at *9 (S.D.N.Y. Aug. 27, 2018), *aff'd*, 782 F. App'x 77 (2d Cir. 2019))); *see also id*. at *8 n.17 ("[I]t does not appear from the docket that Plaintiff served the FAC or SAC on these Defendants. . . . [B]ecause Plaintiff's claims are time-barred and/or fail on the merits, the Court would decline to enter default judgments against these Defendants if Plaintiff sought entry of a default judgment and therefore it is appropriate to dismiss claims against these Defendants at this time."); *Johnson v. New York City*, No. 12-CV-4379, 2013 WL 950870, at *3 (S.D.N.Y. Mar. 7, 2013) ("As the same conviction underlies

plaintiff's claims against defendant Thomas Woods (who has not yet been served in this action), the Court dismisses the Complaint with respect to Woods *sua sponte*.  Because plaintiff has not given any indication that a valid claim may be stated via an amended complaint, this case is DISMISSED WITH PREJUDICE."); *Hyped Holdings LLC v. United States*, No. 22-CV-5340, 2023 WL 6121784, at *1 n.1 (E.D.N.Y. Sept. 19, 2023) (dismissing *sua sponte* the complaint with prejudice "against all Defendants because the same grounds for dismissal of the United States warrant dismissal of the complaint as to the IRS and Matthew James," who were not served (internal quotation marks omitted)).  Since Plaintiffs' Section 11 claim against CLSA suffers from the same deficiency as the claim against the other Securities Act Defendants— namely, that none of the challenged statements are materially false or misleading and the Securities Act claims are time-barred, *see supra* § IV.B—the claim against CLSA is dismissed as well.

## V.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  It is hereby:

ORDERED that Plaintiffs' Amended Complaint is DISMISSED with prejudice and without leave to amend.  The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated: September 10, 2025
New York, New York

Vernon S. Broderick
United States District Judge